## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CHAPTER 7** |
| **ORLY GENGER** | § | |
| | § | **CASE NO. 19-10926-TMD** |
| Debtor. | § | |

| | | |
|---|---|---|
| **DALIA GENGER AND D&K GP LLC** | § | |
| | § | |
| **vs.** | § | **ADVERSARY _____** |
| | § | |
| **ORLY GENGER** | § | |

### DALIA GENGER AND D&K GP LLC'S COMPLAINT TO DETERMINE THE DISCHARGE AND/OR DISCHARGEABILITY OF ORLY GENGER

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUTPCY JUDGE:

Dalia Genger, a creditor and party in interest, ("Dalia") and D&K GP LLC (on behalf of D&K Partnership Ltd. (Dalia and D&K are collectively "Dalia") and files this complaint and Adversary Proceeding seeking to Object to the discharge of the Chapter 7 Debtor Orly Genger, and alternatively to Object to the dischargeabilty of the debt and claims owed Dalia.

## I.
## PRELIMINARY STATEMENT

1.      *Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581, 1586 (2016) is instructive on the relief sought of the denial of the Debtor's discharge:

> "The term "actual fraud" in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected *without a false representation*."

Dalia is the direct injured person by Orly's conspiracy and fraud and has a right to assert those claims.  As a direct creditor Dalia objects to the discharge and dischargeability of this Debtor (herein "Debtor" or "Orly") for actual fraud in the fraudulent transfer of all funds she monetized

for $32 million paid by this Debtor to insiders with the actual intent to hinder, delay and defraud Dalia, a creditor. As significant, the fraudulently transferred funds were encumbered with a constructive trust under New York law, and recognized in the Fifth Circuit that "……the imposition of a constructive trust is a potent remedy, as it gives the successful claimant priority over the debtor's unsecured creditors; …We look to state law to determine whether a party has adequately demonstrated that property is held in constructive trust for another"[1] because property the subject of a constructive trust is not property of the estate. *Id.*

## II.
## JURISDICTION AND VENUE

2.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a).

3.     This dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (J) as more particularly set out herein below.

4.     This objection is filed pursuant to 11 U.S.C. § 727 and in the alternative, 11 U.S.C. § 523(a) as more particularly set out herein below.

## III.
## THE PARTIES

5.     Plaintiff is Dalia Genger, a creditor and party in interest to this Debtor, and is the Debtor's mother and the contract party in the Integrated Agreement.

6.     Plaintiff D&K GP LLC as the general partner of D&K Limited Partnership, a New

---

[1]     *In re Southmark Corp.,* 49 F.3d 1111, 1118 (5th Cir. 1995) further holding that :... the funds in question were held in "quasi" (or constructive) trust by Southmark for ARA. Section "541(d) excludes property subject to a constructive trust from the bankruptcy estate." citing *In re Carolin Paxson Advertising, Inc., 938 F.2d 595, 597 (5th Cir. 1991)* ("A constructive trust generally arises when a person with legal title to property owes equitable duties to deal with the property for the benefit of another."). Id. Southmark 1115 at note 8;  In re Bullion Reserve of N. Am., 836 F.2d 1214, 1217 n. 3 (9th Cir.) (explaining that presumption that funds in debtor's account belong to its estate is overcome by showing that funds were held in constructive trust for another), cert. denied, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988);  Id. at note 20.  Id. Southmark at 116.*

York limited partnership, is a creditor and party in interest in this case.

7.    The Debtor is Orly Genger, an individual believed to reside is the Country of Israel and sometimes in Austin, Texas, and a member of a conspiracy to defraud described below, involving her father Arie Genger, her husband Eric Herschmann and his law firm, Kasowitz, Torres and Benson.

8.    Nothing in the filing and prosecution of this Adversary Proceeding waives, alters, amends, or limits Dalia's rights to pursue these members of the civil conspiracy in the proceeding now pending in the Southern District of New York styled *Genger v. Genger*, 17-cv-8181 (SDNY) and including the pending Turnover Motion.  Likewise, nothing in the filing or prosecution of this Adversary Proceeding limits Dalia's right to pursue such other third parties as members of the conspiracy described herein.

9.    Hon. Judge Forrest, US District Court (SDNY) first found that this entire dispute involves two marital agreements:

> [a]s part of the divorce, Dalia agreed to convey her marital rights to 794.40 shares of TRI to trusts benefiting Sagi and Orly (the "Sagi Trust" and the "Orly Trust,"[4] respectively) in exchange for a commitment by Sagi and Orly to financially support her. This arrangement was effectuated via three documents.[2]

10.    This same Judge Forrest now has pending in his Court the Turnover Motion, including the Turnover Memorandum involving the same transactions made the basis of this Complaint.  Dalia incorporates herein the entire Turnover Memorandum and the Turnover Motion, including all of its exhibits, attachments, transcripts and arguments and authorities, as incorporated herein by reference for all purposes.

---

[2]    See, SDNY Judge Forrest Op#1, pg. 1, 3  (*Genger I,* 76 F. Supp. 3d 491, 492).

**A.     INTRODUCTION AND SUMMARY OF THE ARGUMENTS**

11.     The Complaint discloses pervasive fraud by the Debtor and her father, to destroy that which the father and debtor, in writing, promised to Dalia in order to control then steal stock valued in excess of $60 million, by extracting with these written promises a Divorce Settlement Agreement and the "Integrated Agreement" both the subject of adjudicated fraud and breach.  A detailed history is necessary to illustrate the Debtor's fraudulent conduct, individually and as a member of a conspiracy involving her father, her lawyer-husband, and his law firm, among others.

12.     The Background Facts are complex although most of the facts set out herein below are established by Orders and Judgments of the Second Circuit Court of Appeals twice affirming, the District Court (SDNY) judgments; from a final Arbitration Judgment; from the Delaware Supreme Court and the Delaware Chancery Court opinions; and from the New York State Supreme Court and Appellate Court opinions.

13.     Dalia is the ex-wife of Arie who are the parents of Sagi Genger (herein "Sagi") and his sister Orly Genger (herein "Orly" or the "Debtor") [SDNY Forrest Op#1, pg. 1, 3  (*Genger I,* 76 F. Supp. 3d 491, 492)].  These four (4) family members have been involved in a "seemingly never-ending  series of lawsuits stemming from the 2004 divorce of Arie and Dalia."  [*Id*. pg. 1, 3 (Genger I, 76 F. Supp. 3d 491)].  The facts recited herein consist substantially of quoted references to the SDNY District, Judge Forrest's first 2015 opinion (cited as *Genger I*, 76 F. Supp. 3d) and second 2018 opinion also from the SDNY Judge Forrest (cited as *Genger II*, 2018 WL 363252; 2018 U.S. Dist. LEXIS 126958).  *Genger II* was rendered after *Genger I* was affirmed in all things

by the Second Circuit Court of Appeals [cited as "2nd Cir App#1"].[3] *Genger II* was likewise affirmed by the Second Circuit Court of Appeals ["2nd. Cir. App#2]. In addition, many of the facts recited are quoted *verbatim* from the Delaware Chancery Court and Delaware Supreme Court final judgments and opinions on the fraudulent activities for which Arie was sanctioned millions of dollars. In addition, facts and quotes are also taken from a final Arbitration award finding Arie's intentional misrepresentation resulted in $4 million of damages.[4] Finally, a number of documents are recited in connection with the pending Turnover Motion before Hon. Judge Freeman, US District Court (SDNY) and references to both the" Turnover Memorandum" and its "redactions" illustrates where parties having access to the confidential information have filed confidential pleadings to which Dalia has not had access.

14.    This family litigation arises from two distinct but critical false representations by Arie Genger ("Arie"), the ex-husband of Dalia Genger ("Dalia") both incorporated by Arie in his Divorce Settlement Agreement to his then-wife Dalia to retain control of the stock ownership of a family business ("TRI"), as follows:

- First, the Arbitration Award found that Arie misrepresented the worthlessness of certain TRI stock (based on a false representation of over $30mm of fake indebtedness purportedly owed by him as a shareholder) to induce the Divorce Settlement Agreement; and

- Second, the Delaware Supreme Court (and the New York Appellate Court) found that Arie misrepresented the legal restrictions on a transfer of Dalia's share of her marital property interest in the TRI stock to their two (2) Children's Trusts, designed and

---

[3]    *Genger v. Genger*, 663 Fed. Appx. 44 *; 2016 U.S. App. LEXIS 17642 **; 2016 WL 5539979 (2nd Cir. 2016) [2nd Cir. App#1].
[4]    *See, infra Genger vs. Arie Genger,* Arbitration Final Award, Case No. 13 170 Y 00996 0 (May 6. 2008) (herein the "Arbitration Award").

agreed to be subject to a written claw-back by Dalia at her election, executed with her son and daughter (Sagi and the Orly, the Debtor) found by the Second Circuit Court of Appeals to be evidenced by "**one Integrated Agreement**" and designed to provide the post-divorce future support of Dalia, now 73 years old and a retired home maker.[5]

However after suffering judgments for damages confirming Arie's misrepresentations of more than $4 million, and after another judgment for almost $4 million in sanctions and damages for Arie's manipulation and destruction of evidence before the Delaware Chancery Court, the Debtor and Arie designed and implemented a conspiracy involving himself, his daughter Orly, the Debtor and the Debtor's insiders including her husband and his law firm, to fraudulently and intentionally direct the Dalia-encumbered funds: (i) received by Orly only as part of the Divorce Settlement Agreement; and (ii) held by Orly pursuant to the Integrated Agreement's obligation for Dalia's future source of support; and (iii) stolen through a fraudulent transfer scheme and given to her father, her father's creditors, the Debtor's husband and his law firm. The exclusive source of Orly's wealth was the Dalia marital property share of the TRI Stock contributed pursuant to these two marital agreements (the Divorce Settlement Agreement and contemporaneous Integrated Agreement) found by the Second Circuit Court of Appeals to have been monetized at the end of 2013 ***by Orly for more than $32 million in late 2013***. This fraudulent conspiracy and resulting fraudulent transfers literally gave not only $17 million cash to her father, but also was designed to give the remaining $15 million in promissory note debt due Orly, not to Dalia for her support as the Divorce Settlement Agreement and the Integrated Agreement mandated, but:

      (i)      to Dalia's ex-husband Arie and ***his*** purported creditors; and

---

[5]      The falsity of Arie's second representation was cited by the Delaware Supreme Court and eventually caused the Genger family to be divested of over $400mm in assets, due to Arie's "perfidy". *TR Investors et. al. vs. Arie Genger*, 2010 WL 2901704 at *18 (Del Chancery 2010).

(ii)     to the Debtor's rich husband and his law firm,

all designed to avoid all the Claw Back Rights and obligations due Debtor's mother encumbering her marital property TPI Stock.

15.     Ultimately, final judgments arising from breach of the Integrated Agreement by Orly, currently totaling about $3.5 million, coupled with the Turnover Motion and proceeding pending in the SDNY to recover the fraudulent transfers, gave rise to the filing of this Chapter 7 that literally challenges every aspect of honest and full disclosure of the truth mandated by bankruptcy policy.

16.     It was thus, no coincidence, that this Chapter 7 bankruptcy case was filed on the eve of the deadline of the Debtor and her insider father, husband and his law firm (all targets of the pending SDNY Turnover Motion) to respond to the Turnover Motion and Turnover Memorandum and its damning list of evidence and law, establishing the $32 million in fraudulent transfers (much of which evidence is now subject to these Insiders' Motions for Protection to prevent disclosure to Dalia because they unilaterally marked "confidential" and have threatened suit if even the Chapter 7 Trustee, not to mention Dalia, are given access to such information).[6]

17.     Thus, with the motion to compel the return of the fraudulently transferred funds' pending before the same federal Judge Forrest that had found prior defaults and prior misconduct, this Debtor sought to move the controversy to Austin Texas in hopes of a different outcome.

18.     Remarkably, Orly filed this Chapter 7 case hoping to reverse the judicial findings, conclusions and judgments[7] of the SDNY Courts, Delaware Chancery and Supreme Court, and

---

[6]     This refusal to allow access to relevant documents is more fully discussed and exposed in Dalia's Response to the Motion to Quash Dalia's subpoenas seek access to such documents, now in the hands of the Trustee, the Debtor and her insiders.
[7]     Those courts, across three different litigations, all concluded that Debtor made off with Dalia's current and future support funds. [*See, infra Forrest 1*, *Forrest 2*, *Jaffe Decision* on reconsideration].

grant releases to the Debtor and her Insiders for a potential payment of slightly more than 3% of the fraudulently transferred funds, the balance of $31+ million *to remain with those creating the* ***fraudulent transfer and leaving Dalia and her judicially-recognized rights with literally no*** ***assets of this estate***. Orly's insiders seek to continue frivolous litigation *against* Dalia (*e.g.* most recently, the Trustee's bad legal advice from the Kasowitz firm resulting in his failed attempt to obtain reconsideration and severance of Dalia from a previous Supreme Court of New York judgment exonerating her of all liability for certain Orly-brought claims).[8]

19.     Importantly, this Chapter 7 bankruptcy involves ***only insider creditors*** (and insider-third party targets of these fraudulent transfers) and is a text-book example of a bad faith filing for the sole purpose of forum shopping and delay, and a text book example of conduct and omissions justifying the denial of the discharge of the Debtor.

