**KELLEY DRYE & WARREN LLP**

A LIMITED LIABILITY PARTNERSHIP

**101 PARK AVENUE**

**NEW YORK, NY 10178**

—————

(212) 808-7800

WASHINGTON, DC

LOS ANGELES, CA

CHICAGO, IL

STAMFORD, CT

PARSIPPANY, NJ

—————

BRUSSELS, BELGIUM

—————

AFFILIATE OFFICE

MUMBAI, INDIA

FACSIMILE

(212) 808-7897

www.kelleydrye.com

JOHN G. DELLAPORTAS

May 13, 2019

**Via ECF**

Hon. Debra Freeman
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:     *Genger v. Genger*, 1:17-cv-08181-KBF-DCF

Dear Judge Freeman:

Judgment creditor Sagi Genger ("Sagi") respectfully submits this letter motion regarding its discovery dispute with non-party Kasowitz Benson & Torres LLP ("Kasowitz"). The parties have met and conferred telephonically on April 4, April 15, and May 6, 2019.

## STATEMENT BY SAGI GENGER

Pursuant to Fed.R.Civ.P. 37, Sagi respectfully brings this motion: (a) to compel Kasowitz to comply with two subpoenas served on the firm by Sagi (Exhs. A-B); and (b) to require Kasowitz to reimburse Sagi for the attorney's fees and expenses he has had to incur as a direct consequence of the firm's concealment of the March 31, 2017 Agreement among judgment debtor Orly Genger ("Orly"), her father Arie Genger ("Arie"), her husband Eric Herschmann, and her counsel, Kasowitz (the "2017 Agreement"). (Exh. C, submitted *in camera*.)

### False Statements Made Under Oath

As the Court is aware, Orly claims to be unable to pay the judgment in this case, despite having four Kasowitz partners (Messrs. Kasowitz, Benson, Bowen and Kurland) representing her. Meanwhile, there is $15 million still to be paid to Mr. Bowen, as payment agent, under the 2013 agreement by which Orly settled her claims against the Trump Group.

For more than eight months, Sagi has been trying to determine what arrangements, if any, have been made with respect to that $15 million. At his deposition, Kasowitz's Rule 30(b)(6) witness Michael Bowen testified that: "Orly has no claim to any of that money." Exh. D at 39. "[S]peaking on behalf of the firm," Mr. Bowen further testified that: "We don't have any information about any agreements between the AG Group" as to the $15 million. *Id.* at 29, 32. When asked to explain the basis of his testifying knowledge as a Rule 30(b)(6) witness, Mr.

**Exhibit A**

**K E L L E Y   D R Y E   &   W A R R E N** LLP

Hon. Debra Freeman
May 13, 2019
Page Two

Bowen responded that it was "protected work product," but that: "I am telling you and attesting under oath that I made reasonable inquiry. I don't mind telling you that reasonable inquiry would involve communications with Mr. Hirschman [sic]." *Id.* at 20-22.[1]

Kasowitz's testimony matches the interrogatory answer the firm signed in addition to Orly, who swore under oath that she had "no knowledge" when she was asked to "[i]dentify the amount, date, and recipient of all payments … to be made to any person or entity pursuant to Defendant's 2013 settlement." Exh. E. Similarly, at his 2018 deposition, David Broser, another signatory to the 2013 settlement (and a lifelong friend of Orly and Arie), expressly denied that any written agreement existed as to the $15 million. Exh. F at 13-14.

As it turns out, all of these sworn statements (and many others by counsel)[2] were <u>false</u>. Under the terms of the 2017 Agreement, which everyone denied existed, Orly (together with her father Arie) continues to joint control the $15 million still to be paid under the 2013 settlement. By the Agreement, Orly provides detailed written instructions as to what will become of that money. Most significantly, Orly directs that $2 million thereof will be sent directly to her husband, Mr. Herschmann, allegedly to repay a "loan" for legal services the parties described in their Premarital Agreement and elsewhere as "pro bono." (Exh. C.)

**Kasowitz's Concealment of the 2017 Agreement**

The critical 2017 Agreement was responsive to multiple document requests directed at both Orly and Kasowitz. To cite just one example, Request No. 1 of the September 17, 2018 Subpoena served on Kasowitz sought, *inter alia*: "All documents constituting, containing, reflecting or relating to any agreement or other financial arrangements involving Orly Genger and/or any group in which Orly Genger is a part." (Exh. A)

If Orly has produced the 2017 Agreement back in September when it was first sought, much of post-judgment discovery, and the attendant burdens on this Court, could have been avoided. It is no coincidence that the 2017 Agreement undercuts much of what Orly and her lawyers have told this Court post-judgment. Had it been timely produced, it surely would have been a central focus of depositions and other discovery. Unfortunately, Kasowitz did not produce the document until Sagi learned of its existence, and demanded it by name, which was only after Sagi had already deposed Kasowitz, Orly and Mr. Broser.

At a minimum, the 2017 Agreement should have been produced following this Court's January 8, 2019 discovery order, which required Orly to produce all documents relating to Orly's assets and liabilities. The 2017 Agreement relates to both.

---

[1]    We annex the entire deposition transcript hereto, highlighted so that the Court can see the lengths to which the witness went to avoid answering questions. (Exh. D.)

[2]    The District is not alone in being on the receiving end of misleading statements. The Second Circuit was told, in furtherance of Orly's appeal, that: "The remaining balance of $15 million … has nothing to do with Orly." Case 18-2471, Doc. 62, p. 25 of 32.

**Exhibit A**

**K E L L E Y   D R Y E   &   W A R R E N** LLP

Hon. Debra Freeman
May 13, 2019
Page Three

There could have been no misunderstanding on this point. As Your Honor will recall, Mr. Herschmann appeared before the Court at the January 8, 2018 conference, and argued – unsuccessfully – that Sagi is only "entitled to know what assets she has, right, and he's entitled to know what debts are due and owing to her. But if she owes additional debts, that's not relevant to the judgment creditor in collecting his judgment." (Exh. G at 60.) Clearly, Mr. Herschmann was trying to avoid having to produce the 2017 Agreement.

The Court rejected Mr. Herschmann's argument, finding the law to be the opposite. (Exh. G at 72.) That should have settled the matter, and the 2017 Agreement should have been produced at that time. There can be no question but that it was in Kasowitz's custody or control, as the firm drafted the document, which was signed by two Kasowitz partners (Mr. Herschmann on his own behalf and Michael Rosenbloom on behalf of the firm).[3] Yet, as late as March 19, 2019, Kasowitz still had not produced the document to Sagi, or even made him aware of its existence. Instead, it stood on its prior denials that any such agreement existed.

The only reason we even learned of the existence of the 2017 Agreement is because passing reference is made to it on Section 6(f) of the $2 Million December 31, 2016 promissory note between Orly and her husband. (Apparently, the draftsman—Kasowitz partner Michael Rosenbloom—did not notice the anachronism when he *backdated* the promissory note to make it appear to coincide with a much earlier payment Mr. Herschmann made to his firm.)

On March 19, 2019, we noticed the reference and immediately asked that the document be included in Arie Genger's document production, which was then impending. (Exh. H.) Lo and behold, the very next day, without our even asking them, Kasowitz, apparently realizing the gig was up, finally produced the 2017 Agreement. By that point, however, we had already taken the depositions of Kasowitz's Rule 30(b)(6) witness, David Broser, and Orly herself (the latter in Texas, at Orly's insistence). All those depositions need to be repeated.

In our April 15 telephone conference, when I asked Mr. Bowen why he had testified that no such agreement existed, he told me he was unaware of the 2017 Agreement at the time of his deposition. (Yet despite our request, he never submitted an errata sheet for his transcript.) Accepting Mr. Bowen's denial, that necessarily means Mr. Bowen's partners at Kasowitz—two of whom, as noted above, are actual signatories to the 2017 Agreement—concealed this critical piece of evidence from him so as to dupe him into giving false testimony.

In our May 6 telephone conference, Mr. Bowen added that any added expense to Sagi was his own fault, for taking depositions before he had all the documents. Obviously, we disagree with the notion that subpoenaed parties can make false statements under oath, violate court orders, and then impose the cost of that wrongdoing on the victim.

---

[3]     With the benefit of hindsight, Mr. Herschmann's post-hearing insistence that he not be identified as Orly's counsel—notwithstanding introducing himself at the hearing as "Eric Herschmann on behalf of Orly Genger"—may be attributable to a desire to avoid the full consequences of his firm's non-compliance with the Court' discovery order.

**Exhibit A**

**K E L L E Y   D R Y E   &   W A R R E N**  LLP

Hon. Debra Freeman
May 13, 2019
Page Four

### Requested Remedy

As noted above, Sagi will need to take further discovery from its signatories about the 2017 Agreement, as well about the backdating of the $2 million Promissory Note which the 2017 Agreement revealed. At this juncture, it appears to us that Orly, her husband/law firm, and her father have conspired to create an elaborate scheme to try to render Orly judgment-proof, so that she might avoid honoring her liability to Sagi. Perhaps most telling, Mr. Herschmann filed a lien against all of Orly's assets on May 10, 2017, just a few days after Judge Gammerman issued a ruling completely rejecting Orly's $85 million damages claim against Sagi (the litigation claim Orly has frequently claimed would more than "offset" any liability to Sagi).

Before bringing this motion, Sagi tried to get this information by serving a new subpoena on Kasowitz (Exh. B) seeking, *inter alia,* transmittals and internal communications which would show the actual dates on which the critical documents were prepared, executed and delivered (as opposed to their nominal dates), as well as the reasons for their creation and backdating. Although Kasowitz produced certain metadata in response, it has withheld critical transmittals and internal communications, claiming they are all "privileged."

At this point, in order to untangle the various suspect transactions between the judgment debtor and her husband and father, Sagi seeks two forms of relief:

<u>First</u>, we ask for an order compelling Kasowitz to make a complete document production in response to the two subpoenas. Kasowitz never served timely written objections to the first subpoena, so any objections to the first subpoena are waived. As for the second subpoena, any privileged objections should be logged, as Fed.R.Civ.P. 26(b)(5)(A)(ii) requires, so that they can be put to an *in camera* inspection if needed. Preliminarily, we do not believe that Orly/Kasowitz, having tried to pass off backdated documents as legitimate, and having given false testimony under oath, can claim any valid privilege.[4] However, the issue is not yet ripe, as Kasowitz refuses even to identify the documents on which it claims privilege.

<u>Second</u>, now that the 2017 Agreement has finally been produced, Sagi will need to re-depose Kasowitz and Orly about these matters. (We recently completed the re-deposition of Mr. Broser.) Pursuant to Fed.R.Civ.P. 37(b)(2)(C), we ask that the Court order Kasowitz to reimburse Sagi for his attorney's fees and expense associated therewith, and direct those depositions take place promptly and in New York. In the alternative, pursuant to Fed.R.Civ.P. 37(b)(2)(A), Orly/Kasowitz/Herschmann should be precluded from trying to interpose this alleged debt in a manner that would impede judgment collection.

---

[4]     The attorney-client privilege does not shield information relating to, *inter alia*, fraudulent conveyances, perjury, or other litigation misconduct. *See United States v. Barrier Indus.,* 1997 U.S. Dist. Lexis 318, *8 (S.D.N.Y. Jan. 17, 1997); *Shahinian v. Tankian*, 242 F.R.D. 255, 258 (S.D.N.Y. May 7, 2007); *Zimmerman v. Poly Prep Country Day Sch.,* 2012 U.S. Dist. Lexis 78816, **29-30 (E.D.N.Y. June 6, 2012).

**Exhibit A**

**K E L L E Y   D R Y E   &   W A R R E N** LLP

Hon. Debra Freeman
May 13, 2019
Page Five

<u>**STATEMENT BY KASOWITZ BENSON**</u>

      [Kasowitz Benson has declined to provide its own statement, claiming we insufficiently met and conferred on this discovery dispute.  Attached hereto as Exhibit I is my declaration detailing the month-long meet-and-confer process that preceded this letter motion.]

                         Respectfully submitted,

                         John Dellaportas

Encls.

cc:  All Counsel of Record

**Exhibit A**

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| SAGI GENGER | ) |
| *Third-Party*  Plaintiff | ) |
| v. | ) |
| ORLY GENGER | ) |
| | ) |
| *Third-Party Defendant* | ) |

Civil Action No.  1:17cv8181

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:   Kasowitz Benson & Torres LLP, 1633 Broadway, New York, NY 10019

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

Please see Exhibit A

| Place: | Kelley Drye & Warren LLP | Date and Time: | |
|---|---|---|---|
| | 101 Park Avenue, 27th Fl, New York, NY 10178 | October 5, 2018 | 9:00 am |

The deposition will be recorded by this method:   Stenographically and Videotape

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

Please see Exhibit A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   September 17, 2018

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | /s/ John Dellaportas |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Sagi Genger
_____, who issues or requests this subpoena, are:

John Dellaportas, Kelley Drye & Warren LLP, 101 Park Avenue, 27th Fl, New York, NY 10178
jdellaportas@kelleydrye.com, (212) 808-5000

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

**Exhibit A**

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 14-cv-5683

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

**Exhibit A**

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Exhibit A

## EXHIBIT A

## DESCRIPTION OF UNPAID JUDGMENT PURSUANT TO CPLR 5223

In an action in the United States District Court for the District of New York (Case No. 14-cv-5683) (KBF)(DF)) between plaintiff Sagi Genger ("Sagi") and defendant Orly Genger ("Orly"), an Amended Judgment was entered on  August 17, 2018    in favor of Sagi, judgment creditor, and against Orly, judgment debtor, in the amount of $ 3,219,698 , of which $3,219,698 + interest remains due and unpaid.  Pursuant to NY CPLR 5223, false swearing or failure to comply with this subpoena is punishable as contempt of court.

## DOCUMENT REQUESTS AND SUBJECT MATTER OF TESTIMONY

1. All documents constituting, containing, reflecting or relating to any agreement or other financial arrangements involving Orly Genger and/or any group in which Orly Genger is a part.

2. All documents concerning any property held by or debts owed to Orly Genger.

3. All documents relating to: (A) the Settlement Agreement dated June 16, 2013 among Orly Genger, Arie Genger, Arnold Broser, David Broser, and Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Trans-Resources, LLC, Jules Trump, Eddie Trump and Mark Hirsch (the "Orly Settlement Agreement"); (B) any escrow accounts/arrangements ; and/or (C) any promissory notes issued thereunder.

4. All documents concerning the attached Stipulation and/or the attached First Amendment to Stipulation and Release.

5. All agreements as to the past, present or future disposition of any settlement proceeds under the Orly Settlement Agreement.

6. All account statements for any escrow accounts related to the Orly Settlement Agreement.

7. All documents concerning any indemnity demands and/or indemnity payments made under the Orly Settlement Agreeement.

8. All payments made to any person or entity pursuant to the Orly Settlement Agreement.

9. All non-privileged communications regarding any of the foregoing subjects.

**Exhibit A**

## STIPULATION

The undersigned counsel, on behalf of their respective parties, hereby stipulate and agree as follows:

1.    Reference is made to the Settlement Agreement and Release entered into as of June 16, 2013 (the "Agreement"), by and between (1) Arie Genger, (2) Orly Genger (in her individual capacity and as beneficiary of the Orly Genger 1993 Trust), (3) Arnold Broser, (4) David Broser (the first four parties collectively known as "AG Group"); and (5) TR Investors, LLC, (6) Glenclova Investment Co., (7) New TR Equity I, LLC, (8) New TR Equity II, LLC, (9) Trans-Resources, LLC, (10) Jules Trump, (11) Eddie Trump, and (12) Mark Hirsch (the remaining parties collectively known as the "Trump Group", and together with the AG Group, the "Parties").

2.    Each of the Parties to the Agreement hereby stipulate and agree to permit Bill Wachtel and his law firm to resign as attorney payee for the AG Group and to permit Michael Paul Bowen of the law firm Kasowitz Benson Torres LLP to be substituted as attorney payee for the AG Group for purposes of the Agreement and agree that they will execute the First Amendment to Settlement Agreement and Release in a form substantially similar to the attached.

DATED:   May 25, 2017

For TRUMP GROUP:

By: _____

For AG GROUP:

By: _____

For WILLIAM B. WACHTEL and
WACHTEL MISSRY LLP (FORMERLY,
WACHTEL, MASYR & MISSRY, LLP):

By: _____

,Upon return of the Notes (as defined in the Agreement) to the Trump Group, the Parties

**Exhibit A**

Case 1:17-cv-08181-VSB-RCF  Document 209-1  Filed 05/13/19  Page 6 of 10

## FIRST AMENDMENT TO SETTLEMENT AGREEMENT AND RELEASE

Reference is made to the Settlement Agreement and Release entered into as of June 16, 2013 (the "Agreement"), by and between (1) Arie Genger, (2) Orly Genger (in her individual capacity and as beneficiary of the Orly Genger 1993 Trust), (3) Arnold Broser, (4) David Broser; and (5) TR Investors, LLC, (6) Glenclova Investment Co., (7) New TR Equity I, LLC, (8) New TR Equity II, LLC, (9) Trans-Resources, LLC, (10) Jules Trump, (11) Eddie Trump, and (12) Mark Hirsch (collectively, the "Parties").

**WHEREAS**, Section 3 of the Agreement directs that certain payments under the Agreement are to be made to certain of the Parties designated in that Agreement as the "AG Group" by making said payments to "Wachtel" (as defined in the Agreement) as attorney for the AG Group;

**WHEREAS**, the AG Group has decided that the payments to be made under Section 3 of the Agreement are to be made to new counsel for the AG Group; and,

**WHEREAS**, the Parties agree to modify the Agreement pursuant to Section 17 of the Agreement;

**IT IS HEREBY AGREED THAT**:

1.      All references to "Wachtel" in the first sentence of Section 3 of the Settlement Agreement, titled "Further Consideration from the Trump Group," are deleted, and in their place, the following is inserted:

> Michael Paul Bowen, of the law firm Kasowitz Benson Torres LLP ("KBT")
> (via wire transfer to the KBT Firm's escrow account, or as directed by Bowen
> or KBT).

**Exhibit A**

2.    All other terms of the Agreement, including the remainder of Section 3, shall remain unchanged, and in full force and effect.

3.    The Trump Group shall execute and issue amended Subrogated Notes that reflect the change noted in paragraph 1, above.  Upon execution of this Agreement, the previously issued Subordinated Notes payable to the AG Group, which designate Wachtel, Masyr & Missry, LLP, as payee are null and void.

4.    This agreement may be executed in multiple counterparts and by fax or PDF, each of which, when so executed and delivered, shall be considered an original, but such counterparts shall together constitute one and the same instrument agreement.

[signature pages follow]

2

**Exhibit A**

IN WITNESS WHEREOF, the Parties have caused this First Amendment to the Settlement Agreement to be duly executed as follows:


**TR Investors, LLC**                         **Arie Genger**


By: _____        _____


Name: _____

                                                  Date: _____

Title: _____


Date: _____

**Glenclova Investment Co.**              **Orly Genger (in her individual capacity
                                          and in her capacity as beneficiary of the
                                          Orly Genger 1993 Trust)**


By: _____


Name: _____         _____


Title: _____         Date: _____


Date: _____

3

**Exhibit A**

**New TR Equity I, LLC**

By: _____

Name: _____

Title: _____

Date: _____

**New TR Equity II, LLC**

By: _____

Name: _____

Title: _____

Date: _____

**Trans-Resources, LLC**

By: _____

Name: _____

Title: _____

Date: _____

**Arnold Broser**

_____

Date: _____

**David Broser**

_____

Date: _____

4

**Exhibit A**

Jules Trump

_____

Date: _____

Eddie Trump

_____

Date: _____

Mark Hirsch

_____

Date: _____

5

**Exhibit A**

# Exhibit C

## To be submitted *in camera*

## In the Matter Of:

SAGI GENGER -v- ORLY GENGER

1:17cv8181

## MICHAEL PAUL BOWEN

*October 05, 2018*



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit A

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   --------------------------------------------

3   SAGI GENGER,

4                        Third-Party Plaintiff,

5            -v-      Civil Action No. 1:17cv8181

6   ORLY GENGER,

7                        Third-Party Defendant.

8   --------------------------------------------

9

10              DEPOSITION OF MICHAEL BOWEN, a Witness

11   herein, taken by the Plaintiff, at the offices of

12   KELLEY DRYE & WARRREN LLP, 101 Park Avenue, 27th

13   Floor, New York, New York 10178, on Friday, October

14   5, 2018, at 10:00 a.m., before Jeffrey Shapiro, a

15   Shorthand Reporter and notary public, within and

16   for the State of New York.

17

18

19

20

21

22

23

24

25
```



**Exhibit A**

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                          2

```
 1   A P P E A R A N C E S :

 2   KELLEY DRYE & WARREN LLP

 3   Attorneys for SAGI GENGER

 4   101 Park Avenue, 27th Floor

 5   New York, New York 10178

 6   BY:  JOHN DELLAPORTAS, ESQ.

 7

 8

 9   Also Present:

10   Sagi Genger

11

12                    ***

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Exhibit A

```
1
2
3        IT IS HEREBY STIPULATED AND AGREED by
4   and between the attorneys for the respective
5   parties hereto, that the filing, sealing and
6   certification be, and the same are hereby waived;
7
8        IT IS FURTHER STIPULATED AND AGREED
9   that all objections, except as to the form of the
10  questions, shall be reserved to the time of the
11  trial;
12
13       IT IS FURTHER STIPULATED AND AGREED
14  that the within examination may be subscribed and
15  sworn to before any notary public with the same
16  force and effect as though subscribed and sworn to
17  before this Court.
18
19
20
21
22
23
24
25
```



**Exhibit A**

```
 1  Whereupon,

 2                        MICHAEL BOWEN,

 3  after having been first duly sworn, was examined

 4  and testified as follows:

 5                     DIRECT EXAMINATION

 6  BY MR. DELLAPORTAS:

 7          Q.    State your name for the record.

 8          A.    Michael Paul Bowen.

 9          Q.    What is your address?

10          A.    My work address is 1633 Broadway, New

11   York, New York 10019.

12                (Exhibit 1 was so marked for

13                 identification.)

14  BY MR. DELLAPORTAS:

15          Q.    Good morning, Mr. Bowen.

16          A.    Good morning.

17          Q.    So I've marked as Exhibit Kasowitz 1,

18   the subpoena in this case for Kasowitz Benson &

19   Torres, LLP.

20          Mr. Bowen, you're here as the corporate

21   witness for Kasowitz Benson & Torres, LLP?

22          A.    Yes.  The witness for the entity

23   Kasowitz, Benson, & Torres.

24          Q.    And if I just refer to it for

25   shorthand as Kasowitz, you will know I'm referring
```



**Exhibit A**

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                          5

```
 1                        Bowen
 2   to the firm?
 3          A.    Sure or KBT.
 4          Q.    Yeah, I'll never remember that.
 5   Let's go with Kasowitz, but you can refer to it as
 6   KBT if you prefer.
 7        So you have a subpoena in front of you?
 8          A.    I do.
 9          Q.    If you can turn to Exhibit A.
10          A.    Yes.
11          Q.    And, specifically, the document
12   request on subject matters?
13          A.    Yes.
14          Q.    Do you see numbers one through nine?
15          A.    Correct.
16          Q.    Did you undertake a search on behalf
17   of the firm to see what documents you had?
18          A.    Yes.
19          Q.    And can you describe that search or
20   that process?
21          A.    I made a reasonable inquiry and also
22   used my own intimate knowledge of the firm's role
23   in connection with all things Genger.
24          Q.    And you have produced in response to
25   that one document entitled, "First Amendment to
```



Exhibit A

```
 1                        Bowen
 2    Settlement Agreement and Release"; is that
 3    correct?
 4            A.    Correct.  And I think that's
 5    responsive to Request No. 4.
 6                  MR. DELLAPORTAS:  Okay.  So let's
 7            mark that as Kasowitz Exhibit 2.
 8                  (Exhibit 2 was so marked for
 9            identification.)
10    BY MR. DELLAPORTAS:
11            Q.    So, other than this, you have no
12    responsive documents?
13            A.    That's correct.
14            Q.    Was anything withheld on privilege
15    grounds?
16            A.    Yes and no.  Excuse me.
17          Yes and no, because the primary objection is
18    relevance, although some documents that we deemed
19    irrelevant would also be privileged or at least
20    some of them are.
21            Q.    And when you say the primary
22    objection, where were those objections interposed?
23            A.    We can go through them all, but if
24    you take No. 4 as an example, "All documents
25    concerning the attached stipulation and the
```



