IN THE UNITED STATED DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Orly Genger,<br><br>              Debtor. | Case No. 19-mc-459<br><br>Underlying Case No. from U.S. Bankruptcy Court for the Western District of Texas: 19-bk-10926-TMD |

**PLEASE TAKE NOTICE** that, pursuant to Rule 45 of the Federal Rules of Civil Procedure, upon the accompanying Memorandum of Law in Support of Non-Party Creditor KBT's Motion to Quash Subpoena and the exhibit thereto, non-party Kasowitz Benson Torres LLP will move this Court, the United States District Court for the Southern District of New York, at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007-1312, at a time and date to be determined by the Court, for an Order quashing the subpoena dated September 27, 2019.

Dated: New York, NY
      October 10, 2019

                             KASOWITZ BENSON TORRES LLP

                             By: */s/ Michael Paul Bowen*
                             Michael Paul Bowen
                             Andrew R. Kurland
                             1633 Broadway
                             New York, New York  10019
                             mbowen@kasowitz.com
                             Tel.: 212-506-1700
                             Fax: 212-506-1800

                             *Counsel for Kasowitz Benson Torres LLP*

**Exhibit A**

IN THE UNITED STATED DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Orly Genger, <br><br> Debtor. | Case No. 19-mc-459 <br><br> Underlying Case No. from U.S. Bankruptcy Court for the Western District of Texas: 19-bk-10926-TMD |

## MEMORANDUM OF LAW IN SUPPORT OF
## NON-PARTY CREDITOR KBT'S MOTION TO QUASH SUBPOENA

Kasowitz Benson Torres LLP ("KBT"), a creditor in the bankruptcy proceeding pending in the Western District of Texas captioned *In re Orly Genger*, Case No. 19-bk-10926-TMD, brings this miscellaneous proceeding to quash a subpoena, dated September 27, 2019 (the "KBT Subpoena," copy attached hereto as Ex. A) issued by Sagi Genger ("Sagi"), and respectfully states as follows:

1.     In the underlying Chapter 7 bankruptcy, initiated by the filing of a voluntary petition on July 12, 2019, Sagi issued the KBT Subpoena seeking a representative of the law firm to appear for a deposition in New York on October 11, 2019.  At no time did Sagi make any efforts to discuss a reasonable time and place for this deposition or make any effort to accommodate KBT or the other interested parties in this bankruptcy, including the debtor and numerous other creditors, in order to find a mutually agreeable time and location for the deposition.  In addition, the KBT Subpoena is grossly overbroad and unduly burdensome.  It requires KBT to designate one or more spokespersons to address "The Subject Matters Addressed in the Attached Motion to Dismiss and authentication of the exhibits cited therein." Ex. A, at p. 1 (under heading "Testimony").  The attached 27-page motion covers a sprawling range of matters and multiple other lawsuits involving the debtor and Sagi and 35 exhibits, a

**Exhibit A**

number of which are entire deposition transcripts that, again, cover a wide range of topics. One of the exhibits, moreover, is the entire deposition testimony of KBT taken in 2018 by Sagi. *See* KBT Subp. at p. 9, Ex. M.

2.     KBT requests that the KBT Subpoena be quashed in its entirety on the ground that it is so overly broad and unreasonably burdensome that it fails to comply with the requirements of the applicable federal procedural rules. The subpoena should also be quashed because Sagi's counsel failed to comply with local rules requiring good faith efforts to confer with all interested parties to designate a mutually-agreeable time and location for the deposition.

## ARGUMENT

3.     Rule 45 and Rule 30(b)(6) of the Federal Rules of Civil Procedure (incorporated by Rule 9014(c) and Rule 9016 of the Federal Rules of Bankruptcy Procedure) provide that, "in its notice or subpoena" to a "corporation, partnership or association," the requesting party (here, Sagi) "must describe with reasonable particularity the matters for examination." Fed. R. Civ. P. 30(b)(6). The KBT Subpoena, on its face, fails to comply with this basic requirement. It does not specify any particular topics for examination and certainly none "with reasonable particularity," as required. *See Innomed Labs, LLC v. Alza Corp.*, 211 F.R.D. 237, 240 (S.D.N.Y. 2002) (quashing subpoena for failure to specify topics with sufficient particularity). *See also BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, No. 14-cv-10067, 2017 WL 3610511, at *11 (S.D.N.Y. Aug. 21, 2017) ("An overly broad Rule 30(b)(6) subpoena notice subjects the noticed party to an impossible task, because, where it is not possible to identify the outer limits of the areas of inquiry noticed, compliant designation is not feasible.").

**Exhibit A**

4.     While attaching a document to a subpoena may satisfy this requirement in cases where the document is the topic (*e.g.*, when the entity to be deposed created or issued the attached document), that is not this case.  Here, the document is a wide-ranging screed, some of which at least facially pertains to KBT and the bulk of which does not.  In all events, the burden is on the party issuing the subpoena to make it "reasonably" clear what the topics are; it should not be left up to guesswork by the subpoenaed party, as Sagi did here.  This lack of clarity is worse in this case since KBT was deposed by Sagi just last year, in October 2018, and the attachment to the KBT Subpoena refers to that prior deposition, suggesting that it is included within the scope of the subpoena.  The KBT Subpoena is thus either wholly repetitive and, therefore, unduly burdensome and prohibited under the rules, *see* Fed. R. Civ. P. 45(d)(1), or Sagi is required at a minimum to delineate what additional nonrepetitive topics are on the table.

4.     In addition to this fundamental error and violation of the applicable rules, Sagi's counsel undertook no good faith effort to meet and confer with KBT or any of the other interested parties in the bankruptcy to select a mutually convenient date (or at minimum the least inconvenient date) and location for this deposition.  In modern practice, both before this Court and the Texas court, this is common courtesy and best practices, and, for many courts, it is mandatory.  Sagi's failure to accord his fellow law practitioners this basic professional courtesy is an additional reason to quash the KBT Subpoena as it stands.

5.     Finally, under the federal rules, this Court may transfer this motion to quash to be decided by the issuing Court (in this case, the U.S. Bankruptcy Court for the Western District of Texas) if KBT consents or if this Court finds "exceptional circumstances."  Fed. R. Civ. P. 45(f).  Here, KBT consents to the transfer and there are also exceptional circumstances.  First, the subject of the subpoena at issue is in aid of and involves a motion to dismiss the Texas

**Exhibit A**

bankruptcy (which is attached to the KBT Subpoena), which motion is pending a full hearing in

that "issuing" court.  Second, Sagi has issued numerous subpoenas in that Texas proceeding,

many of which are subject to pending motions to quash or for a protective order, which motions

are also pending before the issuing court.

<u>**CONCLUSION**</u>

WHEREFORE, KBT's motion to quash the KBT Subpoena should be granted in its

entirety.

Dated:  New York, New York
            October 10, 2019

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: <u>*/s/ Michael Paul Bowen*</u>
        Michael Paul Bowen
        Andrew R. Kurland
        1633 Broadway
        New York, New York  10019
        mbowen@kasowitz.com
        Tel.: 212-506-1700
        Fax: 212-506-1800

*Counsel for non-party*
*Kasowitz Benson Torres LLP*

**Exhibit A**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by email on the counsel for the issuing party, listed below.

