Dates of drafts of Amended and Consolidated Secured Promissory Note dated December 31, 2016 in the amount of $5,372,324.73, between Arie Genger ("Lender") and Orly Genger ("Borrower"):

- Draft 11/9/17
- Draft 11/10/17
- Draft 11/17/17
- Draft 12/14/17
- Draft 12/15/17
- Draft 12/20/17
- Draft 2/9/18
- Draft 2/13/18
- Draft 2/26/18
- Final 4/5/18

**Exhibit A**

## Page 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -----------------------------------------X
 3   SAGI GENGER,
 3
              Plaintiff,
 4
                              Civil Action No.:
 5                            1:17cv8181
          -against-
 6
     ORLY GENGER,
 7
              Defendant.
 8   -----------------------------------------X
 9
10                 May 14, 2019
11                 10:00 A.M.
12
13
14   DEPOSITION of the Non-Party Witness, LANCE G.
15   HARRIS, taken by the Plaintiff, pursuant to a
16   Subpoena, held at the offices of Kelley, Drye &
17   Warren LLP, 101 Park Avenue, 27th Floor, New
18   York, New York 10178, before Yuliya Yemtsova, a
19   Professional Court Reporter and a Notary Public
20   of the State of New York.
21
22
23
24
25
```

## Page 2

```
 1        A P P E A R A N C E S
 2
     KELLEY DRYE & WARREN LLP
 3   Attorneys for the Plaintiff
     SAGI GENGER
 4        101 Park Avenue, 27th Floor
          New York, New York 10178
 5
     BY: JOHN DELLAPORTAS, ESQ.
 6    P: (212) 808-5000
 7
 8
 9
10
11
12
     ALSO PRESENT:
13        SAGI GENGER - Plaintiff
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1        221. UNIFORM RULES FOR THE
          CONDUCT OF DEPOSITIONS
 2   221.1 Objections at Depositions
     (a) Objections in general.No objections shall
 3   be made at a deposition except those which,
     pursuant to subdivision (b), (c) or (d) of Rule
 4   3115 of the Civil Practice Law and Rules, would
     be waived if not interposed, and except in
 5   compliance with subdivision (e) of such rule.
     All objections made at a deposition shall be
 6   noted by the officer before whom the deposition
     is taken, and the answer shall be given and the
 7   deposition shall proceed subject to the
     objections and to the right of a person to
 8   apply for appropriate relief pursuant to
     Article 31 of the CPLR.
 9   (b) Speaking objections restricted.Every
     objection raised during a deposition shall be
10   stated succinctly and framed so as not to
     suggest an answer to the deponent and, at the
11   request of the questioning attorney, shall
     include a clear statement as to any defect in
12   form or other basis of error or irregularity.
     Except to the extent permitted by CPLR Rule
13   3115 or by this rule, during the course of the
     examination persons in attendance shall not
14   make statements or comments that interfere with
     the questioning.
15   221.2 Refusal to answer when objection is made.
     A deponent shall answer all questions at a
16   deposition, except (I) to preserve a privilege
     or right of confidentiality, (ii) to enforce a
17   limitation set forth in an order of the court,
     or (iii) when the question is plainly improper
18   and would, if answered, cause significant
     prejudice to any person.  An attorney shall
19   not direct a deponent not to answer except as
     provided in CPLR Rule 3115 or this subdivision.
20   Any refusal to answer or direction not to
     answer shall be accompanied by a succinct and
21   clear statement of the basis therefor.  If the
     deponent does not answer a question, the
22   examining party shall have the right to
     complete the remainder of the deposition.
23
24
25
```

## Page 4

```
 1        221. UNIFORM RULES FOR THE
          CONDUCT OF DEPOSITIONS
 2
     221.3 Communication with the deponent
 3        An attorney shall not interrupt the
     deposition for the purpose of communicating
 4   with the deponent unless all parties consent or
     the communication is made for the purpose of
 5   determining whether the question should not be
     answered on the grounds set forth in section
 6   221.2 of these rules and, in such event, the
     reason for the communication shall be stated
 7   for the record succinctly and clearly.
 8
          IT IS FURTHER STIPULATED AND AGREED
 9   that the transcript may be signed before any
     Notary Public with the same force and effect as
10   if signed before a clerk or a Judge of the
     court.
11
12        IT IS FURTHER STIPULATED AND AGREED
     that the examination before trial may be
13   utilized for all purposes as provided by the
     CPLR.
14
15        IT IS FURTHER STIPULATED AND AGREED
     that all rights provided to all parties by the
16   CPLR cannot be deemed waived and the
     appropriate sections of the CPLR shall be
17   controlling with respect hereto.
18
19        IT IS FURTHER STIPULATED AND AGREED
     by and between the attorneys for the respective
20   parties hereto that a copy of this examination
     shall be furnished, without charge, to the
21   attorneys representing the witness testifying
     herein.
22
23
24
25
```



**Exhibit A**

1    (Whereupon, Harris Exhibit 1-2,
2  subpoenas, were pre-marked for identification
3  as of this date by the reporter.)
4  L A N C E  G.  H A R R I S, having been first duly
5  sworn by a Notary Public of the State of New York,
6  testified as follows:
7  EXAMINATION BY MR. DELLAPORTAS:
8    Q.   Please state your name for the
9  record.
10   A.   Lance G. Harris.
11   Q.   What is your address?
12   A.   1211 Avenue of the Americas, 40th
13  Floor, New York, New York 10036.
14       MR. DELLAPORTAS:  Before we got on
15  the record, Mr. Harris and I agreed that for
16  purposes of streamlining the deposition, the
17  ordinary stipulations would apply, including,
18  most importantly, that all objections are
19  preserved.  Correct.
20   Q.   So, good morning, Mr. Harris.
21   A.   Good morning, Mr. Dellaportas.
22   Q.   So we're going to streamline this.
23  We know you're a little under the weather, so
24  we're going to try to get you in and out of
25  here as fast as possible.

1    A.   Thank you very much.
2       MR. DELLAPORTAS:  Let me first mark
3  as Harris Exhibit 3 -- oh, and just for the
4  record, we premarked as Harris Exhibits 1 and 2
5  the two subpoenas served on the law firm of
6  Stein & Harris, which brought us here today.
7  And we may ask questions about those later.
8       But for now, let's mark as Harris
9  Exhibit 3 a series -- a ten-page document
10  production produced to us yesterday by
11  Mr. Harris.  The first page of which states
12  dates of draft of Amended and Consolidated
13  Secured Promissory Note.
14       (Whereupon, Harris Exhibit 3, dates
15  of drafts of Amended and Consolidated Secured
16  Promissory Note, was marked for identification
17  as of this date by the reporter.)
18   Q.   So, Mr. Harris, can you tell us
19  what this first page is?
20   A.   Sure.  You had asked for metadata
21  and other backup support vis-à-vis the
22  consolidated promissory note dated December 31
23  between Arie and Orly for approximately $5.3
24  million.  So, in my office, we don't have a
25  server, or we don't use any cloud facility, so

1  everything's on local computers, so some were
2  new, some were not.  So on my prior associate's
3  main computer, these drafts existed as of these
4  dates, when those were the dates of last
5  modifications.  So we then reviewed that,
6  replicated that, and provided that information
7  to you.
8    Q.   Okay.  So is your firm on any kind
9  of network?
10   A.   No.  That's my -- that's exactly
11  the point.
12   Q.   You have individual hard drives?
13   A.   Individual hard drives.  Correct.
14   Q.   Okay.  And you said your associate.
15  What was your associate's name?
16   A.   At that time, that associate was
17  Nicole Phillips, who was the drafter of those
18  dates.  She -- it was several computers, but on
19  this computer, which we have -- still have,
20  these were the drafts that existed on that
21  particular computer.
22   Q.   And Ms. Phillips was the attorney
23  who drafted the promissory note?
24   A.   That's my best recollection.
25   Q.   Okay.  And on whose behalf did she

1  draft it?
2    A.   Our client, Arie Genger.
3    Q.   What did these individual bullet
4  entries signify?
5    A.   Modifications of the document,
6  every date that they were modified or some
7  saved change was made.
8    Q.   Okay.  So this was -- there's only
9  a single Word document?
10   A.   There's a single Word document.  As
11  I understand it, it was, at some point,
12  converted, and my sense is on 4/5/18 was the
13  date, it was converted to PDF, but my senses,
14  these are all draft changes of a Word document
15  that ultimately resulted in a PDF document.
16   Q.   I see.  And was there someone at
17  your office who assisted with the creation --
18  who created this document?
19   A.   My current associate, who uses one
20  of Nicole's old computers that had this
21  information on there.
22   Q.   What's the associate's name?
23   A.   Annetta Sookdeo.  That's my best
24  pronunciation.
25   Q.   How do you spell that?

1    A.   S-O-O-K-D-H-O -- I don't
2  remember -- oh, maybe -- let me just check, if
3  you don't mind, my phone, so I don't misspell
4  an associate's name, which is embarrassing,
5  'cause I only have one.  S-O-O-K-H-D-E-O.
6    Q.   Okay.  And what about e-mails, do
7  you have an e-mail network at your firm?
8    A.   We have e-mails.  We have recently
9  upgraded to a cloud-based system, and so we
10  don't have historic e-mails from prior
11  employees.  Obviously only current were
12  updated.  And I asked Annetta to search
13  everything she could, and Blanca, my paralegal,
14  who's worked on Genger matters, to search
15  everything she could.  And I searched mine and
16  we found no -- other than there was a couple of
17  e-mails between me and Arie that are
18  attorney-client, as I indicated in my e-mail to
19  you, I believe yesterday or two days ago, there
20  was nothing else I found on this note.
21    Q.   Okay.  So there were two e-mails
22  between you and Arie concerning this note?
23    A.   I have located two e-mails.
24    Q.   Do you recall the dates of those
25  e-mails?

1    A.   I don't.  I apologize.
2    Q.   I mean, we would ask you to log
3  those, so that we can, you know, just a
4  standard privilege log, to, from, CCs, date,
5  and broad subject matter, so we can see whether
6  we want to test the privilege.
7      So how did this note come into
8  being?
9    A.   As evidenced by the checks I've
10  previously provided to you, it's been a
11  longstanding policy, back to '07, I believe,
12  for Arie, as having -- Orly having litigation
13  that she could not afford to fund, that Arie
14  would advance Orly money pursuant to a loan.
15  And -- and the loans sort of were tallied and
16  determined on an annual basis, and this note
17  became the ultimate balance as of 12/31/16.
18    Q.   Okay.  Let's take a look at the
19  note, if we can.
20    A.   Sure.
21    Q.   So it's actually attached to your
22  Harris Exhibit 2, the second subpoena.
23    A.   All right.  Let me -- hold on.  I'm
24  getting there.  Got it -- no, I don't have it.
25    Q.   It could be -- it's Exhibit C.

1    A.   Right.  You said Exhibit 2, so I
2  got confused.
3    Q.   I'm sorry.
4    A.   Yeah, I got it.
5    Q.   It's Deposition Exhibit 2 is the
6  subpoena, and Exhibit C?
7    A.   I got it.  Perfect.
8    Q.   So do you see in the whereas
9  clauses, there's a first note, second note,
10  blah, blah, blah, all the way to the tenth
11  note; do you see that?
12    A.   Yes.  Yes, sir.
13    Q.   Where are those notes?
14    A.   Those notes would have been, in the
15  ordinary course, destroyed.  You know, I get
16  hit by a car, you don't want notes floating
17  around for different amounts.  So upon the
18  consolidation of a note, you would always void,
19  vacate, destroy a note, you know, prior note,
20  since this is -- becomes the amalgam of all of
21  those notes.
22    Q.   Okay.  So you said "would have been
23  destroyed."  Are you saying they were
24  destroyed?
25    A.   As far as I -- yes.

1    Q.   Did you destroy them?
2    A.   I destroyed at least some of them,
3  I recall.  I don't recall each and every one of
4  them, but I do recall some of them that I,
5  personally, destroyed.
6    Q.   So I'm asking you which -- let me
7  break it down.  Which of these notes have you
8  physically seen, have you laid eyes on, if any?
9    A.   Most, if not all.
10    Q.   Okay.  And you're saying that you
11  destroyed all copies -- you've seen most, if
12  not all, of the notes labeled first note
13  through tenth note described in this document?
14    A.   I have seen most, if not all, of
15  these notes described in this document, and I
16  destroyed at least some of them, personally,
17  myself.
18    Q.   What became of the rest?
19    A.   They were all destroyed.  I don't
20  have any copies of them.  They are all
21  destroyed as best as I understand it.
22    Q.   And so which ones did you destroy?
23    A.   Mr. Dellaportas, I have racked my
24  brain on the issue.  I don't recall which ones
25  I destroyed.



**Exhibit A**

1    Q.    Who drafted these notes?
2    A.    They go back a long time.  I've had
3    several associates.  So most likely, associates
4    would have drafted them, if I not -- did not
5    draft them.