## B.     THE 1993 SAGI AND ORLY TRUSTS – THE SOURCE OF THE DEBTOR'S WEALTH AND FRAUD

20.     Dalia and Arie formed two trusts in 1993 for the benefit of Sagi and Orly.  The trusts are officially named the "Sagi Genger 1993 Trust" and the "Orly Genger 1993 Trust." (DSOF ,J 26.) [*Id*. SDNY Forrest Op#1, pg. 3, footnote 2  (*Genger I*, 76 F. Supp. 3d 492, n. 4)].  The wealth of these trusts form the basis of the transfer by Dalia of her marital property (the TPI Stock) pursuant to the two marital agreement, that resulted in the monetization of the stock for $69+ million dollars in realized value of "TRI" Stock -  $17 million of the Debtor's share in cash was

---

[8]      Judge Jaffee, on October 4, 2019 in the NY Supreme Court, 109749/2009, in response to the Trustee's Motion to Reconsider and Sever Dalia, Rule:

> Having read the papers in support of plaintiffs' order to show cause and defense counsel's email of October 4, 2019, ***I find that because the damages assertedly arising from Dalia's alleged fraud*** ***are those that have been adjudicated*** (NYSCEF 1594, 1630), the action was properly marked disposed, per order dated August 9, 2019.  [Emphasis Added.]

This is but one example of how once Dalia made her daughter Orly a multi-millionaire on the written promise by Orly to contribute to Dalia's support, Orly has not only refused to pay her mother one penny of support but instead sued her mother for tortuously forcing Orly to accept the millions and her responsibility.  Orly's argument - "no good deed should go unpunished."

fraudulently transferred to the parties the Orly Chapter 7 Trustee proposes to release, along with the balance remaining of $15 million be abandoned to these Insiders by the Chapter 7 Trustee, for the meager 3% recovery of potentially $1 million, with the approval of this Court.

## C.   THE "TRI" AND "TPR" ENTITIES – THE SOURCE OF ORLY'S WEALTH

21.     "In 1985, Arie formed Trans-Resources, Inc. ("TRI") a Delaware corporation that specializes in manufacturing fertilizer and producing chemicals for agricultural use. [*See*, *Genger v. TR Inv'rs, LLC,* 26 A.3d 180, 183-84 (Del. 2011) (herein "Del Sup 2011"). TRI was wholly owned by TPR Investment Associates, Inc. ("TPR"). [*Id*. Del Sup 2011]. By 1993 TPR was owned "by (Arie), his wife, and his family trusts." [*Id*. SDNY Forrest Op#1 (*Genger I,* 76 F. Supp. 3d 4___)]. Arie's wife, Dalia, and Orly and Sagi, "held minority shareholder interests in TPR (with the) children's TPR shares held in two separate trusts, the "Orly Trust" and the "Sagi Trust," respectively." [*Id*. Del Sup 2011 at 184].

22.     Under Arie's control, TRI faced difficulties.[9] "[B]y 2001 (TRI) was nearly insolvent. Its bonds were trading at a fraction of their $230 million face value." [*Id.* Del Sup 2011]. "Jules Trump ("Jules"), a close friend of (Arie) for nearly 25 years … caused two "**Trump Group**" members [no relation to the President Trump], Glenclova and TR Investors ("Glenclova" and "Investors"), to purchase $220 million (face value) of (TRI)' bonds for $25 million" believed[10] to have then been contributed to the TRI operations. [*Id*. Del Sup 2011]. Glenclova and Investors "entered into an agreement with (TRI) and TPR to convert their bond holdings into an equity

---

[9]     This statement is cautiously used and was the representations of Arie. However, several years after the events bringing the Trump Group to aid in refinancing these allegations of financial difficulties, the Trump Group discovered that Arie had completely destroyed the computer records of TRI, even directing one of TRI's IT employees to wipe hard drives clean of all records. [*See*, *infra* Delaware Sup. Ct. opinion and judgment affirmed on appeal]

[10]     Noted below, the word "believed" reflects the fact that the Delaware Chancery court, upon discovering that Arie had erased and bleached all business records of TRI during the ongoing Chancery court litigation, withdrew a prior settlement and sanctioned Arie. [*See*, *infra*]

interest in (TRI) (the "Stockholders Agreement") … by which "TPR was reduced from 100% to 52.85%, and Glenclova and Investors owned the remaining 47.15%..." but leaving Arie in control. [*Id*. Del Sup 2011 at 184].[11]

23.　　The Stockholders Agreement "restricted the transfer of (TRI) shares to any persons or entities except those that were designated therein as 'Permitted Transferees'" … without first giving "written notice to the other (TRI) shareholders, who would then have a right of first refusal." [*Id*. Del Sup 2011 at 184].　Failure "to comply with those restrictions and the prior notice requirement would automatically be deemed invalid and void and would trigger the non-selling shareholders' right to purchase the invalidly-transferred shares (the "Purchase Rights")."　[*Id*. Del Sup 2011].

**D**.　　**THE DIVORCE BY DALIA FROM ARIE – ARIE'S FIRST TWO CRITICAL FRAUDULENT MISREPRESENTATIONS**

24.　　As noted throughout, Arie committed numerous fraudulent acts regarding his divorce and the TRI transactions. This developed into post-divorce fraud in concert with Orly (and her Insiders).　The fraud was and remains designed to assure the Divorce Settlement Agreement providing for Dalia's future care through the TRI Stock value would instead be converted to his own use.　"On October 26, 2004, Arie and Dalia Genger divorced."　[*Id*. Del Sup 2011 at 184]. Arie lied to Dalia to induce the Divorce Settlement Agreement and transfer of her marital rights in the TRI Stock.

**1.　　The Tri-Party Integrated Agreement Between Dalia, Sagi and Orly**

25.　　As noted above, the 2004 Divorce Settlement Agreement contained an Agreement for Dalia's future support, later determined by the SDNY Court to be one "Integrated Agreement."

---

[11]　　Sagi is currently the President and CEO of TPR Investment Associates, Inc. ("TPR"). [*Id*. SDNY Forrest Op#1. pg.3　(Genger I, 76 F. Supp. 3d 492)].

(*Genger I*, 76 F. Supp. 3d 493).   In litigation discussed *infra*, Dalia and Sagi alleged that Orly entered into a tri-party agreement with Dalia, under which Sagi and Orly would receive her marital shares of stock in TRI, in exchange for providing Dalia with financial support derived from the economic value obtained from that stock. [SDNY Forrest Op#1, pg. 2, 4 (*Genger I*, 76 F. Supp. 3d 497-498)].   References to litigation over the Integrated Agreement began in 2015, the first occasion that Dalia sought support from her children.   Although Sagi complied and paid the request, Orly refused any support to her mother.  (*Genger I*, 76 F. Supp. 3d 494).   The SDNY suit brought by Sagi in 2015 sought to require Orly to pay her 50% share to support her mother [SDNY ForrestOp#1 pg. 1 (*Genger I*, 76 F. Supp. 3d 491)].   Orly has steadfastly opposed paying her mother anything – instead:

> Orly, for her part, denies the agreement's validity and enforceability, primarily because she claims she never actually received the promised shares of stock, which means that the agreement is not supported by consideration.  ***But, as it turns out, Orly has effectively monetized an interest in the very shares she claims not to have received to the tune of $32.3 million***.
>
> Orly contends that this case is 'an attempt to push the camel's nose under the tent flaps," and that Sagi and Dalia "hope to create a pipeline allowing them to siphon money from Orly for the rest of her life.' (ECF No. 92 at 1.)

[SDNY Forrest Op#1, pg. 2  (Genger I, 76 F. Supp. 3d 491) (Emphasis added)]; *See, also* [SDNY Forrest Op#2 pg. 4-5].[12]   In the Court's analysis of the Divorce Settlement Agreement, "[t]he Court (saw) things differently: this case is a simple breach of contract action."  [*Id.* SDNY Forrest Op#2 at 13].   First, Judge District Judge Forrest found that "[a]s part of the divorce, Dalia agreed to convey her marital rights to 794.40 shares of TRI to (the two) trusts benefiting Sagi and Orly (the

---

[12]     SDNY Forrest Op#2 also expressly noted that "Orly had monetized her beneficial interest for $32.3 million, a substantial portion of each attributable to Dalia's conveyed marital interest."  *Id.  See, also Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 185 (Del. 2011).

[13]     Judge Forrest made the following finding and conclusions in her rulings:
"Because there is no triable issue as to whether there was a valid and enforceable agreement supported by consideration, and for the reasons that follow, the Court GRANTS Sagi's motion for summary judgment…"  *Id*. at pg. 2.

"Sagi Trust" and the "Orly Trust" respectively) in exchange for a commitment by Sagi and Orly to financially support her." [SDNY Forrest Op#1, pg. 3 (*Genger I*, 76 F. Supp. 3d 492)]. The Court found, and held, that "… the arrangement was effectuated *via* three documents:

> First, the 2004 Divorce Stipulation by which " Dalia promised to convey equal interests in a total of 794.40 shares of TRI to the Orly Trust and the Sagi Trust." [SDNY Forrest Op#1 at pg. 4 (Genger I, 76 F. Supp. 3d 4__)].14

> Second, "… a letter signed by Sagi and Dalia dated October 30, 2004 (the "2004 Promise") (in which) … Sagi agreed to pay Dalia up to an amount equal to all dividends, distributions, proceeds or other payments attributable to the TRI shares, upon Dalia's demand" and "… (that the agreement provides that it) "is made 'in consideration of the following: 'Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of [TRI], or beneficial [f/n 6][15] interests in those shares, by trusts for [their] benefit.'"

[SDNY Forrest Op#1, pg. 4 (*Genger I*, 76 F. Supp. 3d 492)]. Judge Forrest found that Orly (then "vacationing Fiji" at the time and unable to contemporaneously execute this 2004 Promise "…verbally agreed to indemnify Sagi for 50% of the payments he would have to make under the 2004 Promise... [SDNY Forrest Op#1, at 5 (*Genger I*, 76 F. Supp. 3d 493)].

26.     The Third Agreement was Orly's signed "November 10, 2004 Indemnity of Sagi (the "**2004 Indemnity**")" by which Orly agreed:

> to indemnify Sagi "for and against one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations ... , including [Sagi's] reasonable counsel and other professional fees, expenses and costs, which arise from [Sagi's] undertakings in the [2004 Promise]."

[SDNY Forrest Op#1, at 5-6 (*Genger I*, 76 F. Supp. 3d 493)].

---

[14]     "The 2004 Divorce Stipulation contains an "entire understanding clause, which is subject to a carve-out for other agreements expressly incorporated by reference and those 'entered into concurrently herewith.'" *Id*. at pg. 4

[15]     The text of Footnote 6 reads:
Beneficial ownership is "[a] corporate shareholder's power to buy or sell the shares, though the shareholder is not registered on the corporation's books as the owner." *Ownership*, Black's Law Dictionary (9th ed. 2009); *see also Cartica Mgmt. v. CorpBanca, S.A.*, No. 14—CV-2258 PKC, 2014 WL 4804491, at *15 (S.D.N.Y. Sept. 25, 2014) (explaining the definition of beneficial ownership under federal securities law). Record ownership is determined based on who is "listed in the issuer's books as the owner of stock on the record date." *Stockholder of Record*, Black's Law Dictionary (9th ed. 2009). Id. at 493

27.     What is stunning about this bankruptcy case and the Trustee's decisions thus far, is that the Debtor was a multi-millionaires (given access to and in fact monetized $32 million in TRI stock received from her mother's marital property) only to transfer the entire $32 million to her father (purportedly to fund his creditors) and to her husband and his law firm (purportedly claiming millions in legal fees and if true, all spent in these repeated failed efforts in Arie's and Orly's litigation (all lost by Arie and/or Orly) including millions in sanction awards, as the court initially noted that the family "employed a small army of lawyers to fight over the pieces of the family pie…".  [SDNY Forrest Op#1, pg. 4   (*Genger I,* 76 F. Supp. 3d 491)].  However, the "pie" disappeared, even though the SDNY Court, District Judge Forrest established that Orly was in control of the funds:

> "Based on the prior rulings of this Court… [it] has been conclusively established that: (1) the 2004 Integrated Agreement is valid and enforceable; (2) Sagi and ***Orly monetized their beneficial interests in the TRI shares for a total of $69.3 million***, a substantial portion of which was attributable to Dalia's conveyed marital interest; and (3) … Dalia is entitled to demand payment up to a certain amount in her "sole and absolute discretion." Doc. 112.

[SDNY Forrest Op#2 at *17, *Genger II*, 2018 WL 363252; 2018 U.S. Dist. LEXIS 126958]. [Emphasis added].  Both *Genger I* and *Genger II* were affirmed by the Second Circuit Court of Appeals, all finding and holding that it was Orly that *monetized their beneficial interests in the TRI shares for a total of $69.3 million.  The Second circuit itself repeated that Orly's shares were monetized for $32 million in its decision, finding irrelevant Orly's claim that she gave the money away*:

> ***Orly benefitted from the shares regardless of whether the settlement money went to Orly, as a gift to Arie***, or to pay debts to her litigation partners…. But surely any $32 million transaction for ***her*** shares would confer upon her more than a peppercorn, …[16]

---

[16]     No one asserts that any of the funds were used to pay Orly's debts.