Exhibit A

```
 1                          Bowen

 2    attached first amendment to stipulation and

 3    release," that would involve documents, for

 4    example, of e-mail of either drafting this thing

 5    or circulating it for signature.  And in our view

 6    that's irrelevant.

 7          Q.    Why is that irrelevant in your view?

 8          A.    It's irrelevant because it has

 9    nothing to do with identifying assets that belong

10    to Orly Genger or assets that are to be paid to

11    Orly Genger.

12          Q.    And has Kasowitz served any written

13    objections in response to the subpoena?

14          A.    No.  We are interposing the

15    objections orally.

16          Q.    So why don't we go through and you

17    can tell me what specifically are your objections?

18    Let's start with No. 1 -- if any.

19          A.    Well, we object to it as overbroad

20    and irrelevant because, again, to the extent the

21    firm has any knowledge of any agreements where

22    Orly Genger owes money or is a debtor, it's

23    irrelevant to property that -- or assets that she

24    owns or that are to be paid to her.  So it's

25    beyond the scope of Article 52.
```

| | |
|---|---|
| 1 | Bowen |
| 2 | On the other hand, if there are documents or |
| 3 | agreements that reflect assets owned by Orly |
| 4 | Genger or that are to be paid to Orly Genger, that |
| 5 | would be responsive and we think relevant and we |
| 6 | undertook a search for that and there are none. |
| 7 | Q.    Okay.  Number 2.  Do you have |
| 8 | objections to No. 2? |
| 9 | A.    No.  I think that's completely |
| 10 | responsive.  That states, quote, "All documents |
| 11 | concerning any property held by or debts owed to |
| 12 | Orly Genger."  We -- the firm has no documents |
| 13 | responsive to that, but we interpose no objection |
| 14 | to that. |
| 15 | Q.    Okay.  What about No. 3?  Any |
| 16 | objections to that? |
| 17 | A.    "All documents relating to the |
| 18 | settlement agreement -- " Right. |
| 19 | Well, we object to you using the phrase |
| 20 | "Orly Settlement Agreement" to define that because |
| 21 | it's misleading and confusing.  It's not an Orly |
| 22 | Settlement Agreement.  What you are referring to |
| 23 | is a settlement agreement between the AG Group and |
| 24 | the Trump group and it's usually referred to as |
| 25 | the "AG/Trump Settlement Agreement." |



Exhibit A

```
 1                          Bowen

 2         And because of that agreement or, quote,

 3    unquote, "all documents relating to that

 4    agreement," has nothing to do with property owned

 5    by Orly Genger or property or assets to be paid to

 6    Orly Genger.  That entire request, at least

 7    Subpart A, is irrelevant.

 8         Q.    Why in your -- I'm sorry.  I didn't

 9    mean to cut you off.

10         A.    Okay.  Subpart B, "any escrow

11    accounts, arrangements, to the extent that it was

12    for the benefit of Orly Genger" meaning the escrow

13    assets belong to her or are to be paid to her, we

14    deem that relevant and would produce responsive

15    documents if any, but I can attest today that

16    there are none.

17         And the same with Subsection C, "any

18    promissory notes issued thereunder."  So if there

19    were any promissory notes in the possession,

20    custody, or control of Kasowitz that were payable

21    to Orly Genger or reflected assets that she owns

22    or that are due to be paid to her, we'd deem that

23    responsive and would produce any documents if any.

24    But I can attest here today that we are in

25    possession of none; no such documents.
```

Exhibit A

```
 1                          Bowen
 2          Q.    Okay.  We'll circle back to that.
 3    Let's move on.  Let's go through the list first.
 4          A.    Okay.  Number 4, I have already spoke
 5    about unless you want me to reiterate it.
 6          Q.    So you have given us the first
 7    amendment and the stipulation itself, but you
 8    haven't given us any documents related to what you
 9    are interposing and irrelevance objection?
10          A.    Correct.
11          Q.    Number 5?
12          A.    Which states, quote, "All agreements
13    as to the past, present, or future disposition of
14    any settlement proceeds under the Orly settlement
15    agreement," close quote.
16          Again, we object to that phrase Orly
17    settlement agreement as misleading and potentially
18    misleading and potentially false.
19          But if you are referring to the AG/Trump
20    Settlement Agreement, which we think you are, if
21    there were agreements that reflected assets owned
22    by Orly or to be paid to Orly under that
23    settlement agreement or in relation to that
24    settlement agreement, that's relevant in our view
25    and we would produce such documents if any
```



**Exhibit A**

```
 1                        Bowen
 2   existed.  And we did search for such documents,
 3   but I can attest, on behalf of the firm, there ae
 4   no such documents in our possession, custody, or
 5   control.
 6          Q.    Let's go to No. 6.  Any objections to
 7   that?
 8          A.    Quote, "all accounts, statements for
 9   any escrow accounts related to the" -- what you
10   call the "Orly Settlement Agreement."
11          Again, the same objection as misleading,
12   intentionally so, but the AG/Trump Settlement
13   Agreement.  If there were account statements for
14   escrow accounts that reflected assets owned by
15   Orly or to be paid to Orly Genger, we would
16   produce those, but I can attest that we're not,
17   you know, we're not in custody, possession, or
18   control of any such accounts.
19          In fact, I don't mind telling you that we
20   are not in possession, custody, or control of any
21   account statements or any escrow accounts relating
22   to the AG/Trump Settlement Agreement, period.
23          Q.    Okay.  Number 7.  Do you have any
24   objection to that?
25          A.    Quote, "All documents concerning any
```

```
 1                         Bowen

 2   indemnity demands and/or indemnity payments made

 3   under the Orly settlement agreement."  The same

 4   objection as using that phrase to be potentially

 5   misleading.

 6        We read that as referring to the AG/Trump

 7   Agreement.  It is kind of a vague, ambiguous

 8   objection there.  I'm not really sure what you are

 9   asking.  Maybe you can clarify that today, but I

10   can say we're not aware of any -- the firm is not

11   aware of indemnity demands and/or indemnity

12   payments related to the AG/Trump Settlement

13   Agreement period.

14        But we would deem, if we were aware or had

15   such documents and they reflected Orly's assets or

16   assets to be paid to Orly, we would deem that

17   relevant and responsive.

18        But like I said, I can go beyond that and

19   say we are not aware of any indemnity demands,

20   period.  But that is subject to you clarifying

21   what you really meant by that.  I may be

22   misinterpreting that.

23        Q.   We will come back to that, let's just

24   get through our list.

25        Number 8.  Any objections to that?
```



```
 1                        Bowen

 2          A.     Quote, "All payments made to any

 3   person or entity pursuant to the Orly Settlement

 4   Agreement."  The same objection as intentionally

 5   misleading by referring to it as the "Orly

 6   Settlement Agreement" it is the AG Group/Trump

 7   Group Settlement Agreement.

 8          With that understanding, if we had records,

 9   meaning the firm, of payments to Orly or that were

10   to be paid to Orly in relationship to that -- in

11   relation to that particular settlement agreement,

12   but this is also subsumed under your first

13   request, those documents, in our view, would be

14   responsive and relevant and we would produce them,

15   if any.

16          To the extent that you are asking about

17   other people that -- that are not Orly or that

18   don't reflect assets owned by her or to be paid to

19   her, we would object that that is beyond the scope

20   of Article 52 and irrelevant and not responsive.

21          Having said all of that, on behalf of the

22   firm, I can attest that there are -- the firm is

23   in possession of no records whatsoever of any

24   payments made under this AG/Trump Settlement

25   Agreement.
```



**Exhibit A**

```
 1                          Bowen

 2          Q.    Lastly, No. 9, "All non privileged

 3   communications regarding any of the forgoing

 4   subjects."

 5          A.    Everything I said previously would

 6   apply to that.

 7          Q.    Incorporate all of your prior

 8   objections?

 9          A.    Right.  Obviously, you're -- you're

10   subpoenaing a law firm that represents Orly

11   Genger.  Every single one of these requests could

12   impinge upon privilege; so it could be the case

13   that there are e-mails and other types of

14   documents that would be attorney-client privilege

15   and work-product privilege, and we're not

16   undertaking to do a log because we think that is

17   overly burdensome and bordering on harassment.

18          And when you subpoena a law firm that

19   represents a person that you are adverse to, I

20   assume you're expecting a lot of it to be

21   privileged.

22          Q.    So, other than what you have just

23   stated, does Kasowitz have any further objections

24   to Nos. 1 through 9?

25          A.    I don't think so.
```



Exhibit A

MICHAEL PAUL BOWEN                                October 05, 2018
SAGI GENGER -v- ORLY GENGER                                    15

| 1  | Bowen |
|----|-------|

 2        Q.    Let's go back to No. 7, because that

 3   one, I think, you asked for clarification on?

 4        A.    Correct.

 5        Q.    Have you read the -- what you refer

 6   to as the AG/Trump Settlement Agreement?

 7        A.    Only in part and a long time ago.

 8        Q.    Okay.  Are you aware that there are

 9   two promissory notes that were issued pursuant to

10   the Trump Group -- AG/Trump Group Settlement

11   Agreement for $7.5 million each?

12        A.    There are promissory notes by the

13   Trump Group if I am remembering correctly, yes.

14        Q.    Okay.  And those payments, to the

15   best of your knowledge, have not been made yet;

16   correct?

17        A.    To the best of the firm's knowledge

18   -- I mean, the firm had no knowledge of that

19   whatsoever.

20        Q.    Okay.  Do you recall in reading the

21   agreement that the Trumps have certain rights to

22   deduct defense costs and other related legal costs

23   for indemnification and whatnot?

24        A.    Correct, yes.

25        Q.    From those ultimate payments of $15



Exhibit A

```
 1                        Bowen
 2    million?
 3          A.    That's my understanding, yes.
 4          Q.    Okay.
 5          A.    And when I say "my" I mean on behalf
 6    of the firm.
 7          Q.    Yeah.  I'll just -- everything from
 8    this point forward, I will have an understanding
 9    if you say "my" you mean the firm and if I say
10    "you" I mean the firm.
11          A.    If there are any singular pronouns, I
12    mean, I'm speaking with the royal we.
13          Q.    Yeah.  I'll assume the royal we
14    unless you specify other words and you can assume
15    from me the royal we unless I specify you
16    personally?
17          A.    Understood.
18          Q.    So with that clarification, do you
19    have any documents responsive to that demand?
20          A.    Well, with that clarification, the
21    firm is unaware of any documents relating to those
22    two promissory notes or the Trump Group's claim of
23    offset on promissory notes that relate to assets
24    owned by Orly or to be paid to Orly.
25          Q.    Okay.  So you have intentionally
```



Exhibit A

```
 1                        Bowen
 2   narrowed the request to your view of anything
 3   that's relating to payments to be made to Orly?
 4           A.    Or that reflects assets she owns.
 5           Q.    Okay.  And why in your view would
 6   indemnity demands by the Trump Group not relate to
 7   any assets owned by Orly or to be paid to Orly?
 8           A.    You are dealing with the scope of the
 9   firm's understanding of this, so with that caveat,
10   the payments that are due under the AG/Trump
11   Settlement Agreement, and under those two
12   promissory notes, are to the AG Group and not to
13   Orly.
14           Q.    Okay.
15           A.    If there is some arrangement within
16   the AG Group that allocates any portion of the
17   payments to Orly, the firm is unaware of it.
18           Q.    Is the firm aware of any arrangement
19   with respect to the payment of the remaining
20   proceeds at all?
21           A.    My hesitation in answering that
22   question is that it may be impinging on privileged
23   information.  To the extent that we have that
24   information, it would be in the attorney-client
25   relationship with Orly.  And I'm not at liberty to
```

MICHAEL PAUL BOWEN                                October 05, 2018
SAGI GENGER -v- ORLY GENGER                              18

```
 1                       Bowen

 2    waive privilege, so I would assert privilege as to

 3    that question on behalf of Orly Genger as the

 4    owner of the privilege.

 5           Q.    Well, you declined to produce

 6    documents responsive to our requests on the ground

 7    that Kasowitz affirmatively takes the position

 8    that there is no arrangement that Orly will get

 9    any of that money.  Do I understand that

10    correctly?

11           A.    No.  You misstated my testimony.

12    It's not that we affirmatively understand that

13    Orly is not getting any of that money, it's that

14    the Kasowitz has no information.

15           Q.    Does that include Mr. Hirschman when

16    you say, "Kasowitz has no information"?

17           A.    Well, Mr. Hirschman is Orly Genger's

18    spouse, so he may have information qua spouse, but

19    not as a partner in the firm.  And I frankly don't

20    know what is in his head.

21           Q.    Okay.  So nobody in -- in making the

22    decision not to produce documents responsive to

23    this request on the ground that Orly wasn't

24    getting any of the money, nobody asked

25    Mr. Kasowitz as to his knowledge of the ultimate
```

```
 1                   Bowen
 2   disposition of the $15 million?  I'm sorry,
 3   Mr. Hirschman?
 4        A.    I understood you meant Mr. Hirschman.
 5        Well, I'm not going to get into any
 6   methodology that I used in preparing for the
 7   deposition because that's privileged work product.
 8   I am testifying under oath that I made a
 9   reasonable inquiry and a reasonable search.  And
10   your question was -- I'm sorry.  I lost your
11   question.
12        Q.    In deciding not to produce documents
13   responsive to the subpoena on the ground that they
14   do not relate to payments ultimately to be made to
15   Orly Genger, did the firm inquire with its
16   partner, Mr. Hirschman, to confirm that in fact
17   none of the $15 million will ultimately be paid to
18   Orly Genger?
19        A.    Well, without specifying what
20   methodology I used to gather information
21   responsive to this subpoena, and to make decisions
22   about what is and is not responsive, I can testify
23   that to firm's understanding and to the firm's
24   knowledge, none of that money belongs to or is to
25   be paid to Orly Genger.
```



Exhibit A

MICHAEL PAUL BOWEN                                      October 05, 2018
SAGI GENGER -v- ORLY GENGER                                         20

```
 1                         Bowen
 2        Q.    And is your position driven by the
 3   fact that on the face of the agreement it says
 4   that the money is to be paid to something called
 5   the "AG Group"?
 6        A.    I don't understand your question.
 7        Q.    What is the basis of your
 8   understanding that none of the money is to be paid
 9   to Orly Genger?
10        A.    The basis for the firm's
11   understanding is the knowledge, institutional
12   knowledge, that we have based on our review of
13   documents, some of which are privileged, and my
14   reasonable inquiry of the lawyers at the firm that
15   have been involved in the Genger matter since the
16   firm was originally involved.
17        And if you are asking me did we make some
18   kind of interpretation and are we just basing this
19   on the interpretation of one document, the answer
20   is no.
21        Q.    Okay.  And circling back to my
22   question:  Did anyone inquiry of Mr. Hirschman
23   about that?
24        A.    I'm not going to answer any questions
25   about methodology that I used on behalf of the
```



Exhibit A

```
 1                         Bowen
 2    firm to be prepared to answer questions today
 3    because that's a protected work product.  But I am
 4    telling you and attesting under oath that I made
 5    reasonable inquiry.  I don't mind telling you that
 6    reasonable inquiry would involve communications
 7    with Mr. Hirschman.
 8            Q.    Is Mr. Hirschman currently a partner
 9    in the firm?
10            A.    Yes.
11            Q.    Is he an equity partner?
12            A.    I don't know what you mean by that.
13    I'm not sure what that means at my firm.  Now I'm
14    speaking personally, not on behalf of the firm.
15    The firm knows.
16            I did not do any reasonable inquiry on that
17    particular question, so I don't know the answer to
18    that.
19            Q.    Okay.
20            A.    It's beyond the scope.
21            Q.    Well, you know, every firm organizes
22    their partnership different from every other firm,
23    but in some cases the title "partner" is just a
24    title and in other cases it implies what I view as
25    more of an actual partnership which is an
```

ESQUIRE
DEPOSITION SOLUTIONS

Exhibit A

```
 1                      Bowen
 2   ownership, and they share the profits and what
 3   have you.  So I don't know how Kasowitz organizes
 4   things, but to that extent, would you view
 5   Mr. Hirschman as a either an equity partner or a
 6   true partner or a profit sharing partner?
 7          A.   That is beyond the scope of what I'm
 8   prepared to attest to on behalf of the firm.  I
 9   honestly don't know the answer to that question.
10          Q.   Okay.  So who, in your view, is the
11   $15 million to be paid to?
12          A.   Well, the view of the firm is that
13   the money is to be paid into -- into, I guess, a
14   trust or into an escrow -- I forget how the
15   wording works -- into an escrow that's to be held
16   by me personally and in -- I shouldn't say
17   personally, but me in my capacity as partner with
18   the Kasowitz firm.  But the disposition of that
19   money, once -- if it is ever received -- is up to
20   the AG Group.
21          Q.   When you say, "the AG Group" what do
22   you mean by that?
23          A.   Well, the AG Group is defined in the
24   AG/Trump Settlement Agreement.
25          Q.   Let's go ahead and mark that as
```



**Exhibit A**

```
 1                       Bowen
 2    Kasowitz 3.
 3                  (Exhibit 3 was so marked for
 4            identification.)
 5    BY MR. DELLAPORTAS:
 6         Q.    So if you look on the opening
 7    paragraph, there is the description of the AG
 8    Group.  Do you see that?
 9         A.    Yes.
10         Q.    When you refer to the AG Group are
11    you -- what you are referring to is consistent
12    with this definition?
13         A.    Yes.
14         Q.    And so the definition has the AG
15    Group including Arie Genger; is that right?
16         A.    Yes.
17         Q.    And Orly Genger?
18         A.    Yes.
19         Q.    And Arnold Broser?
20         A.    Yes.
21         Q.    And David Broser?
22         A.    Yes.
23         Q.    And it says, "In their individual
24    capacity on behalf of all entities managed, owned
25    or controlled in any way by Arnold or David Broser
```



Exhibit A

```
 1                        Bowen
 2   and which are in any way relating to the subject
 3   matter hereof."
 4          Do you see that?  It's lines 4 and 5?
 5          A.    Yes.  That's the -- you read the
 6   parenthetical after David Broser?  Yes.
 7          Q.    So, what entities are those?
 8          A.    I have no idea.
 9          Q.    You don't know any -- you don't know
10   the names of any entities associated with Broser?
11          A.    No.
12          Q.    Let's go back to Kasowitz 2 --
13          A.    Okay.
14          Q.    -- which is the first amendment.
15          A.    Right.
16          Q.    What are the circumstances by which
17   this came about?
18          A.    I'm not sure that's within the scope
19   of your subpoena, but I'm willing to give you some
20   leeway.
21          Q.    I think there is a whole category.
22          Well, all documents concerning any property
23   -- it's No. 4.  So you can answer, you can object,
24   but that's my question.
25          A.    Well, I object that it's outside the
```



Exhibit A

MICHAEL PAUL BOWEN                                          October 05, 2018
SAGI GENGER -v- ORLY GENGER                                           25

| | |
|---|---|
| 1 | Bowen |

 2   scope of the subpoena.  Your authority is to look

 3   for assets that belong to Orly Genger or that are

 4   to be paid to her.  I don't see how the context of

 5   this first amendment has anything to do with that

 6   for the reasons we just discussed.

 7          Q.   Yet you produced it.

 8          A.   Yes.  Yes, we did because you

 9   specifically asked for it and you produced a copy

10   to us but it was unsigned so we gave you the

11   executed copy.

12          Q.   Okay.  And you would agree --

13          A.   Just so it's perfectly clear that you

14   have the operative document.

15          Q.   Okay.  And you would agree with me,

16   wouldn't you, that this document contemplates an

17   eventually payment of up to $15 million to you;

18   correct?

19          A.   No.

20          Q.   No?  What does it do?  You tell me.

21          A.   It is a mechanism for payment under

22   the AG/Trump Settlement Agreement that goes into

23   an escrow account that would be set up by me

24   and/or the Kasowitz firm per direction from the AG

25   Group.



Exhibit A

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        26

```
 1                           Bowen
 2          Q.    And so when you say, "direction by
 3     the AG Group," what would you consider to be
 4     direction by the AG Group?
 5          A.    I don't know how else to describe
 6     what I just described.
 7          Q.    Let's assume a year from now $15
 8     million comes in.  What will it take for you to
 9     make a payment to anyone of that $15 million?
10          A.    It would take direction from the AG
11     Group.
12          Q.    Meaning what?
13          A.    Meaning direction from the members of
14     the AG Group.
15          Q.    Meaning Arie Genger, Orly Genger, and
16     the two Brosers?
17          A.    That's how it's defined to the firm's
18     understanding in the relevant documents.
19          Q.    Okay.  So, the only way you will
20     release the proceeds at some -- if such proceeds
21     should come in the future -- is from a written
22     instrument signed by Arie Genger, Orly Genger,
23     Arnold Broser and David Broser?
24          A.    I don't know if there is a
25     requirement for a written instrument.  It may be
```



Exhibit A

```
 1                    Bowen
 2   right.  I don't -- it's beyond the scope.
 3        Q.   Well, let's say they all get on the
 4   phone with you.  Let's take out writing.
 5        A.   What is the question?
 6        Q.   Is it correct that the only way you
 7   will release the proceeds is if you are instructed
 8   by all four of those individuals to do so in the
 9   same manner?
10        A.   No, that is not correct.
11        Q.   How is it incorrect?
12        A.   There is no understanding that the
13   firm is aware of that it's a majority vote or a
14   consensus vote or anything like that.  It's
15   whatever -- whatever the agreement there is in and
16   among the members of AG Group, the firm has no
17   knowledge of that.
18        Q.   Is the AG Group a corporation?
19        A.   I have no idea.
20        Q.   A trust?
21        A.   I have no knowledge.
22        Q.   LLC?
23        A.   No knowledge.
24        Q.   When you say you are going to take
25   instructions from the AG Group, how is that going
```



```
 1                        Bowen
 2   to be communicated to you?
 3        A.    I think that's beyond the scope of
 4   this deposition and beyond the scope of your
 5   authority under Article 52.  With that objection,
 6   and without waiving that objection, I'm really not
 7   sure how to answer that question.
 8        How would that be communicated to me.
 9        Q.    Look, in a few days we are going to
10   go before a judge, just to be frank.  The judge is
11   going to want to know about this $15 million.  You
12   are the escrow agent for the $15 million.  Clearly
13   you know the circumstances under which you would
14   release the $15 million, so why don't you just
15   share this with me now so that you don't
16   unnecessarily annoy the federal judge?
17        A.    Is that a question?
18        Q.    It's a suggestion.  I've asked
19   several questions and you have been very
20   disingenuous.  Why don't you just try to answer
21   them.
22        A.    Look.  I don't understand why you are
23   making this into a hostile, ad hominem attack on
24   me.
25        Q.    I'm not making an ad hominem on you.
```



Exhibit A

```
 1                          Bowen
 2           A.    I'm speaking on behalf of the firm.
 3      I have --
 4           Q.    You are saying you have $15 million
 5      and you --
 6           A.    Excuse me.  Let me finish.
 7           Q.    -- have no idea how it is going to.
 8      Do you understand how this is going to look when
 9      the judge sees this transcript?  I'm trying to
10      help because I don't want -- I don't need to make
11      unnecessary motions.  I'm just trying to collect
12      some money here.  I'm not trying to burden the
13      court.
14           A.    You interrupted my answer.  You spoke
15      over me so that the court reporter couldn't take
16      down what I was saying.
17           Q.    Knock yourself out.
18           A.    I'm not going to engage in this kind
19      of argumentative behavior.  I thought that we were
20      going to be here as two professionals talking in a
21      professional way.  You have immediately devolved
22      into your normal mode of behavior, which is ad
23      hominem attack and unreasonable speeches on the
24      record.
25           Everything you said I disagree with.  I have
```

MICHAEL PAUL BOWEN                                          October 05, 2018
SAGI GENGER -v- ORLY GENGER                                              30

```
 1                           Bowen
 2    been very clear about the scope of which I'm
 3    prepared to answer and the scope within which we
 4    think your subpoena is authorized.
 5          If you want to continue this, you must deal
 6    with me civilly.  If you do that again, I'm going
 7    to leave and then you can explain to the federal
 8    judge and you can go look at the ethical rules,
 9    the professional rules which require you to be
10    civil, why it was you weren't able to complete
11    this deposition.
12          Q.    I have been perfectly --
13          A.    Do you want to continue?
14          Q.    I have been perfectly civil with you.
15    Your answers, frankly, are an embarrassment.
16          A.    Don't characterize my answers.
17    That's not being civil.  Ask a question.  If you
18    have objections to my answers, you can proceed.
19          Q.    Please testify as to under -- what
20    circumstances you will release the proceeds
21    pursuant to the document where you are the escrow
22    agent?
23          A.    I have already testified.  This is
24    asked and answered -- I'll interpose that
25    objection -- at the direction of the AG Group.
```