*/s/ Michael Paul Bowen*


John Dellaportas
Emmet, Marvin & Martin, LLP
120 Broadway
New York, New York 10271
Email: JDellaportas@EMMETMARVIN.COM

*Counsel for Sagi Genger*

**Exhibit A**

# EXHIBIT A

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

_____ Western _____ District of ____ Texas _____

In re _____ Orly Genger _____
Debtor

(Complete if issued in an adversary proceeding)

Case No. ___ 19-10926-TMD ___

Chapter ___ 7 ___

_____
Plaintiff
v.

Adv. Proc. No. _____

_____
Defendant

## SUBPOENA TO TESTIFY AT A DEPOSITION
## IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: __ Kasowitz, Benson, Torres LLP, 1633 Broadway, New York, NY 10019 _____

(Name of person to whom the subpoena is directed)

[X] *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

**The Subject Matters Addressed in the Attached Motion to Dismiss, and authentication of the exhibits cited therein.**

| PLACE | DATE AND TIME |
|---|---|
| Emmet, Marvin & Martin LLP, 120 Broadway 32nd Floor, New York, NY 10271 | October 11, 2019 at 9:00 AM. |

The deposition will be recorded by this method: _____

[ ] *Production*: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

_____

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: __ September 27, 2019 __

CLERK OF COURT

OR

_____      _____
Signature of Clerk or Deputy Clerk                    Attorney's signature

The name, address, email address, and telephone number of the attorney representing (name of party)
Sagi Genger
_____ , who issues or requests this subpoena, are:
John Dellaportas, Emmet, Marvin & martin, LLP, 120 Broadway, New York, NY 10271, 212-238-3000

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## Exhibit A

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any):* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

**Exhibit A**

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (Page 3)

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 7 |
| ORLY GENGER, | § | |
| | § | CASE NO. 19-10926-TMD |
| Debtor. | § | |

**JUDGMENT CREDITOR SAGI GENGER'S MOTION TO DISMISS
BANKRUPTCY CASE OR, ALTERNATIVELY, TO TRANSFER
VENUE, AND MEMORANDUM OF LAW IN SUPPORT**

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE

COMES NOW, Sagi Genger ("Sagi"), a pre-petition judgment creditor of Orly Genger, the Debtor ("Orly" or the "Debtor") under the foregoing, Chapter 7 case ("Bankruptcy Case"), by and through the undersigned counsel, and, pursuant to 11 U.S.C. §§ 305(a) and 707, and Rules 1014 and 1017 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), files this, his Motion to Dismiss this Chapter 7 Bankruptcy Case or, Alternatively, to Transfer Venue, and Memorandum of Law in Support (this "Motion"), and, in support would respectfully show the Court as follows:

### I.     JURISDICTION AND VENUE

1.     Subject to the movant's dispute of the propriety and validity of this Bankruptcy Case, including but not limited to before this Court, this Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(a) and 1334, and Sections 305 and 707 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). This Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

**Exhibit A**

2.    Venue in this District of this Bankruptcy Case is **not** proper pursuant to 28 U.S.C. § 1408, but until this Bankruptcy Case is dismissed or transferred, venue of this Motion in this District is proper pursuant to 28 U.S.C. § 1408.

3.    The statutory predicates for the relief requested herein are sections 305(a) and 707 of the Bankruptcy Code, Bankruptcy Rules 1014 and 1017, and Rule 1017 of this Court's Local Rules of Bankruptcy Procedure ("Local Rules").

## II.    SUMMARY

4.    This Bankruptcy Case is the latest in a decade-long saga of Orly Genger and her father Arie Genger engaging in vexatious litigation tactics spanning a dozen or more cases pending or previously resolved in New York state and federal courts, as well as Delaware chancery courts, over the proceeds from the sale of equity interests in a business named Trans-Resources, Inc. ("TRI").

5.    In 2013—as found by the U.S. District Court for the Southern District of New York (and affirmed by the U.S. Court of Appeals for the Second Circuit)—**"Orly monetized her beneficial interest in the [TRI] shares for $32.3 million."** *Genger v. Genger*, 76 F.Supp.3d 488, 501 (S.D.N.Y. 2015), *aff'd,* 663 Fed. Appx. 44 (2d Cir. Sept. 29, 2016); *Genger v. Genger*, 2018 WL 3632521 (S.D.N.Y. 2018), *aff'd,* 771 Fed. Appx. 99 (2d. Cir. June 28, 2019).  Yet, the Debtor's sworn bankruptcy schedules list "total property" of only $56,627.77.  This Bankruptcy Case is an attempt to shield the diversion of that tremendous value.

6.    Even putting aside this $32.3 million in missing value, Orly Genger is far from a typical Chapter 7 debtor.  By outward appearances, she looks to be one of the more fortunate members of our society.  She and her husband

. Her husband is a senior partner at a law firm

At his prior job, he received an executive severance package of $50 million and use of a corporate jet. His exotic car collection includes a Rolls Royce, Bentley and Lamborghini. Other than Sagi, no other creditor has brought a collection suit against the Debtor; indeed, her only other "creditors" are her father, her husband and her husband's law firm (each of whose claims, as explained below, are contrived), and allegedly her prior law firm, which firm was discharged from service three years ago and has made no formal demand for payment of which Movant is aware. In point of fact, the Debtor has no creditors that are not directly or indirectly tied to the underlying litigation pending in New York Courts to avoid a series of fraudulent conveyances made by the Debtor to frustrate Sagi's claims.

7.      The purpose of this bankruptcy filing thus is not to aid a good faith debtor in dealing with her debts and obtaining a fresh start. Rather, it is to frustrate the efforts of one particular creditor, the Debtor's brother, Sagi, to collect on a judgment which represents Orly's half of a financial commitment she made to support her estranged mother, out of the $32.3 million of equity proceeds cited above. Those proceeds were generated from the TRI equity that Orly received in connection with her indemnification of certain domestic support obligations to her mother at the time of her parents' divorce. When it appeared that the federal court in New York was on the cusp of entering a judgment setting aside the Debtor's fraudulent conveyances and encumbrances, thereby enabling her to pay her bona fide debts, the Debtor filed for bankruptcy in order to invoke the automatic stay and stop this from happening. Now, she seeks a discharge of her few legitimate debts so she can enjoy the full fruits of the foregoing $32.3 million windfall, which she has encumbered for the benefit of her husband and her father, who in turn has encumbered all his assets back to her husband, in order to frustrate the rights of her bankruptcy estate and its true, bona fide creditor.

**Exhibit A**

8.      This Court must not permit the Debtor and her conspirators to use Chapter 7 of the Bankruptcy Code in order to hinder, delay and defraud creditors. Even if it had been filed for a legitimate purpose, this Bankruptcy Case is not properly in this District. A little over an hour before filing for bankruptcy, Orly was still describing herself as "a domiciliary of Israel." Attached hereto as **Exhibit "A"** is a true and correct copy of the Debtor's *Petition for Panel Rehearing and Rehearing En Banc*, dated July 15, 2019, Appeal No. 18-2471-cv (2d. Cir. 2019). See pp. 2, 5. Proper venue, if anywhere in the United States, is in the Southern District of New York, and if not dismissed this case should be transferred there.

### III.    BACKGROUND

9.      To understand why a person of this Debtor's means, with a recent $32.3 million windfall from her parents and only one real creditor, has filed for bankruptcy, requires background into the history of the Genger family dispute.