6    Q.    Okay.
7    A.    Me or an associate.
8    Q.    So if -- I understand it's a bit of
9    a memory test, but if you can identify the
10   names of any associates who you believe may
11   have drafted any of these one to ten promissory
12   notes?
13   A.    Yes.  Over the last ten years, I've
14   had three, so I can recall those names, except
15   I don't remember Rosa's last name.  Rosa, then
16   it was Natalie Garcia, and then it was
17   Ms. Phillips, and I'm blanking on her name,
18   which I told you earlier.
19   Q.    Nicole Phillips?
20   A.    Nicole Phillips.  Thank you.
21   Q.    And where are the Word documents of
22   these ten notes?
23   A.    They would've been on the
24   individual associate's computer that they used
25   to draft them at that time.

1    Q.    Okay.  Did you check -- did you
2    search for these in the process of responding
3    to one or both of our subpoenas?
4    A.    Yes.  I've searched my computer and
5    Nicole's -- the computer that's at the office
6    from Nicole's old office, yes.
7    Q.    And?
8    A.    We don't have any copies.
9    Q.    Okay.  So you're saying you don't
10   have any paper copies of any of the ten
11   promissory notes, and you don't have any Word
12   copies or other electronic copies?
13   A.    I do not have electronic copies.
14   Q.    Okay.  Do you have paper copies of
15   any of these notes?
16   A.    Not that I recall.  We have checked
17   most of the -- I mean, as you can appreciate,
18   the Genger files are voluminous.  We have done
19   an earnest search, but we continue to search
20   through all of the documents to continue to be
21   responsive to your subpoenas.  We have not
22   found any.
23   Q.    Okay.  Now, I note that the ten
24   promissory notes described here, none of them
25   actually have a date attached to them.  Why is

1    that?
2    A.    Poor drafting -- strike that.
3         I don't know why they would not
4    have been identified by date.  They were
5    identified by a year, which would have
6    corresponded to the amount loaned in that year.
7    They probably should have had a date ascribed
8    to them of the date of the note.  And for some
9    reason, when the amended and consolidated
10   secured promissory note was created, the
11   whereas did not include dates of the prior
12   notes.
13   Q.    Okay.  So describe the process.
14   Every year, your firm would draft a new
15   promissory note for Arie and Orly Genger?
16   A.    That was generally the practice,
17   that we would -- you know, at the end of the
18   year, meet and confer with Arie and the
19   accountant and review our books and determine
20   how much was borrowed, and then draft a
21   corresponding note.
22   Q.    And then what would happen to that
23   note?
24   A.    That note would be signed.  I would
25   have it, and I would hold it, and then we would

1    do the same thing next year.
2    Q.    Signed by whom?
3    A.    It would be signed by Orly.
4    Q.    How did Orly come to get the notes?
5    A.    You know, back in earlier days, she
6    would be in my office more than she has been in
7    more recent years.  So we would either be
8    definitionally, by her coming by my office,
9    which I recall on several occasions, and in the
10   later years, one would imagine by messenger,
11   because I think for most of that time, she
12   lived in the city.
13   Q.    So Orly would either come to your
14   office or messenger a signed copy of the
15   promissory note?
16   A.    Right.  I mean -- I mean, I
17   remember one occasion being in Arie's office
18   and Orly being there.
19   Q.    Okay.  Was ever any of these notes
20   either e-mailed either to her or signed back
21   from her?
22   A.    I did not e-mail with Orly very
23   much over the course of years.  It was mostly
24   in-person conversations.  I mean, literally
25   rarely.



**Exhibit A**

1    Q.   So just to be clear.  For the ten
2   promissory notes described herein, you don't
3   have any paper copies, you don't have any
4   electronic copies, you don't have any e-mail
5   transmittals about them, and you don't know the
6   dates?
7    A.   Well, not knowing the dates, I
8   think, is not a correct statement.  I think the
9   dates are evidenced by the saying --
10   Q.   Sorry.
11    A.   I didn't want to interrupt.  By
12   saying 2008, definitionally meaning the
13   calendar year 2008.  Could it have been
14   clearer?  Sure.  But I think it is indicative
15   of the loan for that year reading the whereas
16   clause in the ordinary course.  Plus, as you
17   know, you have the backup checks that evidenced
18   the loan -- the underlying loans for those
19   years -- for most of those years.
20    Q.   What were the interest rates on
21   these notes?
22    A.   Oh, that's a great question.  I
23   believe we used the -- the midterm AFRs on all
24   of them, which for most of the period of time,
25   believe it or not, was a constant 2.17.  Don't

1   ask why I remember that.  And then I think at
2   one point it tipped up to about two and a half,
3   is my best recollection.
4    Q.   And did Orly ever make any payments
5   on any of these ten promissory notes?
6    A.   Not that I'm aware of.
7    Q.   Okay.  Did you provide copies of
8   promissory notes to either Orly or Arie, or did
9   your office maintain the only copies?
10    A.   As far as I understood, they
11   maintain the only copies.
12    Q.   I'm sorry, "they"?
13    A.   The royal "they."  Me, my office.
14    Q.   Okay.  So you did not provide
15   copies either to the borrower or the lender of
16   the promissory note?
17    A.   No.  Again, these were ongoing
18   notes and we wanted to just not be confused.
19   So as far as I understood, I was the depository
20   for the document.
21    Q.   Now, you understand that both the
22   borrower and the lender shared an accountant,
23   Mr. Fisher, correct?
24    A.   I didn't understand the question.
25    Q.   Do you understand that the borrower

1   and the lender share an accountant, Bill
2   Fisher?
3    A.   Oh, accountant.  I thought you said
4   account.
5    Q.   I'm mumbling today.  Sorry.
6    A.   Don't worry about it.  I just
7   wanted to get -- yes, I don't believe that was
8   always the case during the course of this all
9   these years, but I do know that that is, in
10   fact, the case today.  Or, actually, I don't
11   know that.  I knew at one point during this
12   term, that was the fact.  I don't know since
13   Ms. Genger got married, whether she uses
14   Mr. Fisher or somebody else.
15    Q.   Okay.  Well, let's leave it to the
16   years of the promissory notes, which is 2007 to
17   2016, and I believe Ms. Genger got married in
18   September of 2016.  So up until her marriage,
19   are you aware that the borrower and the lender
20   shared an accountant, Bill Fisher?
21    A.   Again, I -- my best recollection
22   with this, again, being a memory test, is
23   sometime between '07 and '10, I believe she had
24   a different accountant.
25    Q.   Stanley Altmark?

1    A.   Yes.
2    Q.   Okay.  Other than Mr. Altmark, are
3   you aware of any other accountants that either
4   Arie or Orly used during this time period?
5    A.   I have no idea what accountants
6   Arie used besides Mr. Fisher.  As to Orly, I
7   only know of those two accountants up until her
8   marriage, which, again, since then, I don't
9   know if she has some other accountant.
10    Q.   Okay.  Did you ever provide either
11   Mr. Fisher or anyone at his firm, or
12   Mr. Altmark or anyone at his firm, copies of
13   any of the notes designated as first note
14   through tenth note?
15    A.   The actual notes, no.  The
16   information contained within the notes,
17   absolutely.
18    Q.   Is there any writing in existence,
19   whether it be an e-mail, a letter, or maybe a
20   voicemail captured somewhere, any reference in
21   existence prior to the date of this note to
22   these promissory notes described herein?
23    A.   As I said, the sum and substance of
24   those promissory notes as to amounts,
25   interesting rates, I am certain there had been



**Exhibit A**

1  e-mail communication between Mr. Fisher and I
2  relating to the borrowing and the interest
3  rate, because the midterm AFRs, I only would
4  have gotten from an accountant.  I don't keep
5  AFR rates around, and accountants seem to know
6  that pretty quickly.  So I'm certain I've
7  gotten that information either from Stanley
8  Altmark's office and/or Bill Fisher's office on
9  an annual basis.
10      Q.  Okay.  So I'm not asking about
11  communications about interest rates, although I
12  didn't see anything in your production from
13  that, so we would ask that you produce those
14  communications, if they exist.  But more
15  specifically, prior to this note that we're
16  looking at, this purported December 31, 2016,
17  promissory note, is there any reference
18  anywhere in writing in existence to the words
19  "promissory note" associated with Arie's
20  payment of Orly's legal fees?
21      A.  I'm sure there are communication
22  between Arie and I as to Orly's promissory note
23  that would be protected.
24      Q.  Privileged, you mean?
25      A.  Privileged.

1      Q.  We would ask that you provide us a
2  log of those communications.  They're
3  responsive to our request, and maybe some
4  portions of them are privileged.  But it's our
5  view, just to be blunt, that these promissory
6  notes never existed.  And if you have evidence
7  that they existed, we would suggest that you
8  produce them right away, because the matter is
9  going to be litigated.
10      A.  What are the stacks of checks?
11      Q.  Well, I'm here to answer the
12  questions.
13      A.  Okay.  I just thought it was pretty
14  obvious that they clearly existed alone, but
15  okay.
16      Q.  Okay.  Well, just where in writing
17  does it reference that prior to December 31,
18  2016.  You tell me.
19      A.  Where does what reference what?
20      Q.  If I take a time machine back to
21  December 30th, 2016, where in the world can I
22  see that there's a reference to a promissory
23  note between Arie and Orly Genger?
24      A.  Where can you see --
25      Q.  Where do I find it?  Is it an

1  e-mail?  Is it in writing?
2      A.  Well, again, there is writings
3  between Arie and I.  I hear your request for a
4  log.  I will take that under advisement, but
5  there certainly had been many communications
6  regarding promissory notes.  These were not
7  gifts.  These were not -- these were nothing
8  but loans, as evidenced by, ultimately, the
9  amended and consolidated secured promissory
10  note, and I think it's pretty clear, but...
11      Q.  So describe a little bit more about
12  your e-mails.  So you say that you've gone to a
13  cloud-based server, correct?
14      A.  As of, like, literally ten days
15  ago.  Yes.
16      Q.  What's the company that does that?
17      A.  I don't know.  I outsource with
18  other -- with another company to provide my
19  service.  I use a gentleman who provides me my
20  IT.
21      Q.  What's his name?
22      A.  John DeVito.
23      Q.  Like Danny DeVito?
24      A.  Except John, and he's much taller.
25      Q.  Okay.  But I'm saying the spelling?

1      A.  Yes, I believe that's the correct
2  spelling.
3      Q.  Do you sublease space in the
4  Zeichner Ellman firm for your law firm?
5      A.  I do.  I think technically, it's a
6  license, but...
7      Q.  Fair enough.
8      A.  Yes.
9      Q.  And just to be clear, I'm not
10  trying to trick you or anything.  When I say
11  "you," it's colloquial, it can mean your firm
12  as opposed to you, personally.
13      A.  I took it that way, but thank you
14  for the clarification.
15      Q.  Okay.  So, do you share any
16  technology with the Zeichner firm?
17      A.  I -- technically, I think I do for
18  the purposes of scans.  Like when I scan
19  something, you know, it gets scanned over their
20  system to me, but it's to my e-mail.
21      Q.  Like their copier?
22      A.  Their copier.
23      Q.  You use their phone service?
24      A.  Yeah.  Yeah.  I don't know.  I
25  mean, I have a direct dial number.  It doesn't



**Exhibit A**

1  go through their switchboard. But do they
2  record the ins and outs of my -- I have no
3  idea.
4      Q.  Okay. And then what about
5  computers, do you share a network with them?
6      A.  Absolutely not. They -- I can't
7  even use Wi-Fi, because they do a lot of Bank
8  of America work, and they're very strict about
9  their protocols. So never have those two
10  crossed, mostly because of their requirements.
11      Q.  And prior to using the cloud-based
12  system, you just had e-mails stored on
13  individual hard drives?
14      A.  Yes, sir.
15      Q.  What software program did you use?
16  Was it Outlook?
17      A.  Outlook.
18      Q.  Okay.
19      A.  It wasn't Microsoft Exchange. It
20  was Outlook. It was definitely Outlook. I
21  think now it's Exchange.
22      Q.  Now it's Exchange. Okay. I'm
23  never sure what the difference is between
24  those.
25      A.  Neither am I, but that's my best

1  answer. But I can be correct. I'm pretty sure
2  now it's Exchange, and before it was Outlook.
3  And Exchange is supposed to be better.
4      Q.  Let's go to the -- well, let me say
5  one more thing. We had -- at least my
6  understanding of our agreement was that you
7  would produce the actual metadata. This seems
8  to be a document prepared by someone describing
9  it?
10      A.  It is. I told you it was.
11      Q.  Yeah. So we would ask that you
12  actually send us the actual word documents so
13  we can examine the metadata on it.
14      A.  You want the actual Word -- I will
15  take that under advisement. I'll just -- we'll
16  see how that all works.