28.     Thus, as part of the divorce, and reliance on Arie's mis-representations, Dalia agreed to convey her marital rights to 794.40 shares of TRI to the two Trusts benefiting Sagi and Orly (the "Sagi Trust" and the "Orly Trust," respectively) in exchange for a written commitment by Sagi and Orly to financially support her from the Trusts' assets (sometimes the "Claw back Right"). (*See, supra* the "2004 Integrated Agreement" holdings of the SDNY District Court and Second Circuit Court of Appeals). However, as mentioned above, none of this promised support from Orly's multi-million dollar windfall would come to pass voluntarily.

29.     In addition to the post-divorce fraud and conspiracy (*See, infra*), two significant written lies were integral parts of Arie's orchestration of his fraudulent-induced Divorce Settlement Agreement:

## 2.     First, the Divorce Settlement Agreement TRP and TPI Valuation Lies

30.     First, to induce Dalia's divorce agreement "Arie assert(ed) that TRI had nominal value due to an $80 million bank defaulted debt, pension liabilities and the ***Bogalusa litigation*** …. [*See Dalia Genger vs. Arie Genger,* Arbitration Final Award, Case No. 13 170 Y 00996 0 (May 6. 2008) (herein the "Arbitration Award").[17] This representation was contrived and materially false, as found by the arbitrator, a retired appellate justice. When, in 2007, Dalia discovered the truth and offered to settle the matter peaceably, Arie commenced an arbitration against Dalia for a declaration that he did not lie and demanded damages from her. Justice Milonas, sitting as an arbitrator found: "The center of this arbitration involves the Bogalusa issues" [*Id*. Arbitration Award pg. 7-8] and the arbitration dealt with the issue of "[h]ow would distributions differ if the Bogalusa update had not (according to Arie) 'inadvertently omitted information,' information that

---

[17]     Later, and after the divorce Arie was sued by Dalia in an arbitration for failing to disclose significant assets, and "after 14 days of hearings" Dalia was given a final judgment in excess of $4 million against Arie. [*See*, Final Arbitration Award, Case No 13 170 Y 00996 07 May 6, 2008]

may have made a $30 million difference in valuation?" [*Id*. Arbitration Award, at pg. 7]. Arie had scheduled and represented to Dalia that the TPR [TRI's then parent] valuation was "unknown" as "a direct result of the representing as "Unknown" (his fraudulent representation) of "… *his personal contingent liability* of $30M as a result of the Bogalusa litigation" claimed by Aire. [Arbitration Award, *Id*. (emphasis added)]. "That listing *was there for a reason and it was clearly wrong and skewed the numbers significantly*." [*See*, Arbitration Award pg. 7-8 (emphasis added)]. Justice Milonas found "*significantly misleading*" Arie's representation "that his personal contingent liability was based on the fact that the litigation was not resolved due to potential 'opt-outs' and that additional attorney fees were to be paid." [*Id*. Arbitration Award pg. 8]. In truth, "*Arie's exposure, if at all, was minimal*. In no measure could these factors have resulted in anything close to a $30M personal liability." [*Id*. Arbitration Award pg. 8] The arbitrator awarded Dalia $3.85 million plus interest. *Id*.

### 3. Second, the Divorce Settlement Agreement Second Lie – the "Right to Transfer Dalia's TRI Stock"

31. Again to induce Dalia to sign the Stockholder Agreement and convey her marital rights to 794.40 shares of TRI to the "Sagi Trust" and the "Orly Trust," respectively in exchange for a written commitment by Sagi and Orly to financially support her from the Trusts' assets (sometimes the "Claw back Right" [*See, infra* the "2004 Integrated Agreement" holdings of the District Court. and Second Circuit Court of Appeals) Dalia was told that her transfer was authorized and enforceable. This was false as the Delaware Chancery Court found that "… (Arie) knew that neither Trust was a 'Permitted Transferee' of the (TRI) shares under the Stockholders Agreement …" with the Trump Group. [*Id*. Del Sup 2011 at 184-185].

32.    Notwithstanding this actual fraud, but to implement the Claw back Rights set out in the Divorce Settlement Agreement and the Integrated Agreement, "[t]hree days later, on October 29, 2004, Arie caused TPR to transfer its 52.85% ownership in (TRI) as follows:

(i)    to himself, approximately 13.9% of those shares; and

(ii)    to each of the Orly Trust and the Sagi Trust, approximately 19.5% of those shares. (the "2004 Transfers.")."   [*Id*. Del Sup 2011 at 184-185].   Next, "[t]he trustees of both Trusts purported to give irrevocable lifetime proxies to (Arie) to vote the TRI shares held by each Trust (the "Irrevocable Proxies" or "Proxies")" thereby assuring his control.  [*Id*. Del Sup 2011 at 185].   The Chancery Court found that "… (Arie) knew that neither Trust was a 'Permitted Transferee' of the (TRI) shares under the Stockholders Agreement …" [*Id.*].  However, his fraud kept him in control only until 2008

33.    The Chancery Court found that in 2008 Arie was forced to disclose his fraud when "[d]uring the spring of 2008, (TRI) again ran into financial difficulty and was facing foreclosure on an overdue bank debt." [*Id*. Del Sup 2011 at 185].[18]  The Trump Group agreed to again help, but "in exchange for additional equity that would give Glenclova and Investors majority voting control.  (Arie) agreed to those terms, which were documented in the '2008 Funding Agreement.'" [*Id*. Del Sup 2011 at 185].  When confronted at the Closing of the 2008 Funding Agreement with covenants representing ownership, Arie admitted the TRI stock transfers but ("… later claimed that the Trump Group "ratified the 2004 Transfers").  Arie simply claimed that he "… orally told Jules (Trump) about them on several occasions.  In both the trial court and this (Supreme) Court, the Trump Group (and Jules) disputed that claim."  [*Id*. Del Sup 2011 at 185].

---

[18]    In 2008, TRI's operations experienced a remarkable turn-around, generating over $200 million in operating cash flow.  TRI's lenders saw this as an opportunity to force TRI to become immediately current on its hundreds of millions in indebtedness which were in default.  In connection therewith, TRI's banks demanded an immediate equity contribution of $70 million.  By this point, Arie concedes that TRI's equity was worth in excess of $1 billion.

34.     While the Trump Group was willing to waive the prohibitions on the 2004 transfer leaving the Genger family's $500 million interest intact, Arie's refusal to consummate the funding Agreement and hand over majority voting control of TRI, caused them to enforce their purchase rights. [*Id*. Del Sup 2011 at 186]. Instead of consummating the funding agreement, Arie surreptitiously "up-streamed" funds from a TRI subsidiary in contravention of bank covenants, then "threatened … to sue the Trump Group if they challenged the legal validity of the 2004 Transfers" [*Id*. Del Sup 2011 at 186].[19]

### E.     THE TRUMP GROUP'S "END-RUN" AROUND THE ARIE FRAUD TO ACQUIRE THE SAGI TRI SHARES FOR CONTROL

35.     The Trump Group initiated a two-prong response.  First, they invoked their "Purchase Rights" and Glenclova filed a lawsuit in the United States District Court for the Southern District of New York (the "New York litigation") to enforce the Stockholders Agreement" against TPR which was then controlled by Sagi.  [*Id*. Del Sup 2011 at 186].[20]

---

[19]     This sudden discovery of funds to "up-stream" and avoid the necessity of the new loan Arie said was needed, adds further credence to the consistently unreliable and false testimony of Arie who, during the Trump vs. Arie Delaware litigation discussed *infra*, the Trump Group discovered Arie intentionally destroyed all of the business records of TRI.

[20]     Sagi purchased both Dalia and Orly's Trust's interest in TPR as part of his responsibilities of completing the estate plan put together in 1993.  Orly later sued Dalia, Sagi, and Sagi's sister-in-law, claiming the price cheated her trust and was part of a fraudulent conspiracy that injured her by at least $85 million.  After initially agreeing with Orly that Sagi's (but not Dalia's) conduct breached formal procedural norms (Orly's shares could have been more vigorously shopped to other buyers), it provided Orly with seven years of discovery. The New York Court initially found after a two week trial that the $2.2 million price paid met the heightened standards of the entire fairness doctrine and that the buyers Orly identified had no interest in her TPR stock outside of its interest in TRI.  Upon further application to the Court by Kasowitz (the lawyers the Trustee is seeking to engage) on Orly's behalf, the Court clarified that Orly failed to even meet her burden of production that the stock had any value at all.  The New York Court dismissed all Orly's claims with prejudice.  In other words, Orly had her husband litigate with her brother and mother for a decade over zero, generating over 1,600 docket entries and millions in legal fees for her brother and mother who actually have to pay them.  Previously in 2013, in order to try to bring peace to her family, Dalia arranged for Sagi to execute a settlement agreement with her as Orly's Trustee to quiet these claims for over $10 million.  Orly successfully overturned the settlement of her valueless claims on technical issues of New York Trust and Estate Law preferring to use her free lawyers to harass her mom instead.  That is who Orly Genger is in a nutshell – a person who can turn down $10 million for a cheap thrill at her mom's expense and then seek bankruptcy protection while she continues to glob trot between her five homes all-the-while proclaiming poverty.

36.     Second, and more importantly, the Trump Group contacted Sagi and offered "… to acquire the (19.5% stock interest in TRI shares) that TPR purportedly transferred to the Sagi Trust in the 2004 Transfers (the "Sagi Trust Shares"). These negotiations with Sagi resulted "… in the '2008 Purchase Agreement' under which the Trump Group purchased the Sagi Trust Shares…" for $26.7 million in settlement of their suit with TPR. The Trump Group agreed to delay their rights under the 2001 shareholder agreement to purchase the remaining shares of TRI from TPR until such time as a court determined that TPR was their rightful owner. [*See, Genger v. TR Inv'rs, LLC*, No. 6906-CS, 2013 Del. Ch. LEXIS 355 (Ch. Aug. 30, 2013) *infra*].

37.     Not unexpectedly, "(Arie) refused to recognize the Trump Group's (voting rights, and the next day) "… the Trump Group filed a Delaware Court of Chancery action … for a determination that as (TRI's) majority stockholder, the Trump Group was entitled to designate and elect a majority of the members of the (TRI) board." "One month after the Trump Group (sued) the parties settled their dispute ("agreeing the Trump Group constituted a lawful majority of TRI") and entered into a stipulated final judgment…." [*Id*. Del Sup 2011 at 187-188]. Although seemingly resolving Arie's problems with his partners, remarkably, Arie's fraud continued to be discovered:

> Two weeks after the entry of the stipulated final judgment, the Trump Group moved for relief from that judgment and to re-open the Section 225 proceeding. The Trump Group claimed that, after taking control of (TRI), they discovered that (Arie) had destroyed documents relevant to the Section 225 action in violation of a document preservation order entered by the Court of Chancery on August 29, 2008 (the "Status Quo Order"). The Vice Chancellor granted the Trump Group's motion and re-opened the case.

[*Id*. Del Sup 2011 at 188]. "The Vice Chancellor granted the Trump Group's motion and re-opened the case." *Id*.

> After conducting a trial …the trial court concluded that (Arie) had violated, and was in contempt of, the Status Quo Order, (for) deletion of files stored on his work

computer at (TRI) (further finding) … that after deleting those computer files, (Arie) directed an employee to use special software that 'wiped' the unallocated free space on both his computer's hard drive and on a (TRI) computer server (making) it impossible, even by use of computer forensic techniques, to recover any deleted files that were stored in those computers' unallocated free space.

[*Id*. Del Sup 2011 at 188].  Among numerous sanctions, "… the trial court awarded the Trump Group $750,000 of the attorneys' fees (and the parties) later agreed that (Arie) would pay an additional $3.2 million fee to the Trump Group, an amount that the court also awarded." [*Id*. Del Sup 2011 at 188].

38.     "The Court of Chancery conducted a separate trial on the merits of the Section 225 claims (the "Merits Opinion") holding "the Trump Group lawfully possessed a majority voting interest … in (TRI)". [*Id*. Del Sup 2011 at 189].  Immediately thereafter, Arie and Orly filed a suit collaterally attacking the Chancery's decision. Upon a motion for reconsideration, the Chancery Court issued a "Side Letter Opinion" that the Orly Trust was not formally before the court "… nonetheless (held) that neither (Arie) nor the Orly Trust beneficially owned any (TRI) shares … therefore under the Side Letter Agreement, the Trump Group was entitled to vote  both the (Arie) Shares and the Orly Trust." [*Id*. Del Sup 2011 at 189].

39.     "(Arie) … appealed from the final judgment that flows from all three of these opinions—the Spoliation, the Merits, and the Side Letter Opinions." [*Id*. Del Sup 2011 at 189]. The Delaware Supreme Court upheld the Spoliation order and the Merits Opinion, but on the Side Letter held that "the Court of Chancery crossed a jurisdictional line and exceeded its powers … over the Orly Trust or TPR". [*Id*. Del Sup 2011 at 201-202].   Thus, the holding:

> "the Court of Chancery lacked the power to augment TPR's beneficial ownership interest, or diminish the Orly Trust's beneficial ownership interest, in (TRI) by adjudicating that TPR beneficially owned the (Arie) Shares and Orly Trust Shares."

[*Id*. Del Sup 2011 at 203]. Thus, Arie and Orly still had their collective foot-in-the-door to mitigate the injury cause by his misrepresentation on transferability.