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        31

```
1                         Bowen
2          Q.    What does that mean?
3          A.    I don't know how else to explain it
4    to you.
5          Q.    What does it mean?
6          A.    What do you not understand about it?
7          Q.    Tell me what it means to be at the
8    direction of the AG Group?
9          A.    Well, first of all I object that this
10   is outside the scope of your subpoena.  If you had
11   a basis to say that some of that money is either
12   belongs to Orly Genger or is payable to Orly
13   Genger, you can make that showing and we can have
14   that discussion.
15         Q.    Well, I think we have a document
16   here --
17         A.    We'll probably have to -- excuse me.
18   I'm in the middle of my answer.
19         Q.    Okay.
20         A.    We'll probably have to litigate that,
21   but as of right now I see that outside of the
22   scope of your authority under Article 52 and
23   outside the scope of this subpoena.
24         However, without waiving that objection, I'm
25   willing to give you some latitude which is what I
```



Exhibit A

```
 1                     Bowen
 2  said and I'm willing to describe to you the firm's
 3  understanding of how this mechanism works.
 4          Q.    So please proceed.
 5          A.    Well, I have already told you that
 6  the AG Group has to give direction about how the
 7  money is disbursed after it hits the escrow
 8  account held by the firm.
 9          Q.    Uh-huh.
10          A.    You asked me how is that direction
11  going to be communicated.  My response is, on
12  behalf of the firm, however the AG Group wants to
13  communicate it.  It can be in writing, it can be a
14  phone call.  It would have to be something that
15  could be documented I would assume just to, you
16  know, discharge our recordkeeping responsibilities
17  to show the flow of the money and, you know, 1099s
18  and whatnot.
19          And then you are asking me who can speak on
20  behalf of the AG Group whether it has to be all
21  four in consensus, whether it has to be a majority
22  vote, whether somebody else can speak on behalf of
23  the AG group and my answer is:  We don't have any
24  information about any agreements between the AG
25  Group.  We're not aware that there is any dispute
```

```
 1                        Bowen

 2    among the members of the AG Group, that there is

 3    any agreement among the AG Group about who can

 4    direct the money and who can't direct the money

 5    maybe.  If that -- maybe that will become an issue

 6    down the road but we are not aware of it.

 7           Q.    Are you aware of anyone who is

 8    authorized to speak on behalf of the AG Group?

 9           A.    Well, my understanding is that the

10    members of the AG are reflected in Exhibit 3,

11    these four individual people, and then the

12    entities as you have pointed out.  I'm not aware

13    of any issue about who the spokesperson for the

14    group can be.

15        If you are asking me can I identify who the

16    spokesperson for the group is, the answer is no.

17    We're not aware that a spokesperson has been

18    designated.  We're not aware that it's an issue.

19           Q.    Well, let me ask you:  $15 million

20    comes in, Arie Genger calls you up and says, I'm

21    speaking on behalf of the AG Group, will you send

22    him the money?

23           A.    I can't really answer that question.

24    It's a hypothetical.  I'm not -- again, I think

25    it's outside the scope of the subpoena so I'll
```



**Exhibit A**

```
 1                       Bowen

 2   object on that basis, but in the spirit of giving

 3   you some latitude so that you have some

 4   transparency into this arrangement at least as far

 5   as the firm is aware, the answer is maybe yes,

 6   maybe no.  I mean, if we don't hear from the other

 7   members of the group that there is some

 8   dissension, then the answer would be that we would

 9   follow that direction, hypothetically speaking.

10        Q.    If I ask that question for Orly

11   Genger, would you give the same answer?

12        A.    If Orly Genger called up speaking on

13   behalf of the AG Group?  Yes, the same answer.

14        Q.    What about Arnold Broser?

15        A.    Same answer.

16        Q.    David Broser?

17        A.    Same answer.

18        Q.    Has any money been received pursuant

19   to this document?

20        A.    No.

21        Q.    This Kasowitz 2?

22        A.    No.

23        Q.    Okay.  Have there been any

24   communications with members of the Trump Group

25   about potential receipt of this money pursuant to
```



Exhibit A

MICHAEL PAUL BOWEN                                          October 05, 2018
SAGI GENGER -v- ORLY GENGER                                           35

```
 1                        Bowen
 2   this document?
 3        A.    Well, the trump Group signed Exhibit
 4   2, the members of the Trump Group did, so yes.
 5        Q.    Were new notes issued pursuant to
 6   this document?
 7        A.    No.
 8        Q.    Promissory notes?
 9        A.    I think there were amendments.  It
10   might have been a supplemental amendment.  I don't
11   recall.  It just reflects the same information
12   that's in this amendment.
13        Q.    I'm sorry.  Can you just read that
14   back.
15        A.    I will explain.  If you read Exhibit
16   2 you will see that it's making amendments about
17   the direction of how the Trump group is to route
18   the money.  I believe and I'm going from memory
19   here, that the note itself -- the originally
20   issued note -- refereed to Watell.
21        That there was either a supplemental
22   attachment to the note or an amendment to the note
23   that substituted Kasowitz firm, me, for Watell.
24   Any changes to the note are changes that you see
25   reflected here.
```



Exhibit A

```
 1                         Bowen
 2          Q.    And Kasowitz was in possession of the
 3    old notes?
 4          A.    The answer to that is no.
 5          Q.    What about the new notes?  Or the
 6    amended notes?
 7          A.    Yes.
 8          Q.    You haven't produced those?
 9          A.    No.
10          Q.    Why haven't you produced those?
11          A.    Because we don't see it within the
12    scope of the subpoena or the scope of your -- the
13    wording.
14          Q.    And the reason?
15          A.    If you want it, I will take it under
16    advisement.  I mean, we gave you the executed
17    version of the first amendment because you gave it
18    to us unsigned.  In the spirit of full
19    transparency, we wanted you to have the document
20    that shows that that's the operative agreement so
21    you don't have any confusion about it.
22          Q.    And in your view, why were the
23    amended subordinated notes production of the
24    amendment subordinated notes beyond the scope of
25    the subpoena?
```

ESQUIRE
DEPOSITION SOLUTIONS

Exhibit A

```
 1                        Bowen

 2         A.    Because it doesn't reflect assets

 3    owned by Orly or to be paid to Orly.

 4         Q.    Why not?

 5         A.    I don't know what you mean "why not,"

 6    it doesn't.

 7         Q.    Well, because it's to be paid to a

 8    quote, unquote, group of which Orly is one member;

 9    correct?

10         A.    Well, your statement that she is a

11    member of the AG Group is correct.

12         Q.    And the notes are to paid to the AG

13    Group; correct?

14         A.    No.  They are to be paid at the

15    direction of the AG Group.

16         Q.    Okay.  And the AG Group is not in

17    itself some sort of corporation or partnership as

18    far you know.  It's not some sort of legal entity;

19    correct?

20         A.    The firm has no information about

21    that.

22         Q.    Okay.  But to the best of your

23    knowledge, you're not aware of any legal entity

24    created that's known as the AG Group?

25         A.    The firm is not.
```



Exhibit A

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        38

```
 1                          Bowen
 2        Q.    Okay.  So we have notes to be paid at
 3   the direction of a group of which Orly is one
 4   member and yet you are taking the position that
 5   that is not, in any way, relevant to that process
 6   by which we seek to identify assets potentially
 7   payable to Orly Genger herself?
 8        A.    That's correct because as I testified
 9   earlier, it is the firm's understanding that there
10   is no -- there is no arrangement that any amount
11   of that money is to be paid to Orly or that she
12   owns or has any claims to any amount of that
13   money.
14        Q.    What is the firm's understanding as
15   to how that money is to be disbursed if received?
16        A.    It's up to the AG Group.  It has
17   nothing to do with any kind of ownership claim by
18   Orly.
19        Q.    Has the AG Group shared that
20   understanding with Kasowitz?
21        A.    That's the firm's understanding.  I'm
22   not going to try and parse out what part of that
23   may be protected by privilege and what part of it
24   is coming through third party communications.  I'm
25   not in a position to do that.
```



Exhibit A

```
 1                        Bowen

 2        Q.    Well, has the AG Group shared its

 3   intention as to how, if the money is received, it

 4   intends to direct you to disburse it?

 5        A.    No.  Other than it's our

 6   understanding, again, based on communications that

 7   I can't parse out, that Orly Genger has no claim

 8   to any of that money nor is any of that money

 9   being paid to her.

10        Q.    What is your understanding based on?

11        A.    I already explained to you that I

12   can't parse out what communications that's based

13   on because some are privileged and some are not.

14   And it's just -- it's an impossibility to try and

15   make that kind of fine distinction, but it

16   involved communications with our client and it

17   involved communications with the members of the AG

18   Group.

19        Q.    Okay.  Is Arnold Broser a client of

20   the firm with respect to this matter?

21        A.    Not with respect to the Gengers, no.

22        Q.    With respect to anything else?

23        A.    No.  Well, I don't know.

24        Q.    That you are aware?

25        A.    Well, I -- I don't know.
```



Exhibit A

```
1                      Bowen
2        Q.    In which you, Michael Bowen, are
3    aware?
4        A.    Well, I'm not really here testifying
5    on my behalf to try and move this along.  I can
6    say that it's without the scope of the subpoena so
7    I didn't do any reasonable inquiry trying to
8    figure out if the firm represents the Brosers in
9    any, you know, any other matter totally unrelated
10   to this.  I have no knowledge of that.  I guess,
11   just to help you, I will volunteer in my
12   individual capacity, I have to idea.
13       Q.    Let me just limit it to this.
14   Limited to this, Arnold Broser is not a client of
15   the firm?
16       A.    That's correct.
17       Q.    And what about David Broser?
18       A.    Same answer.
19       Q.    What about Arie Genger?
20       A.    Arie Genger is a little more
21   complicated because we -- the firm has appeared on
22   his behalf in some of his litigations involving
23   disputes with Sagi Genger, who may or may not be
24   related to this settlement agreement because it's
25   so convoluted.  I don't know the answer to that.
```

Exhibit A

```
 1                          Bowen
 2        Q.    With respect to this settlement
 3   agreement, you are not able tell me whether the
 4   firm believes it has a privileged attorney-client
 5   relationship with Arie Genger?
 6        A.    That's correct.  I'd have to look
 7   into that.
 8        Q.    And the reason I ask is because you
 9   declined to answer certain questions with regard
10   to your knowledge of the ultimate disposition o
11   these proceeds on privileged grounds.
12        So, when you make that objection, are you
13   specifically speaking of Orly's privilege or are
14   you speaking also of a potential privilege with
15   Arie?
16        A.    Well, I haven't declined to answer
17   anything.  I have answered all of your questions.
18   I have interposed objections that constrain the
19   information that I can provide.
20        It is certainly the case that we represent
21   Orly Genger in all aspects of her dispute --
22   disputes, plural, with Sagi Genger, and certainly
23   in connection with the AG/Trump Group Settlement
24   Agreement so that prohibits me from divulging
25   communications that we have had with members of
```

```
 1                       Bowen
 2   the AG Group to come to conclusions or the
 3   understanding that we have.  It's not really
 4   conclusions, it's really just our understanding.
 5        Q.   So you are declining or you feel
 6   constrained not to identify communications with
 7   any of the four members of the AG Group?  Is that
 8   what I understood your last answer to mean?
 9        A.   I can't parse out how we came to the
10   understanding based on who told us what, because
11   some of that is privileged and I'm not going to
12   give you unprivileged communications so you can
13   deduce privileged information.
14        Q.   Well, let's put aside what I can
15   deduce and not deduce.  You have made a statement
16   that Kasowitz believes that none of the $15
17   million will ultimately be paid to Orly.  I have
18   asked you the basis for that understanding and you
19   said it's -- you're constrained by the privilege
20   from answering it.  I have asked who that
21   privilege is with --
22        A.   I've got to correct you.
23        Q.   Hold on.  Let me finish and then you
24   can correct everything I said that is wrong.
25        I've asked you the basis for who you had the
```



MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                         43

| | |
|---|---|
| 1 | Bowen |

2 | privilege with, and you said, "Orly and maybe

3 | Arie."  What I'd like for you to do is to identify

4 | for me any communications you have had with anyone

5 | who is not Orly Genger or Arie to the extent you

6 | are maintaining a privileged relationship with him

7 | with respect to this matter with regard to the

8 | ultimate disposition of the $15 million?

9 |         A.    I can't answer that question because

10 | you -- you made some misstatements in there about

11 | what I have said just moments ago.  So I can't

12 | adopt your long preamble and now, because you

13 | interrupted me when I tried to correct you, I

14 | don't remember what it was you were saying that it

15 | was mistaken.

16 |         Q.    I can do without the preamble.

17 |         A.    I'd like to correct the preamble.

18 |         Q.    You can read it back and make any

19 | corrections you want.

20 |             (Readback of prior question.)

21 |             THE WITNESS:  So you are mistaken in

22 |          saying that I'm constrained from telling

23 |          you the basis for the understanding.  I

24 |          told you the basis for the understanding.

25 |          You didn't ask to get into the

```
 1                    Bowen

 2          communications that -- the substance of

 3          the communications that the firm has had,

 4          I presume the question is with each member

 5          of the AG Group on that topic, and my

 6          answer to that is:

 7              Because of the privilege, I cannot

 8          parse out which information came from

 9          which member of the AG Group, or how many

10          discussions we had over what period of

11          time or who had these discussions on

12          behalf of the firm.  That's not within the

13          scope of preparing for this deposition so

14          I don't have that information at my

15          fingertips.

16              And then, on top of that, there are

17          privilege concerns because some of that

18          information certainly came from Orly

19          Genger who is a client and some came from

20          Arie Genger who may be a client for these

21          purposes.  I'm not clear on that on behalf

22          of the firm.  That would take further

23          investigation on my part.

24      Q.    Let me just limit it to the Brosers.

25  What communications have you had with Brosers with
```



1                          Bowen

2     respect to the ultimate disposition of the

3     proceeds?

4          A.    Other than telling you that there

5     were communications with the Brosers between the

6     Brosers and the firm on that topic I cannot get

7     into details of the communications.  That's not

8     available to me.

9          Q.    Why can't you?

10         A.    That's not something that I prepared

11    in anticipation of the testimony today.  I did not

12    see it within the scope of the subpoena or

13    relevant to your inquiry.

14         Q.    Why did you not see it within the

15    scope of the subpoena?

16         A.    The question is:  Did the firm have

17    an understanding that anything relating to the

18    settlement agreement or the $15 million notes, you

19    know, minus whatever setoffs the Trump Group is

20    going to claim.  And that payment mechanism, if

21    anything related to that has a relationship to or

22    assets owned by Orly or assets to be paid to Orly,

23    and the firm's understanding is that it does not.

24         So how the firm came to that understanding

25    and what goes into that understanding and what

Exhibit A

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        46

```
 1                         Bowen
 2   other people may have claims to that money or
 3   don't have claims to that money, all of that is
 4   irrelevant to us and irrelevant to your subpoena.
 5        Once the firm has the understanding that it
 6   is not an asset of Orly and it's not payable to
 7   Orly, that answers your question.
 8        Q.   And so even if the firm has an
 9   understanding as to whom that money is payable to,
10   you're not going to share that with me here today?
11        A.   It's payable at the direction of the
12   AG Group, the AG Group has given us no direction
13   on where the money is to be paid.
14        Q.   How do you know that it is not
15   ultimately to be paid in part to Orly Genger?
16        A.   Because our understanding, based on
17   communications that we have had with members of
18   the AG Group, Orly has no claim to any of that
19   money and none of that money is payable to her.
20        Q.   What's that understanding -- I'm
21   sorry, when were those communications made?
22        A.   Over the course of multiple years
23   going back to at least the day of the amendment.
24   I think even earlier than this.  What's the date
25   of this?  June of -- no.  This is dated, I think,
```

```
 1                          Bowen
 2    last summer, in 2017.  It certainly predates that
 3    so it's a series of communications that goes back
 4    many years.
 5              Q.    When you say, "many years" what is
 6    the start of that?
 7              A.    When was the trial that we did in
 8    front of Judge Jaffe
 9              Q.    In 2015?
10              A.    Yeah, so it started in that time
11    period to the present.
12              Q.    So who does have a claim to those
13    assets if not Orly?  To those proceeds if not
14    Orly?
15              A.    Well, since it's at the control of
16    the AG Group, I think the AG Group would have that
17    understanding.  The firm does not.
18                   (Recess taken.)
19    BY MR. DELLAPORTAS:
20              Q.    I'm going to just clarify one of your
21    prior answers.
22              A.    Sure.
23              Q.    When you say that Orly Genger has no
24    claim to the payments made under the note, are you
25    saying that the money -- that the money is going
```

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        48

```
 1                          Bowen
 2     to AG Group, and beyond that you don't know what
 3     they plan to do with it, or are you saying that
 4     you have knowledge that the AG Group will not be
 5     transmitting any of that to Orly Genger?
 6            A.    The latter.
 7            Q.    Okay.
 8                  MR. DELLAPORTAS:  I would like to
 9            next mark as Kasowitz 4 a document
10            entitled:  "Satisfaction of Judgment"
11            dated March 28, 2018.
12                  (Exhibit 4 was so marked for
13            identification.)
14     BY MR. DELLAPORTAS:
15            Q.    Mr. Bowen, this is a satisfaction of
16     judgment in the predecessor case in which your
17     firm represented Ms. Genger; correct?
18            A.    It's a 2014 case?
19            Q.    Yes.
20            A.    Yes.  That's correct.
21            Q.    And this payment was -- this
22     satisfaction was filed on March 28, 2018?
23            A.    According to the document, yes.
24            Q.    Okay.  And the third whereas clause
25     says that, "Whereas Orly Genger caused the
```



```
 1                         Bowen
 2    $21,005.24 to be paid on March 27, 2018."
 3           A.    I see that.
 4           Q.    And it was signed and filed by
 5    Kasowitz; correct?
 6           A.    Yes.
 7           Q.    How did Ms. Genger make that payment?
 8           A.    I have no knowledge.
 9           Q.    Do you know where the money came
10    from?
11           A.    No.
12           Q.    And Kasowitz doesn't know where the
13    money came from?
14           A.    I don't believe so.  I don't believe
15    this went to Kasowitz.
16           Q.    How did Kasowitz have the comfort
17    level to file a statement in federal court saying
18    a payment was made?
19           A.    I don't understand your question.
20    Are you saying that we didn't have a reasonable
21    basis to make that statement?  Did you receive the
22    money?  Your client should know whether or not he
23    received the money.  We never heard any complaint
24    that the money was not received.
25           Q.    What was the basis for your belief
```



Exhibit A

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        50

```
 1                        Bowen
 2   that the $21,000 and so forth, was paid by Orly
 3   Genger on March 27, 2018?
 4        A.    That's beyond the scope of your
 5   subpoena, number one.  It's trying to invade
 6   privilege, number two.  Number three, do you have
 7   the basis to say the money wasn't paid?  Is what
 8   you are saying is that the money was not paid?  Is
 9   that what your claim is?
10        Q.    Well, I'm just here to ask
11   questions --
12        A.    Is that implicit in your questions?
13        Q.    -- not to answer questions.
14        A.    Let me put it this way:  To the
15   extent that you are implicit in your question of
16   the claim that $21,005.24 reflected on Exhibit 4
17   was not in fact paid in full satisfaction of the
18   judgment, then to the extent that that is what you
19   are saying, we -- we reject that claim.  We have
20   no information that it was not paid.
21        Q.    Implicit in my question is that if
22   Kasowitz was being truthful in his representation
23   in federal court, then Ms. Genger, at one point in
24   time, during the course of this litigation, had
25   access to $21,000 in order to make that payment.
```



```
 1                         Bowen
 2   My question is:  Where did that come from?
 3          A.    That's a false premise.  Why would
 4   you possibly say that.
 5                 (Laughter.)
 6                 Why are you laughing?
 7          Q.    Because you are being an idiot.
 8   That's fine.
 9          A.    So you just called me an idiot.
10   Calling me an idiot in a federal deposition is
11   against your ethical obligations.
12          Q.    Can you answer the question?
13          A.    Can you acknowledge the fact that you
14   just violated your ethical obligations by calling
15   me an idiot?
16          Q.    Can you answer the question?
17          A.    Do you want to retract that statement
18   or do something to try and fix the fact that you
19   just made another ad hominem attack after I told
20   you that I will not tolerate that?
21          Q.    Can you please answer the question?
22          A.    If you acknowledge the fact that you
23   are out of line and you retract your statement.
24          Q.    I will correct it:  Your answer was
25   idiotic.
```



Exhibit A

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        52

| | |
|---|---|
| 1 | Bowen |

2        A.    Fine.  That's still an ad hominem

3    attack.  Do you think that's better?  Do you know

4    a federal judge is going to be reviewing this

5    transcript?  Fine.  I will take that as your -- as

6    your position.  I'll make sure a federal judge

7    reviews this transcript.

8        Q.    Wonderful.  Can you now answer the

9    question?

10        A.    State your question again, please.

11        Q.    Can you read back the last question.

12             (Question read back.)

13   BY MR. DELLAPORTAS:

14        Q.    If Kasowitz was being truthful in his

15   representation to the federal court that Orly paid

16   -- cause to be paid $21,000, implicit within that

17   is that Orly at one time had access to $21,000 and

18   my question is:  What is Kasowitz' knowledge with

19   respect to the source of that asset?

20        A.    I can't answer that question because

21   you have false premises.  The fact that somebody

22   has paid a judgment doesn't mean that that person

23   had the assets to pay the judgment.  You can ask a

24   third party to pay the judgment.  You can obtain

25   loans which means you are taking on even more debt



Exhibit A

1                              Bowen

2    to pay the judgment.

3          Q.    So which is it?

4          A.    So I don't know, but I can't answer

5    the question with all of those presuppositions

6    that you put in there, which are not necessarily

7    true.  Leaving that aside, if your question is,

8    what does the firm know about where Orly Genger

9    got the money to pay this judgment, this amount of

10   money that is reflected in Exhibit 4, the answer

11   is, which I think I told you before, we don't

12   know.

13         Q.    That includes Mr. Hirschman?  He

14   doesn't know how his wife paid that judgment?

15         A.    I don't know how a spouse or the

16   information a spouse had in relationship to a

17   spouse.  I'm not here testifying on behalf of

18   Mr. Hirschman.  And there are spousal privileges

19   that may or may apply to that information.  I can

20   only speak on behalf of the firm.