10.     From the moment she procured this largesse, the Debtor knew that the value represented by the TRI shares was not "free money," rather, it came encumbered by a commitment that the Debtor had made back in 2004 to assist her brother Sagi in his support of their mother, Dalia, as part of Dalia's divorce from their father Arie, *out of these very proceeds*. Specifically, as part of that divorce, Dalia agreed to convey her marital rights to 794.40 shares of TRI for the benefit of Orly and Sagi, respectively. Dalia, Sagi and Orly further agreed that, if the TRI shares ever yielded an economic benefit, Dalia could clawback some of that benefit to support herself in her retirement. *Genger,* 76 F.Supp.3d at 492-493.

11.     For logistical reasons (Orly was yachting off the coast of Fiji when the divorce

**Exhibit A**

case settled), the parties structured their agreement in two documents,[1] such that Dalia would first demand support from Sagi for up to a fixed amount, following which Sagi would then be indemnified from the Debtor for fifty percent (50%) thereof. *Genger,* 76 F.Supp.3d at 493. However, in the intervening years, Orly grew estranged from her mother. Thus, she set about to dishonor this financial commitment through a series of legal and financial maneuvers which she coordinated with her father and her husband, culminating in this bankruptcy petition.

12.  Dalia's claw-back rights first crystallized on June 16, 2013, when Orly entered into a settlement agreement (the "2013 Settlement Agreement") with certain third parties (collectively known as the "Trump Group")[2] whom she and her father had sued over, *inter alia,* claims to beneficial ownership of the TRI shares. Under the 2013 Settlement Agreement, the Trump Group agreed to pay $32.3 million to Orly's attorney and grant Orly, her father, and his creditors with general releases. In exchange, Orly acknowledged that the Trump Group owned "all right, title and interest" to TRI shares previously purportedly held for Orly's benefit in trust. *Genger,* 76 F.Supp.3d at 493-494. The $32.3 million settlement payment consisted of $17.3 million in cash up front, plus two additional $7.5 million promissory notes to be made over time. *Id.* at 494 n. 11. It is undisputed that those two notes remain outstanding.

13.  As later calculated by the U.S. District Court, Orly is obligated to indemnify Sagi for up to $12.35 million of the aforementioned $32.3 million. *Genger,* 2018 WL 3632521, 2018 U.S. Dist. LEXIS 126958, *17 n. 5 (S.D. N.Y. 2018).[3] That would still leave Orly at least $20

---

[1]  The U.S. District Court later held these two documents to form a single integrated agreement. *Genger,* 76 F.Supp.3d at 497.

[2]  The Trump Group has no affiliation with the President of the United States, or his family.

[3]  As the District Court found: "Dalia's conveyed marital interest of 794.4 shares represents 36% of the total TRI shares that were monetized. Using that figure, the maximum amount payable to Dalia under

**Exhibit A**

million, which would please most people. Not Orly. In collaboration with her father Arie, and later her Big Law attorney/husband, Eric Herschmann, Orly set about to deny Sagi his lawful right to partial indemnification of his support obligation to Dalia. Thus, when the first $17.3 million settlement payment was made in 2013, the Debtor directed her then-attorney, William Wachtel of the New York firm Wachtel Missry, to immediately wire the entire sum to a purported trust established for the putative benefit of her business partners (who were supposedly *Arie's* creditors, but not creditors of the Debtor). Attached hereto as **Exhibits "B"** and **"C"** are true and correct copies of each of

, each of which is incorporated herein by reference for all purposes. Because, however, the remaining $15 million had not yet come due, the conspirators had to be more creative. Together, they hatched a scheme to encumber those two promissory notes by having the Debtor pledge them as "security" to her husband and father for bogus, backdated "liabilities." Attached hereto as **Exhibits "D", "E", "F",** and **"G"** are true and correct copies of each of *Subordinated Notes With First Amendments, UCC Financing Statement (Texas), State of Florida Uniform Commercial Code Financing Statement Form, UCC Financing Statement (New Jersey)*, each of which is incorporated herein by reference for all purposes. They later fought tooth-and-nail to keep this scheme hidden as long as possible, going so far as to submit numerous false sworn statements.

14.    This fraud—which Sagi only discovered through ten months of post-judgment discovery—continues today and in this Bankruptcy Case. Orly, incredibly, omits the $15 million receivable from her bankruptcy schedules ("Schedules"). Instead, she lists "total property," outside of her multi-million dollar, penthouse apartment at Austin's "W" Hotel, of only

---

the 2004 Integrated Agreement is approximately $24.7 million (or 36% of the total $69.3 million value [to Sagi and Orly])." *Id.*

**Exhibit A**

$56,627.77. *See* Schedule A/B, at No. 63. In this way, she apparently hopes to discharge her debts while preserving her assets. Given that the U.S. District Court for the Southern District of New York found that Orly alone had monetized her beneficial interests in the disputed TRI shares, these corresponding receivables should have been scheduled, and their omission cannot be other than deliberate. *Genger,* 76 F.Supp.3d at 491.

15.     The specific reason Sagi is a judgment creditor in this bankruptcy case is because, in the fall of 2017, Dalia made a demand for financial support in the amount of $6 million. Although this was less than one-quarter of her entitlement under the parties' 2004 agreement, Orly refused to pay her $3 million share, despite the 2004 agreement having been adjudicated to be valid and enforceable in an earlier federal court suit. *See Genger,* 76 F.Supp.3d at 499-501. A second lawsuit ensued. On August 17, 2018, the District Court entered a first-party judgment against Sagi in favor of Dalia for $6 million plus interest and expenses, and a third-party judgment against the Debtor in favor of Sagi for half that amount, $3 million plus interest and expenses (the "Judgment"). Attached hereto as **Exhibits "H" and "I"** are true and correct copies of each of *Sagi Genger Third Party Judgment* and *Dalia Genger Judgment*, which are incorporated herein by reference for all purposes. The Debtor did not pay the Judgment, but rather appealed to the Second Circuit, which unanimously affirmed the Judgment in Sagi's favor. *Genger v. Genger*, 2018 WL 3632521 (S.D.N.Y. 2018), *aff'd,* 771 Fed. Appx. 99 (2d. Cir. June 28, 2019).

16.     The 2013 Settlement Agreement did not expressly allocate the Trump Group's $32.3 million as amongst Orly and her three settling co-parties, but rather, as noted above, directed payment to Orly's counsel of record in the underlying suit. Attached hereto as **Exhibit "J"** is a true and correct copy of *Settlement Agreement and Release (2013)*, which is

**Exhibit A**

incorporated herein by reference for all purposes. As the District Court found, however, it was the Debtor alone who monetized her beneficial interest in her trust's shares for $32.3 million. *Genger,* 76 F.Supp.3d at 491. Her settling co-parties, Arie and the Brosers, had no live claims to monetize. The Brosers had never asserted any claims against the Trump Group to settle. Exhibit J. While Arie had done so, his claim to ownership of the TRI shares had been extinguished by a previous decision of the Delaware Supreme Court, with the Delaware Chancery Court threatening to hold him in contempt if he did not discontinue efforts to reclaim his ownership in TRI. *See TR Investors, LLC v. Genger*, 2013 Del. Ch. Lexis 48, **91-94 (Del. Ch. Feb. 18, 2013) ("With the issuance of this opinion, there are now not one but two judicial decisions adverse to Genger's efforts to relitigate who has majority control of Trans-Resources. This court rarely imposes the powerful sanction of contempt, and never does so with anything but regret....If no accord is reached, I shall then have no option other than to consider the motions."). On June 14, 2013, the Trump Group filed a reply brief seeking a daily fine against Arie if he did not immediately withdraw his New York suit. Attached hereto as **Exhibit "K"** is a true and correct copy of *Plaintiffs' Reply Brief in Further Support of Their Second Motion For Contempt and For Other Relief*, which is incorporated herein by reference for all purposes. The very next day, on June 15, 2013, the Settlement Agreement was signed by Arie. Exhibit J at 32.