17      Q.  I assume you'll take everything we
18  say under advisement, and then we can get the
19  transcript and we'll --
20      A.  Figure it out. Okay. Perfect.
21      Q.  Okay. So let's go to the next
22  page, if we can.
23      A.  Wait, I've got to switch documents.
24      Q.  This is Harris Exhibit 3. So what
25  is this next page?

1      A.  This is the e-mail -- we had talked
2  about e-mails and I indicated to you that I
3  sent some e-mails in what I call the package,
4  which is this Exhibit 3, and this is an e-mail
5  to my associate, Blanca -- I mean, from my --
6  to my associate, Blanca, from the Texas
7  Department of State, acknowledging receipt of
8  the UCC file. You had asked for e-mails.
9      Q.  Sure. And that was on August 3rd,
10  2018?
11      A.  Apparently at 6:33 p.m.
12      Q.  So this is dated, I think,
13  August 3rd, 2018?
14      A.  Yes, sir.
15      Q.  So it was around that time that you
16  filed the UCC? Or your firm filed the UCC?
17      A.  That is the time that Blanca sent
18  the e-mail copy to the Department -- the Texas
19  Department of State. Yes.
20      Q.  Okay. And the UCC, am I correct,
21  reflects the secured -- the secured debt
22  pursuant to the promissory note that we just
23  looked at?
24      A.  Yes, sir.
25      Q.  Okay. And how soon before the

1  filing of this UCC was the secured promissory
2  note actually signed and delivered?
3      A.  My understanding is that the
4  secured promissory note was assigned sometime
5  in April of 2018.
6      Q.  And what explains the delay between
7  the signing in April 2018 and the filing in
8  August 2018?
9      A.  My -- so we don't file a ton of
10  UCCs, and I think my associate just had a bunch
11  of stuff to do and this is when it got done.
12  We knew it had to get done. And she was
13  researching the best way to do -- you know,
14  file these in the various states. And then we
15  were also determining which state to file them
16  in.
17      Q.  Okay. And so you believe it was --
18  going back to the first page now, it says,
19  "Final 4/5/18." I believe you said that's when
20  it was converted to the PDF; is that what you
21  said?
22      A.  Yes, sir.
23      Q.  Do you know when after that date it
24  was signed by Orly Genger?
25      A.  In the ordinary course, when I



**Exhibit A**

1  convert something to a PDF, that's for signing.
2  I mean, that's the whole reason I do it,
3  otherwise, you get various drafts, it gets very
4  confusing.  So the last thing I do when it's
5  set, is then put it into a PDF and it gets
6  signed.
7      Q.    Did Ms. Genger come to your office
8  to sign it?
9      A.    In April of '18, no, I believe what
10  had happened was, 'cause I believe at that time
11  she was living in Israel, and what I think
12  happened -- what I'm pretty sure happened is
13  that I had had it messengered over to Arie.
14  Arie was going to Israel on or about that time,
15  and he was going to have that effectuated, came
16  back, messengered it to me, or FedEx'ed it to
17  me, I don't recall, and then I would have --
18  oh, messengered -- I remember he messengered it
19  to me, and then I would have then met with
20  Blanca to have this thing signed up.
21      Q.    Okay.  And you have the original of
22  this?
23      A.    Yes, I have the original of this.
24  Absolutely.
25      Q.    Why is the -- it was signed in

1  April.  Why is it dated December 31st, 2016?
2      A.    Because, like we had done with all
3  the promissory notes, our practice -- my
4  practice was to get a year-end number.  So this
5  was the year-end number, the consolidated
6  year-end number for '16.  I had not yet gotten
7  the '17 number.  So I didn't want to -- you
8  know, I would just be chasing things.  So I
9  wanted to just have a clear cutoff of a year
10  certain, and we had the '16 number, so that's
11  the number I used.  I believe, but don't quote
12  me, soon thereafter, we did a '17 note, and
13  then we may or may not have done an '18 note.
14  I think there might be an '18 note.  But we
15  definitely did a '17 note.
16      Q.    Have you produced those?
17      A.    I thought I had.  If I have not, I
18  will endeavor to do so.
19      Q.    We saw you produced two additional
20  notes, each one matching amounts that I believe
21  Orly paid in the federal case for this or that
22  or the other, I guess that Arie advanced Orly
23  to pay.  And they're for specific amounts, but
24  they're not year-end notes.  So do you have
25  additional year-end notes for '17?

1      A.    I'd have to look at those numbers
2  and match it up to year-end and then check to
3  see, but okay.
4      Q.    Okay.  If you --
5      A.    I thought the '17 note -- the '18
6  note, you may be right, may have been an
7  interim note, but the '17 note, I thought was
8  the year-end note.  But I will double-check
9  that.
10      Q.    Okay.  Well, we'll look at what you
11  produced later, and you'll let us know if
12  there's something else.
13          So then the next e-mail is -- maybe
14  you can tell us what page -- the next page on
15  this document is, the third page?
16      A.    That is evidence of earlier on that
17  same day, on the 3rd of August, of the mailing
18  of a UCC filing to the State of New Jersey, I
19  believe.
20      Q.    Why was the State of New Jersey
21  selected for the UCC filing?
22      A.    I was unclear at the time as to the
23  official state of residence of Orly.  So my
24  view was, and is, that there's no harm, no
25  foul, if I file it in a state that she's not

1  otherwise a resident of.
2      Q.    And I understand why you chose
3  Texas, and it looks a little bit later, did you
4  choose Florida as well?
5      A.    I think I may have.  I'll double --
6  when we get there, I'll confirm.
7      Q.    So why did you choose Texas and New
8  Jersey?
9      A.    My understanding is that there are
10  residences in both states.
11      Q.    When you say there are residences
12  in both states, what's your understanding?
13      A.    I think that was my understanding.
14      Q.    There was residences where Orly
15  stays in both states?
16      A.    Where Orly stays.  Orly, to the
17  best of my knowledge, has slept in both states.
18      Q.    Did you select any other state?
19      A.    You just earlier indicated I may
20  have selected Florida.
21      Q.    I may have confused that with
22  someone else.
23      A.    Okay, that's fine.
24      Q.    You tell me?
25      A.    No.  No.  This is only Texas and



**Exhibit A**

1 New Jersey, so those are the states. I believe
2 we tried to file in DC, as indicative, because
3 I know Orly also sleeps in Israel, and I think
4 we had some problem effectuating that UCC,
5 because I don't see it here. But I know we had
6 conversations, and that was probably part of
7 the delay in my paralegal trying to figure out
8 how to file in the District of Columbia, which
9 apparently has a whole set of rules and
10 processes.
11    Q.    Bear with me a second.
12    A.    No worries.
13    Q.    So if you could turn to page 9 of
14 the -- I'm sorry, where -- of the second to
15 last page of the document you're looking at.
16    A.    Oh.
17    Q.    Basically --
18    A.    Yeah.
19    Q.    -- the second to last page,
20 paragraph 19, subordination agreement controls?
21    A.    Yes.
22    Q.    It references a subordination
23 agreement dated December 31, 2016. Do you see
24 that on the third --
25    A.    Yes.

1    Q.    Okay. And this is a note that your
2 firm drafted?
3    A.    Yes.
4    Q.    Okay. And so what is this
5 agreement that it's referencing?
6    A.    I believe there's an agreement that
7 says that the Eric Herschmann $2 million
8 promissory note gets paid before this note gets
9 paid.
10    Q.    Okay. And you had seen that
11 agreement before drafting this thing?
12    A.    Either I had seen it or I had been
13 told about it. You know, the sum and substance
14 was there is a subordination.
15    Q.    And you know whether you saw it
16 firsthand or whether someone described it for
17 you?
18    A.    I don't recall. I believe I've
19 seen at least a draft of it, if I did not see
20 the final version.
21    Q.    Okay. So let's move on to 3. So
22 if we could go back to Harris 2 --
23    A.    Yep.
24    Q.    -- and specifically to Exhibit D.
25    A.    D.

1    Q.    I just want to make sure that this
2 is the subordination agreement that you
3 referenced in the note you prepared?
4    A.    Again, whether it was this or some
5 draft of this, sum and substance is --
6    Q.    You're aware of it?
7    A.    I was aware that, again, the
8 $2 million note had preference over the
9 $5.3 million note. That was made aware to me.
10    Q.    Had you seen the $2 million note
11 prior to drafting the -- we'll call it the
12 $5 million note?
13    A.    I don't know if I saw it before or
14 after. I can't --
15    Q.    Okay. But you've seen it?
16    A.    But I've seen some -- again, I
17 don't know that I've seen the final. I'm not
18 the keeper of those documents, but I certainly
19 know there was a $2 million note.
20    Q.    Did you prepare any role in
21 drafting either the $2 million note or the
22 subordination agreement?
23    A.    I had reviewed the document --
24 documents. I don't -- when you say "role," I
25 mean, I communicated the concept with -- I

1 spoke to my client about it, and I've spoken to
2 -- I believe -- I don't recall if it was Eric
3 or a Kasowitz attorney, about the terms
4 generally.
5    Q.    Okay. So I don't want to get into
6 what you discussed with your client. It's
7 obviously privileged.
8    A.    Of course.
9    Q.    But let me break it down into
10 elements.
11    A.    Sure.
12    Q.    So do you know which firm was the
13 principle draftsman on the -- let's take it one
14 at a time, the $2 million note?
15    A.    We can take them both, because I
16 believe they were both Kasowitz.
17    Q.    Okay. Oftentimes with corporate
18 documents, they go back and forth and they get
19 revised drafted, negotiated by the parties
20 before they go into final. So did you play a
21 role like that for either Arie or Orly Genger
22 vis-à-vis the Kasowitz firm?
23    A.    I don't believe that there was a
24 lot of back and forth, but yeah, I represented
25 Arie. I reviewed -- as I said, I reviewed



1  drafts of both documents, but I don't recall
2  there being a ton of back and forth.
3      Q.   How did you see the drafts?  Were
4  they e-mailed to you?
5      A.   They were -- well, my offices are
6  not far from Kasowitz, so I believe I've gotten
7  some messengers.  I remember some phone calls.
8  I don't know that I've seen -- I know there
9  were e-mails.  I don't know that I have them,
10  because I've looked, but I know there are
11  e-mails.
12     Q.   You aren't representing Eric
13  Herschmann in this transactions?
14     A.   No.
15     Q.   Do you know who was representing
16  Eric Herschmann, if anyone?
17     A.   My best sense is Eric Herschmann
18  and perhaps the Kasowitz firm.
19     Q.   Were there other Kasowitz attorneys
20  you dealt with over there?
21     A.   Other than Eric?
22     Q.   Yeah.  With regard to --
23     A.   The two documents.
24     Q.   Yeah.
25     A.   I'm just trying to remember if

1  there was another attorney.  I think there was
2  an attorney there who had sent me a document,
3  but I don't recall his name.  If I find the
4  e-mail, I'll obviously tell you.
5      Q.   Could it have been either Michael
6  Rosenbloom or Jack Schulman?
7      A.   I don't know.  It could have been
8  Michael Rosenbloom sounds familiar.  I've never
9  heard of Schulman before.
10     Q.   Fair enough.  So what do you recall
11  about your communications with the Kasowitz
12  firm or surrounding these two documents?
13     A.   Generally, they were providing the
14  documents to me on behalf of Arie.  And then
15  there was -- that was about it.  I mean, there
16  wasn't much -- as I said, there wasn't much of
17  red lines floating around.  We had this note,
18  Arie needs to sign this note; we have a
19  subordination agreement.  We know Arie has
20  loaned money to Orly over the years.  We want
21  to make sure Eric gets paid -- or I want to
22  make sure that I get -- receive my money before
23  Arie.  And that was the sum and substance.
24     Q.   To the best of your knowledge, when
25  did Arie and Orly execute and deliver the

1  $2 million promissory note?
2      A.   I have no -- I have no knowledge of
3  that.  Again, as I said, I don't think I've
4  ever seen, other than perhaps in a production
5  from you, the signed $2 million note.  I
6  certainly have -- or the subordination
7  agreement.  Actually, this one isn't even fully
8  signed.
9      Q.   I think it's missing Arie's
10  signature.
11     A.   Yeah.  But I was certainly made
12  aware of those documents.  On the $2 million
13  note, Arie is a signator.
14     Q.   Yes.
15     A.   I may have facilitated the receipt
16  of his signature.
17     Q.   Do you recall about when he signed
18  that?
19     A.   I don't.  I don't recall when he
20  signed that $2 million note.  But I do recall
21  facilitating that signature.
22     Q.   So has Arie ever borrowed money
23  from Mr. Hirschmann?
24     A.   I believe the $2 million note is
25  part and parcel of a loan to Arie.  Aren't they

1  both borrowers?
2      Q.   That was going to be my question,
3  is why is Mr. Hirschmann -- I'm sorry, why is
4  Mr. Genger a signatory to the $2 million note
5  to Mr. Hirschmann?