## F.  THE 2013 ORLY ("AG GROUP") SETTLEMENT WITH THE TRUMP GROUP

40.  Later, Orly settled her claims for $32 million [SDNY Forrest Op#1, pg. 6 (*Genger I*, 76 F. Supp. 3d 494)][21] and signed a stipulation in her derivative capacity precluding Dalia's claims as trustee, Dalia stipulated to dismissal of the Delaware action at Orly's written request [*See*, *Genger v. TR Inv'rs, LLC*, No. 6906-CS, 2013 Del. Ch. LEXIS 355 (Ch. Aug. 30, 2013)][22] That stipulation triggered the Trump's rights to purchase record ownership of Orly's TRI shares from TPR for $10.3 million under the 2008 Side Letter Agreement. Thus, Orly and Sagi collectively monetized their interest for $69 million - $32.3 million to Orly and $36.7 million to Sagi ($26.7 million plus $10.3 million).

41.  Orly's Chapter 7 Trustee is tasked to investigate all of these transaction, but could not possibly do so without full and honest disclosures.[23] Multiple Courts have held that it was

---

[21] The agreement provides that ***Orly, Arie, and their litigation funders***[21] will receive $32.3 million in exchange for a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and that ***Orly waives all of her claims to the TRI shares***, both as a trust beneficiary and individually. The 2013 Trump Settlement Agreement does not waive any of the Orly Trust's claims. However, in the agreement Orly agreed to cause the Orly Trust to do the same. [*See* footnotes omitted]. [SDNY Forrest Op#1, pg. 6 (*Genger I*, 76 F. Supp. 3d 494) (emphasis added)]

[22]     The Agreed Stipulation provided that:
  1.  "The Trump Group, having closed on the purchase of the so-called Orly Trust Shares … (and) Trump Group owns, for all purposes, all right, title and interest (beneficially, of record and otherwise) to all authorized and issued shares of (TRI) [Id. at *2];
  2.  The $10,314,005 plus accrued interest in proceeds from the sale currently held in escrow (the "Sale Proceeds") shall remain in escrow … until such time as a court in New York shall direct the disposition of the Sale Proceeds, or as the parties to such Escrow Agreement shall otherwise jointly agree …
  3.  "[T]he Trump Group shall disclaim any and all claims to the Sale Proceeds …

[23]     At the other end of the spectrum, and balanced against a debtor's privacy interests, is the strong public interest and policy in full, open, and proper administration of a bankruptcy case by a trustee, ***including a thorough investigation of the debtor's assets***. *See id.* at 417 (citing *Dougherty v. Capitol Cities Comm., Inc.,* 631 F.Supp. 1566, 1571 (E.D.Mich.1986) (internal citation omitted).' Without doubt, a debtor's honest and full disclosure is " 'essential to the administration of the bankruptcy estate.' " *Roudebush v. Sharp (In re Sharp),* 244 B.R. 889, 891 (Bankr.E.D.Mich.2000) (quoting *Cohen v. McElroy (In re McElroy),* 229 B.R. 483, 488 (Bankr.M.D.Fla.1998)). " 'The integrity of the entire bankruptcy system rests upon full and honest disclosure by debtors of all of their assets.' " *In re Walker,* 323 B.R. 188, 198 (Bankr.S.D.Tex.2005) (quoting *Rosenshein v. Kleban,* 918 F.Supp. 98, 104

Orly that monetized her Trust's interest in the TRI Stock, and it certainly was not done so by the Trust's Trustee, Dalia nor does this Chapter 7 Trustee been told the truth

### G. THE INITIAL HIDING THE TRANSACTION AND HIDING THE ACTUAL ALLOCATION OF THE $17 MILLIOIN IN CASH

42. On July 1, 2013, the Trump Group made the first $17.3 million payment under the Trump Settlement Agreement. Within 48 hours the money had traveled through five accounts:

    a. First, in the account of a Trump Group entity called "TI Capital Corp.,"

    b. Next, the funds were wired to the client IOLA account of Wachtel Missry LLP (the firm representing Orly in the underlying suit),

    c. Next, was then wired to an account at Northern Trust Bank in the name of the "Genger Litigation Trust" (a trust co-created by Orly and Arie and naming another of Orly's lawyers, Lance Harris, and David Broser as co-trustees);

    d. Next was the wire of the funds to an account at Goldman Sachs in the name of "ADBG LLC" (the Broser entity designated as lender in the parties' Credit Agreement), and

    e. Finally, all but $1 million of it ended up in an account at Credit Suisse in the name of "Tedco" (another entity owned by the Broser family).

---

(S.D.N.Y.1996)); *see Schechter v. Hansen (In re Hansen),* 325 B.R. 746, 757 (Bankr.N.D.Ill.2005) (noting that " 'the very integrity of the bankruptcy court and the successful administration of the bankruptcy system rest upon compliance with the debtor's obligation of disclosure' ") (quoting *Urological Group, Ltd. v. Petersen (In re Petersen),* 296 B.R. 766, 790 (Bankr.C.D.Ill.2003)). To that extent, a debtor "who comes to the bankruptcy court must come clean, make full disclosure of all information relevant to the administration, and must fully cooperate with the trustee." *U.S. Tr. v. Gardner (In re Gardner),* 344 B.R. 663, 667 (Bankr.M.D.Fla.2006) (citing *Kentile Floors, Inc. v. Winham,* 440 F.2d 1128 (9th Cir.1971); *N. Trust Co. v. Garman (In re Garman),* 643 F.2d 1252 (7th Cir.1980)); *see also In re Wimpee,* 343 B.R. 845, 849 (Bankr.W.D.Ky.2006) ( "[T]he protection provided by the Bankruptcy Code was intended to aid the 'honest but unfortunate debtor.' *Cohen v. de la Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). As such, this [c]ourt expects debtors who seek such protection to deal with this [c]ourt, the [t]rustee, and all creditors with all candor."); *U.S. Tr. v. Halishak (In re Halishak),* 337 B.R. 620, 624 (Bankr.N.D.Ohio 2005) (noting that "in exchange for receiving the benefits of a bankruptcy discharge, debtors are expected to fully, honestly and unconditionally cooperate with the bankruptcy process").

[*See*, **Exh. Y** SDNY Turnover Memorandum[24]].   The Chapter 7 Trustee has indicated no information has been furnished to allow the Trustee to follow the flow of these funds or to determine who actually received the funds and why.   This information should be given to the Trustee to allow the thorough investigation mandated by the Code, unhindered by secreting documents and transactions from this Trustee.

### H.   DALIA'S FIRST DEMAND FOR SUPPORT AND THE FIRST SDNY SUIT – MOTIVATING ORLY'S NEW FRAUDULENT CONDUCT

43.    In early January 2014, after believing that Sagi and Orly had their fortunes preserved in some part, "… Dalia requested $200,000.00 from Sagi under the Integrated Agreement, which promptly Sagi paid.  On  January  23,  2014,  Sagi informed Orly of Dalia's demand and on February 17, 2014, demanded $100,000 from Orly under the Integrated Agreement and 2004 Indemnity.  [SDNY Forrest Op#1, pg. 6-7 (*Genger I*, 76 F. Supp. 3d 494)].  Orly refused to pay.  This lawsuit for breach of contract followed." [SDNY Forrest Op#1, pg. 7 (*Genger I*, 76 F. Supp. 3d 494)].

---

[24]    Although the vast majority of facts recited to this point are directly quoted from final judgments and opinions, here the "confidential information" that is being withheld requires that Dalia cite this Court to the evidence at this point known only to the Debtor, her Insiders, and Sagi Genger under a confidentiality agreement that the Debtor, her Husband, and the Chapter 7 Trustee have refused to allow access (even though Dalia agrees to sign and be bound by the confidentiality agreement, and even though the information and documents relate directly to the pending 9019 Motion).   Dalia thus far has been deprived of any ability to properly respond to the Chapter 7 Trustee's or the Debtor's Motions because both refuse Dalia access.  No conceivable bankruptcy policy could support this position.  "The obligation of full disclosure is crucial to the integrity of the bankruptcy process." *In re Hyde*, 222 B.R. 214, 218 (Bankr.S.D.N.Y.1998), rev'd on other grounds, 235 B.R. 539 (S.D.N.Y.1999) (*citing In re Wincek*, 202 B.R. 161, 166 (Bankr.M.D.Fla.1996)), aff'd, 208 B.R. 238 (M.D.Fla.1996) ("[F]ull disclosure of all relevant information has always been an important policy of the bankruptcy laws." (internal quotations and citations omitted) (alteration in original)). Bankruptcy policy reasons favor creating strong incentives for debtors to be forthcoming about all of their assets. *In re Maha*n, 104 B.R. 300 (Bankr. E.D. Cal. 1989). *See, e.g., In re Zick*, 931 F2d 1124 (6th Cir.) (lack of good faith is a valid basis for dismissing a Chapter 7 case for "cause"); *Carolin Corp. v. Miller*, 886 F2d 693 (4th Cir. 1989) (Chapter 11 filing may be dismissed for lack of good faith).   Successful challenge to debtor's discharge protects bankruptcy policy of ensuring that only honest debtors, who satisfy requirements of the Code, receive privilege of bankruptcy discharge. *In re Buzzeo*, 315 B.R. 243, (Bankr. D. Conn. 2004).  Since the Bankruptcy Code was meant to discharge only an honest debtor, the Code should be liberally applied to protect the debtor only in those cases where there is no intent to violate its provisions. *In re Suttles*, 819 F.2d 764, (7th Cir. 1987).

44.     First, "Orly filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) … then filed a motion to dismiss for lack of subject-matter jurisdiction under Rules 12(b)(l) and 12(h)(3)…. Sagi filed a motion for summary judgment." [SDNY Forrest Op#1, pg. 7-8 (*Genger I*, 76 F. Supp. 3d 494)]. "On September 30, 2014,16 Sagi filed a letter-motion to compel production of the 2013 Trump Settlement Agreement" and Orly opposed. [SDNY Forrest Op#1, pg. 9 (*Genger I*, 76 F. Supp. 3d 494)]. Judge Forrest "granted Sagi's letter-motion to compel." Along with this, "… the Court ordered the parties to submit three-page letters regarding the potential impact of the 2010 Settlement Agreement on the claims and defenses at issue". [SDNY Forrest Op#1, pg. 9-10 (*Genger I*, 76 F. Supp. 3d 495-496)]. The Court then undertook to determine all matters by summary judgment.

45.     Orly's true colors showed when she argued to the SDNY Court, after it initially refused to order disclosure of the 2013 Trump Settlement Agreement, that "only Sagi benefited" from Dalia's TRI shares. Remarkably, Orly argued that neither "Orly (nor) the Orly Trust have … (any) of the proceeds"; "Sagi … obtain[ed] all the value – and Orly none." (*Genger I*, 76 F. Supp. 3d 496) (Case 1:14-cv-1006, Doc. 38, pp. 1, 3, 18). Faced with these arguments, the Court ordered Orly to produce the 2013 Trump Settlement Agreement. Orly moved for reconsideration, and for a stay pending an emergency appeal she filed with the Second Circuit. All of these were denied, and the document was produced. *Id.*, Doc. 64. 76 (*Genger I*, 76 F. Supp. 3d 497). The 2013 Agreement belied pretty much every representation Orly had made to the Court.

46.     On summary judgment, Orly correctly, though crudely, argued that her potential liability to her mother was much higher than meets the eye:

> "This case is an attempt to push the camel's nose under the tent flaps. … Today's request for $200,000 is only the beginning: ***their next request will be for millions***." Case 1:14-cv-1006, Doc. 92 p. 1 (*Genger I*, 76 F. Supp. 3d 491) (emphasis added).

Rejecting these self-serving entitlement arguments, first, the Court granted Sagi's summary judgment as to his breach of contract claim" and on Sagi's promissory estoppel cause action.  *Id.* at 11-12 (*Genger I*, 76 F. Supp. 3d 496).

> The 2004 Promise and the 2004 Indemnity are sufficiently unambiguous such that there is no triable issue as to whether they form an integrated agreement.[25]  Without the 2004 Indemnity, Sagi could be obligated under the 2004 Promise to pay Dalia double the economic benefit he received from his shares of TRI, and Orly would effectively have received the shares as a gift. …. There is accordingly no triable issue as to whether the documents were "designed to effectuate the same purpose" and to "be read together."

*Id*. at 13-14 (*Genger I*, 76 F. Supp. 3d 496-97).  Next, as to Orly's allegation that her indemnity was unsupported with any consideration,

> The 2004 Integrated Agreement clearly purports to provide each party with a benefit in exchange for a legal obligation: Dalia receives <u>financial support</u> in exchange for the transfer of the TRI shares to the Sagi Trust and the Orly Trust; Sagi receives an ownership interest in the TRI shares[20] in exchange for a commitment to financially support Dalia; and Orly receives an ownership interest in TRI shares in exchange for a commitment to indemnify Sagi. (And), the 2004 Promise states that Orly and Sagi are benefiting from receipt of **either** the TRI shares **or** "beneficial interests in those shares," by their respective trusts.

[(*Genger I*, 76 F. Supp. 3d 499)]. [Emphasis original].  Important to this Chapter 7 case (and critical to respond to the Chapter 7 Trustee's settlement proposal), is District Judge Forrest's finding and conclusion that "Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Trump Settlement Agreement."