21         On behalf of the firm, we have no knowledge

22   about where that money was sourced from or even

23   how it was transmitted.  I guess I have to look at

24   how it was transmitted.  I may -- the firm may

25   have that information.  It was not something I



Exhibit A

```
 1                         Bowen
 2   prepared for today because you didn't identify it
 3   as a topic in your subpoena.
 4         But, in any event, to suggest that Kasowitz
 5   as a firm is acting in bad faith because it didn't
 6   have a good faith basis for filing this
 7   satisfaction of judgment, on behalf of the firm, I
 8   completely reject that and I think it's unethical
 9   and unprofessional for you even to suggest it.
10   That's my answer.
11         Q.    First of all, you're being
12   disingenuous.  There was no suggestion that you
13   were acting in bad -- the firm was acting in bad
14   faith in filing this piece of paper.  I do think
15   there is a serious question in that regard with
16   respect to your answers here today but we will
17   proceed.
18         Is that your signature on page 2 or is that
19   Mr. Hirschmann?
20         A.    Well, I will just note that, once
21   again, you are making an ad hominem attack.
22         Q.    I'm clarifying an allegation you made
23   against me.
24         A.    You're making an ad hominem attack on
25   me and you are saying I'm acting in bad faith when
```



```
 1                      Bowen
 2    I'm here --
 3                 (Talking over each other.)
 4         Q.    That's a serious question.
 5         A.    -- trying to give you serious and
 6    professional and careful answers on behalf of the
 7    firm.
 8         Q.    Okay.  Well, one is them is:  Whose
 9    signature is that on page 2?
10         A.    Which exhibit?
11         Q.    Kasowitz 1.
12         A.    That's my signature.
13         Q.    And so at the time you made this, you
14    had no idea how Orly came to pay the $21,000?
15         A.    It's asked and answered, but I will
16    try and explain it again to you.  The firm has no
17    information about the source of those funds.  It
18    may have information about the mechanism of how
19    the funds were transferred, but I did not prepare
20    that information for today.  I don't personally
21    have it and I did not prepare that information for
22    today, because it was not identified as a topic
23    for this deposition.
24         By the way, this also doesn't refer to
25    assets that Orly owns or that are payable to Orly.
```



**Exhibit A**

| | |
|---|---|
| 1 | Bowen |
| 2 | Q. And when you say "the firm" you are |
| 3 | excluding Mr. Hirschman who is a partner of the |
| 4 | firm? |
| 5 | A. Absolutely not. |
| 6 | Q. So you are saying Mr. Hirschman has |
| 7 | no idea where that money came from? |
| 8 | A. Absolutely not. I'm speaking only on |
| 9 | behalf of the firm. |
| 10 | Q. And you understand that the firm is |
| 11 | comprised of its partners; correct? |
| 12 | A. Yes. |
| 13 | Q. Mr. Hirschman is one of its partners? |
| 14 | A. Yes. |
| 15 | Q. If fact, he was the -- listed as the |
| 16 | lead counsel with respect to the matter in which |
| 17 | the satisfaction of judgment was filed. |
| 18 | A. That may be. |
| 19 | Q. He is not just some random partner |
| 20 | who I picked out of the website. He was actually |
| 21 | the lead partner and lead attorney with respect to |
| 22 | the matter that I'm now asking you about; correct? |
| 23 | A. Asked and answered. |
| 24 | Q. Okay. And so when you're speaking |
| 25 | that the firm doesn't know where this $21,000 came |

```
 1                      Bowen
 2   from, are you including Mr. Hirschman in that or
 3   are you excluding Mr. Hirschman from that?
 4         A.    Speaking on the information that is
 5   available to the firm, qua firm, that
 6   Mr. Hirschman has information available to him,
 7   qua spouse -- I'm not privy to that information
 8   speaking only on behalf of the firm.  Speaking on
 9   behalf of the firm, I'm not excluding any
10   available source of information available to the
11   firm.
12         Q.    And how do you parse through, in your
13   mind, what Mr. Hirschman knows qua firm versus qua
14   spouse?
15         A.    I don't even know how to answer that
16   question.
17         Q.    It was the basis upon which you
18   answered the last question so I'd like to probe
19   the basis on which you answered the last question.
20         A.    Let me put it this way:  I didn't
21   interview Mr. Hirschman to invade his marital
22   relationships with his wife.  I didn't ask him
23   about personal information of any sort at any
24   time.  I am, however, privy to information that
25   Mr. Hirschman has that's relevant to your
```

Exhibit A

```
 1                          Bowen
 2     subpoena.  And that is available to the firm
 3     meaning it's information that he learned in his
 4     capacity as a lawyer at the firm.
 5            Q.    When you said you didn't interview
 6     him about his marital communications, did you
 7     interview Mr. Hirschman at all with respect to
 8     your preparation for this?
 9            A.    I 'm not providing any answers about
10     what I did to prepare for this deposition other
11     than saying that I made reasonable inquiry and I
12     made reasonable searches and drawing upon my own
13     personal experiences as a partner at the firm, and
14     as a lawyer for Orly Genger, since we became
15     involved in the Genger affairs on behalf of Orly
16     Genger in, I guess, that was 2015.
17            Q.    Let me ask you more generally:  What
18     bank accounts are you aware that Ms. Genger
19     currently has access to?
20            A.    The firm is aware of no bank accounts
21     that she has that is in her name or that belong to
22     her.  I have anecdotal information that -- that
23     belongs to the firm that she had some kind of an
24     account that was attached, I think, by your client
25     that had a few thousand dollars, like, $8,000 or
```



**Exhibit A**

```
 1                           Bowen
 2     something to that extent, which is, I think, part
 3     of this 2014 proceeding, if I remember right.
 4              Q.    Does Ms. Genger pay for your
 5     services?  Pay the firm?
 6              A.    That's privileged information.  I'm
 7     not getting into any financial arrangements
 8     between Orly Genger and the firm other than to
 9     tell you that there is no money or assets that
10     belong to her or that are payable to her in that
11     relationship.
12              Q.    Can you read that back.
13              (Readback of prior question.)
14     BY MR. DELLAPORTAS:
15              Q.    What do you mean by that?
16              A.    I mean, there is no money going the
17     other way.  Meaning the firm doesn't hold assets
18     for Orly Genger and there are no assets or funds
19     that are payable to Orly Genger that the firm has.
20     For example, sometimes clients pay a retainer that
21     has not been charged against yet.  There's nothing
22     like that in this relationship.
23              Q.    Okay.  Have payments been made during
24     the relationship from Orly Genger to the firm?
25              A.    I'm not privy to answer that
```



**Exhibit A**

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        60

```
 1                         Bowen
 2    question; it's privileged information.
 3         Q.    What's your basis for saying that's
 4    privileged information?
 5         A.    Because the relationship between
 6    attorney-client is highly confidential and most
 7    often privileged.  Unless you have some authority
 8    you want to talk about, we can reconsider it.  You
 9    have to have a reason if you are going to get into
10    the financial relationship with an attorney and a
11    client.
12         Q.    Yes.
13         A.    Given the fact that you are looking
14    for assets I'm comfortable in telling you that
15    there has been no payment of any sort from Orly
16    Genger to my firm in this year, 2018.
17         Q.    What about during the -- since the
18    lawsuit was filed in October 2017?
19         A.    I'm not -- I think that information
20    would both be irrelevant and protected by
21    privilege.
22         Q.    Why in your view would it be
23    irrelevant?
24         A.    It's not identifying assets that
25    belong to Orly Genger or that are payable to Orly
```

ESQUIRE
DEPOSITION SOLUTIONS

**Exhibit A**

```
 1                      Bowen
 2    Genger.
 3         Q.    And you don't believe that if Orly
 4    Genger made a payment from an account less than a
 5    year ago, that might not have some bearing on the
 6    location of her assets today?  You are so
 7    confident in that that you are willing to have the
 8    direction to yourself not to answer that question
 9    in the context of discovery?
10         A.    I don't understand your question.  If
11    your question is:  Is the firm aware of the bank
12    account that it received funds from and the bank
13    account belongs to Orly Genger, the answer to that
14    question is no.  The firm is not aware -- other
15    than the one account I identified a moment ago,
16    which had $8,000 in it and I believe that was
17    attached by your client in the prior proceeding,
18    sub district, I believe, I may be getting those
19    facts mixed up in my head, but again, to try and
20    reframe your question so I understand it.
21         If your question is:  Did the firm ever
22    receive any payment from Orly Genger from a bank
23    account that the firm can identify as belonging to
24    Orly Genger?  The answer is no.
25         Q.    When you use the term "belong" --
```



**Exhibit A**

```
 1                            Bowen
 2     "an account belonging to Orly Genger," what do you
 3     mean by that?
 4            A.    I mean an account that is either for
 5     her benefit or that she controls.
 6                  MR. DELLAPORTAS:  We'll mark Kasowitz
 7            5 a document entitled "Satisfaction of
 8            Judgment" dated May 8, 2018.
 9                  (Exhibit 5 was so marked for
10            identification.)
11     BY MR. DELLAPORTAS:
12            Q.    This is, again, a document that your
13     firm filed it looks like May 2018.  Do you
14     recognize it?
15            A.    Yes.
16            Q.    Is that your signature on the second
17     page?
18            A.    Yes.
19            Q.    It reflects that a judgment was
20     satisfied to Ms. Dahlia Genger in the amount of
21     $58,059.30.
22         Do you see that?
23            A.    Yes.
24            Q.    What was the source of the payment
25     for that $58,000?
```



Exhibit A

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        63

```
1                          Bowen
2         A.    The firm has no information about
3   that.
4         Q.    So you are representing that the firm
5   does not know how Ms. Genger made that $58,000
6   payment?
7         A.    No.  That's a separate question.  The
8   first question was what's the source and the
9   answer is that the firm does not know the source.
10  The second question is how the payment was made.
11  The answer to that is that the firm may have that
12  information, but I didn't research that and I'm
13  not prepared to address it because it wasn't
14  within the scope of your subpoena.
15        Had you identified it I could have given you
16  a definitive answer.  So we made no, you know,
17  whatever mechanism or method or route the money
18  went, but I don't have that information at the tip
19  of my finger tips right here today.
20        Q.    So, your view is that Ms. Genger's
21  access to $58,000 just a few months ago, was not
22  within the scope of our subpoena?
23        A.    No.  I didn't testify to that.  I
24  testified that had you identified that one of the
25  topics that you wanted to discuss was the method
```



```
 1                        Bowen
 2    or manner in which these satisfaction -- excuse
 3    me -- these judgments were paid that are reflected
 4    in these two documents Exhibits 4 and 5, I could
 5    have been prepared to address that because it may
 6    very well be that the firm does know how those
 7    payments were made
 8            Q.    Well, one of the subjects are
 9    assets --
10            A.    Excuse me, one second.
11            Q.    -- of Ms. Genger?
12            A.    I have to finish that answer.
13            Q.    Okay.
14            A.    You also said that the fact that she
15    had access to this money and you made a comment
16    that that should be relevant within the scope of
17    your subpoena --
18            Q.    One would think.
19            A.    Well, I understand that you are
20    expressing your view -- your own personal view of
21    that -- but logic kind of dictates that that may
22    or may not be true because it always is the case
23    that an impecunious person can have a debt paid by
24    somebody else on their behalf, now whether that
25    happened here or not, I have no information.  The
```

Exhibit A

```
 1                        Bowen
 2   firm has no information.
 3        Q.    So the firm doesn't know where this
 4   money came from either?  That's what you are
 5   saying?
 6        A.    No.  Because you keep subtilely
 7   changing the question and I think -- I want to,
 8   make sure we are not misunderstanding each other.
 9   If you are asking me the source of the money, the
10   firm does not know the source of the money.
11        If you are asking where the money came from,
12   what the manner was in which the money was
13   transferred from one location to another, was it
14   by check, was it by wire, or some other type of
15   electronic transfer, the answer is:  We may be
16   aware of that but I have not prepared that
17   information for today's deposition.
18        Q.    Is the firm aware of where Ms. Genger
19   currently resides?
20        A.    I believe that's outside the scope of
21   this deposition.  I don't understand what her --
22   where she -- I guess -- well, first of all, I
23   should clarify:  When you say where she resides,
24   are you asking for her domicile, in the technical
25   sense of that word?
```

| | |
|---|---|
| 1 | Bowen |
| 2 | Q. Interpret it however will yield an |
| 3 | answer. |
| 4 | A. Well, the firm is aware that she |
| 5 | primarily resides in Tel Aviv, Israel. And also |
| 6 | that she has an interest in some form that -- I'm |
| 7 | not necessarily -- I may not be remembering |
| 8 | correctly, I believe a condominium in Austin, |
| 9 | Texas. She spends some time there. But I don't |
| 10 | know. And I think there have been public filings |
| 11 | on that. So whatever the public filings are to |
| 12 | the extent that the firm's knowledge on that as of |
| 13 | the time that those filings were made. |
| 14 | Q. Does Ms. Genger have any interest in |
| 15 | any other homes other than the two that you just |
| 16 | described? |
| 17 | A. Well, I don't know that she has any |
| 18 | interest in the Tel Aviv home. If by "interest" |
| 19 | you mean ownership interest, the firm doesn't have |
| 20 | information about that at all. |
| 21 | Q. What do you know about that subject? |
| 22 | A. The only information that the firm |
| 23 | has is that she lives there at the address that is |
| 24 | a matter of public record. |
| 25 | Q. What about other homes? |



| | |
|---|---|
| 1 | Bowen |
| 2 | A.   The firm has no information about |
| 3 | that at all other than the fact that she does have |
| 4 | some type of interest and it may be through |
| 5 | marital property and it may not.  I don't know the |
| 6 | ins and outs -- the firm doesn't know the ins and |
| 7 | outs of the Austin, Texas property. |
| 8 | Q.   When you say "marital property," what |
| 9 | do you mean? |
| 10 | A.   I'm not using that in any kind of |
| 11 | legal or technical meaning or a term of art |
| 12 | meaning.  I just know that sometimes a husband and |
| 13 | wife can own property as joint tenants in common |
| 14 | or income and it's not something where -- it |
| 15 | doesn't necessarily reflect that one spouse or |
| 16 | another actually contributed anything to the |
| 17 | purchasing the property it's just by virtue of |
| 18 | their status of being married that it's considered |
| 19 | to belong to both. |
| 20 | Q.   What other marital property are you |
| 21 | aware of with respect to Ms. Genger? |
| 22 | A.   None. |
| 23 | Q.   Does Ms. Genger have an interest in |
| 24 | her husband's partnership interest? |
| 25 | A.   The firm is not aware of that.  To |

```
 1                         Bowen
 2    the extent it's relevant, the firm is not aware of
 3    it.
 4           Q.    When you mentioned you made a
 5    reasonable inquiry with respect to the subject
 6    matters of the subpoena, what specifically did you
 7    do?
 8           A.    I'm sorry?
 9           Q.    When you say you made a reasonable
10    inquiry with respect to the subject matters of the
11    subpoena -- it's a term you've used several times
12    in deposition -- what, specifically, did you do?
13           A.    I'm not going to answer that
14    question.  That is privileged work-product
15    information.  I will repeat what I said before,
16    which is:  I made reasonable inquiries of
17    personnel at the firm who have knowledge into
18    Genger matters.  I made reasonable searches in the
19    sense that I looked at information both in
20    documentary form and otherwise that's available to
21    the firm that's related to this topic, and the
22    representation of Orly Genger.
23           And I'm basing it on my extensive knowledge
24    and participation in representing Orly Genger
25    since the firm became involved in the very
```

Exhibit A

```
 1                        Bowen
 2     beginning -- I mean, in the very beginning of the
 3     firm's involvement starting sometime in 2015, I
 4     believe.
 5              Q.    Where does Mr. Hirschman live?
 6              A.    Well, I don't think that's relevant.
 7     I don't see how that's relevant to the subpoena.
 8              Q.    So you are declining to answer?
 9              A.    I'm declining to answer on the basis
10     that confidential information about a partnership,
11     individual partners, is beyond the scope of this
12     subpoena.  If you want to clarify why you think
13     it's relevant I'm willing to reconsider, but I
14     don't see any relevance whatsoever.
15              Q.    To the best of your knowledge, are
16     they still married?
17              A.    I don't see how that's relevant
18     either.
19              Q.    Okay.
20              A.    If you want to explain why you think
21     it -- I mean, look, one of the things that you
22     have not ever tried to justify is why you are
23     trying to interfere or interpose into this private
24     marital relationship between Ms. Sagi's own sister
25     and her husband.  If you want to explain it, you
```

MICHAEL PAUL BOWEN                                          October 05, 2018
SAGI GENGER -v- ORLY GENGER                                              70

```
 1                        Bowen
 2    can explain it.
 3         Q.    You just said they had marital
 4    property.
 5         A.    How -- how --
 6         Q.    I have an uncollected $3 million
 7    judgment.  Isn't it, at least, marginally rel
 8    event that I inquiry about their marital property?
 9         A.    You're not asking about their marital
10    property.  Now you are asking about their marital
11    relationship and whether or not they are still
12    married.
13         Q.    Yes.
14         A.    And I guess the question --
15         Q.    Isn't that relevant to marital
16    property if they are in fact still married?  No?
17         A.    No.  Well, first of all, I don't
18    think it's a valid question.  I think it's an
19    offensive question.
20         Q.    An offensive to ask whether they are
21    still marred?
22         A.    Yes.
23         Q.    Okay.
24         A.    Secondly, I'm speaking on behalf of
25    the firm, and the firm doesn't have information
```



```
 1                    Bowen
 2   about the marital status of it's various partners
 3   unless or until there is some reason to notify the
 4   firm about a marriage or a divorce or some other
 5   type of change in status that the firm might need
 6   to be aware of in terms of insurance.
 7        I see that you're not really paying
 8   attention to my answer so I am just going to stop
 9   even though my answer is not finished.  If you
10   want to listen --
11        Q.   The reporter is capturing you
12   answers.
13        A.   No, I'm not going to speaking when
14   I'm being treated in this fashion.  If you want to
15   listen to the answer --
16        Q.   You're being treated perfectly fine.
17   Stop making speeches.  You are allowed to answer
18   the question.  I didn't interrupt.  You
19   interrupted yourself.  You were making a speech,
20   finish your speech and then we will go on to the
21   next question.  I'm listening.  I can do two
22   things at the same time.
23        A.   You were talking to your client.
24        Q.   I was not talking to my client.  I
25   was reviewing my notes while I was listening to
```

Exhibit A

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        72

```
 1                        Bowen
 2    your answer.  Believe it or not, I'm capable of
 3    doing that.
 4            A.    Tell me where I was and I will pick
 5    it up.
 6            Q.    The reporter can tell you that.
 7                  (Readback of prior question.)
 8            THE WITNESS:  I got it.  So continuing
 9            my answer to the extent that your question
10            is asking whether or not there has been
11            any communications with the firm with
12            respect to Mr. Hirschman marital status
13            other than the fact he was married to Orly
14            Genger at some point, I believe, in 2016
15            if my memory is correct, the answer is no.
16            MR. DELLAPORTAS:  Make the next one
17            marked as Kasowitz Exhibit 6, February 5,
18            2018 letter.
19                  (Exhibit 6 was so marked for
20            identification.)
21    BY MR. DELLAPORTAS:
22            Q.    This is a letter you submitted to the
23    court.
24            A.    Correct.
25            Q.    If you go to the last page, the first
```



Exhibit A

```
 1                        Bowen

 2    full paragraph on page 3.

 3            A.    Yes.

 4            Q.    In it you wrote to Judge Freeman

 5    "Orly has attested that long before this action,

 6    she purchased a home in Tel Aviv with her husband

 7    and that she lives there with her infant

 8    daughter."

 9         What attestation are you referring to there?

10            A.    It would be the sworn declaration

11    that she submitted in this action.

12            Q.    In this case?

13            A.    I believe so.

14            Q.    Okay.  Do you represent Arie Genger

15    with respect to this matter?  I'm talking about

16    the case we are currently in to today?

17            A.    The judgment enforcement case?

18            Q.    Yes.

19            A.    I don't think he is a party in this

20    action.  We may or may not represent him for

21    purposes of discovery if and when there is any

22    discovery propounded on him, but I don't know the

23    answer to that.

24            Q.    So, I will represent to you that we

25    served a subpoena on him and he did not appear for
```

```
1                          Bowen
2    that as in fact I e-mailed you a few weeks ago.
3    Are you representing with respect to that
4    subpoena?
5           A.   I don't believe so.  What do you mean
6    you e-mailed me about it?
7           Q.   I e-mailed you --
8           A.   Do you mean me personally or the
9    firm?  Somebody else?
10          Q.   I e-mailed you personally.
11          A.   About Arie Genger?
12          Q.   Yes.  I e-mailed you, Mr. Freedman,
13   and Mr. Montclair --
14          A.   Mr. who?  I'm sorry.
15          Q.   Montclair?  Paul Montclair?  He was
16   prior attorney of Arie with regard to our subpoena
17   and asked if you represented him with regard to
18   that subpoena?
19          A.   You didn't get a response from
20   anybody at my firm?
21          Q.   No, I only e-mailed you.
22          A.   When you say Mr. Friedman, who are
23   you talking about?
24          Q.   Leon Friedman.  That's another prior
25   attorney of Mr. Genger.
```



Exhibit A

```
 1                         Bowen
 2         A.    It's possible that I missed that
 3   e-mail.  If you didn't include anybody else on the
 4   Kasowitz team.  I don't remember it personally.
 5   On behalf of the firm, I have no information that
 6   we represent Arie Genger with respect to any
 7   process that you may or may not have served on
 8   him.
 9         Q.    In this case.
10         A.    I have no information about whether
11   or not -- right, in this case.  Currently.  Let's
12   just say currently.  And I don't have any
13   information about whether you in fact did serve
14   process on him.
15         Q.    Okay.
16         A.    So I can't comment on that either.
17         Q.    So, suffice it to say that we don't
18   believe your relevance objections were well taken.
19         Our position is this deposition has to be
20   continued until the proper documents are produced
21   and the proper questions are answered, but subject
22   to that position we have nothing further for
23   today?
24         A.    Okay.
25               (Time noted:  11:41 a.m.)
```



Exhibit A

MICHAEL PAUL BOWEN                                    October 05, 2018
SAGI GENGER -v- ORLY GENGER                                        76

```
 1                          Bowen

 2              THE WITNESS:  Read and sign.

 3          (Time noted:  p.m.)

 4

 5                    _____

 6                         MICHAEL BOWEN

 7

 8  Subscribed and sworn to before me
    this _____ day of _____, 20___.
 9  _____
              NOTARY PUBLIC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**Exhibit A**

1

2                           I N D E X

3

   WITNESS              EXAMINATION BY                    PAGE
4
   MR. BOWEN            DIRECT / DELLAPORTAS              4
5

6

                            EXHIBITS
7
   KASOWITZ      DESCRIPTION                              PAGE
8
   1            Subpoena                                  4
9
   2            Amendment to Settlement Agreement         6
10
   3            AG/Trump Settlement Agreement             23
11
   4            Satisfaction of Judgment                  48
12
   5            Satisfaction of Judgment                  62
13
   6            February 5, 2018 letter                   72
14

15

16

17

18

19

20

21

22

23

24

25



                      **Exhibit A**

```
 1                   C E R T I F I C A T I O N
 2
 3               I, Jeffrey Shapiro, a Shorthand
 4   Reporter and notary public, within and for the
 5   State of New York, do hereby certify:
 6               That MICHAEL BOWEN, the witness whose
 7   examination is hereinbefore set forth, was first
 8   duly sworn by me, and that transcript of said
 9   testimony is a true record of the testimony given
10   by said witness.
11               I further certify that I am not
12   related to any of the parties to this action by
13   blood or marriage, and that I am in no way
14   interested in the outcome of this matter.
15
16               IN WITNESS WHEREOF, I have hereunto
17   set my hand this 14th day of October, 2018.
18
19
20
21
22
23                              JEFFREY SHAPIRO
24
25
```



```
 1        DEPOSITION ERRATA SHEET

 2

 3    Our Assignment No. J2899510

 4    Case Caption:  Genger vs. Genger

 5

 6     DECLARATION UNDER PENALTY OF PERJURY

 7              I declare under penalty of perjury

 8          that I have read the entire transcript of

 9          my Deposition taken in the captioned

10          matter or the same has been read to me,

11          and the same is true and accurate, save

12          and except for changes and/or corrections,

13          if any, as indicated by me on the

14          DEPOSITION ERRATA SHEET hereof, with the

15          understanding that I offer these changes

16          as if still under oath.