17. Despite it having been conclusively established that it was Orly's interest in the TRI shares that was monetized for $32.3 million, the Debtor and her legal team at her husband's law firm (Kasowitz Benson Torres, LLP, "Kasowitz") conspired to conceal her arrangements with respect to the money. When asked in interrogatories signed by Kasowitz and Orly to "[i]dentify the amount, date, and recipient of all payments made and/or to be made to any person or entity pursuant to Defendant's 2013 settlement," Orly falsely swore that she had "no

**Exhibit A**

knowledge." Attached hereto as **Exhibit "L"** is a true and correct copy of *Orly Genger's Objections and Responses to First Set of Post-Judgment Discovery Requests*, which is incorporated herein by reference for all purposes. Shortly thereafter, Kasowitz falsely testified at its Rule 30(b)(6) deposition (the "Bowen Deposition" through its partner, Michael Bowen, the current payment agent under the 2013 Settlement Agreement, succeeding Mr. Wachtel) that:

Attached hereto as **Exhibit "M"** is a true and correct copy of the transcript of the *Oral Deposition of Michael Paul Bowen, dated October 05, 2018*, which is incorporated herein by reference for all purposes (*see* p. 32 [lines 23-24]). Additionally, in a March 11, 2019 brief to the Court of Appeals, Orly told that Court that: "This $17.2 million … had nothing to do with Orly. The remaining balance of $15 million … similarly has nothing to do with Orly." Attached hereto as **Exhibit "N"** is a true and correct copy of the Debtor's *Corrected Reply Brief For Third-Party-Defendant-Appellant*, which is incorporated herein by reference for all purposes.[4] These statements were all false.

18. Eventually, a series of discovery rulings brought out the truth. Orly, together with her father, had

---

[4] The Debtor and her husband would not even give the U.S. District Court a straight answer as to who were Orly's attorneys. After introducing himself at the hearing as "Eric Herschmann on behalf of Orly Genger", Mr. Herschmann then insisted that the Court "correct" a reference to him as his wife's counsel, claiming that, contrary to his own statement, he had only been appearing at the hearing on his own behalf. Attached hereto as **Exhibit "O"** is a true and correct copy of that certain *Transcript of Civil Cause For Hearing Before The Honorable Debra C. Freeman*, which is incorporated herein by reference for all purposes (*see* p. 45 [lines 17-18]). Also attached hereto, as **Exhibit "P"**, is a true and correct copy of the foregoing, referenced *Eric Herschmann Correction Letter*, which is incorporated herein by reference for all purposes. Then, after the Court made that "correction" at his request, he tried to appear for his wife at her deposition along with his law partners. The Court ordered him to leave the deposition. Attached hereto as **Exhibit "Q"** is a true and correct copy of the transcript of the *Oral Deposition of Orly Genger, dated March 7, 2019*, which is incorporated herein by reference for all purposes. Mr. Herschmann had previously entered appearances on behalf of his wife in several actions including the first federal action concerning the 2004 Indemnity.

**Exhibit A**

*See* Exhibit "B". However, Orly retained co-signing authority, with Arie, over the remaining $15 million, pursuant to an agreement to which Orly, Arie, the Brosers, Herschmann, and Kasowitz are all parties and signatories. Attached hereto as **Exhibit "R"** is a true and correct copy of this *March 31, 2017 Agreement*, which is incorporated herein by reference for all purposes.

19.    In terms of fraud, that was only the tip of the iceberg. As the federal court litigation progressively deteriorated for her, Orly, her father and her husband devised a scheme to frustrate the upcoming judgment by encumbering the notes with bogus liabilities. This was a preplanned and purposeful scheme.

Exhibit Q at 79-80.

20.    Key to Orly's plan were four documents, each of which she concealed until Sagi learned of them through third party discovery compelled by the Court:

Attached hereto as **Exhibits "S"**, **"T"** and **"U"** are true and correct copies of each of the foregoing *Amended and Consolidated Secured Promissory Note (Arie)*, *Secured Promissory Note (Herschmann)*, and *Subordination Agreement*, which are incorporated herein by reference for all purposes.

21.

**Exhibit A**

For example, the "December 31, 2016"          note to Arie is          by

      .

Attached hereto as **Exhibit "V"** is

a true and correct copy of such          , which is incorporated herein by reference for

all purposes.

(Exhibit U).

and the UCC liens reflecting the note were not filed until May 2017.

Attached hereto as **Exhibit "W"** is a true and correct copy of this

relating to this note, which is incorporated herein by reference for all purposes; Exhibit E.

22.    All this subterfuge was required because these documents do not reflect any actual, bona fide debts. The Debtor has never directly received a single dollar pursuant to either promissory note, nor has she ever made a single dollar of "repayment" under either one. Exhibit Q (*see* pp. 115-117 [lines 9-5]). Rather, as the story goes, these notes reflect advances that the Debtor's husband and father allegedly made to her lawyers. While it does seem that Arie paid Orly's lawyers directly for certain lawsuits brought in her name, using some of the $17.3 million he supposedly borrowed from the Brosers, incredibly, when one of those suits led to Orly's $32.3 million settlement and the Brosers were repaid in full (through the Genger litigation trust created for their benefit) for Arie's loans up until that point in time, Arie continued to treat *Orly's supposed debt to him for the same amounts as somehow unpaid.* Attached hereto as **Exhibit**

**Exhibit A**

**"X"** is a true and correct copy of a *Schedule of Loans to Arie Genger*, which is incorporated herein by reference for all purposes.

23.     In reality, the whole story was fabricated after the fact and applied retroactively as a fraudulent asset protection scheme to frustrate Sagi's ability to obtain payment on his judgment.   The UCC liens based on Arie's 2016 "secured promissory note" were not filed until August 2018.  Exhibit G.

Attached hereto as **Exhibit "Y"** is a true and correct copy of a transcript of the *Oral Deposition of Lance G. Harris, dated May 14, 2019*, which is incorporated herein by reference for all purposes (*see* p. 14 [lines 9-12]).

Attached hereto as **Exhibits "Z"** and **"AA"** are true and correct copies of each of *Amended and Consolidated Secured Promissory Note and related correspondence* and the transcript of the *Oral Deposition of William Fischer, dated May 2, 2019*, each of which are incorporated herein by reference for all purposes (*see* pp. 45-47 [lines 21-20]).[5]

24.     The  Debtor's

However, the lion's share of Kasowitz's legal work on her behalf was for a state court action

---

[5]     Arie Genger is experienced at litigation shenanigans.  In *TR Investors, LLC v. Genger*, he was fined a whopping $4 million by the Delaware Chancery Court for evidence spoliation, when he caused an IT specialist agent to sneak into the corporate headquarters of TRI in the dead of night and wipe clean its servers because it supposedly contained national security secrets. TR Investors, LLC v. Genger, 2009 Del. Ch. LEXIS 203, *67, 2009 WL 4696062.  The penalty was affirmed by the Delaware Supreme Court. *Genger v. TR Investors, LLC*, 26 A.3d 180 (Del. 2011).