6      A.   Can I see that note?
7      Q.   Sure.  It should be exhibit -- I
8  think it's Exhibit B.
9      A.   Oh, here it is.  That was a
10  $2 million obligation that Arie and Orly agreed
11  to be jointly bound by.
12     Q.   Okay.  And did you have an
13  understanding as to whether Arie has ever
14  actually borrowed any money from
15  Mr. Hirschmann?
16     A.   I don't know.  Other than this
17  2 million, I don't know of any borrowing.  I'm
18  not saying it hasn't existed; I just don't
19  know.
20     Q.   I'm not saying other than this
21  2 million.  I'm saying including this
22  2 million, are you aware that Mr. Genger has
23  ever actually borrowed any money from --
24     A.   Well, I know this $2 million got
25  paid, so I -- this is a borrowing.



**Exhibit A**

1    Q.   Paid from whom to whom?
2    A.   From Eric. I don't know ultimately
3  who was the beneficiary. I'm sure they can
4  tell you better than me, but --
5    Q.   You don't know what this note is
6  for?
7    A.   I presumed it was related to legal
8  fees.
9    Q.   Okay.
10    A.   But, again, I don't want to get too
11  far out on a limb on guessing. But that is my
12  sense.
13    Q.   Okay. And I thought you had
14  captured all of Orly's legal fees in your
15  recordkeeping?
16    A.   No, sir. Absolutely not.
17    Q.   So what's missing from your --
18    A.   Any fees that she paid directly, I
19  would not have information on.
20    Q.   Okay.
21    A.   And we did our best to identify,
22  'cause throughout the years, sometimes Orly
23  would make payment for her fees. And so if you
24  noticed on the spreadsheet, I -- and what took
25  a while was to identify the source of funds

1  coming into my IOLA account, so what I would do
2  is identify the gross amount of the bill, and
3  then identify which portion Arie contributed
4  with the delta, or difference, being what Orly
5  would have contributed.
6        MR. DELLAPORTAS: Would you mind
7  just reading back the answer. I just want to
8  make sure I understand it.
9        (Whereupon, a portion of the record
10  was read back.)
11    Q.   You're saying "the bill." What,
12  specifically, are you talking about?
13    A.   So there would be a legal bill for
14  Orly's services that would come in to me, say,
15  for $300,000, is one example I recall. Arie
16  would have lent Orly $200,000, and you know,
17  wire that money into my account. And Orly
18  would wire 100,000 into my account. When I put
19  the receipt of both of those funds, I would
20  have adequate funds to then pay the Zeichner
21  bill.
22    Q.   And the documents you produced
23  pursuant to our subpoenas, which we'll look at
24  in a moment, those will reflect all monies
25  incoming from either Orly or Arie for the

1  payment of Orly's legal bills?
2    A.   Again, the receipt of the funds.
3  Well -- strike that.
4        We -- John, you and I, had agreed
5  with, I believe, the Court, agreeing that I
6  would provide the checks and that you were
7  getting the receipts into my IOLA account
8  directly from Arie. So I had provided you with
9  both the checks that paid the Orly bills, as
10  well as a spreadsheet that would identify the
11  loan provided for the payment of said bills.
12    Q.   Right.
13    A.   So I just want to be clear about
14  that.
15    Q.   Okay. I take it that you or your
16  firm didn't personally pay any of the legal
17  bills for Orly Genger?
18    A.   I try not to do that.
19    Q.   And is there a third source, other
20  than Arie or, say, Arie's company, AGA, or
21  Orly, of incoming funds to pay Orly's bills?
22    A.   Nobody else wired money into my
23  IOLA account to pay Orly's bills.
24    Q.   So it either would've been Orly, on
25  the one hand, or Arie, on the other hand?

1    A.   Yes, sir.
2    Q.   And Arie might've been either
3  personally, or might've been through his
4  entity, I think he calls it AGA?
5    A.   It's called AGA, and my sense is
6  most of the funds came in from AGA.
7    Q.   Did Arie or Orly ever use any other
8  entities that they're associated with to pay --
9  to give you money to pay her legal bills?
10    A.   To pay Orly Genger legal bills, to
11  the best of my knowledge, the only source of
12  funds to pay those bills came either from Arie
13  or his entity or from Orly.
14    Q.   Okay. And when money came in, how
15  did you know how to disburse it? For example,
16  the $300,000 bill comes in from, say, Zeichner
17  maybe, and you get some money from Orly and
18  some from Arie. Were you given instructions as
19  to how to spend money when it came -- to whom
20  to direct the money when it came in?
21    A.   Well, I would get monthly bills and
22  I would have a monthly requirement, so it was
23  pretty straightforward. I would either call
24  Arie or I would call Bill Fisher or I would, on
25  occasion, speak to Orly and say we have these



1  bills, and it was really done that way.
2      Q.   Okay.  You produced, I think, one
3  e-mail with regard to the payment of one set of
4  bills.  I can't remember when it was, but --
5  but other than what you've produced, do you
6  have any written instructions from either Arie
7  or Orly with regard to the designation or use
8  of proceeds they delivered to your office for
9  legal bills?
10     A.   I have communications with Arie
11  about the loan and draw down on the loan.
12  Sure.
13     Q.   Well, again, anything with regard
14  to the loan, we would ask that if you view it
15  as privileged, it be logged, so we can
16  adequately determine whether or not we agree.
17         Now, the subpoena also sought
18  documents relating to a 2013 settlement
19  agreement.  Are you generally familiar with the
20  2013 litigation settlement agreement that Arie
21  and Orly entered into with the Brosers and the
22  Trumps?
23     A.   Yes.
24     Q.   Okay.  Just broadly speaking, did
25  your firm, or you, play a role with regard to

1  that, that settlement agreement?
2      A.   I played -- strike that.
3          I discussed the settlement
4  agreement with Arie.  My firm had no drafting
5  role in that agreement.
6      Q.   Okay.  Okay.  So in regard to that
7  agreement, which parties, if any, did -- to the
8  agreement did you represent?
9      A.   I represented Arie in that
10  agreement.  I represented Arie in that
11  agreement.
12     Q.   Not Orly?
13     A.   I don't recall if I communicated
14  with Orly about that agreement at that time.
15     Q.   Okay.
16     A.   I do recall communicating with
17  Arie.
18         MR. DELLAPORTAS:  Okay.  Let's mark
19  as Harris 4 a document labeled Genger
20  litigation trust agreement.
21         (Whereupon, Harris Exhibit 4,
22  Genger litigation trust agreement, was marked
23  for identification as of this date by the
24  reporter.)
25     Q.   My first question is:  Who drafted

1  this agreement?
2      A.   I don't recall who drafted this
3  agreement.
4      Q.   Was it your firm?
5      A.   I don't think we were the primary
6  drafter of this agreement.
7      Q.   Okay.  'Cause I can represent that
8  we took Mr. Broser's deposition, and he thought
9  it was your firm that drafted it?
10     A.   You know, it's possible.  I'm not
11  going to rule out, but I don't recall it.
12     Q.   Okay.  Do you know if Mr. Broser
13  had an attorney in connection with the trust
14  agreement?
15     A.   I don't recall dealing with any
16  attorney for Mr. Broser regarding this
17  agreement.
18     Q.   What about Arie and Orly, did they
19  have any other attorneys involved in this trust
20  agreement?
21     A.   No.  I believe it would have been
22  me.
23     Q.   Okay.  So if it wasn't your firm,
24  do you have any idea who else might have
25  drafted this agreement?

1      A.   Well, that's where I sort of get
2  stuck.  Absent it being Mr. Broser, it likely
3  would have been my firm then, 'cause I don't
4  recall any other attorney.
5      Q.   And you're appointed as an, it says
6  "initial trustee" under this agreement, right?
7      A.   Yes.
8      Q.   Are you still a trustee under this
9  trust?
10     A.   I have no idea.
11     Q.   Okay.  And let me just -- have you
12  seen this document before?
13     A.   Yes.
14     Q.   Okay.  So do you have an
15  understanding as to what its purpose is?
16     A.   I have an understanding that this
17  was a catchall for litigation proceeds.
18     Q.   What do you mean by that?
19     A.   There were -- again, I haven't read
20  this document in a while, but my understanding,
21  it identifies a couple of litigations, and
22  should proceeds be realized from those
23  litigations, that those proceeds would come in
24  to this trust.
25     Q.   Okay.  And which litigations?



1    A.    I'd have to look.
2    Q.    Do you have a recollection?
3    A.    I don't.
4    Q.    Okay.
5    A.    Again, this is seven years ago at
6  this point.
7    Q.    Okay.  And when you said the money
8  would be used for -- I'm sorry.
9    A.    I don't know that I said what the
10  money would be used for.
11        MR. DELLAPORTAS:  Could you just
12  read back the last answer, the one before I'm
13  sorry.  The substantive answer.
14        (Whereupon, a portion of the record
15  was read back.)
16    Q.    And what was your understanding as
17  to what was to become of the proceeds once they
18  came into the trust?
19    A.    If they were related -- I don't --
20  I don't want to guess.  But I think as a
21  general concept, the idea was to the extent
22  Orly owed Arie money, that that money would be
23  paid.  And to the extent that Arie owed the
24  Brosers money, pursuant to his loan, that that
25  would be paid, is my best sense.  And once

1  everyone's loan obligations would be -- then it
2  would be otherwise distributed, was sort of my
3  10,000-foot recollection of it.
4    Q.    Okay.  And are you aware that
5  there's a bank account with Northern Trust Bank
6  associated with this trust?
7    A.    Only as -- only from this
8  litigation.
9    Q.    Okay.  But you're a cosignatory on
10  that account?
11    A.    If -- I believe you if you tell me
12  I am.  I have never drawn money for my own
13  benefit on that account.
14    Q.    Fair enough.  Have you authorized
15  payments from that account?
16    A.    I believe some of the settlement
17  proceeds from the Trump settlement went into
18  that account, and then was used to repay Arie's
19  debts to the Brosers, if I'm not mistaken.
20    Q.    Okay.
21    A.    I think the Arie portion of the
22  settlement proceeds went into that trust.
23    Q.    When you say the "Arie portion,"
24  what do you mean by that?
25    A.    The settlement agreement was in

1  tranches.  One of the tranches, I believe, was
2  a $10 million tranche, was sort of identified
3  for the Orly, quote-unquote, the Orly shares.
4  Again, this is going back a long way.  And that
5  was Orly's tranche, or proceeds from that
6  settlement agreement.  And that had not been
7  actualized.  I think Orly lost that case, if I
8  remember correctly, but I know that 10 million
9  never got paid.  So none of the Orly proceeds
10  ever made it through the trust.  It was really
11  just the Arie proceeds, which I believe just
12  about all of them, and if you show me
13  documents, I'm happy to go through them with
14  you, but I believe just about all of those
15  proceeds went to pay the Brosers.
16    Q.    So the settlement agreement, if you
17  may recall, identifies at least $50 million in
18  settlement proceeds, correct?
19    A.    Yes, sir.
20    Q.    So you're saying --
21    A.    Wait.  I think it identifies 50
22  million.  I don't know that at least 50.  I
23  don't know that there's an option for more.
24    Q.    I forget whether there was a few
25  dollars extra, is all I meant.

1    A.    I think it's 50.  I think it's
2  exactly 50.
3    Q.    You may be right.  So, are you
4  saying that other than whatever, the
5  approximately 10 million in that escrow
6  account, the other 40 million you viewed as the
7  Arie proceeds under the settlement agreement?
8    A.    Yes, sir.
9    Q.    So the 40 million is attributable
10  to the Arie shares?
11    A.    Was attributable to the Arie shares
12  and the Arie litigation.  My best recollection
13  is we settled, and I use the royal "we," so
14  excuse me, but that Arie settled that matter on
15  the eve of either going to the Delaware Supreme
16  Court or getting the Delaware Supreme Court
17  decision in his primary case against the
18  Trumps, and that everyone viewed it as right
19  for settlement at that point, without that
20  decision being realized.  And, again, I don't
21  remember if briefs had been filed or were about
22  to be filed, but I recall that this was going
23  to be our second time up in the Delaware
24  Supreme Court.
25    Q.    Where in writing, if anywhere, is



**Exhibit A**

1  it reflected that of the $50 million in
2  settlement proceeds, 40 million were for Arie
3  and 10 million or so were for Orly?
4      A.   Well, I believe the settlement
5  agreement identifies and carves out those
6  $10 million in a separate tranche.  It's not a
7  distribution waterfall, but I believe there are
8  subparagraphs that identify 17 million, 10
9  million, 15 million, something like that.
10  Don't quote me on the exact numbers.  But I
11  know that $10 million was subidentified
12  specifically for the purposes, and that money,
13  as you just reminded me, was being held in
14  escrow for Orly.  So -- or if Orly had won her
15  case, you know, I believe.  So I think the
16  document on its face pretty well identifies
17  those funds.