Judge Forrest also rejected Orly's "mutual mistake" defense, finding and concluding that

> the parties were in fact only mistaken as to their ability to receive and/or monetize record ownership in the TRI shares, and this mistake was not substantial or material because the money was clearly in the beneficial interest - ***Orly monetized her beneficial interest in the Orly Trust shares for $32.3 million***, …

---

[25]    [SDNY Forrest Op#1, pg. 13]

[*Genger I, at 499* (Emphasis Added)].  It was Orly's "beneficial interest" that she monetized, a fact the Chapter 7 Trustee must report and deal with in his analysis of the fairness of any settlement, and why a fraudulent transfer claim is released.   Finally, the District Court pointed out the obvious, that:

> … it would not serve the interests of equity to rescind  the  2004 Integrated Agreement here, as doing so would enable Orly to obtain her benefit from the agreement (the $32.3 million she received for the beneficial interest in the TRI shares) while escaping her obligations under it (her commitment  to financially support  her mother).

[*Genger I, at 501*]. Finally, Judge Forrest held (and the 2nd Circuit expressly affirmed) that "because the 2004 Promise gave Dalia "sole and absolute discretion" to demand funds up to the value of the TRI stock she conveyed, there was 'no merit' to the argument that Sagi or Orly could avoid payment by 'challenging Dalia's need for the money she demanded.'"  [SDNY J Forrest Op#2, pg. *5 (*Genger I*, 76 F. Supp. 3d 491-492)].  Thus, as to  a judgment for damages,  "… Sagi performed his  obligations  under  the 2004 Integrated Agreement … Orly breached  the  2004 Indemnity by refusing to pay Sagi, and nor is there a dispute that Sagi suffered damages of at least $100,000 as a result" for breach of contract and promissory estoppel damages. [*Genger I, at 501*]. As to Orly's claim of Sagi's unclean hands,

> …on July 24, 2014, the Appellate Division of New York's First Judicial Department held that as an officer of TPR, Sagi's fiduciary duty was to the corporation and its stockholders, and that Sagi had not breached any duty to Orly... *Genger v. Genger*, 121 A.D.3d 270, 278-79 (N.Y. App. Div. 2014).

[*Genger I, at 502*]. Sagi was awarded a judgment of $100,000.00 and later an additional $64,875.70 in attorney's fees and $2,733.77 in costs.[26] (herein "Judgment #1")

47.       Orly next spent her attorney's fees on a failed appeal of Judge Forrest's decision and a 60B motion.  *See*, *Genger v. Genger*, 663 Fed. Appx. 44 *; 2016 U.S. App. LEXIS 17642 **;

---

[26]       *See, Genger v. Genger*, 2017 U.S. Dist. LEXIS 80010 (SDNY 2017).

2016 WL 5539979 (2nd Cir. 2016).  The Second Circuit, made clear that Orly's gift of funds to

Arie does not change that $32 million was paid for her shares:

> ***Orly benefitted from the shares regardless of whether the settlement money went***
> ***to Orly, as a gift to Arie***, …. But surely any $32 million transaction for ***her*** shares
> would confer upon her more than a peppercorn, …

*Id*. 2nd Cir I, at *50.[27]  Orly benefitted from the shares – but claims to have received none of the

money she caused to be monetized because she gifted it to Arie.  This blatant and obvious fraud

must result in the denial of this Debtor's discharge.

## I.     THE  2017 SECOND CLAW BACK DEMAND AND JUDGMENT

48.     After Judge Forrests' Opinion #1, and affirmance by the Second Circuit, and now

armed with the law and the facts, Dalia made an additional demand on her children for

$6,000,000.00 of the more than $69 million they received (the "2017 Demand").  This time Sagi

refused to pay unless Orly made her simultaneous payment. [*Id*. Forrest Op#2, pg. *5-6 (*Genger*

*II*, 2018 WL 363252; 2018 U.S. Dist. LEXIS 126958)].  As a result, this time Dalia commenced a

breach of contract action against Sagi three days later, on October 24, 2017.  Sagi argued that

although Integrated Agreement was valid and enforceable:

> "the payment obligation was a joint obligation of his with Orly, who has recently
> indicated she will not honor that obligation, and thus it would be inequitable for
> Sagi to once again make a payment to Dalia without Orly's immediate
> reimbursement."

(*Id*. at 3-8.) [Id. Forrest Op#2, pg. *6 (*Genger II*, 2018 WL 363252; 2018 U.S. Dist. LEXIS

126958)].  Accordingly, Sagi brought a third-party complaint against Orly for breach of the

Integrated Agreement.

---

[27]     In affirming the SDNY Judgment, the Second Circuit also noted that Orly's post-judgment Rule 60(b)(2) and
(3)  motions were properly overruled as without merit.

49.     Orly continued to take the position that she owed her mother nothing. First Orly

argued jurisdiction- "that because she is a United States citizen domiciled in Israel (notably, not

Austin, Texas), she is a non-diverse party and the Court lacks subject-matter jurisdiction." [*Id*. at

*6-7]. "Sagi argues that there is a bona fide controversy between himself and Dalia as a result of

his refusal to pay …" [*Id*. at *7 (*Genger II*, 2018 WL 363252; 2018 U.S. Dist. LEXIS 126958)]

and "both Dalia and Sagi filed motions for partial summary judgment." [Id. at *9 (*Genger II*, 2018

WL 363252; 2018 U.S. Dist. LEXIS 126958)]. Orly argued the following potential issues require

further discovery:

> (1) whether Orly's obligation to Sagi is "capped" by virtue of the 2004 Promise; (2)
> whether the money demanded by Dalia is necessary to support her lifestyle; and (3)
> whether Dalia and Sagi violated the implied duty of good faith and fair dealing.
> Orly further argued that Sagi is not entitled to summary judgment because he has
> not yet paid Dalia's demand.

 [*Id.* Forrest Op#2, pg. *9 (*Genger II*, 2018 WL 363252; 2018 U.S. Dist. LEXIS 126958)]. Dalia

moved for summary judgment against Sagi on her breach of contract claim which the Court

granted. [*Id*. at pg. 17-18 (*Genger II*, 2018 WL 363252; 2018 U.S. Dist. LEXIS 126958)]. Sagi

moved for partial summary judgment against Orly on:

>  (1) his breach of contract claim; (2) his promissory estoppel claim; and (3) his
> declaratory judgment claim to the extent of the $3,000,000 liability sought in this
> action.

[Id. at *18 (*Genger II*, 2018 WL 363252; 2018 U.S. Dist. LEXIS 126958)]. Judge Forrest denied

Orly's defenses to Sagi's summary judgment motion that she has no liability because he has not

yet paid Dalia on two grounds:

> As an initial matter, that argument is now moot in light of this very Opinion &
> Order, which grants Dalia's motion for summary judgment against Sagi.
> Furthermore, Orly's refusal to pay (which does not appear to have been conditioned
> on Sagi's own refusal) constitutes an anticipatory breach of the 2004 Indemnity.

[Id at *20].   The Court awarded Sagi a judgment for $3 million, "… notwithstanding that Orly has failed and refused to pay anything to Sagi on his initial judgment, and never intends to pay he or her mother anything."   (*Genger II*, 2018 WL 363252; 2018 U.S. Dist. LEXIS 126958).   The Second Circuit affirmed entirely this second judgment, ("Judgment #2) this time for $3 million. *Genger v. Genger*, 771 Fed. App. 99*; 2019 U.S. App. LEXIS 19436**; 2019 WL2711762 (2nd Cir. 2019) [2nd. Cir. App#2].

### J.   THE TRUMP SETTLEMENT DISTRIBUTIONS WERE AN ACTUAL FRAUD "FRAUDULENT TRANSFER"

50.     At the time of this Trump settlement, and although Dalia remained the Trustee of the Orly Trust, Dalia was neither consulted nor did she participate in this 2013 Trump Settlement Agreement, and the parties refused to even give her, as Trustee, a copy.   [*See*, *infra*].   Dalia's participation was problematic to the Orly transaction, inasmuch as Dalia was both a Trustee with an economic beneficial interest (through the Claw Back Rights provided in the Integrated Agreement).[28]   Then, on August 30, 2013, the Orly Trust, TPR, and the Trump Group all agreed that "the Trump Group owns, for all purposes, all right, title and interest (beneficially, of record and otherwise) to all authorized and issued shares of [TRI] … and so ordered by the Delaware Chancery Court"  [SDNY Forrest Op#1, pg. 7   (*Genger I*, 76 F. Supp. 3d 494)].[29]

---

[28]     As illustrated in *Furrh v. Furrh*, 251 S.W.2d 927, 934 (Tex. Civ. App. 1952) citing 54 Am.Jur. p. 363, and New York law, it is stated:
> "that a trustee may purchase the trust property at a public auction, where all who wish to purchase have an opportunity of doing so, where the sale was authorized or ordered by the court having jurisdiction of the trust estate and of the trustees …," "as where he is also a beneficiary which interest will be prejudiced in case he does not purchase." Where, "he makes special application to the court for permission to bid, which, upon the hearing of all the parties interested, is granted by the court, then he can make a purchase which is valid and binding upon all the parties interested, * * *." *Scholle v. Scholle*, 101 N.Y. 167, 4 N.E. 334, 336; … *see also Scott v. Mann*, 33 Tex. 725, 726, 729; Bogert on Trusts & Trustees, Sec. 486; Pomeroy Equity Jurisprudence, Sec. 958B.

In other words, a Trustee who has a beneficial interest in Trust distributions may protect themselves and their interests over that of the non-priority beneficiaries (e.g., Orly) without breaching a fiduciary duty.

[29]     Subsequently, a court in this District and New York's First Department both concluded that this so-ordered stipulation determined the Trump Group to be the beneficial owner of the TRI shares. TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP, No. 13 Civ. 8243 (JFK), 2014 U.S. Dist. LEXIS 67116, *5-6 (S.D.N.Y. May 15, 2014);

51. Dalia, deprived of any information or documents of the 2013 Trump Settlement Agreement was not aware that a fraudulent scheme and plan had been put in place that wholly denuded the Orly Trust and Orly individually, in favor of Arie (and his purported creditors), and her lawyer-husband Herschmann, that transferred ***all proceeds*** of the Orly "monetization" of her TRI stock to them and for their benefit only. Orly now claims to be insolvent, broke, and without any significant assets!

52. The payments from the Trump Group for the TRI stock was $32.3 million and came in two parts:

(a) $17.3 million cash paid up front without Orly or her Trust receiving anything in return; and

(b) two additional $7.5 million promissory notes to be paid later, currently naming a partner of the Kasowitz firm as the "payee" on the notes as an escrow agent for, like, Orly. [*See*, **Exh. A** pp. 2-3 SDNY Turnover Memorandum]. This consideration was paid to an escrow agent (attorney William Wachtel, Orly's counsel of record) ***without allocating that sum amongst the four counterparties to the Agreement***, defined therein as Orly, Arie, and the Brosers. [*Id.* Turnover Memorandum at 1.]. Although by "law of the case", it has been "conclusively established" that it was Orly that monetized her interest in the TRI shares for $32.3 million, the Debtor, when asked in interrogatories to "[i]dentify the amount, date, and recipient of all payments made and/or to be made to any person or entity pursuant to Defendant's 2013 Trump Settlement," Orly falsely swore, under oath, that she had "no knowledge." [*See*, **Exh. B** pp. 16-17 SDNY Turnover Memorandum]. Meanwhile, the Kasowitz firm (whose

---

Genger v. Genger, 121A.D.3d 270, 280 (N.Y. App. Div. 2014).

partner Marc Bowen is the current escrow agent under the 2013 Trump Settlement Agreement) falsely testified at deposition that: "We don't have any information about any agreements" concerning payments yet to come due under the Agreement. [*See* **Exh. H** at 32:23-25, SDNY Turnover Memorandum]. Critically, these transactions are neither described nor disclosed in the Debtor's Chapter 7 filings.

53. Both before and after the 2013 Trump Settlement Agreement Orly, and now, the Debtor and her husband live in a string of multi-million-dollar homes throughout the world. [*See*, SDNY Turnover Memorandum, Doc. 80-13, 80-17, 94-1]. Even prior to her marriage, Orly had significant assets. Remarkably, without explanation, almost none of this wealth appears on the Debtors filings – claiming that her total asset wealth is less than $60,000.00 (of course, after paying her lawyer $75,000.00 to file a Chapter 7 bankruptcy). Yet even adding back in her Chapter 7 legal fees, Orly schedules assets of less than .0018% of her known wealth in January 2013. Her explanation for where it went, when she pretends not to know, is that she gave away to Dalia's ex-husband, Arie. This is partially explained by her claims of the 2018 transfer of her 50% ownership in a $3+ million Austin condo to her multi-millionaire husband, but this is only a small portion of the total fraudulent transfers. This transfer of millions of real property or her transfer of hundreds of thousands to a trust for her own benefit, are almost immaterial in the context of what has going on here.