17

18

19          _____

20              Michael Bowen

21

22    Subscribed and sworn to on the _____ day of
      _____, 20_____ before me,
23    _____

24    Notary Public,
      In and for the State of _____
25
```



800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit A**

```
 1          DEPOSITION ERRATA SHEET

 2

 3    Page No._____Line No._____Change to: _____

 4    _____

 5    Reason for change: _____

 6    Page No._____Line No._____Change to: _____

 7    _____

 8    Reason for change: _____

 9    _____

10    Page No._____Line No._____Change to: _____

11    _____

12    Reason for change: _____

13    Page No._____Line No._____Change to: _____

14    _____

15    Reason for change: _____

16    Page No._____Line No._____Change to: _____

17    _____

18    Reason for change: _____

19    _____

20    Page No._____Line No._____Change to: _____

21    _____

22    Reason for change: _____

23

24    SIGNATURE:_____DATE:_____

25            Michael Bowen
```



**Exhibit A**

```
 1              DEPOSITION ERRATA SHEET

 2

 3   Page No._____Line No._____Change to: _____

 4   _____

 5   Reason for change: _____

 6   Page No._____Line No._____Change to: _____

 7   _____

 8   Reason for change: _____

 9   _____

10   Page No._____Line No._____Change to: _____

11   _____

12   Reason for change: _____

13   Page No._____Line No._____Change to: _____

14   _____

15   Reason for change: _____

16   Page No._____Line No._____Change to: _____

17   _____

18   Reason for change: _____

19   _____

20   Page No._____Line No._____Change to: _____

21   _____

22   Reason for change: _____

23

24   SIGNATURE:_____DATE:_____

25        Michael Bowen
```



**Exhibit A**

MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: $15..accounts

---

**Exhibits**

2899510 Mic
hael.
Benson.
EXHIBIT1

2899510 Mic
hael.
Benson.
EXHIBIT2

2899510 Mic
hael.
Benson.
EXHIBIT3

2899510 Mic
hael.
Benson.
EXHIBIT4

2899510 Mic
hael.
Benson.
EXHIBIT5

2899510 Mic
hael.
Benson.
EXHIBIT6

---

**$**

$15
  15:25
  19:2,17
  22:11
  25:17
  26:7,9
  28:11,12,
  14 29:4
  33:19
  42:16
  43:8
  45:18

$21,000
  50:2,25
  52:16,17
  55:14
  56:25

$21,005.24
  49:2
  50:16

$3
  70:6

$58,000
  62:25
  63:5,21

$58,059.30
  62:21

$7.5
  15:11

$8,000
  58:25
  61:16

---

**1**

1
  4:12,17
  7:18
  14:24
  55:11

10019
  4:11

1099s
  32:17

11:41
  75:25

1633
  4:10

---

**2**

2

6:7,8
8:7,8
24:12
34:21
35:4,16
54:18
55:9

20
  76:8

2014
  48:18
  59:3

2015
  47:9
  58:16
  69:3

2016
  72:14

2017
  47:2
  60:18

2018
  48:11,22
  49:2 50:3
  60:16
  62:8,13
  72:18
  77:13

23
  77:10

27
  49:2 50:3

28
  48:11,22

---

**3**

3
  8:15
  23:2,3
  33:10
  73:2

---

**4**

4
  6:5,24
  10:4
  24:4,23
  48:9,12
  50:16
  53:10
  64:4
  77:4,8

48
  77:11

---

**5**

5
  10:11
  24:4
  62:7,9
  64:4
  72:17
  77:13

52
  7:25
  13:20
  28:5
  31:22

---

**6**

6
  11:6
  72:17,19
  77:9

62
  77:12

---

**7**

7

11:23
15:2

72
  77:13

---

**8**

8
  12:25
  62:8

---

**9**

9
  14:2,24

---

**A**

a.m.
  75:25

Absolutely
  56:5,8

access
  50:25
  52:17
  58:19
  63:21
  64:15

account
  11:13,21
  25:23
  32:8
  58:24
  61:4,12,
  13,15,23
  62:2,4

accounts
  9:11
  11:8,9,
  14,18,21
  58:18,20

---

**Exhibit A**

MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: acknowledge..assets

**acknowledge**
51:13,22

**acting**
54:5,13,
25

**action**
73:5,11,
20

**actual**
21:25

**ad**
28:23,25
29:22
51:19
52:2
54:21,24

**address**
4:9,10
63:13
64:5
66:23

**adopt**
43:12

**adverse**
14:19

**advisement**
36:16

**ae**
11:3

**affairs**
58:15

**affirmative
ly**
18:7,12

**AG**
8:23 13:6
17:12,16
20:5
22:20,21,
23 23:7,
10,14

25:24
26:3,4,
10,14
27:16,18,
25 30:25
31:8
32:6,12,
20,23,24
33:2,3,8,
10,21
34:13
37:11,12,
15,16,24
38:16,19
39:2,17
42:2,7
44:5,9
46:12,18
47:16
48:2,4

**AG/TRUMP**
8:25
10:19
11:12,22
12:6,12
13:24
15:6,10
17:10
22:24
25:22
41:23
77:10

**agent**
28:12
30:22

**agree**
25:12,15

**AGREED**
3:3,8,13

**agreement**
6:2 8:18,
20,22,23,
25 9:2,4
10:15,17,

20,23,24
11:10,13,
22 12:3,
7,13
13:4,6,7,
11,25
15:6,11,
21 17:11
20:3
22:24
25:22
27:15
33:3
36:20
40:24
41:3,24
45:18
77:9,10

**agreements**
7:21 8:3
10:12,21
32:24

**ahead**
22:25

**allegation**
54:22

**allocates**
17:16

**allowed**
71:17

**ambiguous**
12:7

**amended**
36:6,23

**amendment**
5:25 7:2
10:7
24:14
25:5
35:10,12,
22 36:17,
24 46:23
77:9

**amendments**
35:9,16

**amount**
38:10,12
53:9
62:20

**and/or**
12:2,11
25:24

**anecdotal**
58:22

**annoy**
28:16

**answering**
17:21
42:20

**answers**
30:15,16,
18 46:7
47:21
54:16
55:6 58:9
71:12

**anticipatio
n**
45:11

**appeared**
40:21

**apply**
14:6
53:19

**argumentati
ve**
29:19

**Arie**
23:15
26:15,22
33:20
40:19,20
41:5,15
43:3,5
44:20

73:14
74:11,16
75:6

**Arnold**
23:19,25
26:23
34:14
39:19
40:14

**arrangement**
17:15,18
18:8 34:4
38:10

**arrangement
s**
9:11 59:7

**art**
67:11

**Article**
7:25
13:20
28:5
31:22

**aspects**
41:21

**assert**
18:2

**asset**
46:6
52:19

**assets**
7:9,10,23
8:3 9:5,
13,21
10:21
11:14
12:15,16
13:18
16:23
17:4,7
25:3 37:2
38:6
45:22

**Exhibit A**

47:13
52:23
55:25
59:9,17,
18 60:14,
24 61:6
64:9

**assume**
14:20
16:13,14
26:7
32:15

**attached**
6:25 7:2
58:24
61:17

**attachment**
35:22

**attack**
28:23
29:23
51:19
52:3
54:21,24

**attention**
71:8

**attest**
9:15,24
11:3,16
13:22
22:8

**attestation**
73:9

**attested**
73:5

**attesting**
21:4

**attorney**
56:21
60:10
74:16,25

**attorney-client**
14:14
17:24
41:4 60:6

**attorneys**
3:4

**Austin**
66:8 67:7

**authority**
25:2 28:5
31:22
60:7

**authorized**
30:4 33:8

**Aviv**
66:5,18
73:6

**aware**
12:10,11,
14,19
15:8
17:18
27:13
32:25
33:6,7,
12,17,18
34:5
37:23
39:24
40:3
58:18,20
61:11,14
65:16,18
66:4
67:21,25
68:2 71:6

———————
**B**
———————

**back**
10:2
12:23

15:2
20:21
24:12
35:14
43:18
46:23
47:3
52:11,12
59:12

**bad**
54:5,13,
25

**bank**
58:18,20
61:11,12,
22

**based**
20:12
39:6,10,
12 42:10
46:16

**basing**
20:18
68:23

**basis**
20:7,10
31:11
34:2
42:18,25
43:23,24
49:21,25
50:7 54:6
57:17,19
60:3 69:9

**bearing**
61:5

**beginning**
69:2

**behalf**
5:16 11:3
13:21
16:5 18:3
20:25

21:14
22:8
23:24
29:2
32:12,20,
22 33:8,
21 34:13
40:5,22
44:12,21
53:17,20,
21 54:7
55:6 56:9
57:8,9
58:15
64:24
70:24
75:5

**behavior**
29:19,22

**belief**
49:25

**believes**
41:4
42:16

**belong**
7:9 9:13
25:3
58:21
59:10
60:25
61:25
67:19

**belonging**
61:23
62:2

**belongs**
19:24
31:12
58:23
61:13

**benefit**
9:12 62:5

**Benson**

4:18,21,
23

**bordering**
14:17

**Bowen**
4:2,8,15,
20 5:1
6:1 7:1
8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1,2
41:1 42:1
43:1 44:1
45:1 46:1
47:1
48:1,15
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
59:1 60:1
61:1 62:1
63:1 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1
76:1,6
77:4



MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: Broadway..consistent

Broadway
    4:10

Broser
    23:19,21,
    25  24:6,
    10  26:23
    34:14,16
    39:19
    40:14,17

Brosers
    26:16
    40:8
    44:24,25
    45:5,6

burden
    29:12

burdensome
    14:17

———————

C

call
    11:10
    32:14

called
    20:4
    34:12
    51:9

calling
    51:10,14

calls
    33:20

capable
    72:2

capacity
    22:17
    23:24
    40:12
    58:4

capturing
    71:11

careful
    55:6

case
    4:18
    14:12
    41:20
    48:16,18
    64:22
    73:12,16,
    17  75:9,
    11

cases
    21:23,24

category
    24:21

caused
    48:25

caveat
    17:9

certificati
on
    3:6

change
    71:5

changing
    65:7

characteriz
e
    30:16

charged
    59:21

check
    65:14

circle
    10:2

circling
    20:21

circulating
    7:5

circumstanc
es
    24:16
    28:13
    30:20

civil
    30:10,14,
    17

civilly
    30:6

claim
    16:22
    38:17
    39:7
    45:20
    46:18
    47:12,24
    50:9,16,
    19

claims
    38:12
    46:2,3

clarificati
on
    15:3
    16:18,20

clarify
    12:9
    47:20
    65:23
    69:12

clarifying
    12:20
    54:22

clause
    48:24

clear
    25:13
    30:2
    44:21

client
    39:16,19

40:14
44:19,20
49:22
58:24
60:11
61:17
71:23,24

clients
    59:20

close
    10:15

collect
    29:11

comfort
    49:16

comfortable
    60:14

comment
    64:15
    75:16

common
    67:13

communicate
    32:13

communicate
d
    28:2,8
    32:11

communicati
ons
    14:3  21:6
    34:24
    38:24
    39:6,12,
    16,17
    41:25
    42:6,12
    43:4
    44:2,3,25
    45:5,7
    46:17,21
    47:3  58:6

72:11

complaint
    49:23

complete
    30:10

completely
    8:9  54:8

complicated
    40:21

comprised
    56:11

concerns
    44:17

conclusions
    42:2,4

condominium
    66:8

confident
    61:7

confidentia
l
    60:6
    69:10

confirm
    19:16

confusing
    8:21

confusion
    36:21

connection
    5:23
    41:23

consensus
    27:14
    32:21

considered
    67:18

consistent
    23:11



MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: constrain..disagree

constrain
41:18

constrained
42:6,19
43:22

contemplates
25:16

context
25:4 61:9

continue
30:5,13

continued
75:20

continuing
72:8

contributed
67:16

control
9:20
11:5,18,
20 47:15

controlled
23:25

controls
62:5

convoluted
40:25

copy
25:9,11

corporate
4:20

corporation
27:18
37:17

correct
5:15 6:3,
4,13
10:10
15:4,16,

24 25:18
27:6,10
37:9,11,
13,19
38:8
40:16
41:6
42:22,24
43:13,17
48:17,20
49:5
51:24
56:11,22
72:15,24

corrections
43:19

correctly
15:13
18:10
66:8

costs
15:22

counsel
56:16

court
3:17
29:13,15
49:17
50:23
52:15
72:23

created
37:24

custody
9:20
11:4,17,
20

cut
9:9

———————

D

Dahlia

62:20

date
46:24

dated
46:25
48:11
62:8

daughter
73:8

David
23:21,25
24:6
26:23
34:16
40:17

day
46:23
76:8

days
28:9

deal
30:5

dealing
17:8

debt
52:25
64:23

debtor
7:22

debts
8:11

deciding
19:12

decision
18:22

decisions
19:21

declaration
73:10

declined
18:5
41:9,16

declining
42:5
69:8,9

deduce
42:13,15

deduct
15:22

deem
9:14,22
12:14,16

deemed
6:18

defense
15:22

define
8:20

defined
22:23
26:17

definition
23:12,14

definitive
63:16

DELLAPORTAS
4:6,14
6:6,10
23:5
47:19
48:8,14
52:13
59:14
62:6,11
72:16,21
77:4

demand
16:19

demands
12:2,11,

19 17:6

deposition
19:7 28:4
30:11
44:13
51:10
55:23
58:10
65:17,21
68:12
75:19

describe
5:19 26:5
32:2

description
23:7 77:7

designated
33:18

details
45:7

devolved
29:21

dictates
64:21

direct
4:5 33:4
39:4 77:4

direction
25:24
26:2,4,
10,13
30:25
31:8
32:6,10
34:9
35:17
37:15
38:3
46:11,12
61:8

disagree
29:25



**Exhibit A**

MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: disburse..extent

disburse
  39:4

disbursed
  32:7
  38:15

discharge
  32:16

discovery
  61:9
  73:21,22

discuss
  63:25

discussed
  25:6

discussion
  31:14

discussions
  44:10,11

disingenuous
  28:20
  54:12

disposition
  10:13
  19:2
  22:18
  41:10
  43:8 45:2

dispute
  32:25
  41:21

disputes
  40:23
  41:22

dissension
  34:8

distinction
  39:15

district
  61:18

divorce
  71:4

divulging
  41:24

document
  5:11,25
  20:19
  25:14,16
  30:21
  31:15
  34:19
  35:2,6
  36:19
  48:9,23
  62:7,12

documentary
  68:20

documented
  32:15

documents
  5:17
  6:12,18,
  24 7:3
  8:2,10,
  12,17
  9:3,15,
  23,25
  10:8,25
  11:2,4,25
  12:15
  13:13
  14:14
  16:19,21
  18:6,22
  19:12
  20:13
  24:22
  26:18
  64:4
  75:20

dollars
  58:25

domicile
  65:24

drafting
  7:4

drawing
  58:12

driven
  20:2

due
  9:22
  17:10

duly
  4:3

_____

E
_____

e-mail
  7:4 75:3

e-mailed
  74:2,6,7,
  10,12,21

e-mails
  14:13

earlier
  38:9
  46:24

effect
  3:16

electronic
  65:15

embarrassment
  30:15

enforcement
  73:17

engage
  29:18

entire
  9:6

entities
  23:24
  24:7,10

33:12

entitled
  5:25
  48:10
  62:7

entity
  4:22 13:3
  37:18,23

equity
  21:11
  22:5

escrow
  9:10,12
  11:9,14,
  21 22:14,
  15 25:23
  28:12
  30:21
  32:7

ethical
  30:8
  51:11,14

event
  54:4 70:8

eventually
  25:17

examination
  3:14 4:5
  77:3

examined
  4:3

excluding
  56:3
  57:3,9

excuse
  6:16 29:6
  31:17
  64:2,10

executed
  25:11
  36:16

exhibit
  4:12,17
  5:9 6:7,8
  23:3
  33:10
  35:3,15
  48:12
  50:16
  53:10
  55:10
  62:9
  72:17,19

Exhibits
  64:4 77:6

existed
  11:2

expecting
  14:20

experiences
  58:13

explain
  30:7 31:3
  35:15
  55:16
  69:20,25
  70:2

explained
  39:11

expressing
  64:20

extensive
  68:23

extent
  7:20 9:11
  13:16
  17:23
  22:4 43:5
  50:15,18
  59:2
  66:12
  68:2 72:9



MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: face..Genger

---

**F**

**face**
20:3

**fact**
11:19
19:16
20:3
50:17
51:13,18,
22 52:21
56:15
60:13
64:14
67:3
70:16
72:13
74:2
75:13

**facts**
61:19

**faith**
54:5,6,
14,25

**false**
10:18
51:3
52:21

**fashion**
71:14

**February**
72:17
77:13

**federal**
28:16
30:7
49:17
50:23
51:10
52:4,6,15

**feel**
42:5

**figure**
40:8

**file**
49:17

**filed**
48:22
49:4
56:17
60:18
62:13

**filing**
3:5 54:6,
14

**filings**
66:10,11,
13

**financial**
59:7
60:10

**fine**
39:15
51:8
52:2,5
71:16

**finger**
63:19

**fingertips**
44:15

**finish**
29:6
42:23
64:12
71:20

**finished**
71:9

**firm**
5:2,17
7:21 8:12
11:3
12:10
13:9,22
14:10,18

15:18
16:6,9,
10,21
17:17,18
18:19
19:15
20:14,16
21:2,9,
13,14,15,
21,22
22:8,12,
18 25:24
27:13,16
29:2
32:8,12
34:5
35:23
37:20,25
39:20
40:8,15,
21 41:4
44:3,12,
22 45:6,
16,24
46:5,8
47:17
48:17
53:8,20,
21,24
54:5,7,13
55:7,16
56:2,4,9,
10,25
57:5,8,9,
11,13
58:2,4,
13,20,23
59:5,8,
17,19,24
60:16
61:11,14,
21,23
62:13
63:2,4,9,
11 64:6
65:2,3,
10,18

66:4,19,
22 67:2,
6,25
68:2,17,
21,25
70:25
71:4,5
72:11
74:9,20
75:5

**firm's**
5:22
15:17
17:9
19:23
20:10
26:17
32:2
38:9,14,
21 45:23
66:12
69:3

**fix**
51:18

**flow**
32:17

**follow**
34:9

**force**
3:16

**forget**
22:14

**forgoing**
14:3

**form**
3:9 66:6
68:20

**forward**
16:8

**frank**
28:10

**frankly**
18:19
30:15

**Freedman**
74:12

**Freeman**
73:4

**Friedman**
74:22,24

**front**
5:7 47:8

**full**
36:18
50:17
73:2

**funds**
55:17,19
59:18
61:12

**future**
10:13
26:21

---

**G**

**gather**
19:20

**gave**
25:10
36:16,17

**generally**
58:17

**Genger**
5:23
7:10,11,
22 8:4,12
9:5,6,12,
21 11:15
14:11
18:3
19:15,18,



MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: Genger's..idiotic

25 20:9,
15 23:15,
17 25:3
26:15,22
31:12,13
33:20
34:11,12
38:7 39:7
40:19,20,
23 41:5,
21,22
43:5
44:19,20
46:15
47:23
48:5,17,
25 49:7
50:3,23
53:8
58:14,15,
16,18
59:4,8,
18,19,24
60:16,25
61:2,4,
13,22,24
62:2,20
63:5
64:11
65:18
66:14
67:21,23
68:18,22,
24 72:14
73:14
74:11,25
75:6

Genger's
18:17
63:20

Gengers
39:21

give
24:19
31:25

32:6
34:11
42:12
55:5

giving
34:2

good
4:15,16
54:6

ground
18:6,23
19:13

grounds
6:15
41:11

group
8:23,24
13:7
15:10,13
17:6,12,
16 20:5
22:20,21,
23 23:8,
10,15
25:25
26:3,4,
11,14
27:16,18,
25 30:25
31:8
32:6,12,
20,23,25
33:2,3,8,
14,16,21
34:7,13,
24 35:3,
4,17
37:8,11,
13,15,16,
24 38:3,
16,19
39:2,18
41:23
42:2,7

44:5,9
45:19
46:12,18
47:16
48:2,4

Group's
16:22

Group/trump
13:6

guess
22:13
40:10
53:23
58:16
65:22
70:14

———————————

H

hand
8:2

happened
64:25

harassment
14:17

head
18:20
61:19

hear
34:6

heard
49:23

held
8:11
22:15
32:8

hereof
24:3

hereto
3:5

hesitation
17:21

highly
60:6

Hirschman
18:15,17
19:3,4,16
20:22
21:7,8
22:5
53:13,18
56:3,6,13
57:2,3,6,
13,21,25
58:7 69:5
72:12

Hirschmann
54:19

hits
32:7

hold
42:23
59:17

home
66:18
73:6

homes
66:15,25

hominem
28:23,25
29:23
51:19
52:2
54:21,24

honestly
22:9

hostile
28:23

husband
67:12
69:25
73:6

husband's
67:24

hypothetica
l
33:24

hypothetica
lly
34:9

———————————

I

idea
24:8
27:19
29:7
40:12
55:14
56:7

identificat
ion
4:13 6:9
23:4
48:13
62:10
72:20

identified
55:22
61:15
63:15,24

identify
33:15
38:6 42:6
43:3 54:2
61:23

identifying
7:9 60:24

idiot
51:7,9,
10,15

idiotic
51:25



**Exhibit A**

MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: immediately..justify

immediately
    29:21

impecunious
    64:23

impinge
    14:12

impinging
    17:22

implicit
    50:12,15,
    21 52:16

implies
    21:24

impossibili
ty
    39:14

include
    18:15
    75:3

includes
    53:13

including
    23:15
    57:2

income
    67:14

Incorporate
    14:7

incorrect
    27:11

indemnifica
tion
    15:23

indemnity
    12:2,11,
    19 17:6

individual
    23:23
    33:11
    40:12

69:11

individuals
    27:8

infant
    73:7

information
    17:23,24
    18:14,16,
    18 19:20
    32:24
    35:11
    37:20
    41:19
    42:13
    44:8,14,
    18 50:20
    53:16,19,
    25 55:17,
    18,20,21
    57:4,6,7,
    10,23,24
    58:3,22
    59:6
    60:2,4,19
    63:2,12,
    18 64:25
    65:2,17
    66:20,22
    67:2
    68:15,19
    69:10
    70:25
    75:5,10,
    13

inquire
    19:15

inquiries
    68:16

inquiry
    5:21 19:9
    20:14,22
    21:5,6,16
    40:7
    45:13

58:11
68:5,10
70:8

ins
    67:6

institution
al
    20:11

instructed
    27:7

instruction
s
    27:25

instrument
    26:22,25

insurance
    71:6

intends
    39:4

intention
    39:3

intentional
ly
    11:12
    13:4
    16:25

interest
    66:6,14,
    18,19
    67:4,23,
    24

interfere
    69:23

interpose
    8:13
    30:24
    69:23

interposed
    6:22
    41:18

interposing
    7:14 10:9

Interpret
    66:2

interpretat
ion
    20:18,19

interrupt
    71:18

interrupted
    29:14
    43:13
    71:19

interview
    57:21
    58:5,7

intimate
    5:22

invade
    50:5
    57:21

investigati
on
    44:23

involve
    7:3 21:6

involved
    20:15,16
    39:16,17
    58:15
    68:25

involvement
    69:3

involving
    40:22

irrelevance
    10:9

irrelevant
    6:19 7:6,
    7,8,20,23

9:7 13:20
46:4
60:20,23

Israel
    66:5

issue
    33:5,13,
    18

issued
    9:18 15:9
    35:5,20

_____

            J

Jaffe
    47:8

joint
    67:13

judge
    28:10,16
    29:9 30:8
    47:8
    52:4,6
    73:4

judgment
    48:10,16
    50:18
    52:22,23,
    24 53:2,
    9,14 54:7
    56:17
    62:8,19
    70:7
    73:17
    77:11,12

judgments
    64:3

June
    46:25

justify
    69:22



MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: Kasowitz..manner

29:17

**K**

**Kasowitz**
4:17,18,
21,23,25
5:5 6:7
7:12 9:20
14:23
18:7,14,
16,25
22:3,18
23:2
24:12
25:24
34:21
35:23
36:2
38:20
42:16
48:9
49:5,12,
15,16
50:22
52:14
54:4
55:11
62:6
72:17
75:4 77:7

**Kasowitz'**
52:18

**KBT**
5:3,6

**kind**
12:7
20:18
29:18
38:17
39:15
58:23
64:21
67:10

**Knock**

**knowledge**
5:22 7:21
15:15,17,
18 18:25
19:24
20:11,12
27:17,21,
23 37:23
40:10
41:10
48:4 49:8
52:18
53:21
66:12
68:17,23
69:15

**L**

**Lastly**
14:2

**latitude**
31:25
34:3

**laughing**
51:6

**Laughter**
51:5

**law**
14:10,18

**lawsuit**
60:18

**lawyer**
58:4,14

**lawyers**
20:14

**lead**
56:16,21

**learned**
58:3

**leave**
30:7

**Leaving**
53:7

**leeway**
24:20

**legal**
15:22
37:18,23
67:11

**Leon**
74:24

**letter**
72:18,22
77:13

**level**
49:17

**liberty**
17:25

**limit**
40:13
44:24

**Limited**
40:14

**lines**
24:4

**list**
10:3
12:24

**listed**
56:15

**listen**
71:10,15

**listening**
71:21,25

**litigate**
31:20

**litigation**
50:24

**litigations**
40:22

**live**
69:5

**lives**
66:23
73:7

**LLC**
27:22

**LLP**
4:19,21

**loans**
52:25

**location**
61:6
65:13

**log**
14:16

**logic**
64:21

**long**
15:7
43:12
73:5

**looked**
68:19

**lost**
19:10

**lot**
14:20

**M**

**made**
5:21 12:2
13:2,24
15:15
17:3
19:8,14
21:4

42:15
43:10
46:21
47:24
49:18
51:19
54:22
55:13
58:11,12
59:23
61:4
63:5,10,
16 64:7,
15 66:13
68:4,9,
16,18

**maintaining**
43:6

**majority**
27:13
32:21

**make**
19:21
20:17
26:9
29:10
31:13
39:15
41:12
43:18
49:7,21
50:25
52:6 65:8
72:16

**making**
18:21
28:23,25
35:16
54:21,24
71:17,19

**managed**
23:24

**manner**
27:9 64:2



**Exhibit A**

MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: March..notes

65:12

March
48:11,22
49:2 50:3

marginally
70:7

marital
57:21
58:6
67:5,8,20
69:24
70:3,8,9,
10,15
71:2
72:12

mark
6:7 22:25
48:9 62:6

marked
4:12,17
6:8 23:3
48:12
62:9
72:17,19

marred
70:21

marriage
71:4

married
67:18
69:16
70:12,16
72:13

matter
20:15
24:3
39:20
40:9 43:7
56:16,22
66:24
73:15

matters

5:12
68:6,10,
18

meaning
9:12 13:9
26:12,13,
15 58:3
59:17
67:11,12

means
21:13
31:7
52:25

meant
12:21
19:4

mechanism
25:21
32:3
45:20
55:18
63:17

member
37:8,11
38:4
44:4,9

members
26:13
27:16
33:2,10
34:7,24
35:4
39:17
41:25
42:7
46:17

memory
35:18
72:15

mentioned
68:4

method
63:17,25

methodology
19:6,20
20:25

Michael
4:2,8
40:2 76:6

middle
31:18

million
15:11
16:2
19:2,17
22:11
25:17
26:8,9
28:11,12,
14 29:4
33:19
42:17
43:8
45:18
70:6

mind
11:19
21:5
57:13

minus
45:19

misinterpre
ting
12:22

misleading
8:21
10:17,18
11:11
12:5 13:5

missed
75:2

misstated
18:11

misstatemen
ts

43:10

mistaken
43:15,21

misundersta
nding
65:8

mixed
61:19

mode
29:22

moment
61:15

moments
43:11

money
7:22
18:9,13,
24 19:24
20:4,8
22:13,19
29:12
31:11
32:7,17
33:4,22
34:18,25
35:18
38:11,13,
15 39:3,8
46:2,3,9,
13,19
47:25
49:9,13,
22,23,24
50:7,8
53:9,10,
22 56:7
59:9,16
63:17
64:15
65:4,9,
10,11,12

Montclair
74:13,15

months
63:21

morning
4:15,16

motions
29:11

move
10:3 40:5

multiple
46:22

_____

N

names
24:10

narrowed
17:2

necessarily
53:6 66:7
67:15

normal
29:22

Nos
14:24

notary
3:15 76:9

note
35:19,20,
22,24
47:24
54:20

noted
75:25
76:3

notes
9:18,19
15:9,12
16:22,23
17:12
35:5,8



**Exhibit A**

MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018

36:3,5,6,
23,24
37:12
38:2
45:18
71:25

notify
71:3

number
8:7 10:4,
11 11:23
12:25
50:5,6

numbers
5:14

———————

O

oath
19:8 21:4

object
7:19 8:19
10:16
13:19
24:23,25
31:9 34:2

objection
6:17,22
8:13 10:9
11:11,24
12:4,8
13:4
28:5,6
30:25
31:24
41:12

objections
3:9 6:22
7:13,15,
17 8:8,16
11:6
12:25
14:8,23

30:18
41:18
75:18

obligations
51:11,14

obtain
52:24

October
60:18

offensive
70:19,20

offset
16:23

opening
23:6

operative
25:14
36:20

orally
7:15

order
50:25

organizes
21:21
22:3

originally
20:16
35:19

Orly
7:10,11,
22 8:3,4,
12,20,21
9:5,6,12,
21 10:14,
16,22
11:10,15
12:3,16
13:3,5,9,
10,17
14:10
16:24

17:3,7,
13,17,25
18:3,8,
13,17,23
19:15,18,
25 20:9
23:17
25:3
26:15,22
31:12
34:10,12
37:3,8
38:3,7,
11,18
39:7
41:21
42:17
43:2,5
44:18
45:22
46:6,7,
15,18
47:13,14,
23 48:5,
25 50:2
52:15,17
53:8
55:14,25
58:14,15
59:8,18,
19,24
60:15,25
61:3,13,
22,24
62:2
68:22,24
72:13
73:5

Orly's
12:15
41:13

outs
67:6,7

overbroad
7:19

overly
14:17

owed
8:11

owes
7:22

owned
8:3 9:4
10:21
11:14
13:18
16:24
17:7
23:24
37:3
45:22

owner
18:4

ownership
22:2
38:17
66:19

owns
7:24 9:21
17:4
38:12
55:25

———————

P

———————

p.m.
76:3

paid
7:10,24
8:4 9:5,
13,22
10:22
11:15
12:16
13:10,18
16:24
17:7
19:17,25

20:4,8
22:11,13
25:4
37:3,7,
12,14
38:2,11
39:9
42:17
45:22
46:13,15
49:2
50:2,7,8,
17,20
52:15,16,
22 53:14
64:3,23

paper
54:14

paragraph
23:7 73:2

parenthetic
al
24:6

parse
38:22
39:7,12
42:9 44:8
57:12

part
15:7
38:22,23
44:23
46:15
59:2

participati
on
68:24

parties
3:5

partner
18:19
19:16
21:8,11,



**Exhibit A**

23 22:5,
6,17
56:3,19,
21 58:13

**partners**
56:11,13
69:11
71:2

**partnership**
21:22,25
37:17
67:24
69:10

**party**
38:24
52:24
73:19

**past**
10:13

**Paul**
4:8 74:15

**pay**
52:23,24
53:2,9
55:14
59:4,5,20

**payable**
9:20
31:12
38:7
46:6,9,
11,19
55:25
59:10,19
60:25

**paying**
71:7

**payment**
17:19
25:17,21
26:9
45:20
48:21

49:7,18
50:25
60:15
61:4,22
62:24
63:6,10

**payments**
12:2,12
13:2,9,24
15:14,25
17:3,10,
17 19:14
47:24
59:23
64:7

**people**
13:17
33:11
46:2

**perfectly**
25:13
30:12,14
71:16

**period**
11:22
12:13,20
44:10
47:11

**person**
13:3
14:19
52:22
64:23

**personal**
57:23
58:13
64:20

**personally**
16:16
21:14
22:16,17
55:20
74:8,10
75:4

**personnel**
68:17

**phone**
27:4
32:14

**phrase**
8:19
10:16
12:4

**pick**
72:4

**picked**
56:20

**piece**
54:14

**plan**
48:3

**plural**
41:22

**point**
16:8
50:23
72:14

**pointed**
33:12

**portion**
17:16

**position**
18:7 20:2
38:4,25
52:6
75:19,22

**possession**
9:19,25
11:4,17,
20 13:23
36:2

**possibly**
51:4

**potential**

34:25
41:14

**potentially**
10:17,18
12:4 38:6

**preamble**
43:12,16,
17

**predates**
47:2

**predecessor**
48:16

**prefer**
5:6

**premise**
51:3

**premises**
52:21

**preparation**
58:8

**prepare**
55:19,21
58:10

**prepared**
21:2 22:8
30:3
45:10
54:2
63:13
64:5
65:16

**preparing**
19:6
44:13

**present**
10:13
47:11

**presume**
44:4

**presuppositions**
53:5

**previously**
14:5

**primarily**
66:5

**primary**
6:17,21

**prior**
14:7
43:20
47:21
59:13
61:17
72:7
74:16,24

**private**
69:23

**privilege**
6:14
14:12,14,
15 18:2,4
38:23
41:13,14
42:19,21
43:2
44:7,17
50:6
60:21

**privileged**
6:19
14:2,21
17:22
19:7
20:13
39:13
41:4,11
42:11,13
43:6 59:6
60:2,4,7
68:14

**privileges**

MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: privy..recess

53:18

**privy**
57:7,24
59:25

**probe**
57:18

**proceed**
30:18
32:4
54:17

**proceeding**
59:3
61:17

**proceeds**
10:14
17:20
26:20
27:7
30:20
41:11
45:3
47:13

**process**
5:20 38:5
75:7,14

**produce**
9:14,23
10:25
11:16
13:14
18:5,22
19:12

**produced**
5:24
25:7,9
36:8,10
75:20

**product**
19:7 21:3

**production**
36:23

**professional**
29:21
30:9 55:6

**professionals**
29:20

**profit**
22:6

**profits**
22:2

**prohibits**
41:24

**promissory**
9:18,19
15:9,12
16:22,23
17:12
35:8

**pronouns**
16:11

**proper**
75:20,21

**property**
7:23 8:11
9:4,5
24:22
67:5,7,8,
13,17,20
70:4,8,
10,16

**propounded**
73:22

**protected**
21:3
38:23
60:20

**provide**
41:19

**providing**
58:9

**public**
3:15
66:10,11,
24 76:9

**purchased**
73:6

**purchasing**
67:17

**purposes**
44:21
73:21

**pursuant**
13:3 15:9
30:21
34:18,25
35:5

**put**
42:14
50:14
53:6
57:20

---

## Q

**qua**
18:18
57:5,7,13

**question**
17:22
18:3
19:10,11
20:6,22
21:17
22:9
24:24
27:5
28:7,17
30:17
33:23
34:10
43:9,20
44:4
45:16

46:7
49:19
50:15,21
51:2,12,
16,21
52:9,10,
11,12,18,
20 53:5,7
54:15
55:4
57:16,18,
19 59:13
60:2
61:8,10,
11,14,20,
21 63:7,
8,10 65:7
68:14
70:14,18,
19 71:18,
21 72:7,9

**questions**
3:10
20:24
21:2
28:19
41:9,17
50:11,12,
13 75:21

**quote**
8:10 9:2
10:12,15
11:8,25
13:2 37:8

---

## R

**random**
56:19

**read**
12:6 15:5
24:5
35:13,15
43:18

52:11,12
59:12
76:2

**readback**
43:20
59:13
72:7

**reading**
15:20

**reason**
36:14
41:8 60:9
71:3

**reasonable**
5:21 19:9
20:14
21:5,6,16
40:7
49:20
58:11,12
68:5,9,
16,18

**reasons**
25:6

**recall**
15:20
35:11

**receipt**
34:25

**receive**
49:21
61:22

**received**
22:19
34:18
38:15
39:3
49:23,24
61:12

**recess**
47:18



**Exhibit A**

MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: recognize..reviewing

recognize
62:14

reconsider
60:8
69:13

record
4:7 29:24
66:24

recordkeeping
32:16

records
13:8,23

refer
4:24 5:5
15:5
23:10
55:24

refereed
35:20

referred
8:24

referring
4:25 8:22
10:19
12:6 13:5
23:11
73:9

reflect
8:3 13:18
37:2
67:15

reflected
9:21
10:21
11:14
12:15
33:10
35:25
50:16
53:10
64:3

reflects
17:4
35:11
62:19

reframe
61:20

regard
41:9 43:7
54:15
74:16,17

reiterate
10:5

reject
50:19
54:8

rel
70:7

relate
16:23
17:6
19:14

related
10:8 11:9
12:12
15:22
40:24
45:21
68:21

relating
8:17 9:3
11:21
16:21
17:3 24:2
45:17

relation
10:23
13:11

relationship
13:10
17:25
41:5 43:6

45:21
53:16
59:11,22,
24 60:5,
10 69:24
70:11

relationships
57:22

release
6:2 7:3
26:20
27:7
28:14
30:20

relevance
6:18
69:14
75:18

relevant
8:5 9:14
10:24
12:17
13:14
26:18
38:5
45:13
57:25
64:16
68:2
69:6,7,
13,17
70:15

remaining
17:19

remember
5:4 43:14
59:3 75:4

remembering
15:13
66:7

repeat
68:15

reporter
29:15
71:11
72:6

represent
41:20
73:14,20,
24 75:6

representation
50:22
52:15
68:22

represented
48:17
74:17

representing
63:4
68:24
74:3

represents
14:10,19
40:8

request
5:12 6:5
9:6 13:13
17:2
18:23

requests
14:11
18:6

require
30:9

requirement
26:25

research
63:12

reserved
3:10

resides

65:19,23
66:5

respect
17:19
39:20,21,
22 41:2
43:7 45:2
52:19
54:16
56:16,21
58:7
67:21
68:5,10
72:12
73:15
74:3 75:6

respective
3:4

response
5:24 7:13
32:11
74:19

responsibilities
32:16

responsive
6:5,12
8:5,10,13
9:14,23
12:17
13:14,20
16:19
18:6,22
19:13,21,
22

retainer
59:20

retract
51:17,23

review
20:12

reviewing
52:4



**Exhibit A**

MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: reviews..stated

71:25

**reviews**
  52:7

**rights**
  15:21

**road**
  33:6

**role**
  5:22

**route**
  35:17
  63:17

**royal**
  16:12,13,
  15

**rules**
  30:8,9

————————

**S**

————————

**Sagi**
  40:23
  41:22

**Sagi's**
  69:24

**satisfaction**
  48:10,15,
  22 50:17
  54:7
  56:17
  62:7 64:2
  77:11,12

**satisfied**
  62:20

**scope**
  7:25
  13:19
  17:8
  21:20
  22:7

24:18
25:2 27:2
28:3,4
30:2,3
31:10,22,
23 33:25
36:12,24
40:6
44:13
45:12,15
50:4
63:14,22
64:16
65:20
69:11

**sealing**
  3:5

**search**
  5:16,19
  8:6 11:2
  19:9

**searches**
  58:12
  68:18

**seek**
  38:6

**sees**
  29:9

**send**
  33:21

**sense**
  65:25
  68:19

**separate**
  63:7

**series**
  47:3

**serve**
  75:13

**served**
  7:12
  73:25

75:7

**services**
  59:5

**set**
  25:23

**setoffs**
  45:19

**settlement**
  6:2 8:18,
  20,22,23,
  25 10:14,
  17,20,23,
  24 11:10,
  12,22
  12:3,12
  13:3,6,7,
  11,24
  15:6,10
  17:11
  22:24
  25:22
  40:24
  41:2,23
  45:18
  77:9,10

**share**
  22:2
  28:15
  46:10

**shared**
  38:19
  39:2

**sharing**
  22:6

**shorthand**
  4:25

**show**
  32:17

**showing**
  31:13

**shows**
  36:20

**sign**
  76:2

**signature**
  7:5 54:18
  55:9,12
  62:16

**signed**
  26:22
  35:3 49:4

**single**
  14:11

**singular**
  16:11

**sister**
  69:24

**sort**
  37:17,18
  57:23
  60:15

**source**
  52:19
  55:17
  57:10
  62:24
  63:8,9
  65:9,10

**sourced**
  53:22

**speak**
  32:19,22
  33:8
  53:20

**speaking**
  16:12
  21:14
  29:2
  33:21
  34:9,12
  41:13,14
  56:8,24
  57:4,8
  70:24

71:13

**specifically**
  5:11 7:17
  25:9
  41:13
  68:6,12

**speech**
  71:19,20

**speeches**
  29:23
  71:17

**spends**
  66:9

**spirit**
  34:2
  36:18

**spoke**
  10:4
  29:14

**spokesperson**
  33:13,16,
  17

**spousal**
  53:18

**spouse**
  18:18
  53:15,16,
  17 57:7,
  14 67:15

**start**
  7:18 47:6

**started**
  47:10

**starting**
  69:3

**State**
  4:7 52:10

**stated**



**Exhibit A**

MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: statement..topic

14:23

statement
  37:10
  42:15
  49:17,21
  51:17,23

statements
  11:8,13,
  21

states
  8:10
  10:12

status
  67:18
  71:2,5
  72:12

STIPULATED
  3:3,8,13

stipulation
  6:25 7:2
  10:7

stop
  71:8,17

subject
  5:12
  12:20
  24:2
  66:21
  68:5,10
  75:21

subjects
  14:4 64:8

submitted
  72:22
  73:11

subordinate
d
  36:23,24

Subpart
  9:7,10

subpoena

4:18 5:7
7:13
14:18
19:13,21
24:19
25:2 30:4
31:10,23
33:25
36:12,25
40:6
45:12,15
46:4 50:5
54:3 58:2
63:14,22
64:17
68:6,11
69:7,12
73:25
74:4,16,
18 77:8

subpoenaing
  14:10

subscribed
  3:14,16
  76:8

Subsection
  9:17

substance
  44:2

substituted
  35:23

subsumed
  13:12

subtilely
  65:6

suffice
  75:17

suggest
  54:4,9

suggestion
  28:18
  54:12

summer
  47:2

supplementa
l
  35:10,21

sworn
  3:15,16
  4:3 73:10
  76:8

───────

T

───────

takes
  18:7

taking
  38:4
  52:25

talk
  60:8

talking
  29:20
  55:3
  71:23,24
  73:15
  74:23

team
  75:4

technical
  65:24
  67:11

Tel
  66:5,18
  73:6

telling
  11:19
  21:4,5
  43:22
  45:4
  60:14

tenants
  67:13

term
  61:25
  67:11
  68:11

terms
  71:6

testified
  4:4 30:23
  38:8
  63:24

testify
  19:22
  30:19
  63:23

testifying
  19:8 40:4
  53:17

testimony
  18:11
  45:11

Texas
  66:9 67:7

thereunder
  9:18

thing
  7:4

things
  5:23 22:4
  69:21
  71:22

thought
  29:19

thousand
  58:25

time
  3:10 15:7
  44:11
  47:10
  50:24
  52:17
  55:13

57:24
66:9,13
71:22
75:25
76:3

times
  68:11

tip
  63:18

tips
  63:19

title
  21:23,24

today
  9:15,24
  12:9 21:2
  45:11
  46:10
  54:2,16
  55:20,22
  61:6
  63:19
  73:16
  75:23

today's
  65:17

told
  32:5
  42:10
  43:24
  51:19
  53:11

tolerate
  51:20

top
  44:16

topic
  44:5 45:6
  54:3
  55:22
  68:21



MICHAEL PAUL BOWEN
SAGI GENGER -v- ORLY GENGER

October 05, 2018
Index: topics..wording

**topics**
  63:25

**Torres**
  4:19,21,
  23

**totally**
  40:9

**transcript**
  29:9
  52:5,7

**transfer**
  65:15

**transferred**
  55:19
  65:13

**transmitted**
  53:23,24

**transmitting**
  48:5

**transparency**
  34:4
  36:19

**treated**
  71:14,16

**trial**
  3:11 47:7

**true**
  22:6 53:7
  64:22

**trump**
  8:22
  15:10,13
  16:22
  17:6
  34:24
  35:3,4,17
  45:19

**Trumps**
  15:21

**trust**
  22:14
  27:20

**truthful**
  50:22
  52:14

**turn**
  5:9

**type**
  65:14
  67:4 71:5

**types**
  14:13

—————————

**U**

**Uh-huh**
  32:9

**ultimate**
  15:25
  18:25
  41:10
  43:8 45:2

**ultimately**
  19:14,17
  42:17
  46:15

**unaware**
  16:21
  17:17

**uncollected**
  70:6

**understand**
  18:9,12
  20:6
  28:22
  29:8 31:6
  49:19
  56:10
  61:10,20
  64:19
  65:21

**understanding**
  13:8
  16:3,8
  17:9
  19:23
  20:8,11
  26:18
  27:12
  32:3 33:9
  38:9,14,
  20,21
  39:6,10
  42:3,4,
  10,18
  43:23,24
  45:17,23,
  24,25
  46:5,9,
  16,20
  47:17

**understood**
  16:17
  19:4 42:8

**undertake**
  5:16

**undertaking**
  14:16

**undertook**
  8:6

**unethical**
  54:8

**unnecessarily**
  28:16

**unnecessary**
  29:11

**unprivileged**
  42:12

**unprofessional**
  54:9

**unquote**
  9:3 37:8

**unreasonable**
  29:23

**unrelated**
  40:9

**unsigned**
  25:10
  36:18

—————————

**V**

**vague**
  12:7

**valid**
  70:18

**version**
  36:17

**versus**
  57:13

**view**
  7:5,7
  10:24
  13:13
  17:2,5
  21:24
  22:4,10,
  12 36:22
  60:22
  63:20
  64:20

**violated**
  51:14

**virtue**
  67:17

**volunteer**
  40:11

**vote**
  27:13,14
  32:22

—————————

**W**

**waive**
  18:2

**waived**
  3:6

**waiving**
  28:6
  31:24

**wanted**
  36:19
  63:25

**Watell**
  35:20,23

**website**
  56:20

**weeks**
  74:2

**whatnot**
  15:23
  32:18

**whatsoever**
  13:23
  15:19
  69:14

**wife**
  53:14
  57:22
  67:13

**wire**
  65:14

**withheld**
  6:14

**Wonderful**
  52:8

**word**
  65:25

**wording**
  22:15



**Exhibit A**