**Exhibit A**

wherein Mr. Herschmann told the court that: "I have a retainer letter that would reflect that all of the attorneys that are on the trial for Kasowitz are working pro bono." Attached hereto as **Exhibit "BB"** is a true and correct copy of the relevant *State Court Transcript Excerpt From Case 1:17-cv-08181-VSB-DCF*, which is incorporated herein by reference for all purposes. Moreover, that was not merely a moment of careless braggadocio.

Attached hereto as **Exhibit "CC"** is a true and correct copy of the *Judgment Creditor Sagi Genger's Memorandum of Law in Support of His Motion For Turnover of Promissory Notes and Funds From Garnishees and Rescission of Fraudulent Conveyance*, which is incorporated herein by reference for all purposes (*see* p. 11). Yet in her bankruptcy Schedules, Orly now claims that she owes Kasowitz $1.5 million,

having made no additional payments since December 2016.[6] Schedule E/F, at No. 4.3.

25. The effect of the foregoing UCC liens, promissory notes and related agreements is to "round trip" the money out of the Debtor's bankruptcy estate and then back to the Debtor through her husband, who supports her. According to her American Express Black Card statements (which the Debtor and her husband concealed in violation of Court orders [Attached

---

[6] Mr. Herschmann did make a $2 million payment to Kasowitz in 2016, the purpose of which is unclear (Mr. Herschmann moved to quash Sagi's subpoena which would have gotten to the bottom of the matter, and then had his wife file for bankruptcy before the Magistrate could rule on the discovery motion). Even if the payment were for Kasowitz's not-in-fact "pro bono" legal work on Orly's behalf, this would simply have been an example of a wealthy spouse paying his less-wealthy spouse's bills. When Orly's legal fortunes soured, however, the payment was retroactively recharacterized as a "secured loan," and a promissory note was created and backdated to conform to that story.

**Exhibit A**

hereto as **Exhibit "DD"** is a true and correct copy of the Debtor's relevant *Centurion Card Statement*, which is incorporated herein by reference for all purposes] and about which she further lied under oath (Exhibit Q)), the Debtor is supported, to the tune of hundreds of thousands of dollars per year, by her husband, Mr. Herschmann.  Exhibit DD.  Indeed, at the recent "341" creditors' meeting, the Debtor claimed not to have access to a single bank or credit card of her own, but rather to be wholly reliant on her husband, even to pay for an ice cream cone for her young child—despite having her own income independent of her husband. Attached hereto as **Exhibit "EE"** is a true and correct copy of the transcript of the *Orly Genger Creditor Meeting, dated August 15, 2019*, which is incorporated herein by reference for all purposes (*see* 47:28-48:03).[7]  At the same meeting, the Debtor also claims to have no knowledge of her husband's considerable assets and no idea where to find such information, although her husband and his attorney were both present at the 341 meeting.  Exhibit EE (*see* 23:58-25:09).

26.     Apparently not wanting to leave any loose ends, with the $32.3 million dissipated by the foregoing scheme, the Debtor set about transferring away her remaining assets as well.

Exhibit AA at pp. 37-40 [lines 23-5].  Last August, after summary judgment was rendered in Sagi's favor in the New York federal suit, the Debtor emptied out all of her U.S. investment and bank accounts and hurriedly wired all the money to her attorney's IOLA account, from where it then disappeared.  Attached hereto as **Exhibit "FF"** is a true and correct copy of a *Vanguard Brokerage Account – Wire Transfer* confirmation, which is incorporated herein by reference for all purposes.  On September 20, 2018 (three weeks

---

[7]     The Debtor reported six-digit income, independent of her husband, for each of the last five reported taxable years 2013 – 2017:  $336,759, $152,882, $347,579, and $161,311.  Movant is not yet in possession of the Debtor's 2018 tax return, for which she filed an extension request.

**Exhibit A**

after judgment was entered against her), Orly recorded a transfer of her controlling interest in her valuable investment portfolio and art holdings business, Everything Important LLC, to her father for no cash but instead only a nominal reduction on her supposed debt to him. Attached hereto as **Exhibit "GG"** is a true and correct copy of her corresponding *Bill of Sale*, which is incorporated herein by reference for all purposes.[8] And on September 28, 2018 (one week after Sagi domesticated his judgment in Travis County), Orly and her husband recorded a "Deed of Trust" purporting to transfer her residual rights to her fifty percent (50%) interest in the couple's property—a multi-million dollar apartment in the W Hotel in downtown Austin—to a trust for the benefit of Mr. Herschmann.

27. Meanwhile, the Debtor now swears that she moved to Texas sometime in late 2018 or early 2019 (incredibly, she contends that she does not, in fact, remember when she moved to Texas. *See* Transcript of 341 Creditors' Meeting, August 15, 2019, at p. 5).[9] Yet the Debtor and her insiders have spent the last two years insisting—repeatedly and **under oath**— that, she permanently resided in Israel with no intention of ever moving back to the United States. For instance, in a May 16, 2018 declaration, Orly attested to the Court under oath that: "Many months before this action was commenced by my mother and brother [in October 2017], I had moved from Austin, Texas to Tel Aviv, Israel. <u>I intended at that time, and still intend, to live permanently in Israel, and have no intention to move from Israel</u>. …All of Sagi's previous claims that my domicile is in … Texas … are inaccurate." Exhibit Y at 2 (emphasis added). Similarly,

---

[8] The Bill of Sale is dated January 1, 2017—twenty months before it was filed—and appears to be yet another _____ document. Exhibit GG.

[9] The Debtor: …the holidays I think, of, of 2018.
    ….
Question: So in September or October of last year, you moved back to Texas?
The Debtor: Um, that's when I- I'd made the decision. I mean, I don't, I don't know ... It made my move- moving back. I mean, this stuff doesn't happen in one singular moment.
    ….
Question: And uh, when did you actually physically make that move um, back to Texas?
The Debtor: Uh, I don't remember.

**Exhibit A**

at his deposition on April 3, 2019 (*i.e., two months after her supposed move to Texas*), her father testified that:

Attached hereto as **Exhibit "HH"** is a true and correct copy of the transcript of the *Oral Deposition of Arie Genger, dated April 3, 2019*, which is incorporated herein by reference for all purposes (*see* p. 6 [lines 1-6]).

28.     When Sagi's counsel wrote to the second-named partner of Kasowitz, Daniel R. Benson, on April 30, 2019 to question Orly's claimed Israeli domicile as of October 2017, Mr. Benson responded in a May 2, 2019 letter ("May 2, 2019 Kasowitz Letter") by threatening to seek disciplinary measures against him, *merely for suggesting* that Orly might have *ever* lived in Texas:

> Whatever your motivation, your statements are demonstrably false, your demands are completely misplaced, and your letter is contemptible. ....
>
> Among other things, over the past several years, I, personally, have visited Mr. Herschmann and Ms. Genger at their Tel Aviv home on two occasions (in September 2017 and October 2018), as have Michael Bowen (in December 2018 and January 2019), Andrew Kurland (in March 2019), and numerous other people, including other lawyers from this firm. During this time, I also have received hundreds of calls with a *972 country code (Israel) from Mr. Herschmann. ...
>
> Please confirm to me immediately in writing that you withdraw your scurrilous April 30 letter and will cease and desist from further such conduct. If you do not do so and if you repeat any false and reckless accusations, we will take all necessary and appropriate steps to seek sanctions and disciplinary measures. Enough is enough.