18      Q.   Okay.  The settlement agreement
19  says whatever it says, and we can take a look.
20      A.   Sure.
21      Q.   Other than the settlement
22  agreement, is there any writing anywhere -- I
23  don't mean a formal agreement; it can be an
24  e-mail, letter, note on a cocktail napkin,
25  anywhere which reflects the allocation of

1  $50 million settlement proceeds that you have
2  just described, as between Arie and Orly
3  Genger?
4      A.   I recall, although I cannot find,
5  and I have searched, drafting a memo outlining
6  -- and I remember discussing this memo vividly,
7  'cause I was in Saratoga, and I was on the
8  phone with Arie and then Yoav and Bryan
9  Linebach, discussing this settlement and Orly
10  getting the $10 million.  I have searched high
11  and low for this memo, as you could imagine it
12  would be helpful to your case in resolving this
13  issue.  I have not yet found it.
14      Q.   Now, you said you sublease space
15  from Zeichner Ellman, correct?
16      A.   Yes, sir.
17      Q.   Or license, I forget.
18      A.   Yes, it is a license.
19      Q.   Did you walk down the hall and ask
20  Zeichner Ellman if they have a copy of this
21  memo?
22      A.   Did I ask them if they had a copy
23  of the memo, you know, I have not done that.  I
24  did not even think to do that, to be honest
25  with you.  I'm happy to go do that.  I can walk

1  down the hall ask Yoav for the memo.  But I do
2  recall the conversation, because I believe the
3  agreement was signed in the summer.
4      Q.   Uh-huh.
5      A.   And I was in Saratoga, New York, on
6  the phone with Yoav and Bryan -- so yes, I can
7  certainly ask them.  But I recall drafting the
8  memo.  I recall having an extensive
9  conversation on the memo with them.  And that
10  is my best recollection.
11      Q.   Okay.  So Orly's attorneys were
12  aware at the time that the only proceeds she
13  was to receive under the 2013 settlement
14  agreement was whatever she could obtain by --
15  in litigation for the $10.3 million trust
16  account?
17      A.   Orly's attorneys absolutely were
18  aware -- well, strike that.
19          I don't want to waive any
20  privilege, so I'm not going to answer that
21  question unless can you explain to me why it's
22  not a privileged communication.
23      Q.   Because you said in connection with
24  the settlement agreement, you represented Arie,
25  not Orly.  So Orly was represented by the

1  Zeichner firm.  So this would be --
2      A.   I believe she was also represented
3  by Bill Wachtel.
4      Q.   That's fine.
5      A.   If I'm not mistaken.
6      Q.   But not you.  And so this would be
7  a communication between parties?
8      A.   Opposing attorneys.
9      Q.   So I will say this:  To the extent
10  you answer the question, I won't deem it as a
11  waiver of privilege.
12      A.   I appreciate it.  Thank you very
13  much.  They absolutely, 100 percent,
14  unequivocally, knew that that was her proceeds,
15  the 10.3, and that was all her proceeds.
16      Q.   And those were the only proceeds
17  she was going to get under that particular
18  agreement?
19      A.   Can you repeat the question.
20          (Whereupon, a portion of the record
21  was read back.)
22      A.   That was the only proceeds she was
23  going to get under that agreement.
24          MR. DELLAPORTAS:  Okay.  You've
25  been going for a while.  I know you have a



**Exhibit A**

1 rough voice, so let's take a ten-minute break.
2     THE WITNESS:  Great.
3     (Whereupon, a recess was taken.)
4     Q.  (By Mr. Dellaportas)  Turn to the
5 last page on the Harris Exhibit 4 the trust
6 agreement.
7     A.  Yes.
8     Q.  Do you see it says -- appears to be
9 an amendment with regard to fees paid to the
10 Wachtel firm?
11     A.  Yes.
12     Q.  Do you recall what, if anything,
13 was paid out of the settlement proceeds to the
14 Wachtel firm?
15     A.  I have no idea.
16     Q.  Okay.  Do you know if there was
17 ever fees paid to the Wachtel firm in
18 connection with the 2013 settlement agreement?
19     A.  I had nothing to do with -- I've
20 never paid the Wachtel firm out of my IOLA
21 account, as you see from the checks.  I'd first
22 seen this document in connection with this
23 litigation.  I was not involved in the drafting
24 or negotiation or any aspect of this agreement,
25 nor do I know if anything's ever been paid out

1 of it.
2     Q.  Are you aware of, more generally,
3 of any kind of fee discussions or fee dispute
4 involving the Wachtel firm?
5     A.  No.  I cannot disavow this enough.
6 I know nothing of it.
7     Q.  Okay.  Fair enough.
8     Are you aware of a 2017 agreement
9 by which Arie and Orly agreed to put certain of
10 the future settlement proceeds in escrow?
11     A.  Only in connection with this
12 litigation.
13     Q.  Meaning what?
14     A.  Meaning I received a copy of your
15 letter filed yesterday --
16     Q.  Yes.
17     A.  -- that identified this document.
18     Q.  Okay.  You were unaware of that
19 2017 agreement prior to my letter?
20     A.  I was generally unaware.  I don't
21 ever recall, to this date, reading that
22 agreement.  And the only thing I was aware of,
23 that I recall being aware of contemporaneously,
24 is that changing out the escrow agent from Bill
25 Wachtel to Michael Bowen.

1     Q.  What do you recall specifically
2 about that?
3     A.  I specifically recall that since
4 Bill was no longer involved in the case, and
5 the Kasowitzes had taken on full responsibility
6 for Orly -- strike that.
7     I recall that Bill Wachtel was no
8 longer involved in the case, and we needed
9 someone else to receive the proceeds.
10     Q.  Okay.  So if I could just direct
11 your attention back to your second subpoena.
12     A.  Sure.  Is that No. 2?
13     Q.  The thicker one, yeah.  Harris 2.
14     A.  Okay.
15     Q.  And specifically to Exhibit B to
16 that subpoena.
17     A.  Sure.  Hold on.
18     Q.  That's the $2 million promissory
19 note we looked at earlier.
20     A.  Getting there.  Got it.
21     Q.  And specifically page 5 of that
22 document.
23     A.  Yes.
24     Q.  And subsection F of that document
25 -- on that page.

1     A.  Yes.
2     Q.  And it references that certain
3 agreement dated as of March 31, 2017, between
4 the borrowers, David Broser, the lender and the
5 escrow agent named therein; do you see that?
6     A.  Yes.
7     Q.  When you saw this note, did you
8 inquire as to what that agreement was?
9     A.  I did not.
10     Q.  Did you not notice at the time?
11 Were you not interested?  Or what was going on
12 there?
13     A.  Either A, B, or all of the above.
14     Q.  You don't remember?
15     A.  I don't.
16     Q.  Now, with regard to the $2 million
17 note that we're looking at, did you find it
18 curious or strange that a married couple would
19 execute a $2 million promissory note between
20 themselves during the -- just a few months into
21 their marriage?
22     A.  Not at all.
23     Q.  Okay.  Did you --
24     A.  My wife's a matrimonial lawyer
25 dealing with high net worth people.  I've seen



1 promissory notes, I've seen all sorts of
2 things. And I should say my ex-wife, 'cause
3 I've also recently gotten divorced. So, yes, I
4 do not find that the least bit odd.
5    Q.   Okay. Now, the other note, I'll
6 call it the $5 million note, since there were
7 ten earlier notes reflecting the exact same
8 amount of debt, why were they all consolidated
9 into a single note at that time?
10    A.   I think I had requested that in
11 order to file -- to make it easier to file the
12 UCCs. And I just thought it would be easier to
13 have it in one number.
14    Q.   Now, the UCCs don't reflect any
15 amount of debt at all; do they?
16    A.   I don't recall. I'm looking at
17 them -- I have to look at them right now. My
18 best recollection is when you file a UCC, you
19 would identify the basis of the debt upon which
20 you're filing the UCC.
21    Q.   So why not just attach the ten
22 notes?
23    A.   It's obviously burdensome. You
24 miss one. It's just easier to have a
25 consolidated note. I do this with clients all

1 the time. It's not an unusual process.
2    Q.   So it was --
3    A.   I mean, if -- in the ordinary
4 course, I would take Orly's current additional
5 notes, and then have a second amended and
6 consolidated secured promissory note, is
7 probably best practices right now.
8    Q.   The actual notes are not attached
9 to any of your UCC filings; is it?
10    A.   Again, I'm still looking at that.
11 I think it was. I'd be surprised if it wasn't.
12 I'm just trying to see any indication that it
13 was. I am sure it was attached to the filing.
14    Q.   Do you have any record of actually
15 providing that, that note to any of the states
16 in which you filed the UCC?
17    A.   Well, I have the UCC and the note
18 here, so I have no indication it wasn't
19 attached.
20    Q.   I can represent to you that we've
21 reviewed all the UCC filings and we don't see
22 any reference to the note or to a dollar amount
23 in any of these files.
24    A.   Okay. So then I will have to
25 acquire -- perhaps it was not required and we

1 didn't have to, but it was prepared in
2 anticipation of filing it with the UCC. I did
3 not recall or realize it had not been.
4    Q.   Okay.
5    A.   Until your representation, which I
6 obviously believe.
7    Q.   Now, you mentioned a few times a
8 messenger service.
9    A.   Yes.
10    Q.   What messenger service do you use
11 at your firm?
12    A.   I use -- there are ZEK, or
13 Zeichner, messengers that deliver messages.
14    Q.   I see. So they're like internal
15 Zeichner Ellman messengers?
16    A.   Yes.
17    Q.   They bill you for it?
18    A.   They bill me for it, yes.
19    Q.   And other than in the context with
20 the current discovery disputes, have you had
21 communications over the years with Mitchell
22 Goldberg? That would be the lawyer for David
23 Broser.
24    A.   Other than in the current
25 conversations over the years. I think the

1 first time I spoke to him is in connection with
2 this litigation.
3    Q.   Okay. What about have you ever
4 heard of a law firm called Richards Kibbe?
5    A.   No.
6    Q.   Are you familiar with a 2007 Genger
7 family trust? I'm sorry, Orly Genger family
8 trust. I left out a word, a critical word,
9 Orly Genger family trust?
10    A.   A 2007 Orly Genger family trust. I
11 don't. My best answer is maybe.
12    Q.   Okay. Next, I'd like to mark a
13 document production you made on February 8,
14 2019, as Harris Exhibit 5.
15       (Whereupon, Harris Exhibit 5,
16 February 8, 2019, production, was marked for
17 identification as of this date by the
18 reporter.)
19    Q.   Mr. Harris, if you can actually
20 just go to Exhibit B. It's about halfway
21 through the stack.
22    A.   Exhibit B is halfway through the
23 stack. Yes. I don't have it yet. Oh, Exhibit
24 B. Yeah, Exhibit B.
25    Q.   I'm just hoping you can walk me



**Exhibit A**

1  through what's in Exhibit B here.
2  A.  Well, I think this is the same copy
3  of the New Jersey UCC filing I, again, produced
4  yesterday.
5  Q.  Okay.  And then two pages later is
6  the Texas UCC filing?
7  A.  And then the Texas UCC filing.
8  Q.  Okay.  So neither of those either
9  references the amount of the secured debt or
10  attaches the note, correct?
11  A.  I'm taking your representation.  It
12  was my intent to attach it, and I can only
13  presume it was not required, so it wasn't
14  attached.  But until today, I would have told
15  you it was attached.
16  Q.  Okay.  And then the next document
17  in Exhibit B is just the $5.3 million note we
18  looked at, correct?
19  A.  Yes.
20  Q.  Let's get past that.
21  A.  We, for some reason, have another
22  copy of the New Jersey filing, and another copy
23  of the Texas filing, and then we have a $21,000
24  note.
25  Q.  Okay.  The $21,000 note is dated

1  March 27, 2018?
2  A.  Yes, sir.
3  Q.  And do you recall about when that
4  was signed by Ms. Genger?
5  A.  I don't.  I would presume sometime
6  thereafter.
7  Q.  Okay.  And do you know why, since
8  the 2016 note was only signed at least a month
9  after this document, the $21,000 debt was not
10  included in that note?
11  A.  Yes.  As I said earlier, we had
12  some certains due and owing from Arie to Orly
13  through '16, and I wanted to preserve that and
14  roll up those other notes to that subcertain.
15  I didn't have all of the '17 data available to
16  me at that time, nor did I have all of the '18
17  data, and I like to do things by calendar year,
18  just cleaner.
19  Q.  If we could skip past the note to
20  the next --
21  A.  Sure.
22  Q.  Looks like another UCC filing
23  statement.  Maybe another copy of the New
24  Jersey UCC.
25  A.  With all these UCC filings, are

1  these all the same filings?
2  Q.  I don't know whether they're
3  successive filings or the same copies of
4  filings.