54. Attached hereto as **Exhibit 1** is a true and correct copy of the June 16, 2013 Trump Settlement Agreement executed by Orly Genger and other parties. Attached hereto as **Exhibit 2** is a true and correct copy of an excerpt from the trial transcript in the case of *Genger v. Genger*, Index No. 100697/2008 (N.Y. Cnty. Sup. Ct.). Almost none of what is discussed below can be

found in any of the Debtor's filings or disclosures. It was Orly individually that was compelled by the 2013 Trump Settlement Agreement to provide the Trump Group with, *inter alia*,

(a)     a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and

(b)     Orly's waiver of all of her claims to the TRI shares, both as a trust beneficiary and individually. [*Genger I*, 76 F. Supp.3d at 493-94]. As Orly later told the Court of Appeals for the Second Circuit, the Agreement provides "that the Trump Group would pay $32 million to the AG Group in exchange for a release of any ownership interest in the TRI shares." [*See*, Case 15-350, Doc. 93 p. 14.].

55.     The Debtor's schedules ignore, and certainly do not disclose that (as four (4) opinions of the NY Federal trial and appellate Courts found) in 2013 "*Orly monetized her beneficial interest in the [family business] TRI shares for $32.3 million.*" [*See, e.g. Genger I,* 76 F. Supp.3d at 501]. It could not be clearer:

> Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement.

[*See, e.g. Genger I,* 76 F. Supp.3d  at 499]. Orly's wealth was all derivative of the TRI shares *contributed in great part by her mother Dalia to the Orly Trust* and expressly burdened by the obligations of the Integrated Agreement (that encumbered the TRI shares) by written commitments Orly had made to her mother Dalia nine years earlier, recognizing Dalia's "Claw back Rights" of some of the TRI value to support her retirement – the economic value later calculated by the SDNY Court to be $24.7 million (*See*, *Genger III*, 2018 U.S. Dist. Lexis 126958, *17 n.5). Important here for this Bankruptcy Court to understand, is that Orly's co-parties to the 2013 Trump Settlement Agreement, Arie, and the Brosers, (as well as Kasowitz, Herschmann) ***had no live***

***claims to monetize against the stock***, yet received 100% of all proceeds, thus assuring Dalia's

Claw back Rights were rendered valueless.

56.     "The $32.3 million consists of $17.3 million in cash up front, plus two additional

$7.5 million [promissory notes] to be made over four years." *Id.* at 494 n.11.  All cash has been

paid out.  Thus, instead of honoring Orly's written commitment to her mother, Orly, in concert

and conspiracy with her father Arie Genger and her attorney/husband Eric Herschmann, set about

on a scheme to frustrate that financial obligation and deny Dalia all support.  When the first $17.3

million payment was made in 2013, Orly directed one of her then-attorneys, William Wachtel, to

immediately wire the entire sum to a trust established for the benefit of Arie's (not Orly's)

creditors.  As the Broser's counsel, one of the Transferees stated, it in addressing the SDNY court,

admits that none of the funds went to pay an Orly creditor, but only Arie creditors:

[beginning Exhibit 2 at pg. 79]:

```
10  MR. GOLDBERG: Your Honor, the essence of the
11  litigation trust agreement that was put in place in 2012 was
12  to protect the lender so that the first monies that were paid
13  under the settlement agreement would go to pay the liability
14  of Arie Genger under the credit agreement.
…
22  MR. GOLDBERG: In other words, the monies that came
23  in   So the 32 million was the settlement; $17,257,000 has
24   been paid to date.  And Your Honor has heard that tracking the
25  funds, the funds first went into the -- Bill Wachtell [Ph.]

Pg. 80
1   who was the attorney for the AG Group, who then transferred
2   the monies into a litigation , the Genger Litigation Trust
3   account. $17,257,000 was placed in the trust account. And
4   from there, $17,200,000 went to pay off the loan that was as
5   between Mr. Broser and Arie Genger individually.
6   That's where the lion's share of the first tranche
7   of the settlement went .  It went to -- I know Your Honor ' s not
8   making fact finding summations. This part of it is all
9   based on the efforts of Mr. Dellaportas have all been
10  established with documentary evidence that the flow of money
```

11  went into the (Genger Litigation) trust and ***then went to pay down the loan between***
12  ***Arie Genger and Mr. Eraser's entity*** which he created to lend
13  money to Arie Genger.

Not a penny of the funds Orly monetized went to Orly or was paid on Orly debt.  In fact, Arie who

got $17 million from Orly is claiming to be her creditor. [*See, infra*]   And, there can be no dispute

that the Brosers understood they were being paid from money that did not belong to their borrower

(Arie), but rather to a third party (Orly) *who owed them nothing*. [*See*, **Exh. D** at 36:9-10 attached

to SDNY Turnover Memorandum].   The Brosers were knee deep in this scam – they both were

named as third-party defendants in the SDNY Turnover suit (*See*, Exh. I SDNY Turnover

Memorandum), and fought Sagi's discovery at every turn, requiring multiple interventions by the

SDNY Federal Courts for Sagi to learn the truth.  [*See*, **Exhs. C, D** at 19:16-32:15, SDNY Turnover

Memorandum].

> **K.     WITH TWO SUITS AND TWO JUDGMENTS NOW AFFIRMED ON
> APPEAL – THE INSIDER'S SCRAMBLE TO HIDE OR ENCUMBER ALL
> REMAINING ASSETS**

57.     Orly could not dissipate those funds, because they were not yet payable (to date,

certain preconditions have not yet been met and they have not yet been paid).   Because the

remaining $15 million had not yet come due, the AG Group had to be more creative to avoid

Dalia's or Sagi's access to the remaining $15 million.  So, Orly, her father and her husband devised

a plan to frustrate the upcoming judgments for the Claw back demands by encumbering these two

notes with bogus liabilities.  [*See*, redaction in SDNY Turnover Memorandum, referencing **Exh.

X** at 79:12-80:7 (emphasis added)].  The conspiracy hatched a scheme to encumber the $15 million

evidenced by the two Trump Group promissory notes by having Orly pledge them as "security" to

her husband and father for patently bogus "liabilities."

58.     Key to the fraudulent scheme by Orly, her father and husband, were three documents, each of which Orly concealed until the Court ordered them produced (and one which of she kept hidden even after the Court ordered it produced [See, Doc. 209]):

(a)     a [redaction] secured promissory note dated December 31, 2016, in favor of her father, Arie;  and

(b)     a [redaction]  secured promissory note dated December 30, 2016 in favor of her husband, Eric Herschmann; and

(c)     an agreement dated March 31, 2017 (the "2017 Agreement").

[See, **Exhs. T, U, V** to SDNY Turnover Memorandum].  With respect to these two promissory notes, three initial observations are important:

• First, **Exhs. AA, BB**.  [See, redactions SDNY Turnover Memorandum pg. 10]

• Second, **Exh. X** at 109:15-17; 139:11-15. [See, redactions SDNY Turnover Memorandum pg. 10]

• Third, [See, redactions SDNY Turnover Memorandum pg. 10]  Id. **Exh. X** at 116:16-22.

Together, these documents are a sham designed to frustrate collection of the judgments and all of the current and future Claw back Rights of Dalia.

**L.     The Arie Promissory Note**

59.     The promissory note to Arie (**Exh. T**) supposedly represents sums Arie has advanced Orly for legal fees. As the story goes, Arie paid Orly's lawyers directly for her various suits, using some of the $17.3 million he borrowed from the Brosers.  One of those suits was the state court action that ultimately led to Orly's $32.3 million settlement.  But incredibly, when Arie repaid the Brosers using Orly's settlement funds, [See **Exh. W** [redaction] SDNY Turnover

Memorandum pg. 10], <u>Arie did not extinguish Orly's supposed debt to him and even claims a</u> <u>secured debt in this bankruptcy</u>.  In reality, the whole story was cooked up after the fact and applied retroactively as a fraudulent scheme.  [*See* **Exh. AA** [redaction] SDNY Turnover Memorandum pg. 11].  And the UCC liens based on this note was not filed until August, 2018 of last year (within the insider preference period).  [*See,* **Exh. J. Exhs. X** at 141:3-10; EE at 69:20-70:17, O pp. 11-23 [redaction] SDNY Turnover Memorandum pg. 11].

**M**.    **The Herschmann Promissory Note**

60.    Orly's promissory note to her husband, Eric Herschmann [*See*, **Exh. U** [redaction] SDNY Turnover Memorandum pg. 11] is no better and is fraught with fraud and insider dealings.

**N**.    **The Kasowitz and Herschmann Attorney's Fees**

61.    The lion's share of Kasowitz's legal work on her behalf was in a state court.  In March 2015, Mr. Herschmann told that court that: "I have a retainer letter that would reflect that all of the attorneys that are on the trial for Kasowitz are working *pro bono*." [*See*, **Exh. M** [redaction] SDNY Turnover Memorandum pg. 11]. That [redaction] does not reflect was merely a moment of careless braggadocio. [*See*, redaction pg. 11].  [*See*, **Exh. Z** p. 27.].

62.    When Orly's legal fortunes soured by (i) entry of the Sagi Judgments and (ii) the multiple Court holdings that Dalia's rights under her Claw back provisions was "one Integrated Agreement" (*e.g.,* Dalia had direct claims against Orly), however, the payment was retroactively recharacterized as a "secured loan," and a promissory note was created ***and backdated*** to conform to that story.  Mr. Herschmann moved to quash Sagi's SDNY subpoena for documents and testimony and Dalia's WDTX Bankruptcy Court subpoena for the confidential documents and testimony, which would get to the bottom of the matter.  Even if the payment were for Kasowitz's

"pro bono" legal work on Orly's behalf, this would simply have been an example of a wealthy spouse paying his less-wealthy spouse's bills.

63.     The years 2017, 2018 and 2019 were busy years for Orly planning of her bankruptcy fraud. And expensive – (*e.g.* over $75,000.00 Chapter 7 legal fee retainer was paid). As noted above, there is a March 31, 2017 agreement tying it all together. [*See*, **Exh. V** to Turnover Motion].  [*See*, [redaction] pg. 12 SDNY Turnover Memorandum] tying together the Debtor's wholesale fraudulent transfers of cash, liens and debt.   If the Trump Group's $3 million indemnity claim is also treated as an offset [*See*, **Exh. N** at 66:9-15 to Turnover Motion], that would leave nothing to pay Sagi's judgment or Dalia's current and future expectancy value of her Claw Back Rights.   Indeed, that was exactly the intent of this scheme, but for a few remaining assets.   The way it worked is as follows:

- Frist, Orly pledged all of her assets to her husband. **Exh. K**.

- Then, to the extent the former was not enough to eat through all of the money coming her way, she then also pledged all of her assets to her father Arie,

- Next, Arie in turn pledged all of *his* assets back to Mr. Herschmann. [*See* **Exh. J** to SDNY Turnover Memorandum pg. 12]. [*See*, [redaction] pg. 12 SDNY Turnover Memorandum] [*See*, Exh. U to Turnover Order.].

64.     According to Orly's deposition testimony and her AmEx Black Card statements [which Orly and her husband concealed, in violation of multiple Court orders (Doc. 202, 206)], the *quid pro quo* of these fraudulent transfers is the obvious fact that Orly is financially supported, to the tune of hundreds of thousands of dollars per year, by her husband.   The effect of the above scheme is to "round trip" the money out of Orly's control and then back to her through her husband or father then to her husband.

65.     Thus, and maybe not surprisingly, this is not the end of Orly's fraud and bankruptcy

fraud.  With litigation pending by her mother and brother on her obligations under the 2004

Integrated Agreement, but not wanting to leave any loose ends (after dissipating the $15 million

notes) Orly set about transferring away her remaining assets as well. [*See*, [redaction] pg. 13 SDNY

Turnover Memorandum] [*See*, **Exh. DD** at 35:4-23 to Turnover Order.].  This is such an obvious

"pigs get fat, hogs get slaughtered" scheme when the following transactions are understood.

66.     While it is unclear when the "December 30, 2016" note was actually signed, [*See*,

[redaction] pg. 12] when matched to the fact that the UCC liens reflecting the note were not filed

until May 10, 2017 (a few days after a New York JHO rejected as entirely worthless Orly's $85

million damages claim against Sagi.   [*See*, Exhs. **BB, K** attached to SDNY Turnover

Memorandum].

67.     And only last August 2018, after summary judgment was rendered in Sagi's favor

in the New York federal suit, the Debtor emptied out all of her U.S. investment and bank accounts

and hurriedly wired all the money to her attorney's IOLA account, from where it then disappeared.

The details of this transaction are ignored in the Debtor's filings and must be questioned by the

Chapter 7 Trustee.   **Exh FF** attached to the pending Motion to Dismiss is a copy of a *Vanguard*

*Brokerage Account – Wire Transfer* confirmation. [*See*, **Exh. P** to SDNY Turnover

Memorandum].

68.     Next, on September 20, 2018 (three weeks after judgment was entered in this

SDNY Doc # 8181), Orly recorded a transfer of her controlling interest in her well-established art

business, "Everything Important LLC" ***to her father for no cash consideration***. [*See*, Exh. Q to

SDNY Turnover Memorandum].

69.     And finally on September 28, 2018 (within the one-year insider preference period) and one week *__after__* Sagi domesticated his judgment in Travis County, Texas, Orly recorded a "Deed of Trust" in Travis County purporting to transfer her rights to her 50% interest in the couple's property – a multi-million dollar apartment in the "W Hotel" in downtown Austin[3] – to a trust for the benefit of her attorney-husband Herschmann. [*See*, **Exh. G** to SDNY Turnover Memorandum]. Then in her bankruptcy in June 2019 Orly declared the Austin property her "homestead" despite claiming to the SDNY Federal Court that she resides full-time in Israel. [Docket #80-1] and despite imputed actual knowledge that she had not resided in Texas for the statutory period necessary to establish such homestead. This manipulation in face of obvious facts and law to the contrary is nothing new -- the U.S. District Court for the Western District of Texas, in transferring Mr. Herschmann's motion to quash to the SDNY, held that:

> "[Eric] Herschmann and [Orly] Genger, as owners of multiple residences, have used this fact to their legal advantage by claiming to reside in whichever location most suits their legal needs at the time."