```
      36:13

words
   16:14

work
   4:10  19:7
   21:3

work-
product
   14:15
   68:14

works
   22:15
   32:3

writing
   27:4
   32:13

written
   7:12
   26:21,25

wrong
   42:24

wrote
   73:4

   ——————————

          Y
   ——————————

year
   26:7
   60:16
   61:5

years
   46:22
   47:4,5

yield
   66:2

York
   4:11
```



agrees to conduct a reasonable search for and produce non-privileged documents responsive to

this request with respect to the accounts identified above from 2017 to the present.

INTERROGATORY NO. 17:
Provide a schedule of all debts owing to Defendant, whether past due or yet to become
due, even if only upon demand by Defendant, and any other intangible asset or property owned
by Defendant that can be assigned or transferred, whether a present or future right or interest and
whether or not vested, at year end for each of last six years, describing any debt over $10,0000
[sic] not appearing because it did not exist at year end.

RESPONSE:

Orly objects to this interrogatory on the grounds that it is vague, ambiguous, compound,

duplicative, overbroad and unduly burdensome. Subject to these objections and the foregoing

general objections, Orly responds as follows: There are no debts currently due to Orly or yet to

become due to Orly, but Orly expects that significant damages will be awarded to her in

connection with her litigations against Sagi currently pending in state court.

REQUEST FOR PRODUCTION NO. 17:
Please produce at the time and place described in the first paragraph on page 1 of this
document, above, all writings and documents concerning and relevant to Defendant's answer to
the foregoing Interrogatory, including but not limited to unredacted copies of all promissory
notes and other documents establishing the debts.

RESPONSE:

Orly objects to this request on the grounds that it is vague, ambiguous, overbroad and

unduly burdensome, and to the extent it seeks documents already in Sagi's possession, custody,

or control.

INTERROGATORY NO. 18:
Identify the amount, date, and recipient of all payments made and/or to be made to any
person or entity pursuant to Defendant's 2013 settlement with, *inter alia*, the parties known as
"The Trump Group," including any and all payments made from any escrow accounts
thereunder.

16

**Exhibit A**

RESPONSE:

Orly objects to this interrogatory on the grounds that it is vague and ambiguous and to the extent it seeks information not known by Orly. Subject to these objections and the foregoing general objections, Orly responds to this interrogatory as follows:

Orly has received $0.00, as well as no non-monetary benefit, in connection with the 2013 settlement with the parties known as "The Trump Group," and has no knowledge of any amounts or benefits other parties may have received under that settlement. Further, Orly knows that Sagi took for himself (either directly or through an entity under his control) the $10,314,005.00 that was supposed to have been allocated to Orly in connection with that settlement.

REQUEST FOR PRODUCTION NO. 18:
Please produce at the time and place described in the first paragraph on page 1 of this document, above, all writings and documents concerning and relevant to Defendant's answer to the foregoing Interrogatory, including but not limited to all payment records, all promissory notes issued thereunder, and all communications concerning any of the foregoing.

RESPONSE:

Orly objects to this request on the grounds that it is vague, ambiguous, overbroad and unduly burdensome, and to the extent it seeks documents already in Sagi's possession, custody, or control and/or documents not in Orly's possession, custody, or control.

INTERROGATORY NO. 19:
Identify all escrow arrangements or agreements made pursuant to Defendant's 2013 settlement with, *inter alia*, the parties known as "The Trump Group," including the content of any escrow account thereunder.

RESPONSE:

Orly objects to this interrogatory on the grounds that it is vague, ambiguous, and to the extent it seeks information not in Orly's possession, custody, or control.

17

**Exhibit A**

DAVID BROSER                                          October 23, 2018
SAGI GENGER vs ORLY GENGER                                          1