Attached hereto as **Exhibit "II"** is a true and correct copy of the *May 2, 2019 Kasowitz Letter*, which is incorporated herein by reference for all purposes.

**Exhibit A**

29.     These false statements are head-spinning.  The Debtor's demonstrated lack of candor and good faith in her sworn, voluntary petition is also an affront to the dignity of this Court and the Bankruptcy Code.  Sagi respectfully submits that the only appropriate remedy for such misconduct is dismissal of the Debtor's bankruptcy case under 11 U.S.C. §§ 305(a) and/or 707.  The Debtor's bankruptcy filing lacks good faith, and has no proper purpose.  It was filed in this Court in a forum-shopping effort to gain a tactical litigation advantage over Sagi by preventing or delaying the U.S. District Court's consideration of Sagi's pending motions to (a) unwind the Debtor's fraudulent conveyances and (b) obtain sanctions and contempt citations for the various acts of egregious litigation misconduct described herein.

30.     Alternatively, Sagi respectfully requests this Court transfer the Bankruptcy Case (including all future adversary, ancillary, and/or related matters) to the U.S. Bankruptcy Court for the Southern District of New York, to ensure that the same forum that has ruled on the Debtor's property rights and the within disputes continues to do so. The Debtor has not actually resided in the District for the requisite time period under 11 U.S.C. § 1408(1).  Indeed, just a few months ago, Magistrate Judge Austin of this Court held that a motion to quash a subpoena brought by Orly's (non-estranged) husband should be transferred to the Southern District of New York, finding that: "[Eric] Herschmann and [Orly] Genger, as owners of multiple residences, have used this fact to their legal advantage by claiming to reside in whichever location most suits their legal needs at the time." *See Genger v. Genger*, Civil Action No.: 1:19-mc-00366-LY (W.D. Tex.), Docket No. 11 (p. 5 of 6).  They are doing the same thing here.

31.     Meanwhile, the Debtor's two greatest assets—the two $7.5 million promissory notes—are located in the Southern District of New York, where the courts have been addressing legal issues related to the Genger family dispute for nearly a decade.  Indeed, as the Debtor's

**Exhibit A**

own Schedules reflect, there are still multiple pending litigation cases in New York, the most significant of which is the federal suit where the Debtor was on the cusp of having her assets restored to her—a fate she, perversely, filed bankruptcy to avoid.

32.     At bottom, this is a two-party dispute.  That dispute should be resolved in the District that the Debtor herself chose when she initiated a string of unsuccessful suits against her brother and mother concerning these very same matters.  If not dismissed, then transfer to the Southern District of New York is clearly warranted.

## IV.     ARGUMENT

### A.     The Case Was Commenced in Bad Faith and Should Be Dismissed

33.     Under Section 707(a) of the Bankruptcy Code, a Bankruptcy Court may dismiss a Chapter 7 case "for cause," which includes cases filed by the petitioner in bad faith. *See In re Krueger*, 812 F.3d 365, 370 (2016) ("This circuit joins those courts that have held a debtor's bad faith in the bankruptcy process can serve as the basis of a dismissal "for cause," even if the bad faith conduct is arguably encompassed by other provisions of the Code.").  As the Court of Appeals for the Fifth Circuit has held: "[C]ause is any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy process. ... This can include prepetition bad-faith conduct, ... postpetition bad faith conduct, or petitions that simply serve no legitimate bankruptcy purpose ..." *Id.* at 370 (citations and quotations omitted).

34.     In addition, the Court may also dismiss Debtor's bankruptcy petition under 11 U.S.C. § 305(a)(1), which provides that a bankruptcy case may be dismissed at any time if "the interests of creditors and the debtor would be better served by such dismissal or suspension." Notably, dismissal under 11 U.S.C. § 305(a)(1) may also be appropriate in instances where "the bankruptcy case constitutes a two-party dispute between the debtor and a single creditor." *In re*

**Exhibit A**

*Amc Investors, LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009). "Courts generally abstain in two-party disputes where relief is available in a non-bankruptcy forum." *Id.* at 488.

35.    "In judging whether there is cause to dismiss a case, a court may consider the debtor's entire course of conduct—before, during, and after the filing of a chapter 7 petition. Embraced by this wide-ranging inquiry are acts or omissions arguably covered by more specific provisions of the Code." *Krueger*, 812 F.3d at 372 (emphasis added). For example, dismissal has been held to be warranted "where the debtor used a bankruptcy filing to 'frustrate [a] divorce court decree and push his ex-wife into bankruptcy,' and thus his 'non-economic motives' were 'unworthy of bankruptcy protection.'" *Id.* (quoting *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 832 (8th Cir.1994)). The Debtor's motives are similarly unworthy here.

36.    The "good faith" requirement has strong roots in equity. As the Third Circuit has explained in *In re SGL Carbon Corp.*, 200 F.3d 154, 161 (3rd Cir. 1999):

> A good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with 'clean hands.' Another basic underpinning of the good faith doctrine is the equitable concept of clean hands. As a general matter, bankruptcy relief is equitable in nature, and, as a general rule, equitable remedies are not available to any party who fails to act in an equitable fashion.
>
> . . .
>
> Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way[.] (Citations and quotations omitted.)

37.    Similarly, the Sixth Circuit in *In re Zick*, 931 F.2d 1124, 1130 (6th Cir.1991) has explained that:

> The Bankruptcy Code is intended to serve those persons who, despite their best efforts, find themselves hopelessly adrift in a sea of debt. Bankruptcy protection was not intended to assist those who, despite their own misconduct, are attempting to preserve a comfortable standard of living at the expense of their creditors. Good faith and candor are necessary prerequisites to obtaining a fresh start. The bankruptcy laws are grounded on the fresh start concept. There is no right, however, to a head start.

**Exhibit A**

*(Quoting In re Jones,* 114 B.R. 917, 926 (Bankr. N.D.Ohio 1990)).

38.     There are two inquiries that are relevant to this question of good faith: "'(1) whether the petition serves a valid bankruptcy purpose' and '(2) whether the petition is filed merely to obtain a tactical litigation advantage.'" *In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 (3d Cir. 2009) (emphasis added, citations omitted); *accord, e.g., In re SGL Carbon Corp.*, 200 F.3d at 165 (where "the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith") (citations and quotations omitted).

39.     In *Krueger,* for example, "the record [was] replete with evidence that Krueger filed bankruptcy for illegitimate purposes, misled the court and other parties, and engaged in bare-knuckle litigation practices, including lying under oath .... As the bankruptcy court found: 'Krueger petitioned for bankruptcy not to seek a fresh start as an honest but unfortunate debtor, but to hamper the state court litigation ....'" 812 F.3d at 374. The Fifth Circuit Court of Appeals therefore held that: "His duplicitous behavior is exactly the sort of conduct contemplated by most courts as giving cause for dismissal under § 707(a)." *Id.* As reflected above, the Debtor has engaged in such litigation practices. Dismissal is thus equally warranted here.