5  A.  Well, let's just spend a minute,
6  because there is a filing number and a date on
7  them.
8  Q.  Yes.
9  A.  And I'm just curious.  No, they're
10  not all of the same filing.
11  Q.  Okay.  So is there --
12  A.  There are different file number and
13  they have different time stamps in.
14  Q.  Understood.  So is there a reason
15  you made multiple filings within the same state
16  for what looks, at least, very similar --
17  A.  Because, as I said earlier, with
18  not having appreciated that fact, I was under
19  the impression, which obviously I was wrong,
20  that the initial filing was for that $5 million
21  note, and then I just got in the habit of every
22  time there was a note including a different
23  filing, which if there was no dollar amount or
24  note attached, I clearly didn't have to.
25  Q.  Okay.  So the second filing was for

1  the second $58,000?
2  A.  Right.  My sense is the filings by
3  date and time are indicative of attached to a
4  note, but clearly, the notes weren't attached.
5  Q.  Okay.  They all seem to be filed --
6  A.  I could have saved myself money and
7  time --
8  Q.  Sure.
9  A.  -- by just keeping this to one note
10  -- one filing.
11  Q.  They all seem to be filed on
12  August 3rd?
13  A.  They do, just different times for,
14  I don't know why, but --
15  Q.  Okay.
16  A.  I assume I had all of the notes
17  signed and with me and it was just easier to
18  file them all at the same time.
19  Q.  So then next, if we get -- skip
20  past the UCCs, we see another note for $58,000
21  dated April 23rd, 2018.  Do you see that?
22  A.  Yes.
23  Q.  Do you recall when Orly signed this
24  document?
25  A.  I don't, but, again, I presume if



1  it was attached to the filing signed -- filing
2  filed on the same date, August 3rd, it was
3  sometime prior between that April date and the
4  August date.
5      Q.   Other than the UCCs you've produced
6  to us, did your firm file any other UCCs on
7  behalf of Arie or Orly Genger?
8      A.   On behalf of Arie or Orly?
9      Q.   I should say Arie Genger.
10     A.   Okay.  Have I filed any other UCCs
11  on behalf of Arie?  As it relates to Orly or as
12  it relates to any matter?
13     Q.   Just as it relates to Orly?
14     A.   No.  These -- except for the ones
15  that we attempted to file --
16     Q.   Sorry.
17     A.   No worries.
18         (Whereupon, a portion of the record
19  was read back.)
20     A.   If she was an Israeli citizen,
21  these were the only UCCs that we filed.  And I
22  don't know if the DC one ever fully went
23  through.
24         MR. DELLAPORTAS:  Let's next mark
25  as Harris Exhibit 6, a thick production from

1  Mr. Harris made to us, the first page of which
2  reads "Genger payments IOLA 4/24/19."
3         (Whereupon, Harris Exhibit 6,
4  Genger payments IOLA 4/24/19, was marked for
5  identification as of this date by the
6  reporter.)
7      A.   I just want to say, upon reviewing
8  the Exhibit No. 5, my best sense is in each of
9  the UCC filings in each of the states, we
10  attached the note that it corresponded to that
11  filing.  I don't know why the state has not
12  registered that note.  But my best recollection
13  is that we did, in fact, attach the note to
14  each of the filings.
15     Q.   So if you could tell me what the
16  chart, which is on the first four pages of
17  Exhibit 6, if you could tell me what this
18  document is?
19     A.   Sure.  We had a meeting confer with
20  the Court about producing checks that were --
21  that represented a goodly portion of the
22  $5.3 million note.  That paid legal fees from
23  my IOLA account.  So this represents my search
24  of my records of my IOLA account that
25  represented loans from Arie to Orly for the

1  period end of 2008 through '15, which is an
2  exhaustive, but not complete list of all the
3  fees paid on behalf of Orly that represent the
4  $5.3 million note, but as indicated to the
5  court, indicative and a substantial portion of
6  that amount.
7      Q.   Okay.  And I think the note was
8  through 2016; wasn't it?
9      A.   Yes, sir.
10     Q.   And so why aren't there 2016
11  numbers on this chart?
12     A.   My recollection of our call with
13  the Court was '17 through '15.  I couldn't find
14  seven, and this represents, as indicated,
15  approximately 4.5 of the 5.3, so I thought it
16  was more than representative of the total of
17  the Orly debt to Arie.
18     Q.   Okay.  And then underneath it are
19  all the checks that are referenced herein?
20     A.   I believe so.
21     Q.   That was your intention?
22     A.   That was my intention.
23     Q.   Fair enough.  When you describe
24  those as loans, on what do you base your belief
25  that the money for each of these came from Arie

1  Genger?
2      A.   I would receive funds -- unless
3  otherwise indicated, I would receive funds from
4  Arie for Orly's loans to pay Orly's legal fees.
5      Q.   So you --
6      A.   Money would come into my IOLA
7  account.
8      Q.   So you had indicated that in some
9  circumstances, Orly would pay directly?
10     A.   In some circumstances, Orly would
11  pay directly or -- but those would be fees that
12  would not come through my office.
13     Q.   Okay.  In any circumstances, did
14  Orly pay you to pay legal fees?
15     A.   Yes.
16     Q.   And where's that reflected on this
17  chart?
18     A.   That's reflected in -- a good
19  example of that is, like in -- by way of
20  example, on the May 2015, check number 2798.
21     Q.   I'm sorry, what was the date?
22     A.   I'm sorry.  May 2015.  It's at the
23  bottom of page 3, the last one.
24     Q.   Okay.
25     A.   It's to the Kasowitz firm.



1    Q.   Yes.
2    A.   It was $313,000.
3    Q.   You made a check out for 313,000?
4    A.   Correct.  Which should be reflected
5  in the attachment.
6    Q.   But you're saying that Arie only
7  loaned the $99,950?
8    A.   Yes, sir.
9    Q.   And the rest came from Orly?
10    A.   Yes, sir.
11    Q.   And so is that the case with each
12  of the ones where you have a note?
13    A.   No.
14    Q.   Okay.  'Cause I note that in each
15  -- in each of the cases where you have a note,
16  that the outbound check is for more than the
17  amount that you've logged, correct?
18    A.   Correct.  There are notes for each
19  time the amount of money I received as loan
20  proceeds from Arie for the benefit of Orly,
21  where the check is greater, I've indicated
22  that.  But not in each of those cases is the
23  difference made up of money from Orly.
24    Q.   So who made up the difference in
25  the other cases?

1    A.   Good question.  So in the other
2  cases, some of it was for fees that were not
3  Orly's responsibility, that were paid directly
4  by -- paid by Arie.  By way of example, Sal
5  Walker, August 2014, check 2711.  The Orly
6  portion was 11830.  The difference was the Arie
7  portion.  And so I only recorded the Orly
8  portion.
9    Q.   I see.  I see.  So in some
10  instances, these were shared representations
11  and the bills were split?
12    A.   Correct.
13    Q.   Do you recall which instances were
14  -- reflect direct payments by Orly versus which
15  instances reflect some sort of fee sharing
16  arrangement between Arie and Orly, with regard
17  to those checks that have notes by them?
18    A.   Okay.  Again, the direct -- when
19  you say "direct payment by Orly," I just want
20  to be clear.
21    Q.   I'm sorry, direct payment to you to
22  pay Orly?
23    A.   That's okay.  I don't.  I know the
24  Kasowitz one.  I know the ZEK, for the May 2015
25  ZEK one, and I know the September 2015 ZEK all

1  represented payments by Orly to me.  In the
2  earlier ones, I'd have to go back to my notes
3  when I had prepared this to give you that
4  detail.  And I believe in the December '09, by
5  giving way of a different example, the
6  difference, at one point ZEK wasn't breaking up
7  their bills, so that check represented a couple
8  of matters, including, I believe, the apartment
9  trust matter, so that this only represented the
10  representation for Orly.
11    Q.   I see.
12    A.   The 31558.
13    Q.   Who paid the bills for the
14  apartment trust matter?
15    A.   I believe Arie lent the trust
16  money.
17    Q.   Okay.  At a certain point, the
18  trust prevailed in that litigation, correct?
19    A.   Correct.
20    Q.   And it obtained clear title to the
21  two apartments, correct?
22    A.   Yes, sir.
23    Q.   And then it sold those apartments
24  to third parties, correct?
25    A.   Yes.

1    Q.   What became of the proceedings?
2    A.   Beyond the scope.  I'm not going to
3  answer.  Pick something.  Pick a choice.  That
4  has nothing to do with this.
5    Q.   Is Orly not a beneficiary of the
6  apartment trust?
7    A.   I don't recall the terms of the
8  apartment trust.
9    Q.   Are you the trustee, one of the
10  trustees to the apartment trust?
11    A.   I don't believe I am a trustee of
12  the apartment trust.
13    Q.   And why do you believe it's not
14  beyond the scope of the -- why do you believe
15  it's beyond the scope of the deposition?
16    A.   Because this is about proceeds --
17  this is about the collection of monies from
18  Orly, not about her being a beneficiary of a
19  trust and what's in that trust.
20    Q.   Okay.  Let me refine it.  Has
21  either Orly or any of Orly's lawyers or other
22  creditors received any proceeds from the
23  apartment trust?
24    A.   Not that I'm aware of.
25    Q.   With regard to -- let's just focus



1 on 2014 and 2015, if we can.
2     A.   Sure.
3     Q.   So in 2014, there's a bill to
4 Kasowitz?
5     A.   Let me get there. In 2014,
6 there's a --
7     Q.   There's a check made out to
8 Kasowitz from your firm for $313,000?
9     A.   In '15, not '14.
10    Q.   I apologize. May 2015?
11    A.   Yes.
12    Q.   And of that, that's Arie loaned
13 99,950, there about?
14    A.   Yes, sir.
15    Q.   The rest was paid by Orly?
16    A.   Yes, sir.
17    Q.   Where did -- what was the source of
18 the Orly payment?
19    A.   I'm sorry. A wire came into my
20 account from Orly.
21    Q.   Okay. We would ask you to produce
22 that, that wire.
23     Same with -- you see two more notes
24 for Zeichner Ellman where the check amount you
25 paid was greater than the Arie loan amount?

1     A.   In 2015, correct.
2    Q.   In each of those, was the
3 difference made up by a payment to your firm
4 from Orly?
5    A.   As I indicated earlier, that's my
6 best recollection, yes.
7    Q.   So for the 2015 payments, the three
8 wires that you appear to receive direct from
9 Orly, we would ask that those be produced.
10     If I could next mark another
11 production from your firm of checks. I forget
12 the date of it. It doesn't have a cover note.
13 But it's for -- date of the first check, for
14 these purposes, January 24, 2014. We can mark
15 that as Harris Exhibit 7.
16     (Whereupon, Harris Exhibit 7,
17 checks, first one dated January 24, 2014, was
18 marked for identification as of this date by
19 the reporter.)
20     (Whereupon, Harris Exhibit 8,
21 checks, first one dated 7/3/13, was marked for
22 identification as of this date by the
23 reporter.)
24    Q.   We had a little discussion off the
25 record. I just want to make clear that we've

1 gotten different checks at different times, but
2 the Harris 6 is intended to be a comprehensive
3 set of all the checks, and the others are
4 duplicative; is that correct?
5    A.   In Harris Exhibit 7, compared to 6,
6 for 14, that is the intent, except in 7, you
7 have the back of the checks. You don't have
8 the back of the checks in Harris 6. And in
9 Harris 8, you have checks that are not in 6
10 that were intended to evidence -- strike that.
11     In Harris 8, I believe are the same
12 checks as in Harris 6. At one point, you got
13 additional checks to evidence that the wire
14 that came to my IOLA account that included
15 settlement proceeds from the 2013 settlement
16 went to pay Arie's legal fees. So you had
17 checks that were related to Arie's legal fees,
18 but I don't see them here.
19    Q.   Okay. I think we reached an
20 agreement where we'd back out all the checks
21 which were not Orly related.
22    A.   Okay. That's fine. Never mind.
23    Q.   Okay.
24    A.   Do you still want me to hold 6?
25    Q.   No, I'm done with this.

1    A.   Got it.
2     MR. DELLAPORTAS: I'd like to next
3 mark as Harris Exhibit 9 a page from a Northern
4 Trust bank statement.
5     (Whereupon, Harris Exhibit 9,
6 Northern Trust bank statement, was marked for
7 identification as of this date by the
8 reporter.)
9    Q.   So Harris Exhibit 9 is an account
10 statement dated August 10, 2018. And it shows
11 a wire sent from Orly Genger in the amount of
12 $9,434.56 to your IOLA account; do you see
13 that?
14    A.   I do.
15    Q.   Is there a reason no documentation
16 was produced by you about this transaction?
17    A.   Let me go back to 6. But to the
18 extent it was not connected with the Arie loan,
19 it would not necessarily have been produced.
20    Q.   The first subpoena sought all
21 documents concerning financial arrangements
22 with Orly Genger.