*See Genger v. Genger*, Case #: 1:19-mc-00366-LY, (W.D. Tex. ) Doc. 11 (p. 5 of 6) [hardly a judicial endorsement of honesty, full disclosure, and good faith, particularly for an officer of this court].

### O.     FILING BANKRUPTCY – RESPONDING IN THE SDNY TO THE FRAUDULENT TRANSFER MOTION WAS SIMPLY TOO DANGEROUS

70.     Each of the foregoing transactions set out above is the subject of the pending fraudulent transfer motion as fraudulent conveyance under New York Debtor and Creditor Law [SDNY cause # 8181, infra] compelling garnishees/transferees Michael Bowen, Arie Genger ("Arie") and Tedco, Inc. (together with its control persons and intermediaries) to turn over to the U.S. Marshal all promissory notes and funds in which third-party defendant and judgment debtor

Orly Genger ("Orly") has an interest sufficient to satisfy Sagi's judgment. As filed, the Sagi Turnover Motion in the SDNY (Doc #8181)[30] also seeks to set aside:

(a)     the $17.3 million cash transfer to Arie, the Brosers and their entity, Tedco, Inc. (and, to the extent necessary, the intermediary entities through which the money passed); and

(b) the encumbrances placed on the two $7.5 million promissory notes by Orly's husband and father. The promissory notes are currently held by Mr. Herschmann's law partner, Michael Bowen (See Exh. H 35:5-25 to Turnover Motion) so he, along with the above-named persons/entities, are being served with this motion.

(c)     Sagi also seeks an award of reasonable attorney's fees and disbursements.

The SDNY Judge set an answer date for the pending Motion and hearing, by which not only the Debtor but all the target Defendants must reply to the Motion. In order to avoid this response obligation, the Debtor filed this Chapter 7 case on the eve of the deadline to respond to the Turnover Motion, in a venue that Orly knew she could not support. For example, after multiple losses in Federal and State Court in New York, the Debtor now swears that she moved to Texas sometime in late 2018 or early 2019 (incredibly, she contends that she does not, in fact, remember when she moved to Texas. *See* Transcript of 341 Creditors' Meeting, August 15, 2019, at p. 5).[31]

---

[30]     Pursuant to (a) CPLR 5225(b) and 5227, and Fed. R. Civ. P. 69; (b) pursuant to DCL 273, 273-a, 275, 276, 278, rescinding all fraudulent conveyances associated therewith; and (c) pursuant to DCL 276-a, awarding Sagi his reasonable attorney's fees and disbursements.

[31]     The Debtor: ....the holidays I think, of, of 2018.
....
Question: So, in September or October of last year, you moved back to Texas?
The Debtor: Um, that's when I- I'd made the decision. I mean, I don't, I don't know ... It made my move-moving back. I mean, this stuff doesn't happen in one singular moment.
....
Question: And uh, when did you actually physically make that move um, back to Texas?
The Debtor: Uh, I don't remember.

Yet the Debtor and her insiders have spent the last two years insisting—repeatedly and **under oath**—that, she permanently resided in Israel with no intention of ever moving back to the United States.  In a **May 16, 2018** declaration, Orly attested to the Court under oath that:

> "Many months before this action was commenced by my mother and brother [in October 2017], I had moved from Austin, Texas to Tel Aviv, Israel. I intended at that time, and still intend, to live permanently in Israel, and have no intention to move from Israel. …All of Sagi's previous claims that my domicile is in … Texas … are inaccurate."

*See*, **Exhibit Y** at 2 (emphasis added) to pending Motion to Dismiss].

71.     Similarly, even the schedules filed literally disclaim the "penalty of perjury" mandates of the Debtor's furnishing and executing complete Schedules and Statements in a bankruptcy case.  The Schedules and Statements neither acknowledge that which the New York Courts have found as "law of the case" multiple times (that the Debtor "monetized" in 2013 her $32 million of TRI Stock) and that all of those funds found their way to her father, his creditors, or her husband.  Not only do the bankruptcy disclosures not mention these transactions, the Chapter 7 Trustee has not announced the investigation or determination of these facts established by years of Federal, State and Arbitration judges' findings.  Dalia believes these facts have been withheld from the Trustee.

**P.     THE REMARKABLE $75,000.00 SCHEDULES AND STATEMENTS FILED BY THE DEBTOR**

**1.     Non-Statutory, Non-Rules Disclaimers in the "Introduction" - the "Global Notes, Methodology and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs"**

72.     Only a cursory analysis of the Schedules and Statements show the extent of non-disclosure bad faith and outright evasion.  Begin with the "Introduction" that is 3 page-single-spaced disclaimer of the accuracy of the disclosures and the purported lack of knowledge of the Debtor in completing and filing her Schedules and Statement of Affairs.  This is a remarkable

attempt to modify the "penalty of perjury" obligation upon execution by a Debtor of her schedules and statements.[32]  As an example:

> Although the Debtor has made reasonable efforts to ensure the accuracy and completeness of such financial information, inadvertent errors or omissions, as well as the discovery of conflicting, revised or subsequent information, may cause a material change to the Schedules and Statement. Thus, the Debtor is unable to warrant or represent the Schedules and Statement are without inadvertent errors, omissions or inaccuracies. … ***Notwithstanding the foregoing, the Debtor shall not be required to update, amend or supplement the Schedules and Statement, but reserves the right to do so***.

After claiming "reasonable" effort to ensure accuracy, the Debtor disclaims her obligation to "update, amend or supplement the Schedules and Statement …" with accurate information even when it is discovered and known to exist.   These disclaimers continue:

- To be certain that nothing in, or missing from, the Schedules and Statements can be used to establish intentional withholding of information, transactions, assets, and liabilities, the Debtor actually suggests that "[i]n the event that the Schedules and Statement differ from the foregoing Global Notes*, the* ***Global Notes shall control***. [*See,* "Global Notes Control, pg. 3]. "Global Notes" are not signed under penalty of perjury – or under any penalty for that matter.

- Next, the Debtor claims to "admits" nothing in her "sworn" schedules or statements (*See*, Reservation of Rights, pg. 2);

---

[32]     The petition, schedules, and statement of financial affairs are executed under oath and penalty of perjury. Fed. R. Bankr.P. 1008; Official Form 1 (Voluntary Petition); Official Form 7 (Statement of Financial Affairs). *See Heil,* 289 B.R. at 907-08. *See also Hamo v. Wilson* (*In re Hamo*), 233 B.R. 718, 725 (6th Cir. BAP 1999); *Beaubouef v. Beaubouef* (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir.1992).

The debtor must fully disclose all information relevant to the administration of the bankruptcy case. *Kentile Floors, Inc. v. Winham,* 440 F.2d 1128 (9th Cir.1971); *In the Matter of Garman,* 643 F.2d 1252 (7th Cir.1980). *See In re Robinson,* 292 B.R. 599 (Bankr.D.Ohio 2003); *Woolman v. Wallace* (*In re Wallace*), 289 B.R. 428 (Bankr.N.D.Okla.2003); *Fleet Securities, Inc. v. Vina* (*In re Vina*), 283 B.R. 803 (Bankr.M.D.Fla.2002); *In re Firrone,* 272 B.R. 213 (Bankr.N.D.Ill.2000); *In re Riccardo,* 248 B.R. 717 (Bankr.S.D.N.Y.2000).

"***It is not for the debtor to decide what is and is not relevant****. A debtor who omits important information and fail[s] to make full disclosure, place[s] the right to the discharge in serious jeopardy." Jensen v. Brooks (In re Brooks),* 278 B.R. 563 (Bankr. M.D. Fla. 2002) (Emphasis Added) In fact, "[c]reditors are entitled to judge for themselves what will benefit, and what will prejudice, them" and the estate. *Chalik,* 748 F.2d at 618.

- Although the debtor schedules less than $60,000.00 in assets, and a $75,000 retainer to her Chapter 7 lawyer, the Debtor claims that "… [i]t would be prohibitively expensive and unduly burdensome and to obtain current market valuations for all of the assets." (*See*, Net Book Value of Assets, pg. 2).

- Regarding her assets, the Debtor suggests that "… the Debtor may not have identified and/or set forth all of her (filed or potential) causes of action against third parties as assets in her Schedules and Statement" (who else would know what the Debtor's purported claims are, if not the Debtor?) then claims that "[t]he Debtor reserves all of her rights with respect to any causes of action against third parties" presumably even the undisclosed one, notwithstanding the fact that "the Debtor" no longer owns any of these causes of action, disclosed or not, all belong to the estate. [*See*, "Causes of Action" pg. 3].

- Remarkably, this same suggestion is also referenced by the Debtor as to the obligations to honestly complete Schedule A/B, first, when the debtor claims "Debtor has identified *claims that third parties, in various litigation, may have suggested that she owns* (and which Debtor does not agree exist)" which apparently the Debtor is not intending to disclose (at least voluntarily). Without the detailed history above, the Court would have no idea to what this disclaimer refers. However, with this Debtors history disclosed, this reference is to the $32 million in fraudulent transfer the Debtor made.

- Next the Debtor claims that (although she lives off the funds and cash of her multi-millionaire husband) and, according to the Debtor although "Schedules I and J request information on the Debtor's non-filing spouse's financial assets and income… [s]uch information is not available to the Debtor, and is, accordingly not listed." The

Schedules do not "request" any information – they "require" full, honest, and truthful disclosures. These answers to the questions are not optional, or at the pleasure of a debtor. The Debtor simply refuses to disclose the information, all of which is "available" to the Debtor. [*See*, "Specific Disclosures" 1st ¶ pg. 4].

• Regarding the $3+ million condominium located in the "W Hotel" downtown Austin, the disclaimers state that "Debtor owns an undivided interest in a condominium property with her non-filing spouse which was granted by gift…." This intentionally vague reference is not only intended to confuse, but when followed by a reference that the ownership rights ("but has no parking rights or other contractual rights with respect to that property") makes clear that the Debtor does not want to talk about the actual purchase price. This intentionally vague statement suggesting that valuation of her asset is not possible defies logic and good faith [*See*, "Specific Disclosures" 2nd ¶ pg. 4].

The true need for these disclaimers becomes crystal clear when this Court reviews the Debtor's purported Schedules and Statements and compares same to the actual historical facts.

### 2.    The Debtor's Schedules of Assets

73.    It is literally a waste of time to review the purported "assets" of this Debtor. Between the disclaimers of all knowledge of the value of her assets and the twenty (20) categories of assets with "unknown" valued or the eight (8) times describing assets as $0.00, this Debtor whose assets she monetized in late 2013-early 2014 for $32,000,000.00 are nowhere to be found. This Debtor, who spent $75,000.00 on Chapter 7 bankruptcy advice, and even suggests that it would be just too expensive to have anyone appraise these values now claims to be literally broke, disclosing only $56,627.77 in asset value.

74.     Critically missing is any indication or even hint that there is $15 million in promissory notes from the Trump/Orly monetization of the TRI stock still being held, now by Mr. Bowen, a partner in Kasowitz and a partner of Herschmann.

### 3.    The Debtor's Schedule of Creditors – Nothing but Insiders

75.     It is, however, the Schedule of Creditors that illustrates the depth of deception of this Debtor's purported need for Chapter 7 bankruptcy protection.  After admittedly turning over almost $17 million to her father Arie in cash, she now schedules her father as a secured creditor for $5,451,389.27.  What could this Debtor possibly have received in fair equivalent value for these payments or this indebtedness ***totaling $22,451,389.27***?  The answer is, of course, nothing. She simply gave all of her monetized stock cash to her father as part of the fraudulent transfer scheme, planning all along to try and wait out the 6-year New York statute of limitations on fraudulent transfers, then file bankruptcy and walk away from her multi-million debts due her brother and mother.  But for the Southern District Federal Courts work and the Turnover Motion, the plan may have worked.

76.     Next, the Debtor schedules her husband as a secured creditor with a claim of $2,301,399.48, apparently legal fees incurred in the multiple losses at the courthouse involving the Debtor's failed litigation against her brother and mother, and the Trumps.  This Insider Claim deserves detailed scrutiny in any discharge arena.

77.     Next, is Kasowitz, Benson, Torres LLP, Herschmann's law firm, and again an Insider,[33] claiming still more legal fees for more losing litigation representation efforts, totaling

---

[33]     Herschmann is clearly an "insider" to the Debtor Orly, as her non-filing spouse.  Likewise, as a partners in the Kasowitch law firm, the law firm is an "insider" to Herschmann.  An "insider to an insider to the Debtor" is under § 101 is deemed an insider to the Debtor.   *In re Bos*, 561 B.R. 868, 885 n.69 (Bankr. N.D. Fla 2016) noted that "…an insider of an insider of the debtor is an insider of the debtor. *citing In re Parks*, 503 B.R. 820, 835 (Bankr. W.D. Wash. 2013) (holding that one-year preference period was applicable because individual was an insider of an insider as to the debtor). Horgan is an insider of Bos."  11 U.S.C.S. § 101(31)(E) also deems an "insider of an affiliate" to be an

$1,457,751.00 [the most recent loss on October 4, 2019, when Judge Jaffee denied this Trustee's ill-advised request (advised by one of the insiders at the Kasowitz firm) to reconsider her prior rulings, and sever Dalia out of that pending suit].