```
 1

 2

 3
                 UNITED STATES DISTRICT COURT
 4               SOUTHERN DISTRICT OF NEW YORK
    ------------------------------
 5  SAGI GENGER,

 6            Plaintiff,

 7         vs.                    No. 1:17CV8181

 8  ORLY GENGER,

 9            Defendant.
    ----------------------------
10

11

12

13            DEPOSITION OF DAVID BROSER

14               New York, New York

15             Tuesday, October 23, 2018

16

17

18

19

20

21

22

23  Reported by:
    Yaffa Kaplan
24  JOB NO. 3006866

25
```



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit A

```
 1                    D. Broser
 2       Q.    Are you aware that there was a
 3   settlement agreement with your signature on it?
 4       A.    Yes, I am.
 5       Q.    Are you aware that the settlement
 6   agreement provided that 17.2 million dollars would
 7   be paid around the time of execution and another 15
 8   or so pursuant to promissory notes under that
 9   agreement?
10       A.    There is a lot of different numbers in
11   the agreement, so I would like to see which
12   specific numbers you are referring to.
13       Q.    Are you aware that any money was to be
14   paid under that settlement agreement?
15       A.    Yes.
16       Q.    Is there an agreement as to where that
17   money is to go as among the members of the AG
18   Group?
19             MR. GOLDBERG:  Pursuant to the
20         settlement agreement?
21       Q.    Can you answer my question?
22       A.    Can you repeat the question?
23             MR. DELLAPORTAS:  Can you read it back?
24             (Record read.)
25             MR. GOLDBERG:  I am asking that money
```



Exhibit A

DAVID BROSER                                    October 23, 2018
SAGI GENGER vs ORLY GENGER                              13

```
 1                     D. Broser
 2         referring to the money under the settlement
 3         agreement.
 4              MR. DELLAPORTAS:  I think my question is
 5         clear.
 6         Q.   Can you answer it?
 7         A.    Where all the money goes under the
 8  settlement agreement?  I believe the settlement
 9  agreement has more than 32 million dollars in it.
10         Q.    Whatever the amount is, my question
11  didn't specify an amount.  Is there an agreement as
12  to where where any or all of that money is to go as
13  among the members of the AG Group?
14         A.    I would like you to read back the
15  question when you brought up 32 million dollars as
16  the number because you did specify a number
17  earlier.
18         Q.   Can you answer this question, or are you
19  refusing to answer this question?
20         A.    Ask it the proper way, I will answer it.
21              MR. DELLAPORTAS:  Can you read back the
22         last question?
23              (Record read.)
24         A.    Yes.
25         Q.    What is that agreement?
```



Exhibit A

DAVID BROSER                                    October 23, 2018
SAGI GENGER vs ORLY GENGER                                    14

```
 1                    D. Broser
 2        A.     What is that agreement?
 3        Q.     What is the agreement?
 4        A.     All the money goes to Ari Genger.
 5        Q.     Is that agreement reduced to writing
 6   anywhere?
 7        A.     No.  Facts speak for it.
 8        Q.     When was that agreement reached?
 9        A.     As the litigations were going on with
10   the Trumps, very, very early in this process.
11        Q.     Sorry.  When you say "very, very early",
12   what do you mean?
13        A.     I mean the same time that Sagi stole all
14   his sister's assets and had claims against Sagi and
15   had the claim against the Trumps for her specific
16   shares.  All the other assets were to go to Ari for
17   the control that his son tried to steal away from
18   him also.  So that's when the process took place.
19   MO   Q.     So I am going to move to strike the
20   references to stealing.  There have been court
21   adjudications with regard to the money that was
22   found that was properly paid to TRS found by United
23   States District Judge Keenan and several other
24   judges.  I am going to ask in the future that you
25   simply answer my question without inserting
```



```
 1                        D. Broser
 2    disparaging false comments about my client that
 3    were adjudicated contrary to how you claim.
 4              So when was this agreement reached?  Can
 5    you answer that question without putting in
 6    spurious insults about my client?
 7         A.    I already answered the question.
 8         Q.    When?
 9         A.    Can you read back my answer I said?
10         Q.    A date.  I would like a date.  A day, a
11    month, a year.  Can you give me a year?  Start with
12    that, a decade.  When was this agreement reached?
13         A.    Pretty early in the process of the
14    litigations against the Trumps.
15         Q.    What litigations against the Trumps?
16         A.    The Delaware actions.
17         Q.    Describe to me that agreement.
18         A.    I had several communications with Jules
19    Trump during the years to -- Eddie Trump and Jules
20    Trump to settle the cases and there was a perfect
21    understanding that all the money was going to Ari.
22    There was litigation with Ari and the Trumps
23    throughout the whole process.  At the end when the
24    settlement was -- took place, there were signatures
25    put on requested by the Trumps.  It was known that
```

Exhibit A

```
1                        UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF NEW YORK
2

3     -------------------------------------X
                                          :
4     SAGI GENGER,                        :   17-CV-8181 (VSB)(DCF)
                                          :
5                         Plaintiff,      :
                                          :
6               v.                        :
                                          :   500 Pearl Street
7     ORLY GENGER,                        :   New York, New York
                                          :
8                         Defendant.      :   January 8, 2019
      -------------------------------------X
9

10              TRANSCRIPT OF CIVIL CAUSE FOR HEARING
             BEFORE THE HONORABLE DEBRA C. FREEMAN
11              UNITED STATES MAGISTRATE JUDGE

12
      APPEARANCES:
13
      For the Plaintiff:        JOHN DELLAPORTAS, ESQ.
14                              Kelley Drye & Warren, LLP
                                101 Park Avenue
15                              New York, New York 10178

16
      For the Defendant:        MICHAEL BOWEN, ESQ.
17                              ERIC HERSCHMANN, ESQ.
                                ANDREW KURLAND, ESQ.
18                              Kasowitz, Benson, Torres LLP
                                1633 Broadway
19                              New York, New York 10019

20

21    Court Transcriber:        SHARI RIEMER, CET-805
                                TypeWrite Word Processing Service
22                              211 N. Milton Road
                                Saratoga Springs, New York 12866
23

24                              APPEARANCES CONTINUED ON NEXT PAGE.

25


      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service
```

**Exhibit A**

```
 1                      UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF NEW YORK
 2

 3    APPEARANCES CONTINUED:

 4    For Himself and
      Steven Spolansky:        LANCE HARRIS, ESQ.
 5                             Stein & Harris
                               1211 Avenue of The Americas
 6                             Floor 40
                               New York, New York 10036
 7
      For Raines & Fischer:    DANIEL LUST, ESQ.
 8                             Goldberg Segalla
                               101 Park Avenue
 9                             New York, New York 10178

10    For David Broser:        MITCHELL GOLDBERG, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Exhibit A**

3

| | |
|---|---|
| 1 | THE CLERK:  <u>Genger and Genger</u>. |
| 2 | Please state your name for the record. |
| 3 | MR. DELLAPORTAS:  Good morning, Your Honor.  John |
| 4 | Dellaportas for the judgment creditor Sagi Genger. |
| 5 | THE COURT:  Okay. |
| 6 | MR. BOWEN:  Good morning, Judge.  For the judgment |
| 7 | debtor Orly Genger, it's Michael Bowen, B-O-W-E-N, with the |
| 8 | Law Firm of Kasowitz, Benson, Torres.  And with me are my |
| 9 | partner Eric Herschmann. |
| 10 | THE COURT:  Who is whom?  Okay. |
| 11 | MR. BOWEN:  Immediately to my left; and my partner |
| 12 | Andrew Kurland. |
| 13 | THE COURT:  All right.  Who do I have -- |
| 14 | MR. BOWEN:  There are a number of other parties |
| 15 | present, Judge, who are subject to the subpoenas. |
| 16 | THE COURT:  Yeah.  I'd like to have everybody's |
| 17 | appearances. |
| 18 | MR. BOWEN:  Okay.  So -- |
| 19 | THE COURT:  Just go around introduce yourselves. |
| 20 | Tell me who you're for. |
| 21 | MR. HARRIS:  Lance Harris for, I guess *pro se*, |
| 22 | myself, regarding my IOLTA account that was subpoenaed. |
| 23 | THE COURT:  Did you sign an appearance sheet here? |
| 24 | MR. HARRIS:  I put in -- |
| 25 | MR. BOWEN:  Yes. |

**Exhibit A**

59

1          And then you'll make the production of the complete

2   tax returns unredacted.  The one thing I've heard that I've

3   already said I would do is to say that they should be used for

4   purposes of the enforcement of this judgment and not for other

5   purposes, okay?

6          MR. HERSCHMANN:  Okay, thank you.

7          THE COURT:  Got that?

8          MR. DELLAPORTAS:  Yes.  And, Your Honor?

9          THE COURT:  Let's move on.

10          MR. DELLAPORTAS:  Okay.  And just to clarify, Your

11   Honor, our subpoena upon Raines & Fischer was somewhat broader

12   than that and sought some other materials as well.  I didn't

13   hear any objection to them, but we would like that to be so

14   ordered.

15          THE COURT:  All right.  Is there objection to

16   anything else that was covered by that subpoena?  What else

17   was covered by the subpoena besides tax returns?

18          MR. DELLAPORTAS:  Any -- we -- I'm sorry, Your

19   Honor.  Let me get out the subpoena.

20          UNIDENTIFIED SPEAKER:  It's 131.

21               [Pause in proceedings.]

22          MR. DELLAPORTAS:  So it seeks six document

23   categories.  It seeks information about the settlement

24   agreement.  It seeks anything about other property or debts

25   held by Orly Genger.  It seeks -- it's about it, really.  And

**Exhibit A**

60

1  documents concerning Orly Genger's accounting work, all

2  communications regarding the foregoing matters.  I mean it's

3  the same stuff we've been talking about all day.

4              MR. HERSCHMANN:  With all due respect to Mr.

5  Dellaportas -- Eric Herschmann -- it is not all related to the

6  same thing.  And let me start with this, if Orly has other

7  liabilities.  That's not applicable to a judgment creditor.

8  He's entitled to know what assets she has, right, and he's

9  entitled to know what debts are due and owing to her.  But if

10  she owes additional debts, that's not relevant to the judgment

11  creditor in collecting his judgment.  But he started off --

12             THE COURT:  Why would it not be relevant to discover

13  that actually certain money is not available because it's owed

14  somewhere else and that other party has priority?

15             MR. HERSCHMANN:  Because it presumes that there's an

16  asset, right.  So the question becomes this, I'm a judgment

17  creditor.  Do I get to go ahead and look at what other

18  liabilities you have.  The answer's normally not.  I get to

19  look at what assets you have.

20             THE COURT:  You have authority on this?

21             MR. HERSCHMANN:  I'm sorry.

22             THE COURT:  Authority?

23             MR. HERSCHMANN:  I don't have it in front of me

24  because I thought --

25             THE COURT:  So, generally what you're saying is in

**Exhibit A**

61

1   post-judgment discovery, a judgment creditor is only entitled
2   to discovery as to assets, not to liabilities?
3           MR. HERSCHMANN:   It's normally assets and debts that
4   are due and owing.   And we could provide that to Your Honor,
5   but those are the two categories that you look towards, debts
6   that are due and owing and assets.   And what we started with
7   Raines & Fischer in the tax returns was $17.2 million.   And
8   now we've agreed we're going to do and produce all of the
9   $17.2 million or all the tax returns unredacted.
10          Now what he's saying is even though those should
11  show a lot of the things on the tax returns, he say I want to
12  see anything else associated with whatever liabilities
13  incurred.   And that's just, in our view, doesn't relate to the
14  two focus areas, which are assets and debts that are due and
15  owing.   And we're prepared to submit --
16          THE COURT:   I'm sorry.   You think the information
17  that the accounting firm has is severable so that there could
18  be certain information that is solely with respect to a
19  liability that can be carved out and not produced and other
20  information solely with respect to assets or amounts due to
21  Orly that can be --
22          MR. HERSCHMANN:   I'm sorry, Your Honor.
23          THE COURT:   I'm talking about the subpoena on Raines
24  & Fischer.
25          MR. HERSCHMANN:   And I apologize.   I misread the

**Exhibit A**

62

```
 1   subpoena.  He asked for debts owed to Orly, and I agree that
 2   --
 3            THE COURT:  Okay.
 4            MR. HERSCHMANN:  -- that's appropriate.
 5            THE COURT:  So do you have other objections to that
 6   subpoena?
 7            MR. HERSCHMANN:  Well, we object to debts owed to
 8   Orly.
 9            THE COURT:  Well, is that in the subpoena?
10            MR. HERSCHMANN:  Well, it says debts to, owed by, or
11   to Orly.  Debts owed --
12            THE COURT:  Wait, I'm sorry.  Does anybody have a
13   copy of the subpoena?  Is it part of the exhibits?
14            UNIDENTIFIED SPEAKER:  130-1.
15            THE COURT:  It's 130-1.  Hold on one second.  Let me
16   pull it out.
17                    [Pause in proceedings.]
18            THE COURT:  All right.  Exhibit A, all tax and
19   information returns filed by or on behalf of Orly Genger,
20   okay.  I'm not reading everything, but that's item 1
21   essentially.
22            Tax and information returns for any trust or entity
23   in which she manages or holds an interest, okay.  Documents
24   relating to the settlement agreement, okay.  Escrow accounts
25   or arrangements thereunder, okay.  Promissory notes issued
```

**Exhibit A**

63

1    thereunder, okay.  Payments thereunder, okay.  Documents

2    relating to actual potential tax treatment of the Orly

3    settlement agreement or any resulting payments, okay.

4         All documents concerning any property held by or in

5    debts owed by or to -- so this is the crux -- debts owed by or

6    to Orly Genger at any point during the last six years.  Then

7    the next item is documents in terms of transfer of Orly

8    Genger's accounting work to another accountant.  And then

9    communications regarding the foregoing matters -- subjects, so

10   -- subject matters.

11        So you have one challenge, and that's the words "by

12   or to" in Item 4?

13        MR. HERSCHMANN:  Yeah.  And, obviously, all

14   communications regarding any of the foregoing subject matters

15   is going to be overly broad if you're talking about an

16   accountant's work for the last six years, you know, on this,

17   especially if he's getting the first --

18        THE COURT:  Well, wait a minute.  Wait a minute.  If

19   the items are relevant, then communications regarding the

20   items are going to be relevant.  The communications regarding

21   the five subject matters listed before, if I find the five

22   subject matters are relevant, I'm going to allow discovery

23   into communications about those five subject matters.  So what

24   I'm taking you to be complaining about is really a single

25   word, and that is the word "by," debts owed by Orly Genger.

64

1   Is that right?

2           MR. HERSCHMANN:  Yes, Your Honor.  If I could just

3   -- I just want to read the last portion.

4                     [Pause in proceedings.]

5           MR. HERSCHMANN:  Your Honor, that's where the focus

6   would be.

7           THE COURT:  All right.  So let me hear briefly from

8   Mr. Dellaportas about the word "by" in Item No. 4.  This would

9   be debts owed by Orly Genger at any point during the last six

10   years.

11           MR. DELLAPORTAS:  Yeah.  This turns out to be highly

12   relevant, Your Honor, and we have a reason for that.  As Your

13   Honor will recall, there was a predecessor action involving

14   this same debt, and it went all the way up to the Second

15   Circuit.  It was affirmed.  And then it came back down, and

16   there was judgment enforcement litigation.  Your Honor had to

17   issue an order about the surety and all that.

18           So when the matter came back down was in early 2017

19   and we started to serve judgment discovery.  At around that

20   time, Orly started filing UCCs, a dizzying array of UCCs in

21   three separate states: Texas, Florida, and New Jersey.  And

22   so, among other things, she filed a UCC statement in May 2017

23   in Texas where she pledged all her assets to Mr. Herschmann,

24   her husband/lawyer.

25           So what's going to happen, we presume, is if and

**Exhibit A**

65

1   when we find an asset to collect on, Mr. Herschmann is going

2   to stand before us and say, Your Honor, I'm first in line.  I

3   have a pre-existing UCC.  So from that standpoint, we would

4   like to know as the judgment creditor if there's some other

5   creditor who claims to be in front of us, who they are, what's

6   the basis for it, and whether it's valid, and so that we can

7   explore that.  And the time to explore that's in discovery,

8   not when we have a U.S. marshal with a levy.  That's not the

9   right way to do it.  The right way to do it is during

10  discovery.

11          So we'd like to know generally what debts she has

12  but specifically Ms. Genger has pledged all her assets to her

13  husband, and she did so after the scope of the liability was

14  pretty well-known.  If there's some sort of documents

15  underlying that, we'd definitely be interested to learn that.

16  The loan agreement, it strikes us as unusual at a minimum and,

17  you know, there's a lot of conflicting hats people are wearing

18  here.

19          So that's what that's about.  And then on top of

20  that, then five days later, her father Arie also pledge his

21  assets to Mr. Herschmann.  Then the following year, Orly

22  pledged her assets in Texas and New Jersey to Arie in August

23  of next year.  So we have this circular set of liens whereby

24  any creditor who comes up to Orly is going to find that Arie

25  claims to be in front of us, that Mr. Herschmann claims to be

**Exhibit A**

66

1   in front of us, and that Arie then whatever he gets, he
2   pledged to Mr. Herschmann.
3           So all of this ends up going -- it forms a perfect
4   circle whereby Orly's assets end up, as long as they're
5   married I assume, be used for the benefit of Orly.  So this is
6   something we definitely need to explore in discovery.  It may
7   be in the accountants.  We have other subpoenas that are
8   before Your Honor as well where we're seeking to vet this, but
9   that's why it's relevant.  Thank you, Your Honor.
10          MR. HERSCHMANN:  Can I respond, Your Honor?  Eric
11  Herschmann.  And this is exactly the point I'm talking about.
12  The issue of what's debt, whether Orly had a mortgage or
13  whether she was lent money subsequent to a 2014 judgment,
14  right, and it's UCC filed, which is what a secured creditor
15  does when they lend money, that's irrelevant.  It's totally
16  irrelevant to judgment enforcement.
17          What he's trying to say is if there's a -- if I go
18  exercise my judgment and if an asset has a lien on it, there's
19  a mortgage on a property, I'm entitled to understand the
20  mortgage and everything else to see whether or not I can get
21  ahead of the mortgage.  That's not what you do in judgment
22  enforcement.  You're checking on what the debtor has, right.
23  But if there's a lien that's been public filed, that's what's
24  happened.
25          The reality of what money got lent and who lent the

**Exhibit A**

67

1   money and how it was done, that's not relevant to his judgment

2   enforcement.  What he's trying to say is it may be that I

3   think your loans or whatever are fraudulent.  He can suppose

4   that, but he'll have no basis for saying it.  And I think the

5   issue, and that's why, Your Honor, the focus should be on what

6   assets she has.

7           If she owes $100 million or $10 million and that

8   money is owed into a secured creditor and Sagi is an unsecured

9   creditor -- and as Mr. Dellaportas well knows that if this

10  judgment is upheld on appeal, that Orly will file for

11  bankruptcy.  That has been made clear.  There is no dispute

12  about that fact, right.  I don't think Sagi Genger disputes

13  it, Orly Genger has said it under oath.  It has been -- it

14  becomes abundantly clear that's what will transpire.

15          But he's here to pursue assets of Orly or debts that

16  are due and owing to Orly, not what she owes to other parties.

17          THE COURT:  First of all, I don't know what the

18  documents are.  I don't even know -- I'm going to direct this

19  to Mr. Lust -- I don't even know if they're severable.  I

20  don't even know if there are documents that would be produced

21  with respect to debts owed to where you could carve out

22  information about debts owed by without having to be, you

23  know, redacting a document.  There may be a net worth

24  statement or something that has, you know, more than one

25  column in it.

**Exhibit A**

68

1          So I don't even know what we're talking about here.

2          MR. LUST:  That's a fair inquiry, Your Honor.  My

3    understanding is that once -- or if and when the subpoena is

4    so ordered, that we would hash it out, see what documents

5    actually are there and, you know, whatever's responsive to the

6    subpoena.  If there's an issue, I'm sure we can involve the

7    parties if there's, you know, some ambiguity.  But I think the

8    terms of the subpoena, at least what the scope of it it lies,

9    I don't think -- I think that's pretty clear.

10          So unless Your Honor wants to sever the debts to or

11   owed by, I mean as it stands now, I think it's all

12   encompassing where we wouldn't have an issue producing that.

13          THE COURT:  All right.  I'm going to give Orly's

14   counsel a very short period of time to provide me with case

15   law authority that post-judgment discovery regarding

16   liabilities of the judgment debtor are not appropriate for

17   discovery.  You find me case law from this circuit that says,

18   no, that ought to be out of bounds.  I'll consider limiting

19   this subpoena to take out those two words "by or" and just

20   leave the "to," the liabilities owed to Ms. Genger.  I'm a

21   little dubious, but that's -- and not a fully educated

22   reaction.

23          And I would also not be inclined to have documents

24   selectively redacted so that they don't make sense in their

25   entirety.  If they are stand-alone documents that only relate

**Exhibit A**

69

1   to her debts -- in other words, not information that's

2   encompassed within a tax return or a net worth statement or a

3   profit and loss statement or something like that, I really

4   wouldn't want to see a document redacted so that it makes less

5   sense, all right.  But I'll give it a very short time to let

6   you see what you come up with.

7           MR. HERSCHMANN:  Eric Herschmann, and I completely

8   agree.  I think what we'd be talking about are documents that

9   are -- and like I'll put it under the doctrine of

10  completeness.  It's not a circumstance where I think Raines &

11  Fischer would say let's redact something out.  And I don't

12  even think they have the documents because I don't think it's

13  relevant on returns, but the documents that are totally

14  separate and apart, right, that have nothing to do with assets

15  or Orly's, right --

16          THE COURT:  Well, let's do this then.  Let's do

17  this.  I'll so order the subpoena.  So, Mr. Lust, when you

18  collect documents for production, take a look at the documents

19  with your client, see if there are any documents that as

20  stand-alone documents relate only to amounts that Orly owes to

21  someone, okay, as opposed to anyone owing her something, all

22  right.  If there are any -- I'm not asking you to redact any

23  documents that are produced, but if there are any stand-alone

24  documents like that, let counsel for both Sagi and Orly --

25  figure out one contact person between you, please, so that Mr.

**Exhibit A**

70

1  Lust knows who to be in touch with on Orly's side.

2          But let counsel know that there's something that

3  you're holding back until that issue is resolved.  If there is

4  nothing, then that issue becomes moot, all right.  Nobody has

5  to do any research, nobody has to give me anything if there

6  really is nothing of that nature.

7          MR. LUST:  And, Your Honor, that's just in general

8  any documents related to No. 4, on Paragraph No. 4?

9          THE COURT:  That's right.  It's only on Paragraph 4

10  where it says, "Documents concerning any property held by or

11  debts owed by or to Orly," if there are any stand-alone

12  documents that relate to debts owed by Orly.

13          MR. LUST:  And, Your Honor, we can -- I can ask our

14  client to just run a search if there's any documents relating

15  to No. 4 whatsoever, you know, I think that might also

16  expedite the process as well, assuming that those --

17          THE COURT:  Well, I think it's going to be covered

18  by some of the others.

19          MR. LUST:  Understood.

20          THE COURT:  That's a fairly broad category.  So

21  we're really just talking about, you know, what does she owe

22  somebody as a stand-alone document.

23          MR. LUST:  Understood.

24          THE COURT:  Okay.  If there's anything like that,

25  tell counsel on both sides.  And before you produce that

**Exhibit A**

71

1  remaining document or those remaining documents, I'll give
2  counsel for Orly an opportunity to give me some authority as
3  to whether it ought to be off limits for asset discovery, and
4  I'll let Mr. Dellaportas respond to that before I rule on it.
5  My hunch is I'm going to order it produced, but I'll give you
6  a chance if you think I'm way off here and the law is clear
7  that it's not appropriate, I'll let you show me that before I
8  order it produced and it's out of the bag.  All right?
9         MR. LUST:  Your Honor, just briefly, as counsel has
10 already agreed to voluntarily produce the tax returns, are we
11 saying that portion of the subpoena's rendered moot?
12        THE COURT:  No, produce it also.
13        MR. LUST:  Okay.  Understood, Your Honor.
14        THE COURT:  So he gets two copies.
15        MR. LUST:  Is there anything further --
16        THE COURT:  God forbid they don't match up and then
17 I'll never hear the end of it, but at least he gets to see.
18        MR. HERSCHMANN:  Just Eric Herschmann, it's also
19 going to be subject to the same confidentiality, right?
20        THE COURT:  That's perfectly fine.
21        MR. HERSCHMANN:  Okay.
22        THE COURT:  All right.  So before you produce it,
23 let's get a confidentiality agreement signed up.  And if --
24 I'm assuming that the accountant is good with whatever's
25 negotiated between the parties since it's your client?