40.     Nor can the purely tactical nature of this filing be ignored. In *In re Syndicom Corp.*, 268 B.R. 26, 51-52 (Bankr. S.D.N.Y. 2001), for example, the Bankruptcy Court identified the following additional factors as reflecting a debtor's bad faith:

a)  the bankruptcy case was filed as a tactical step in connection with litigation and with the purpose of securing a tactical advantage;

b)  there has been no showing of any financial pressure on the debtor other than its adversary in a two-party dispute;

c)  unsecured creditors would not benefit in any material way from the debtor's

filing and would not be prejudiced in any material way as a result of relief from the stay; and

d)  the bankruptcy case was filed with both the purpose and effect of securing benefits for non-debtor individuals in contrast to securing the benefits for the debtor corporation.

41.    Each of the *Syndicom* factors is present here.  This Bankruptcy Case was filed as a tactic to stay the federal court suit wherein, after years of litigation, the U.S. District Court was situated to set aside the Debtor's fraudulent conveyances, and she and her cohorts faced impending motions for sanctions.  Her and Arie's accountant was informed that movant would seek to hold him in contempt for disobeying a discovery order, hours before this case was filed.  The tactical nature of this case is entirely consistent with her and her conspirators' pre-bankruptcy litigation strategy of false oaths and vexatious and frivolous pleadings.

42.    Further, there has been no showing of any financial pressure on the Debtor by any creditor other than Sagi, making this essentially a two-party dispute.  Moreover, Sagi's "pressure" was to attempt to *restore* assets to Orly.  As noted above, prior to filing for bankruptcy, the Debtor spent the better part of a year litigating to avoid having tens of millions of dollars in assets restored to her so she could pay these claims.  That is not the conduct of an honest debtor.

43.    Since June 11, 2019, U.S. District Judge Broderick in the Southern District of New York has had before him Sagi's post-judgment motion to set aside the Debtor's fraudulent conveyances, which would be sufficient to pay all of Orly's creditors, legitimate and otherwise, and obviate any valid purpose this Bankruptcy Case could otherwise serve.  Rather than consent to the motion, Orly first sought and obtained a lengthy extension of her time to reply and then, when that time finally came around, she instead filed this case.  The only purpose of this case is to keep her assets in the hands of her father (who, in turn, has pledged all his assets back to her

**Exhibit A**

husband) and her husband, who supports the Debtor in a lavish lifestyle, while leaving her one true creditor—Sagi (and by extension, her estranged mother, Dalia)—holding the bag. In sum, this is textbook bad faith. The Southern District of New York should be allowed to proceed with its ruling, or else take custody of the Debtor's bankruptcy case.

44. As noted above, the Debtor's Schedules evidence a lack of candor with the Court and creditors. *See e.g., Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261 (5th Cir. 2012) ("the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets." Citations and quotations omitted); *King Louie Mining, LLC v. Comu (In re Comu)*, 2014 Bankr. LEXIS 2969, *269 (Bankr., N.D. Tex. 2014) ("Failure to make a full and accurate disclosure constitutes a bankruptcy crime...").

45. As stated by Judge Mott in *In re Robert*:

> Upon filing for bankruptcy, it is the debtor's obligation to be forthright in providing financial information. No one is obligated to recreate the debtor's financial affairs; that task is his alone. The Bankruptcy Code makes complete financial disclosure a "condition precedent" to discharge.... In short, the global purpose of § 727 is to relieve creditors from the burden of "discovering" assets and to place it where it rightfully belongs, upon the debtor.

*Satija v. Robert (In re Robert)*, 2017 Bankr. LEXIS 3773, *2 (Bankr. W.D. Tex. 2017 (citations and quotations omitted).

46. Here, although Chapter 7 counsel was retained eleven months before the actual Chapter 7 case filing (August 2018) for a retainer amount of $75,000, there is very little, if any, financial information provided in the Schedules or the Statement of Financial Affairs (as to which this Court granted the Debtor a filing extension. *See* Docket No. 9). No information is provided as to the value of the various trusts, some of which the Debtor used to move assets from her own name, and no information is provided with respect to the $17.3 million dollars received in cash and $15 million dollars of notes. Instead of providing full disclosure of the relevant

**Exhibit A**

information that is required of all Chapter 7 debtors, there are four pages of disclaimers entitled "Global Notes, Methodology and Specific Disclosures Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs." Further, the Debtor lists only two secured creditors, her husband and her father Arie, both of whose claims should have been listed as subject to avoidance claims but were not. (See Schedules page 16, 17 and 38). As to the remaining unsecured creditors listed, all of the creditors relate to the underlying litigation to avoid the fraudulent transfers either directly or indirectly. Schedules pages 19-21. The only "third party creditor" appears to be a bonding company, Markel Surety, in the amount of $750, for the provision of a bond in favor of Sagi, in connection with the Debtor's requested injunctive relief before the New York Courts.

47.     Accordingly, the instant case should be dismissed pursuant to either or both of Sections 707(a) and/or 305(a)(1) of the Bankruptcy Code as well. Further, given the severity of the fraud, the Debtor should be barred from filing any new bankruptcy case for at least two years. *See, e.g., Cusano v. Page 31 Klein (In re Cusano),* 431 B.R. 726, 737 (B.A.P. 6th Cir. 2010) ("Where there is sufficient cause, bankruptcy courts have the authority pursuant to 11 U.S.C. §§ 105(a) and 349(a) to prohibit bankruptcy filings in excess of 180 days.").

**B.     If Not Dismissed, the Case Should Be Transferred to the Southern District of New York**

48.     Under 28 U.S. Code § 1408(1), "a case under title 11 may be commenced in the district court for the district … in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the [180] days immediately preceding such commencement, or for a longer portion of such [180]-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such

{01519/0001/00239992.1}
4821-9256-6692v.3

23

**Exhibit A**

person were located in any other district ...." Venue is not proper in this District because Orly has not resided in this District for most or all of the 180-day period preceding her filing, and because far and away her principal assets—the two $7.5 million promissory notes over which she retains signing authority—are located in the Southern District of New York.

49. Pursuant to 28 U.S.C. § 1412, "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, <u>in the interest of justice</u> or <u>for the convenience of the parties</u>." (Emphases added.) The use of the disjunctive "or" in § 1412 creates "two distinct analytical bases upon which transfer of venue may be grounded." *In re Caesars Entm't Operating, Co.,* 2015 Bankr. Lexis 314, *16-17 (Bankr. D. Del. Feb. 2, 2015) (citations and quotations omitted). Here, both analytical bases merit transfer.

50. The <u>interests of justice</u> component of Section 1412 "is a broad and flexible standard which must be applied on a case-by-case basis. It contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness." *Zhang v. Rothrock,* 2006 WL 213951, *1 (S.D.Tex. Jan. 25, 2006) (citation omitted). As the U.S. Supreme Court has noted in the analogous 28 U.S.C. § 1404 context, transfer "in the interest of justice" is favored when a related case involving the same issues is pending in the transferee court. *See Cont'l Grain Co.,* 364 U.S. 19, 26 (1960). "To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Id., accord MC Asset Recovery, LLC v. The Southern Co.,* 339 B.R. 380, 383 (N.D. Tex. 2006) (transferring adversary proceeding to Northern District of Georgia due to "pendency there of somewhat related litigation"); *Zhang, supra* (transferring case "related to" Chapter 13 case to Eastern District of Texas).