23    A.   If I -- yes.
24    Q.   Also all documents concerning any
25 assets of Orly Genger?



**Exhibit A**

1    A.   I presume this went out to pay a
2  bill.  So it wouldn't be an asset or a
3  financial arrangement.
4    Q.   Where did the money go?
5    A.   You see how many checks I write,
6  you don't certainly expect that I recall what
7  happened on August 15 of 2018.
8    Q.   All I know is that --
9    A.   Plus my reporting to you did not go
10  through '18.  I can tell you that I responded
11  to subpoena and that I'm not holding those
12  funds.
13    Q.   Yes, I get that.  So I'm asking
14  what you did with those funds.
15    A.   I paid a bill on behalf of Orly.
16    Q.   What bill?
17    A.   I can't sit here and tell you that.
18  I have no recollection.
19    Q.   It was just last August.  No
20  recollection?
21    A.   Again, you've subpoenaed my IOLA
22  account.  I have a lot of clients, and I write
23  a lot of checks out of that account.  I have
24  zero recollection.  I couldn't even tell you
25  what checks I wrote last month for clients.

1    Q.   Were you aware that this was just
2  two weeks after Orly had lost summary judgment
3  in the federal case?
4    A.   No, I was not aware of the date of
5  the loss of the summary judgment until
6  yesterday.
7        MR. DELLAPORTAS:  Okay.  I'd like
8  to next mark as Harris Exhibit 10 Morgan
9  Stanley bank statement.
10        (Whereupon, Harris Exhibit 10,
11  Morgan Stanley bank statement, was marked for
12  identification as of this date by the
13  reporter.)
14    Q.   If you could look at just the last
15  page of this.
16    A.   Yes, sir.
17    Q.   And here's another wire from Orly
18  to you.  This one, August 14, 2018 for $12,000?
19    A.   Yes, sir.
20    Q.   Do you still hold that money?
21    A.   No.  I hold no money for Orly
22  Genger.
23    Q.   What became of that money?
24    A.   A bill was paid.
25    Q.   You can't tell us what bill?

1    A.   I cannot.
2    Q.   Okay.  So with regard to both
3  Harris 9 and Harris 10, we would ask you to
4  produce all records associated therewith,
5  including any bills paid thereby.
6        Are these legal bills or other
7  kinds of bills?
8    A.   I don't believe I ever paid
9  anything other than legal bills -- well, I paid
10  court reporting bills for Orly.  Anything
11  related to litigation.  I don't think I paid --
12  I've never paid anything not related to
13  litigation, directly or indirectly.
14        MR. DELLAPORTAS:  Okay.  So last,
15  if we could look at Harris Exhibit 11.  That's
16  a Vanguard statement.
17        (Whereupon, Harris Exhibit 11,
18  Vanguard statement, was marked for
19  identification as of this date by the
20  reporter.)
21    Q.   So in this one, if you look -- this
22  is Harris 11.  If you look at the second page,
23  there's a -- looks like Ms. Genger, on
24  August 10, 2018, liquidated what looks to be
25  her entire Vanguard account, $62,000.

1    A.   It does.
2    Q.   And wired it to an account, which,
3  according to the next page, was, again, your
4  IOLA account.  Do you see that?
5    A.   I'm looking.
6    Q.   What became of this $62,000?
7    A.   It was -- a fee was paid.
8    Q.   You have no recollection of what
9  the 62,000 was used for?
10    A.   John, I really wish I could help
11  you.  I don't.
12    Q.   So we ask that all records
13  associated therewith also be produced.
14        MR. DELLAPORTAS:  I'd like to next
15  mark as Harris Exhibit 12 a document production
16  from Stein & Harris dated September 28, 2018.
17        (Whereupon, Harris Exhibit 12,
18  document from Stein & Harris, dated
19  September 28, 2018, was marked for
20  identification as of this date by the
21  reporter.)
22    Q.   So, Mr. Harris, in addition to your
23  firm, we also subpoenaed -- you were the
24  register agent for Everything Important LLC,
25  and we've served a subpoena on that entity.  Do



**Exhibit A**

1  you recall that?
2  A.  Yes, sir.
3  Q.  If we could look to pages 3 and 4
4  of the document.
5  A.  Yes.
6  Q.  Can you tell us what these
7  documents are?
8  A.  You had asked, if I recall
9  correctly, for ownership indications for
10  Everything Important.
11  Q.  Uh-huh.
12  A.  So I believe that schedule A would
13  be to evidencing the initial percentage
14  ownership, and then I believe there was a sale
15  of some portion of that ownership from Orly to
16  Arie Genger that resulted in Arie becoming the
17  52 percent owner, I believe, if it's three
18  shares, and he owned 49 before.
19  Q.  Was it your firm which prepared
20  this bill of sale?
21  A.  No.
22  Q.  Which lawyers did that?
23  A.  I have no knowledge of that.
24  Q.  Okay.  How did you come to get this
25  document?

1  A.  It was sent to me by either Orly or
2  Arie.  I don't recall whom.
3  Q.  Okay.  And you're counsel to
4  Everything Important, LLC?
5  A.  I have had -- I'm not general
6  counsel to them, but I have had particular
7  assignments for Everything Important.
8  Q.  Does Everything Important maintain
9  records which identify what assets the company
10  has?
11  A.  Not that I'm aware of.  I would
12  have no idea.
13  Q.  You would have no idea what assets
14  Everything Important has?
15  A.  Zero.  Again, I'm not general
16  counsel.
17  MR. DELLAPORTAS:  Okay.  So I'd
18  like to next mark as Harris Exhibit 13 an
19  e-mail from Michael Futterman (phonetic) to
20  myself with e-mails below dated October 9,
21  2018.
22  (Whereupon, Harris Exhibit 13,
23  e-mail from Michael Futterman, dated October 9,
24  2018, was marked for identification as of this
25  date by the reporter.)

1  Q.  So, Mr. Harris, on -- this appears
2  to be an e-mail that Mr. Futterman forward me
3  of what purports to be an e-mail from you to
4  him.  Do you see that, dated October 9th, 2018?
5  A.  Yes.
6  Q.  Did you, in fact, send this e-mail?
7  A.  I believe so.
8  Q.  And did you, in fact, advise
9  Mr. Futterman that, quote, please be advised
10  that all works of art by Orly Genger held by
11  the gallery are owned by Everything Important,
12  LLC?
13  A.  Correct.
14  Q.  Now, you just told me you had zero
15  knowledge of whatever assets were owned by
16  Everything Important.  So on what basis did you
17  make this statement?
18  A.  I still don't even know what works
19  of art held by that gallery this references,
20  other than knowing that any works of art
21  prepared by Orly at this gallery were owned by
22  Everything.  Whether it's one piece or ten
23  piece, I have no idea.
24  Q.  What's the basis of your knowledge
25  to that effect?

1  A.  I've been so informed?
2  Q.  By your client?
3  A.  Yes.
4  Q.  Have you ever seen any
5  documentation which reflects that the art owned
6  by this gallery is, in fact, owned by
7  Everything Important, LLC?
8  A.  Have I ever seen any document that
9  would evidence --
10  Q.  A bill of lading?  A sale
11  agreement?  A consignment agreement?  Any --
12  A.  Why would there be a bill of
13  lading?
14  Q.  I don't know.  You tell me.  You
15  didn't produce anything, so you tell me what --
16  A.  I don't have anything.  But a bill
17  of lading comes in -- if it's produced in the
18  United States, you don't necessarily -- and if
19  it wasn't necessarily shipped between Orly and
20  Everything Important, you wouldn't have a bill
21  of lading.
22  Q.  Have you ever seen any piece of
23  paper or any electronic document anywhere in
24  any context reflecting that the art owned by
25  the Eric Firestone Gallery is, as you



**Exhibit A**

1  represented to Michael Futterman, to frustrate
2  our restraining notice, owned by Everything
3  Important, LLC?
4      A.  I believe I have seen documentation
5  which would indicate that the works of art are
6  owned by Everything Important.
7      Q.  Why did you not produce that
8  documentation?
9      A.  I don't have any documentation.
10  You said have I ever seen.  I have seen.
11      Q.  Okay.  So what -- describe in as
12  exact detail as possible, what this document is
13  that you've seen, but no longer possess, which
14  informs you that the artwork in the possession
15  of the Eric Firestone Gallery is, in fact,
16  owned by Everything Important, LLC?
17      A.  I don't recall, and it very well
18  may be protected by attorney-client privilege.
19  But I make that representation based on, you
20  know, inquiry that that art is, in fact, owned
21  by Everything Important.
22      Q.  Inquiry from whom?
23      A.  Say that again.
24      Q.  Inquiry from whom?
25      A.  I've spoken to my client.

1      Q.  Which client?
2      A.  I've spoken to Arie.  I've spoken
3  to Everything Important.
4      Q.  Everything Important is a company.
5  Is there --
6      A.  Companies can make statements.
7      Q.  I get that.  But they make them
8  through human beings, correct?
9      A.  That is always correct.
10      Q.  Anyone other than Arie you spoke to
11  about the ownership of the artwork in the
12  possession of the Eric Firestone Gallery?
13      A.  I don't recall if I spoke to Orly
14  about it.  I know I've spoken to Arie about it.
15  I don't know that I've spoken to Orly about it.
16  I might have.  I don't recall.
17      MR. DELLAPORTAS:  Okay.  Let's --
18  probably have five more minutes, but let's take
19  a break.
20      (Whereupon, a recess was taken.)
21      Q.  (By Mr. Dellaportas) Just a few
22  more questions.  So, Mr. Harris, with regard to
23  the Orly Genger 2007 family trust, we went back
24  and checked the tax returns that Mr. Fisher
25  prepared, and they list you as the co-trustee?

1      A.  I am.  I said I didn't recall, but
2  I guess I am then.
3      Q.  In fact, we had asked for all
4  records concerning the trust in our first
5  subpoena.  Did you go back and search for
6  records for that trust to see if you had any?
7      A.  Yeah, I don't have -- all those
8  records are maintained by Bill Fisher, as far
9  as I understand.
10      Q.  So you have no documents relating
11  to your role as trustee of the 2007 family
12  trust?
13      A.  I don't know what documents I would
14  have.  The role of trustee would be in the
15  trust agreement, which Mr. Fisher has.  So I
16  don't have any independent documents.
17      Q.  What about documents regarding the
18  trust's investments and whatnot?
19      A.  I would think the accountant would
20  hold those.
21      Q.  You don't have any of those?
22      A.  I have not -- nothing is sent to
23  me.  No, I am not the primary on any account
24  statements.  I'm sure whatever Mr. Fisher
25  provided to you will show that.  I do not get

1  any information.
2      MR. DELLAPORTAS:  Okay.  I'd like
3  to next notice another document production from
4  Mr. Harris dated September 16, 2018, and we
5  will call it Harris 14.
6      (Whereupon, Harris Exhibit 14,
7  document production from Mr. Harris, dated
8  September 16, 2018, was marked for
9  identification as of this date by the
10  reporter.)
11      A.  I just want to clarify,
12  Mr. Dellaportas says to Exhibit 13, with the
13  Futterman.  While I do not know the extent of
14  the Everything Important assets, I have always
15  been informed from Orly and Arie that Orly's
16  artwork has always been owned, before this
17  litigation and the like, as far as I can ever
18  remember, has always been owned by Everything
19  Important.
20      Q.  And as far as you can ever
21  remember, have you ever seen a document
22  reflecting that fact?
23      A.  I believe so.  I mean his --
24      Q.  Sorry.  Go ahead.
25      A.  Her artwork, even back when the



**Exhibit A**

1  family was a bit more cohesive, I think they
2  owned something called White Box, and her
3  artwork was owned by them.  And her artwork has
4  always, as far back as I have familial
5  recollection, has always been owned by an
6  entity.  I believe I've seen something, but
7  it's always been everyone's statement and
8  understanding, from as far as -- from the
9  beginning of time that I've been involved.
10     Q.   Anything else you wish to add?
11     A.   No, thank you.
12     Q.   Okay.  So back to Harris 14.  Do
13  you recall receiving this notice of event of
14  default?
15     A.   No, I did not receive this until
16  the connection with this litigation.  As you'll
17  see, they don't have my law firm or the correct
18  floor on the address.  And my building is a
19  large Fox News and a law firm, Ropes Gray, so
20  to find somebody in that building is a
21  monumental effort.
22     Q.   Just -- all right.
23     A.   But I did get a copy of it in
24  connection with this litigation.
25     Q.   This was a production from your

1  firm, correct?  I mean, there are no exhibit
2  labels, but --
3     A.   It looks like my -- it looks like
4  my handwriting on the bottom.
5     Q.   Okay.
6     A.   So I will say I have produced this.
7     Q.   Okay.  And then the next document
8  within this production is the $2 million
9  promissory note?