78.     Next is the Orly Genger Trust listed as an unsecured creditor with a claim "unknown".

79.     The Debtor does schedule the final judgments obtained by her brother, Sagi, totaling $3,219,693.00, but again only an insider or an affiliate of this insider TPR Investments Associates, Inc.  The Debtor does schedule with Dalia (her mother) and D&K GP, LLC an entity owned by her mother.

80.     The only non-insider, non-disputed claim creditor listed is Markel Surety for $750.00.  The Debtor scheduled is Zeichner Ellman & Krause, LLP for $448,310.98, again the Debtor's former lawyers who she dismissed three years ago and who have apparently made no effort to collect and has made assertions of malpractice arising from their services.

81.     In point of fact, the Debtor has no creditors that are not directly or indirectly tied to the underlying litigation pending in New York Courts to avoid a series of fraudulent conveyances made by the Debtor to frustrate Sagi's and Dalia's claims.

82.     The purpose of this bankruptcy filing thus is not to aid a good faith debtor in dealing with her debts and obtaining a fresh start.  Rather, it is to frustrate the efforts of one particular

---

insider "as if such affiliate were the debtor." *See, Sherron Assocs. Loan Fund XXI (Lacey) L.L.C. v. Thomas (In re Parks)*, 503 B.R. 820, 822 (Bankr. W.D. Wash. 2013).[1]

As noted in *Glassman v. Heimbach, Spitko & Heckman (In re Spitko)*, Nos. 04-18836bif, 05-0258, 2007 Bankr. LEXIS 2050, at *27 (Bankr. E.D. Pa. June 11, 2007) "[a]ttorneys have not generally been considered insiders of their debtor-clients. *(citations omitted)*.  Whenever an attorney has been found to be an extra-statutory insider, that status has been imposed because of a relationship with the debtor that transcended the normal attorney-client boundaries. *Compare In re Broumas,* 135 F.3d 769 (Table), 1998 WL 77842 (4th Cir. 1998) [published in full-text format at 1998 U.S. App. LEXIS 3070], (attorney is an insider); *In re Lemanski,* 56 B.R. 981 (Bankr. W.D. Wisc. 1986) (same); *In re Durkay,* 9 B.R. 58 (Bankr. N.D. Ohio 1981).

creditor, the Debtor's mother through her brother, to collect on a judgment which represents Orly's half of a financial commitment she made to support her estranged mother, out of the $32.3 million of equity proceeds cited above, and to deprive her mother of the expectancy of support that these multi-millions handed to her daughter.

83.     Prior to this Chapter 7 case, this Debtor and her insider-coconspirators have refused to produce "recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, …" and ignored subpoenas and numerous legitimate discovery requests requiring multiple court hearings, court orders, and

84.     When it appeared that the federal court in New York was on the cusp of entering a judgment setting aside the Debtor's fraudulent conveyances and encumbrances, thereby enabling her to pay her *bona fide* debts, the Debtor filed for bankruptcy in order to invoke the automatic stay and stop this from happening.  This filing is the poster-child for a bad faith filing, seeking manipulation of multiple courts and the entire bankruptcy process.

## V.
## RECOVERY COUNTS

### COUNT #1
### DENIAL OF DISCHARGE
### 11 U.S.C. §727(A)(3)

85.     Paragraphs 1-84 are incorporated herein for all purposes as if set out herein verbatim.

86.     11 U.S.C. 727(a) -- The court shall grant the debtor a discharge unless –

   (3) the debtor has concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information, including books, documents, records, and papers, form which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

87.     The Debtor has neither reference nor produced documents, nor disclosed in her Schedules or Statements of Affairs, the details of the transactions by which the Debtor cannot account for the use of more than $32 million.

88.     The foregoing facts illustrate that this Debtor has intentionally withheld, failed to disclose, and has hidden millions of dollars in financial transactions without documents to establish the actual and ultimate use of those funds, the names of the transferees of those funds, and the necessary detail.  Accordingly, the Debtor's discharge should be denied.

## COUNT #2
## DENIAL OF DISCHARGE
## 11 U.S.C. § 727(A)(5)

89.     Paragraphs 1-84 are incorporated herein for all purposes as if set out herein verbatim.

90.     Pursuant to 11 U.S.C. 727(a) -- The court shall grant the debtor a discharge unless

>   (5) the debtor has failed to explain satisfactorily, before the determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

91.     This is a text book story of fraud, deception, and deceit that has resulted in Debtor, living a multi-million dollar life style with her American Express Black Card (reserved only to the richest of citizens) claiming to be broke, to have lost all of her assets diminished from $32 million to less than $60,000.00, after paying her bankruptcy counsel $75,000.00 in legal fees to advice and file a Chapter 7 case.

92.     The foregoing facts illustrate that this Debtor has intentionally failed to explain at all, much less satisfactorily, the loss of her assets, and accordingly, the Debtor's discharge should be denied.

## COUNT #3

## DENIAL OF DISCHARGE
## 11 U.S.C. §727(a)(4)(A)

93.     Paragraphs 1-84 are incorporated herein for all purposes as if set out herein verbatim.

94.     Pursuant to 11 U.S.C. 727(a) – The court shall grant the debtor a discharge unless

> (4) the debtor knowing and fraudulently, in or in connection with the case –
> > (A) made a false oath or account.
> > …
> > (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

95.      The schedules and statements are materially false, misleading, deceptively vague and reflect an intentional false oath, disclaimed, of all things, in the very Schedules and Statements.

96.     The Debtor has testified under oath, both prior to the preparation of the Schedules and Statement, and after, that she does not know any details of her past transactions, no details of her assets that have been lost, no understanding of the values of her assets, and no idea of any of her current husbands assets.  The false schedules, coupled with the false swearing of no knowledge, defies credibility.

97.     Most importantly, this Debtor has hidden almost every critical document to the transaction dealing with the Monetization of the $32 million, hidden the use of those funds, and hidden information relevant to the discovery of these facts and accordingly, the Debtor's discharge should be denied.

## COUNT #4
## DENIAL OF DISCHARGE
## 11 U.S.C. §727(a)(3)

98.   Paragraphs 1-84 are incorporated herein for all purposes as if set out herein verbatim.

99.   Pursuant to 11 U.S.C. 727(a) -- The court shall grant the debtor a discharge unless

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

100.   The schedules and statements are materially false, misleading, deceptively vague and reflect an intentional false oath, disclaimed, of all things, in the very Schedules and Statements.

101.   This Debtor has hidden almost every critical document to the transaction dealing with the Monetization of the $32 million, hidden the use of those funds, and hidden information relevant to the discovery of these facts and accordingly, the Debtor's discharge should be denied.

### COUNT #5
### DENIAL OF DISCHARGEABILITY
### 11 U.S.C. §523a)(2)

102.   Paragraphs 1-84 are incorporated herein for all purposes as if set out herein verbatim.

103.   Pursuant to § 523(a) - A discharge under section 727, … of this title does not discharge an individual debtor from any debt—

> (2) for money, property, services, … to the extent obtained by—
>    (A) false pretenses, a false representation, or *actual fraud*, other than a statement respecting the debtor's or an insider's financial condition;

104.   This Debtor, with the full knowledge of her Trust's obligation and of the constructive trust on its assets to support the Debtor's mother (the actual source of the wealth of his Debtor) by actual fraud monetized the Trust's TPI stock, took the funds for her own use without the consent or participation of the Trustee Dalia, and fraudulently transferred these funds to and

for the benefit of her insider father (funds that her father had previously defrauded Dalia into signing the marital agreements (the Divorce Settlement and the Integrated Agreement) and transferring to Orly's trust. But for this fraud Dalia could have support and compliance with these Agreements; but for this fraud Dalia has no assets of the Trust or of Orly to look to.

105. This actual fraud was fraud by commission (including the Monetizing of the funds and the fraudulent transfer) and by omission (including the hiding of the Trump Settlement Agreement and its terms, and the conduct of Trust affairs by the Debtor to the exclusion of the actual Trustee), and accordingly, the Debtor's discharge should be denied.

### COUNT #6
### DENIAL OF DISCHARGEABILITY
### 11 U.S.C. §523(a)(4)

106. Paragraphs 1-84 are incorporated herein for all purposes as if set out herein verbatim.

107. Pursuant to § 523(a) - A discharge under section 727, … of this title does not discharge an individual debtor from any debt—

(4) for fraud … , embezzlement, or larceny;

108. This Debtor, with the full knowledge of her Trust's obligation and of the constructive trust on its assets to support the Debtor's mother (the actual source of the wealth of this Debtor) by actual fraud monetized the Trust's TPI stock, took the funds for her own use without the consent or participation of the Trustee Dalia, and fraudulently transferred these funds to and for the benefit of her insider father (funds that her father had previously defrauded Dalia into signing the marital agreements (the Divorce Settlement and the Integrated Agreement) and transferring to Orly's trust. But for this fraud Dalia could have support and compliance with these Agreements; but for this fraud Dalia has no assets of the Trust or of Orly to look to.

109.     This actual fraud was fraud by commission (including the Monetizing of the funds and the fraudulent transfer) and by omission (including the hiding of the Trump Settlement Agreement and its terms, and the conduct of Trust affairs by the Debtor to the exclusion of the actual Trustee), and accordingly, the Debtor's discharge should be denied.

## COUNT #7
## DENIAL OF DISCHARGEABILITY
## 11 U.S.C. §523(a)(6)

110.     Paragraphs 1-84 are incorporated herein for all purposes as if set out herein verbatim.

111.     Pursuant to § 523(a) A discharge under section 727, … of this title does not discharge an individual debtor from any debt—

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity

112.     Dalia had a property right and legal and equitable interest in the TPI Stock specifically encumbered with the obligations to of future support. This Debtor, with the full knowledge of her Trust's obligation and of the constructive trust on its assets to support the Debtor's mother (the actual source of the wealth of his Debtor) by actual fraud monetized the Trust's TPI stock, took the funds for her own use without the consent or participation of the Trustee Dalia, and fraudulently transferred these funds to and for the benefit of her insider father (funds that her father had previously defrauded Dalia into signing the marital agreements (the Divorce Settlement and the Integrated Agreement) and transferring to Orly's trust.  But for this fraud Dalia could have support and compliance with these Agreements; but for this fraud Dalia has no assets of the Trust or of Orly to look to.

113.     The destruction of the value of this property and the legal and equitable rights of Dalia in this property (including the constructive trust as well as the expectancy of future support

arising from these two marital agreements that funded and created the Orly Trust wealth, was

knowing, deliberate and intentional and accordingly, the Debtor's discharge should be denied.

**COUNT #8**
**DENIAL OF DISCHARGEABILITY**
**11 U.S.C. §523(a)(5), (15)**
**[Dalia Genger Only]**

114.    Paragraphs 1-84 are incorporated herein for all purposes as if set out herein

verbatim.

115.    Pursuant to § 523(a) A discharge under section 727, … of this title does not

discharge an individual debtor from any debt—

> (5)  for a domestic support obligation;
> …
> (15)  to a spouse, former spouse, or child of the debtor and not of the kind
> described in paragraph (5) that is incurred by the debtor in the course of a
> divorce or separation or in connection with a separation agreement, divorce
> decree or other order of a court of record, or a determination made in
> accordance with State or territorial law by a governmental unit;

116.    All of the wealth of the Orly Trust, which wealth was taken by the Debtor

individually, rose from two agreements already adjudicated by final judgments to have been all

part of the marital division of property and support promised by both Arie (in the Divorce

Settlement Agreement) and Orly (in the contemporaneous Integrated Agreement that allowed

receipt of Dalia's marital property in exchange for the Debtor's written promise and agreement).

This debt is entirely a Domestic Support Agreement and wholly non dischargeable.

117.    Accordingly, the Debtor's discharge should be denied.

**V.**
**CONCLUSION**

118.    Creditors Dalia Genger, and D&K GP LLC (on behalf of the Limited Partnership)

have been significantly defrauded by the wrongful and intentional conduct of the Debtor and her

insider-co-conspirators. The actions and conduct are remarkable in scope (loss of $32 million with no documents, no knowledge, while living a millionaires lifestyle, knowing that her mother Dalia Gender be deprived of her rights in her marital property in favor of the "entitlement" daughter and the ex-husband who clearly has taken the wealth of Dalia for his and his daughters own use. This is a case that has multiple reasons and clear evidence that support denial of the discharge of this Debtor.

WHEREFORE, Movants pray for the relief above requested and for such other and further relief that Movants, or any one of them, may be justly entitled, both at law and in equity.

Respectfully submitted,

_/s/ Shelby A. Jordan_
Shelby A. Jordan
Texas Bar No. 11016700
**JORDAN HOLZER & ORTIZ, P.C.**
500 N. Shoreline Blvd., Suite 900
Corpus Christi, Texas 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
sjordan@jhwclaw.com
**ATTORNEYS FOR DALIA GENGER AND D&K GP LLC**