**Exhibit A**

72

1      MR. LUST:  We'd have to probably see this document

2 as it's produced, but I don't imagine there being an objection

3 to it.

4      THE COURT:  All right.  So make sure Mr. Lust is in

5 the loop on that.

6      MR. LUST:  Your Honor, is there anything further

7 required of Raines & Fischer?

8      THE COURT:  Wait, before you go.  I just asked my

9 law clerk who's sitting here to do some quick research on this

10 computer in front of him about this question of whether

11 liabilities are appropriate for discovery post-asset.  And

12 he's telling me that there are a lot of decisions out there

13 stating that a judgment creditor is entitled to wide discovery

14 of the judgment debtor's assets and liabilities.

15      So unless you find something really different from

16 that standard rule, my guess is I'm going to order discovery

17 with respect to both assets and liabilities, all right.  I'm

18 not sure what you're going to find, but since you seem so

19 confident, like I said, I'll give you a chance.  But I am

20 dubious, okay?

21      All right.  Is there anything else for Raines &

22 Fischer?

23      MR. DELLAPORTAS:  No, Your Honor.

24      THE COURT:  You are free to go --

25      MR. LUST:  Thank you, Your Honor.

**Exhibit A**

**Dellaportas, John**

| | |
|---|---|
| **From:** | Dellaportas, John |
| **Sent:** | Tuesday, March 19, 2019 10:40 PM |
| **To:** | 'Gerald Greenberg' |
| **Subject:** | Genger v. Genger |
| | |
| **Importance:** | High |

Hi Gerald.

1. I wanted to make sure you are still on track to make the Arie and AGA productions by the Monday Court-ordered deadline, as it implicates certain other discovery matters. Can you confirm?

2. Also, I wanted to call attention to two responsive documents of which we have been made aware, so you can ensure they are included (and/or we can jointly contact the Court if needed): (a) Agreement dated as of March 31, 2017 between Arie Genger, Orly Genger, David Broser, Eric Herschmann, and the Escrow Agent; and (b) Subordination Agreement dated as of December 31, 2016 among Arie Genger, Orly Genger and Eric Herschmann.

Much appreciated.

John


**JOHN DELLAPORTAS**
Partner

**Kelley Drye & Warren LLP**
101 Park Avenue
New York, NY 10178
Tel: (212) 808-5000
Cell: (917) 685-2084

WWW.KELLEYDRYE.COM

jdellaportas@kelleydrye.com

**Exhibit A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------------------------- x
DALIA GENGER,                                                   :
                            Plaintiff,                         :
                    v.                                         :   Index No. 1:17cv8181
                                                               :
SAGI GENGER,                                                   :
                            Defendant/Third-Party Plaintiff,   :
                    v.                                         :
                                                               :
ORLY GENGER,                                                   :
                            Third-Party Defendant.             :
                                                               :
-------------------------------------------------------------------------------- x
```

### DECLARATION OF JOHN DELLAPORTAS
### REGARDING MEET-AND-CONFER PROCESS

JOHN DELLAPORTAS pursuant to 28 U.S.C. § 1746(2), declares as follows:

1.      I am a member of the law firm of Kelley Drye & Warren LLP and am duly admitted to the Courts of New York State.  I represent the judgment creditor Sagi Genger ("Sagi") in the above-entitled action.  I respectfully submit this declaration in order to detail the meet-and-confer process for the accompanying letter motion of the same date.

2.      The letter motion concerns, *inter alia*, the failure of the law firm of Kasowitz Benson & Torres LLP ("Kasowitz") to produce a critical document, even after a Court order requiring it to so, and its deposition testimony and interrogatory answer denying that such a document even exists.  Because the matters raised in our letter motion are quite serious, before bringing this motion, we wanted to expend every effort to ensure that our facts were correct, and to provide Kasowitz with due opportunity to explain its position.

3.      Accordingly, prior to filing this motion, we held three telephonic meet-and-confer conferences, on April 4, April 15, and May 6, 2019 respectively.  Prior to the second of these

**Exhibit A**

conferences, we circulated to Kasowitz a draft of our proposed letter motion, seeking essentially the same relief as the motion we are filing today, on the same grounds. In response thereto, Kasowitz promised to produce certain documents within one week's time, and we agreed to defer filing our motion until we saw what was produced. The production, however, actually took three weeks, and in our view was deficient in several material respects. Accordingly, we scheduled a third conference to once again reiterate our discovery position.

4. At the conclusion of this May 6 conference, Kasowitz promised to revert to us with its response to Sagi's position by the end of the day. That did not happen. After waiting four days, on May 10, we provided Kasowitz with an updated version of our letter motion, and asked for Kasowitz's section within 72 hours. On the ensuing Sunday, Kasowitz responded by demanding a *fourth* conference. We advised Kasowitz that we were available for the requested conference anytime on Sunday or on Monday afternoon until 3 PM. Kasowitz did not call me for a conference during that timeframe. We thereafter offered to delay filing this motion for yet two more days if Kasowitz would commit to sending its statement in that timeframe. Kasowitz did not respond to our offer. Given the delays, we are proceeding with this motion.

5. Attached hereto are emails reflecting some of the above communications between the parties.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
        May 13, 2019

_____
                JOHN DELLAPORTAS

**Exhibit A**

**Dellaportas, John**

| | |
|---|---|
| **From:** | Dellaportas, John |
| **Sent:** | Friday, April 12, 2019 1:16 PM |
| **To:** | Michael Paul Bowen; 'Andrew R. Kurland' |
| **Subject:** | 4.13.19 Joint Ltr to Judge Freeman (metadata-reimbursement) (Autosaved) |
| **Attachments:** | 4.13.19 Joint Ltr to Judge Freeman (metadata-reimbursement) (Autosaved).docx |

Having not back from you as to our request for an additional meet and confer, we will presume that your positions have not changed from our April 4 conference.  Please find attached our half of the letter motion.  Please provide your half within 72 hours, absent which we will file the letter as is.  Thank you.

**Exhibit A**

**KELLEY DRYE & WARREN LLP**

A LIMITED LIABILITY PARTNERSHIP

WASHINGTON, DC
LOS ANGELES, CA
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ

BRUSSELS, BELGIUM

AFFILIATE OFFICE
MUMBAI, INDIA

**101 PARK AVENUE**

**NEW YORK, NY 10178**

————

(212) 808-7800

FACSIMILE

(212) 808-7897

www.kelleydrye.com

JOHN G. DELLAPORTAS

April 15, 2019

**Via ECF**

Hon. Debra Freeman
United States Magistrate Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:  *Genger v. Genger*, **1:17-cv-08181-KBF-DCF**

Dear Judge Freeman:

Judgment creditor Sagi Genger and non-party subpoena recipient Kasowitz Benson & Torres LLP ("Kasowitz") jointly submit this letter regarding their discovery dispute. Prior to submitting this letter, the parties met and conferred telephonically on April 4.

## STATEMENT BY SAGI GENGER

Pursuant to Fed,R.Civ.P. 37, Sagi respectfully brings this motion: (a) to compel Kasowitz to comply with to the subpoena served on the firm by Sagi (Exh. A); and (b) to require Kasowitz to reimburse Sagi for the attorney's fees and expenses he incurs because of the firm's purposeful concealment of the Escrow Agreement dated March 31, 2017 among Orly Genger, Arie Genger, Eric Herschmann, and Kasowitz (the "Escrow Agreement"). Exh. B.

**The False Statements Made Under Oath**

As the Court is aware, Orly claims to be unable to pay the judgment in this case, despite having four Kasowitz partners representing her in this and related litigations. Meanwhile, there is $15 million still to be paid to Orly and her co-signatories (known therein as the "AG Group") under the 2013 settlement agreement she entered into with the Trump Group.

For the better part of seven months, Sagi has been trying to determine what arrangements, if any, have been made with respect to that $15 million. At the deposition of Kasowitz Benson, the firm' Rule 30(b)(6) witness, Michael Bowen, testified that: "Orly has no claim to any of that money." Exh. C at 39. "[S]peaking on behalf of the firm," Mr. Bowen further testified that: "We don't have any information about any agreements between the AG Group" concerning the

**Exhibit A**

**KELLEY DRYE & WARREN LLP**

Hon. Debra Freeman
April 15, 2019
Page Two

release of the $15 million. *Id.* at 29, 32. Kasowitz's testimony coincided with the interrogatory answers it filed on behalf of its client, Orly Genger, who swore under oath that she had "no knowledge" when asked to "[i]dentify the amount, date, and recipient of all payments … to be made to any person or entity pursuant to Defendant's 2013 settlement." Exh. D.[1]

As it turns out, all of these sworn statements were flat-out false. The Escrow Agreement reveals that Orly (together with her father Arie) maintain joint written control over the $15 million yet to be paid, and provides detailed written instructions as to how that will happen. Most significantly, Orly directs that $2 million of it be sent to her husband, Eric Herschmann, allegedly in payment of a "loan" he made to cover her legal fees to his firm.

### Kasowitz's Concealment of the Escrow Agreement

The Escrow Agreement was responsive to multiple document directed at both Orly and the Kasowitz firm, and well within the scope of the Court's January 8, 2019 discovery order. Yet it was not produced until just a few weeks ago, when Sagi independently became aware of it and specifically asked for it by name. Exh. E.

In our first conference, Mr. Bowen claimed to be unaware of the Agreement at the time of his deposition. Accepting this as true, that necessarily means that Mr. Bowen's partners at Kasowitz – two of whom are signatories to the Escrow Agreement – concealed this critical piece of evidence from him so as to dupe him into false testimony.[2]

It is readily apparent why. The Escrow Agreement undercuts much of what Orly and her lawyers have told this Court since judgement was entered. It surely would have been a central focus of their depositions, had it been timely produced. Unfortunately, Kasowitz did not produce the document until <u>after</u> Sagi had already deposed Orly, Kasowitz and Mr. Broser (who also did not produce the document but rather gave contradictory testimony).

### The Backdated Promissory Note

Among the questions we need to ask the witnesses is why the March 31, 2017 Escrow Agreement is identified in the $2 million Promissory Note that Orly gave her husband, *despite the fact that the Note purports to have been executed on December 30, 2016.* Exh. F. It appears that the Note was backdated to make it seem as if it coincided with a payment Mr. Herschmann made to his firm at that time to pay his wife's legal bill, rather than what it actually was – a

---

[1]    We annex the entire deposition transcript to this letter motion, the Court can see the lengths to which the witness went to avoid answering this and related questions.

[2]    Mr. Herschmann's insistence that he not be identified as his wife's counsel, after he seemingly appeared before this Court on her behalf, may have been motivated by a desire to avoid the consequences of non-compliance with the Court' discovery order.

**Exhibit A**

**K E L L E Y   D R Y E   &   W A R R E N** LLP

Hon. Debra Freeman
April 15, 2019
Page Three

retroactive attempt to shield Orly's assets from liability to Sagi.

Another issue to be resolved in such depositions is why the Escrow Agreement makes no reference to the $5.4 million Promissory Note that Orly gave her father, or the Subordination Agreement between Arie and Mr. Herschmann, both which were supposedly executed on December 31, 2016. Exhs. G, H. It is our belief these documents, too, were backdated, and actually were not executed until around the time that the related UCC financing statement was filed – *i.e.,* August 2018, right after Sagi prevailed in this case on summary judgment.

Sagi has attempted to resolve these mysteries by serving a second subpoena on the Kasowitz firm (Exh. A) seeking, *inter alia,* the metadata and other documents sufficient to show the actual dates on which the critical documents were prepared, executed and delivered (as opposed to their nominal dates), but Kasowitz has refused to produce any such materials.

In the same subpoena, Sagi also sought the contemporaneous accounting records – including transmittal letters/cover emails – sufficient to show how Orly could have possibly run up a $2 million legal bill for a legal representation that was represented in her Premarital Agreement and in open court to be "pro bono." Unfortunately, the only "billing record" Kasowitz produced is a one-page chart created by counsel for this case, which chart fails to show what, if anything, was billed contemporaneously to Orly. Exh. I. Actual, contemporaneous billing records will shed light on whether any payments Mr. Herschmann made to his own firm were pursuant to a loan or instead were just a lawyer covering a spouse's bills.

**Requested Remedy**

At this point, in order to be untangle the various suspect transactions between the judgment debtor and her husband and father, Sagi requests two forms of relief:

First, Sagi seeks an order compelling Kasowitz to make a complete document production in response to his subpoena. Having tried to pass off backdated documents as legitimate, Kasowitz cannot dispute that the metadata and transmittals for these same documents are key evidence. In the alternative, pursuant to Fed.R.Civ.P. 37(b)(2)(A), Sagi asks that Kasowitz, along with its client Orly and its partner Mr. Herschmann, be precluded from trying to interpose these supposed debts in such a manner as to impede judgment collection.

Second, now that the Escrow Agreement has at long last been produced, Sagi will need to re-depose Kasowitz, Orly, David Broser concerning these matters. Pursuant to Fed.R.Civ.P. 37(b)(2)(C), the Court should order the Kasowitz firm to reimburse Sagi for his attorney's fees and expense associated with doing so. We also ask that the Court direct those depositions take place promptly and in New York. Mr. Herschmann and Orly have previously insisted they be deposed only in Texas, despite the fact that Mr. Herschmann practices law here and Orly claims to live in Tel Aviv. They have already imposed enough of an undue burden on Sagi.

**Exhibit A**

KELLEY DRYE & WARREN LLP

Hon. Debra Freeman
April 15, 2019
Page Four

## STATEMENT BY KASOWITZ BENSON

[TO BE COMPLETED]

Respectfully submitted,

John Dellaportas
Counsel for Sagi Genger

/s/
Michael Bowen
Counsel for Orly Genger

**Exhibit A**

## Dellaportas, John

| | |
|---|---|
| **From:** | Andrew R. Kurland <AKurland@kasowitz.com> |
| **Sent:** | Monday, April 15, 2019 11:24 AM |
| **To:** | Dellaportas, John |
| **Cc:** | Michael Paul Bowen |
| **Subject:** | RE: Genger - Production |

Yes, that should work.  Thanks for accommodating the change.  We'll call your cell at 1:30.

---

**From:** Dellaportas, John [mailto:JDellaportas@KelleyDrye.com]
**Sent:** Monday, April 15, 2019 11:19 AM
**To:** Andrew R. Kurland <AKurland@kasowitz.com>
**Cc:** Michael Paul Bowen <MBowen@kasowitz.com>
**Subject:** RE: Genger - Production

I have a conflict at that time.  Can we make it 1:30?

---

**From:** Andrew R. Kurland [mailto:AKurland@kasowitz.com]
**Sent:** Monday, April 15, 2019 8:18 AM
**To:** Dellaportas, John <JDellaportas@KelleyDrye.com>
**Cc:** Michael Paul Bowen <MBowen@kasowitz.com>
**Subject:** RE: Genger - Production

I now have a call with a judge in another matter that will conflict with my joining this call at noon.  I need to be on with Mike as I am familiar with the matters concerning our document production, which is continuing.  Would 2 PM work for you instead?

---

**From:** Dellaportas, John [mailto:JDellaportas@KelleyDrye.com]
**Sent:** Saturday, April 13, 2019 4:30 PM
**To:** Andrew R. Kurland <AKurland@kasowitz.com>
**Cc:** Michael Paul Bowen <MBowen@kasowitz.com>
**Subject:** RE: Genger - Production

OK,  Monday noon.  I can be reached on my cell at that time at 917-685-2084.

---

**From:** Andrew R. Kurland [mailto:AKurland@kasowitz.com]
**Sent:** Friday, April 12, 2019 1:05 PM
**To:** Dellaportas, John <JDellaportas@KelleyDrye.com>
**Cc:** Michael Paul Bowen <MBowen@kasowitz.com>
**Subject:** RE: Genger - Production

John,
Mike needs to participate in this call, but is not available today because he is traveling for college visits with his daughter.  We are able to discuss this on Monday at noon or 5:30 PM.  We have not had an opportunity to review the

1

## Exhibit A

draft letter you sent today about 12 hours after you sent this email, but will endeavor to do so before we speak on Monday so we are prepared to discuss your concerns.

- Andrew

---

**From:** Dellaportas, John [mailto:JDellaportas@KelleyDrye.com]
**Sent:** Friday, April 12, 2019 1:34 AM
**To:** Andrew R. Kurland <AKurland@kasowitz.com>
**Cc:** Michael Paul Bowen <MBowen@kasowitz.com>
**Subject:** RE: Genger - Production

**External Email**

---

Andrew, we have reviewed Kasowitz's subpoena response, and find it to be woefully inadequate.  Please advise what time on Friday you are available for a telephonic meet and confer.  Thank you.  John

---

**From:** Andrew R. Kurland [mailto:AKurland@kasowitz.com]
**Sent:** Thursday, April 11, 2019 1:25 PM
**To:** Dellaportas, John <JDellaportas@KelleyDrye.com>
**Cc:** Michael Paul Bowen <MBowen@kasowitz.com>
**Subject:** Genger - Production

Please see attached.  The password required to decrypt the Zip file will be sent under separate cover.

Andrew R. Kurland
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Tel.  (212) 506-3306
Fax. (212) 835-5254
AKurland@kasowitz.com

This e-mail and any files transmitted with it are confidential and may be subject to the attorney-client privilege. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please notify the sender by e-mail and delete this e-mail without making a copy.

This message is subject to Kelley Drye & Warren LLP's email communication policy.
KDW-Disclaimer

**Exhibit A**

## Dellaportas, John

| | |
|---|---|
| **From:** | Dellaportas, John |
| **Sent:** | Monday, May 06, 2019 11:00 AM |
| **To:** | 'Andrew R. Kurland'; Michael Paul Bowen |
| **Subject:** | today's 11 AM call |

I am reachable at my desk line, 212-808-5000, when you guys are ready.


**JOHN DELLAPORTAS**
Partner

**Kelley Drye & Warren LLP**
101 Park Avenue
New York, NY 10178
Tel: (212) 808-5000
Cell: (917) 685-2084

WWW.KELLEYDRYE.COM

jdellaportas@kelleydrye.com

**Exhibit A**

## Dellaportas, John

| | |
|---|---|
| **From:** | Dellaportas, John |
| **Sent:** | Monday, May 13, 2019 3:24 PM |
| **To:** | 'Andrew R. Kurland' |
| **Cc:** | Michael Paul Bowen |
| **Subject:** | RE: Genger v. Genger |

Andrew, if you are representing to me that you will have your half of the letter by Wednesday 3 pm, then we will grant the 48-hour extension.  But if we are going to wait two days and then just have further delays, we will just go ahead and file now.   Please advise.  Thank you.  John


**JOHN DELLAPORTAS**
Partner

**Kelley Drye & Warren LLP**
(212) 808-5000
jdellaportas@kelleydrye.com

---

**From:** Andrew R. Kurland [mailto:AKurland@kasowitz.com]
**Sent:** Monday, May 13, 2019 2:13 PM
**To:** Dellaportas, John <JDellaportas@KelleyDrye.com>
**Cc:** Michael Paul Bowen <MBowen@kasowitz.com>
**Subject:** RE: Genger v. Genger

Your letter you sent Friday afternoon contains frivolous arguments and misstates what has transpired.  If you nonetheless proceed with filing the letter today, we will submit our response to the Court on Wednesday, and we request that you so advise Judge Freeman.  Thank you.

---

**From:** Dellaportas, John [mailto:JDellaportas@KelleyDrye.com]
**Sent:** Monday, May 13, 2019 11:40 AM
**To:** Andrew R. Kurland <AKurland@kasowitz.com>
**Cc:** Michael Paul Bowen <MBowen@kasowitz.com>
**Subject:** RE: Genger v. Genger

Andrew, we have already had three meet and confers over the last month. If you would like a fourth, as I said, feel free to call me, but I am not extending the deadline, which is 3 pm.  John


**JOHN DELLAPORTAS**
Partner

**Kelley Drye & Warren LLP**
(212) 808-5000
jdellaportas@kelleydrye.com

## Exhibit A

**From:** Andrew R. Kurland [mailto:AKurland@kasowitz.com]
**Sent:** Monday, May 13, 2019 10:27 AM
**To:** Dellaportas, John <JDellaportas@KelleyDrye.com>
**Cc:** Michael Paul Bowen <MBowen@kasowitz.com>
**Subject:** RE: Genger v. Genger

Thanks. Mike needs to be on and is not available today. He or I will get back to you later today with times that work for us.

---

**From:** Dellaportas, John [mailto:JDellaportas@KelleyDrye.com]
**Sent:** Sunday, May 12, 2019 11:07 AM
**To:** Andrew R. Kurland <AKurland@kasowitz.com>
**Cc:** Michael Paul Bowen <MBowen@kasowitz.com>
**Subject:** RE: Genger v. Genger

Andrew, as it so happens, I am in the office today, as well as tomorrow morning and afternoon. Should you wish yet another meet-and-confer, I am available any time. You have my office number, so feel free to call. John

**JOHN DELLAPORTAS**
Partner

Kelley Drye & Warren LLP
(212) 808-5000
jdellaportas@kelleydrye.com

---

**From:** Andrew R. Kurland [mailto:AKurland@kasowitz.com]
**Sent:** Sunday, May 12, 2019 10:45 AM
**To:** Dellaportas, John <JDellaportas@KelleyDrye.com>
**Cc:** Michael Paul Bowen <MBowen@kasowitz.com>
**Subject:** RE: Genger v. Genger

John,

 Contrary to what you suggest, we have not met and conferred on the many new arguments and contentions you raise in your letter. They are frivolous and mischaracterize what has transpired. Further, there is no urgency and your self-imposed 72-hour deadline is inappropriate. You have developed an unhealthy pattern of sending us proposed letters on Friday afternoons and demanding responses within unreasonable timeframes. This constant letter writing campaign to the Court must stop, as it is not appropriate to litigate via letters to the Court in the middle of this discovery process, and your doing so is wasting the resources of the Court as well as everyone else.

 As you know, your extensive discovery has now verified that Orly does not have any money to satisfy this judgment or even pay her everyday living expenses. Your discovery efforts have now become totally vindictive and wasteful, and they are far afield from any legitimate attempt to collect on the judgment. Moreover, they amount to exactly the type of conduct that Judge Freeman warned against during our conference in January. Rather than heed her advice, you've increased the vitriol.

 This said, let's schedule a time this week to meet and confer. We will send you our availability. Please let us know when you are free as well.

 Please be advised that if you do go ahead and file the letter without conferring with us first, we will inform Judge Freeman that you refused to meet and confer despite our request to do so, and take other appropriate

2

**Exhibit A**

measures.  Finally, we again caution you to not publicly file – or describe or quote from – anything that has been designated as Confidential pursuant to the Protective Order.


Andrew R. Kurland
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Tel.  (212) 506-3296
Fax. (212) 835-5254
AKurland@kasowitz.com

This e-mail and any files transmitted with it are confidential and may be subject to the attorney-client privilege. Use or disclosure of this e-mail or any such files by anyone other than a designated addressee is unauthorized. If you are not an intended recipient, please notify the sender by e-mail and delete this e-mail without making a copy.

**From:** Dellaportas, John [mailto:JDellaportas@KelleyDrye.com]
**Sent:** Friday, May 10, 2019 3:21 PM
**To:** Michael Paul Bowen <MBowen@kasowitz.com>; Andrew R. Kurland <AKurland@kasowitz.com>
**Subject:** Genger v. Genger

**External Email**

___

Michael and Andrew:

As discussed, please find attached the updated version of our half of the letter motion sent to you a few weeks ago.  Please provide your half within 72 hours, absent which we will file without it.   Given the amount of time that has passed, we cannot agree to any extensions.  Thanks.


**JOHN DELLAPORTAS**
Partner

**Kelley Drye & Warren LLP**
101 Park Avenue
New York, NY 10178
Tel: (212) 808-5000
Cell: (917) 685-2084

WWW.KELLEYDRYE.COM

jdellaportas@kelleydrye.com


This message is subject to Kelley Drye & Warren LLP's email communication policy.
KDW-Disclaimer

**Exhibit A**