**Exhibit A**

51.     For a transfer founded upon <u>the convenience of parties</u>, in turn, the Fifth Circuit has enumerated the following relevant factors: the proximity of creditors to the Court; the proximity of the debtor to the Court; the proximity of the witnesses necessary to the administration of the estate; the location of the assets; and the economic administration of the estate. in *In re Commonwealth Oil Refining Co.*, 596 F.2d 1239, 1247 (5th Cir. 1979) ("*CORCO*"); *accord Caesars*, 2015 Bankr. Lexis 314, at *20 (citing *CORCO*, 596 F.2d at 1247). In a typical civil action, the debtor's choice of forum would also be a factor, albeit not in and of itself conclusive. *See In re Horseshoe Entertainment,* 337 F.3d 429, 434 (5th Cir. 2003). However, "to be considered at all, the plaintiff's choice of forum must be one which is permitted under the relevant venue statute." *Id.* at 434-35. As this District is not a permissible forum at all, the Debtor's choice in this case is entitled to no weight.

52.     In addition to being the location of the Debtor's principal assets (notwithstanding her fraudulent omission of them from her schedules), the Southern District of New York is where the Gengers have lived, worked and litigated for most of their lives—a fact reflected in the Debtor's own credit card statements. Exh. DD. Her own father, when deposed just a few months ago, stated that the Debtor lives in Israel—as did Orly herself until she filed. Exh. Q *see* pp. 28-29 [lines 24-3]. Even if the Court were to credit the Debtor's claim that she recently moved to Austin, virtually every other creditor or party—including her (non-estranged) husband, according to the web site of his law firm, lives and/or works in New York. *See* https://www.kasowitz.com/people/eric-d-herschmann. These facts alone constitute cause for transfer. *See Casarez v. Burlington Northern/Santa Fe Co.,* 193 F.3d 334, 339 (5th Cir. 1999) (affirming transfer when most fact witnesses lived closer to Fort Worth than El Paso, defendant was headquartered there, and relevant files were there).

**Exhibit A**

53.     Further, the central issue in this bankruptcy will be the Debtor's fraudulent conveyance of her $32.3 million in settlement proceeds to third parties, including her father and his creditors.  Those transfers took place in New York, and will be subject to New York Debtor-Creditor Law governing such transfers, which is yet another factor favoring transfer to the Southern District of New York. *See, e.g., Matter of Continental Airlines, Inc.*, 133 B.R. 585, 587-88 (Bankr. D. Del. 1991) (factors considered by the courts in evaluating transfers of venue for the convenience of the parties include, "the state's interest in having local controversies decided within its borders, by those familiar with its law".  Citations omitted).

54.     Lastly, there is the issue of related cases; there are eight of them.  No less than four TRI-related cases are pending in the U.S. District Court for the Southern District of New York, all of which center on the same issue that is central to this bankruptcy—the fate of the $32.3 million in Orly's settlement proceeds: (a) *Sagi Genger v. Orly Genger,* Civ. Action No. 17-cv-08181; (b) *Recovery Effort v. Zeichner et ano*, Civ. Action No. 19-5641; (c) *Manhattan Safety & Recovery Effort v. Michael Bowen et al.*, Civ. Action No. 19-5642; and (d) *Sagi Genger v. Arnold Broser et al.*, Civ. Action No. 19-cv-06100.  Another four TRI-related cases are pending in the state courts of the same New York county: (a) *In re Application of Orly Genger,* File No. 2009-0017 (Surr. Ct.);  (b) *In re Matter of Dalia Genger,* File No. 2008-0017E (Surr. Ct.); (c) *Dalia Genger v. Arie Genger*, Case No. 113862/2010 (Sup. Ct.); and (d) *Arie Genger et ano v. Sagi Genger et al*., Case No. 651089/2010 (Sup. Ct.).

55.     Without delving into an interminably long litigation history, suffice it to say that the New York federal and state courts have not been favorable to Orly in their rulings.  Thus, she has picked a new forum.  "Forum shopping has never been favored by federal courts, and courts are quick to discern the evil in all its disguises." *In re Abacus Broadcasting Corp.,* 154 B.R. 682,

**Exhibit A**

686 (Bank. W.D Tex. 1993) (citing, *inter alia*, *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1523 (9th Cir.1983)). "This tactic is not simply unfair to the creditors of these estates. It is also unfair to the judges." *Id.* If this case is not dismissed outright, as it should be, then the Debtor's traveling road show should be sent packing back to New York from whence it came.

## V.    CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Creditor Sagi Genger respectfully requests entry of an order (a) dismissing the Debtor's case with a two-year refiling bar or, in the alternative, (b) transferring the case to the United States Bankruptcy Court for the Southern District of New York, and (c) granting him such other and further relief to which he is justly entitled.

Dated: September 12, 2019                 Respectfully submitted,

*/s/ Sabrina L. Streusand*
Sabrina L. Streusand
State Bar No. 11701700
Streusand Landon Ozburn Lemmon LLP
1801 South MoPac Expressway, Suite 320
Austin, Texas 78746
Telephone: (512) 236-9900
Facsimile: (512) 236-9904
streusand@slollp.com

-and-

John Dellaportas (admitted *pro hac*)
Emmet, Marvin & Martin, LLP
120 Broadway
New York, New York 10280
Telephone: (212) 238-3000

*Counsel to Creditor Sagi Genger*

**Exhibit A**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 12, 2019, a true and correct copy of the above referenced document was served via ECF filing and/or regular U.S. mail on the following parties:

Eric Herschmann
210 Lavaca St., Unit 1903
Austin, TX 78701-4582

Eric Herschmann
c/o Raymond Battaglia
66 Granburg Circle
San Antonio, TX 78218-3010

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia, PA 19101-7346

Kasowitz, Benson, Torres LLP
Attn: Daniel Benson, Esq.
1633 Broadway, 21st Floor
New York, NY 10019-6708

United States Trustee
903 San Jacinto, Suite 230
Austin, TX 78701-2450

Zeichner Ellman & Krause LLP
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-6149

Eric J. Taube
Waller Lansden Dortch & Davis, LLP
100 Congress Ave., Suite 1800
Austin, TX 78701-4042

Orly Genger
210 Lavaca St., Unit 1903
Austin, TX 78701-4582

Ron Satija
P.O. Box 660208
Austin, TX 78766-7208

**Exhibit A**

Arie Genger
c/o Deborah D. Williamson
Dykema Gossett PLLC
112 East Pecan St., Suite 1800
San Antonio, TX 78205

Aaron M. Kaufman
Dykema Gossett PLLC
Comerica Bank Tower
1717 Main St., Suite 4200
Dallas, TX 75201

Arie Genger
19111 Collins Ave., Apt. 706
Sunny Isles, FL 33160-2379

SureTec Insurance Co.
c/o Clark Hill Strasburger
901 Main Street, #6000
Dallas, Texas 75202

Orly Genger
210 Lavaca Street
Unit 1903
Austin, Texas 78701

Sagi Genger
c/o John Dellaportas
Emmt Marvin & Martin LLP
120 Broadway, 32nd Floor
New York, NY 10271-3291

The Orly Genger 1993 Trust
c/o Jay Ong
Munsch Hardt Kopf & Harr PC
303 Colorado Street, #2600
Austin, Texas 78701

Zeichner Ellman & Krause LLP
1211 Avenue of the Americas
40th Floor
New York, NY 10036-6149

**Exhibit A**

Brian Cumings
Graves Dougherty Hearon & Moody
401 Congress Avenue
Suite 2700
Austin, Texas 78701

*/s/ Sabrina L. Streusand*
Sabrina L. Streusand