10     A.   Which I believe I received attached
11  to this notice of event of default, which is
12  what Exhibit 14 is.
13     Q.   And when you say you received these
14  documents in connection with this litigation,
15  what do you mean by that?
16     A.   I believe I had made inquiry and
17  someone had sent this to me, not in the mail --
18  not with the notice, but at some later point.
19     Q.   Who is the someone?
20     A.   I believe it was Eric Herschmann,
21  but I don't recall.
22     Q.   What caused you to make inquiry?
23     A.   I believe I had some subpoenas, and
24  I was gathering documents.
25     Q.   And then what's the last page to

1  this production?
2     A.   This was probably -- oh, I don't
3  think it's attached.  Well, actually, this is
4  an interesting document.  This is evidence that
5  the $875,000 that was received by my firm in
6  connection with the 2013 settlement was
7  exclusively used to pay for Arie Genger's legal
8  fees.
9     Q.   Why is it that the only e-mail
10  you're able to find with written instructions
11  over the course of, you know, millions of
12  dollars and covering a hundred or so invoices,
13  was the one in which there was some sort of
14  dispute as to allocation before the Court?
15     A.   Again --
16     Q.   Is that a coincidence?
17     A.   I don't recall having gotten -- I
18  don't recall how this got there or how this
19  came about, whether this was -- I don't know
20  how this came into my possession, but I don't
21  think I got it from my e-mail.
22     Q.   Someone gave it to you?
23     A.   Yes, someone gave this to me,
24  'cause -- and maybe in connection with these
25  other documents.  But I didn't even recall that

1  this was produced or attached.
2     Q.   Okay.
3     A.   But it certainly lays to rest your
4  initial inquiry into this matter, I would
5  presume.  Right?
6     Q.   So --
7        MR. GENGER:  Don't address my
8  counsel.
9        MR. HARRIS:  Well, then stop
10  snarking.
11     Q.   So how did you record the annual
12  amounts of legal fees?  Was there some sort of
13  -- you obviously showed me one chart, which
14  appeared to be prepared for purposes of
15  litigation.  But how did you record
16  contemporaneously the amounts that were owed on
17  an annual basis, as reflected in those
18  promissory notes?
19     A.   Amounts that were owed on an annual
20  -- I would either keep some internal
21  spreadsheets or just some working papers.
22     Q.   Where are those working papers or
23  spreadsheets?
24     A.   I -- at some point, Bill Fisher
25  took over and he prepared a spreadsheet, which



**Exhibit A**

1 I think he sent you. And I don't have any
2 papers anymore. This was all done, and it's
3 all done now by Bill Fisher.
4    Q.   Okay. So I'll represent to us that
5 Mr. Fisher said he first started collaborating
6 with you on the calculation of the fees in
7 2015. Do you agree with that?
8    A.   Sounds about right.
9    Q.   So he said from 2007 to 2014, the
10 task was exclusively yours, and then you worked
11 together on it from 2015 onwards?
12    A.   That sounds about right.
13    Q.   Okay. So the records from how you
14 came about these calculations from 2007 to
15 2014, where do they exist?
16    A.   I had work papers that I had sent
17 to Bill Fisher that he then used to create his
18 spreadsheet, which then I signed off on, and
19 that became the official report.
20    Q.   Okay. Now, we've gone --
21 Mr. Fisher has produced some e-mails, Arie's
22 produced some e-mails between you, Mr. Fisher
23 and Arie, and we don't see any reference in any
24 of them to any promissory notes reflective of
25 these -- of Arie's payment of legal fees on

1 Orly's behalf. Do you have an understanding as
2 to why that may be?
3    A.   I have -- it has always been a
4 loan. It's always been reflected as a loan. I
5 have no idea why the term "promissory note" has
6 not appeared in whatever documents you've
7 received. Has the word "loan" appeared? I'd
8 be shocked if the word "loan" hasn't appeared.
9    MR. DELLAPORTAS: Let's mark as
10 Harris 15 a chart labeled Arie Genger schedule
11 of amounts due.
12    (Whereupon, Harris Exhibit 15,
13 chart labeled Arie Genger schedule of amounts
14 due, was marked for identification as of this
15 date by the reporter.)
16    Q.   Now, Mr. Harris, do you recognize
17 this chart?
18    A.   Yes.
19    Q.   And Mr. Fisher indicated that the
20 2007 to '14 numbers came from your firm?
21    A.   Yes. That was the papers I
22 referred to earlier that were provided to
23 Mr. Fisher to create the '07 to '14 column.
24    Q.   Why didn't you just give them the
25 promissory notes for those years, rather than

1 add up the law firm numbers?
2    A.   Because we were keeping track by
3 law firm.
4    Q.   You were also keeping track by
5 promissory note, correct?
6    A.   By annual period.
7    Q.   Wouldn't that have been nice to
8 give him to at least double-check the numbers
9 you have given him?
10    A.   I don't recall what information I
11 provided to him in total, but the total amount
12 due was most important, and the firm's was most
13 important, and this is the amount owed by Orly.
14 And, you know, he was also keeping track of, as
15 indicated by his notes, what Arie was paying in
16 legal fees. So this was the best check and
17 balance of both the debt owed to Orly and the
18 expenditure that Arie was incurring on his own,
19 and make sure that there's no double billing,
20 double amounts. So I think this would be the
21 best -- I mean, as far as I was concerned, this
22 would be the best way to reflect and report all
23 of these numbers.
24    Q.   Did you make Mr. Fisher aware of
25 the existence of promissory notes reflective of

1 these amounts?
2    A.   Yes. He always knew this was a
3 loan and debt. And as I indicated earlier, on
4 an annual basis, I would speak to him about the
5 midterm AFR.
6    Q.   Thank you, but that's not what I
7 asked.
8    Did you make him, Mr. Fisher aware
9 that there were promissory notes in existence
10 at that time reflecting the debts for 2007 to
11 2014?
12    A.   Yes.
13    Q.   You did make him aware of that?
14    A.   Absolutely. He knew there were
15 promissory notes. He absolutely knew there
16 were promissory notes.
17    MR. DELLAPORTAS: We will take a
18 break, but we are not done.
19    (Whereupon, a recess was taken.)
20    MR. DELLAPORTAS: So we have no
21 further questions. We obviously have a lot of
22 open document issues. The one thing we would
23 reemphasize, although they're all important, is
24 that in particular with regard to the ten
25 promissory notes reflected in the $5.3 million



1  note, if you have any contemporaneous records
2  reflecting that those promissory notes ever
3  existed, we would ask that you produce them
4  right away, because it's our intention to go
5  seek a court order scanning your hard drives,
6  if necessary, to see if they exist. So please
7  take that under advisement. Thank you.
8           (Time Noted: 12:50 P.M.)
9
10          LANCE G. HARRIS
11
12  Subscribed and sworn to before me
13  this     day of      , 2019.
14
15
16
17
18
19
20
21
22
23
24
25

1           DEPOSITION ERRATA SHEET
2
3  Esquire Deposition Assignment No. J4114147
4  Case Caption:  Sagi Genger v. Orly Genger
5
6      DECLARATION UNDER PENALTY OF PERJURY
7      I declare under penalty of perjury that
8  I have read the entire transcript of my
9  deposition taken in the captioned matter or
10  the same has been read to me, and the same is
11  true and accurate, save and except for changes
12  and/or corrections, if any, as indicated by me
13  on the DEPOSITION ERRATA SHEET hereof, with
14  the understanding that I offer these changes
15  as if still under oath.
16      Signed on the      day of
17          , 20
18
19      LANCE G. HARRIS
20
21
22
23
24
25

1
2           C E R T I F I C A T E
3  STATE OF NEW YORK   )
4  COUNTY OF KINGS     )
5
6      I, YULIYA YEMTSOVA, a Notary Public
7  within and for the State of New York, do
8  hereby certify:
9      That LANCE G. HARRIS, the witness
10  whose deposition is hereinbefore set
11  forth, was sworn and that such
12  deposition is a true record of the
13  testimony given by such witness.
14      I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage and that I
17  am in no way interested in the outcome
18  of this matter.
19      IN WITNESS WHEREOF, I have hereunto
20  set my hand this 14th day of May, 2019.
21
22
23
24          YULIYA YEMTSOVA
25

1
2           DEPOSITION ERRATA SHEET
3  Page No. _____ Line No._____ Change to:_____
4  _____
   Reason for change:_____
5
6  Page No. _____ Line No._____ Change to:_____
7  _____
   Reason for change:_____
8
9  Page No. _____ Line No._____ Change to:_____
10  _____
   Reason for change:_____
11  Page No. _____ Line No._____ Change to:_____
12
13  _____
   Reason for change:_____
14  Page No. _____ Line No._____ Change to:_____
15
16  _____
   Reason for change:_____
17  Page No. _____ Line No._____ Change to:_____
18
19  _____
   Reason for change:_____
20  Page No. _____ Line No._____ Change to:_____
21
22  _____
   Reason for change:_____
23  SIGNATURE:_____DATE:_____
24          LANCE G. HARRIS
25



**Exhibit A**

```
 1
 2        DEPOSITION ERRATA SHEET
 3   Page No._____ Line No._____ Change to:_____
     _____
 4
     Reason for change:_____
 5
     Page No._____ Line No._____ Change to:_____
 6
     _____
 7
     Reason for change:_____
 8
     Page No._____ Line No._____ Change to:_____
 9
     _____
10
     Reason for change:_____
11
     Page No._____ Line No._____ Change to:_____
12
     _____
13
     Reason for change:_____
14
     Page No._____ Line No._____ Change to:_____
15
     _____
16
     Reason for change:_____
17
     Page No._____ Line No._____ Change to:_____
18
     _____
19
     Reason for change:_____
20
     Page No._____ Line No._____ Change to:_____
21
     _____
22
     Reason for change:_____
23
     SIGNATURE:_____DATE:_____
24
              LANCE G. HARRIS
25
```

```
 1   May 14, 2019
 2
 3
 4              I N D E X
 5   EXAM BY                              PAGE
     MR. DELLAPORTAS                        5
 6
 7
 8              E X H I B I T S
 9   FOR IDENTIFICATION                   PAGE
     Harris Exhibit 1-2, Subpoenas          5
10
     Harris Exhibit 3, dates of drafts of   6
11   Amended and Consolidated Secured
     Promissory Note
12
     Harris Exhibit 4, Genger litigation   46
13   trust agreement
14   Harris Exhibit 5, February 8, 2019,   64
     production
15
     Harris Exhibit 6, Genger payments     70
16   IOLA 4/24/19
17   Harris Exhibit 7, Checks, first one   78
     dated January 24, 2014
18
     Harris Exhibit 8, Checks, first one   78
19   dated 7/3/13
20   Harris Exhibit 9, Northern Trust      80
     bank statement
21
     Harris Exhibit 10, Morgan Stanley     82
22   bank statement
23   Harris Exhibit 11, Vanguard           83
     statement
24
     Harris Exhibit 12, Document from      84
25   Stein & Harris, dated September 28,
     2018
```

```
 1
 2        DEPOSITION ERRATA SHEET
 3   Page No._____ Line No._____ Change to:_____
     _____
 4
     Reason for change:_____
 5
     Page No._____ Line No._____ Change to:_____
 6
     _____
 7
     Reason for change:_____
 8
     Page No._____ Line No._____ Change to:_____
 9
     _____
10
     Reason for change:_____
11
     Page No._____ Line No._____ Change to:_____
12
     _____
13
     Reason for change:_____
14
     Page No._____ Line No._____ Change to:_____
15
     _____
16
     Reason for change:_____
17
     Page No._____ Line No._____ Change to:_____
18
     _____
19
     Reason for change:_____
20
     Page No._____ Line No._____ Change to:_____
21
     _____
22
     Reason for change:_____
23
     SIGNATURE:_____DATE:_____
24
              LANCE G. HARRIS
25
```

```
 1   Harris Exhibit 13, E-Mail from        86
     Michael Futterman, dated October 9,
 2   2018
 3   Harris Exhibit 14, Document           92
     production from Mr. Harris, dated
 4   September 16, 2018
 5   Harris Exhibit 15, Chart labeled      98
     Arie Genger schedule of amounts due
 6
 7
     REQUESTS FOR PRODUCTION              PAGE
 8   Communication between Arie and the    21
     witness as to Orly's promissory note
 9
     Actual word documents with metadata   26
10   on it
11   Anything with regard to the above     45
     referred loan
12
     Source of the Orly payment for the    77
13   wire
14   The 2015 payments, the three wires    78
     that the witness appears to receive
15   directly from Orly
16   All records associated with both      83
     Harris 9 and Harris 10, including
17   any bills paid thereby
18   Records associated therewith also be  84
     produced
19
     Promissory notes reflected in the    100
20   $5.3 million note, any
     contemporaneous records reflecting
21   that those promissory notes ever
     existed
22
23
24
25
```



**Exhibit A**