# IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CHAPTER 7** |
| **ORLY GENGER,** | § | |
| | § | **CASE NO. 19-10926-TMD** |
| **Debtor.** | § | |

**OBJECTION AND RESPONSE OF JUDGMENT CREDITOR
SAGI GENGER TO THE TRUSTEE'S APPLICATION UNDER
FEDERAL RULE OF BANRUPTCY PROCEDURE 9019 AND
<u>LOCAL RULE 9019 TO APPROVE COMPROMISE</u>**

EMMET, MARVIN & MARTIN, LLP
Thomas A. Pitta (*Pro Hac Vice* Admission Pending)
John Dellaportas
120 Broadway
New York, NY 10271
(212) 238-3000
tpitta@emmetmarvin.com
jdellaportas@emmetmarvin.com

Sabrina L. Streusand
State Bar No. 11701700
Streusand Landon, Ozburn & Lemmon, LLP
1801 S. MoPac Expressway, Suite 320
Austin, Texas 78746
(512) 236-9901 (Telephone)
(512) 236-9904 (Facsimile)
streusand@slollp.com

*Attorneys for Judgment Creditor
Sagi Genger*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .........................................................................................1

    A.  The Substantive Terms of the Settlement Agreement
        Are Indefensible................................................................................................1

    B.  The Settlement Agreement Allows the Wealthy Debtor to
        Complete Over a Decade of Efforts to Shield Her Assets
        from Her Rightful Creditors...............................................................................3

ARGUMENT ...............................................................................................................6

    A.  Probability of Success in Litigation, with
        Consideration for Uncertainty in Fact and Law.....................................7

    B.  Complexity and Likely Duration of Litigation and
        Any Attendant Expense, Inconvenience, and Delay,
        Including Difficulties, if any, to be Encountered in Collection...........13

    C.  Paramount Interest of Creditors and Proper
        Deference to Their Respective Views....................................................14

    D.  Extent to Which Settlement is Truly the Product of
        Arm's-Length Bargaining (Not Fraud or Collusion)...........................16

    E.  All Other Factors Bearing on the Wisdom of the Compromise...........19

CONCLUSION..........................................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Genger v. Genger,*
  76 F. Supp. 3d 488 (S.D.N.Y. 2015),
  *aff'd*, 663 F. App'x 44 (2d Cir. 2016)....................................................... 3, 4, 9

*Genger v. Genger,*
  2018 WL 3632521 (S.D.N.Y. July 27, 2018),
  *aff'd*, 771 F. App'x 99 (2d. Cir. 2019)............................................................ 3, 9

*In re ASARCO LLC,*
  2009 WL 8176641 (Bankr. S.D. Tex. June 5, 2009) ....................................... 7, 14

*In re AWECO, Inc.,*
  725 F.2d 293 (5th Cir. 1984) ................................................................................ 22

*In re Devon Capital Management,*
  261 B.R. 619 (Bankr. W.D. Pa. 2001) ................................................................. 22

*In re JNS Aviation, LLC,*
  350 B.R. 283 (Bankr. N.D. Tex. 2006)............................................................ *passim*

*In re Moore,*
  608 F.3d 253 (5th Cir. 2010) ................................................................................... 7

*In re U.S. Brass Corp.,*
  255 B.R. 189 (Bankr. E.D. Tex. 2000) ................................................................... 6

*In the Matter of Gary M. BEACH,*
  2017 WL 2861282 (5th Cir. 2017) .......................................................................... 7

*Matter of Foster Mortg. Corp.,*
  68 F.3d 914 (5th Cir. 1995) ...................................................................... 7, 14, 15

*Matter of Jackson Brewing Co.,*
  624 F.2d 605 (5th Cir. 1980) ................................................................................... 7

*Matter of Cajun Electric Power Cooperative, Inc.,*
  119 F.3d 349 (5th Cir.1997) .................................................................................... 6

*TR Investors, LLC v. Genger,*
  2013 WL 603164 (Del. Ch. Feb. 18, 2013) .......................................................... 10

*U.S. Bank Nat. Ass'n ex rel. CWCapital Mgmt. LLC v. Vill. at Lakeridge, LLC,*
  138 S. Ct. 960 (2018).............................................................................................. 15

**Regulations, Rules and Additional Authorities**

Black's Law Dictionary (10th ed. 2014)........................................................................................ 15

Fed. R. Bankr. P. 9019 ..................................................................................................................... 1

Fed. R. Bankr. P. 9019(a) ............................................................................................................... 6

Local Rule 9019 ............................................................................................................................... 1

Judgment Creditor Sagi Genger ("**Sagi**"), by and through his undersigned counsel of record, hereby files this Objection to the Application Under Federal Rule of Bankruptcy Procedure 9019 and Local Rule 9019 to Approve Compromise (the "**Settlement Motion**") filed by Ron Satija (the "**Trustee**"), the trustee in the above-captioned chapter 7 bankruptcy case. In support of his objection, Sagi respectfully states as follows:

## PRELIMINARY STATEMENT

A.    The Substantive Terms of the Settlement Agreement Are Indefensible

1.    The Settlement Agreement could only be based on the Trustee's complete misunderstanding of the true assets of the estate. This misunderstanding is not a mistake. The Debtor (Orly Genger) ("**Orly**" or "**Debtor**") her husband Eric Herschmann ("**Herschmann**"), her father Arie Genger ("**Arie**"), and the Broser parties (collectively, "**Team Arie**") have spent years and millions of dollars to create the fallacy that Orly Genger has no assets in an effort order to frustrate the promises she made to her mother, Dalia Genger ("**Dalia**") and brother, Sagi. The Settlement Agreement, which contravenes the express findings of multiple federal courts, would finally accomplish that goal.

2.    The most glaring failure on the part of the Trustee is that the Settlement Agreement proposes to give away $15 million that is clearly an asset of the estate for *de minimus* consideration. While the two $7.5 million notes (the "**Notes**") currently held in escrow by Kasowitz partner, Michael Bowen, were not included in the Debtor's deficient schedules, there is no basis to argue that they are not assets of the estate.

3.    The Notes are part of the proceeds of the settlement of the litigation between Arie and Orly on the one hand and the Trump Group on the other hand. Because Arie's underlying claims had been extinguished by the time of the settlement, the U.S. District Court

twice determined (both times affirmed by the Second Circuit) that all of those proceeds belonged to Orly.  Orly thus remains the beneficial owner of the Notes.  Indeed, ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████.  The Trustee, incredibly, has abandoned $15 million for a mere $750,000.  That itself should be sufficient to prevent approval of the Settlement Agreement.

4.     In addition to the inexplicable forfeiture of nearly $15 million, the Settlement Agreement also releases $25 million in additional, viable fraudulent transfer claims against the Broser parties (who have the means to pay them) for a mere $250,000, based on the false statement that the claims have expired.  As set forth below, they have not.

5.     Next, the Settlement Agreement allows the Debtor's husband, Herschmann, to purchase her 50% ownership interest in their jointly-held condominium atop the W Hotel in downtown Austin (the "**Austin Condominium**") for $200,000, notwithstanding her interest having a market value of nearly $1.75 million.

6.     Further, the Settlement Agreement purports to release parties—specifically, Herschmann, Arie, Kasowitz and the Brosers—who have committed repeated acts of fraud on the courts in New York and Delaware, false testimony under oath, falsification and backdating of documents, and other misconduct, without any effort to explain the wrongful conduct being released.  Perhaps most egregiously, the Settlement Agreement would release the estate's one-year preference claim against Arie Genger, the Debtor's father, who placed a patently fraudulent $5.4 million lien on the Debtor's assets within a year of this case filing and

pledged his assets back to the Debtor's husband, Herschmann, and thus, post-discharge, to the Debtor herself.

7.     Thus, even the paltry sums collected under this Settlement Agreement would go right back to the Debtor, with not a penny to her legitimate creditors.

8.     The Trustee tries to justify the lopsided bargains in the Settlement Agreement by arguing that, in exchange, he has secured the agreement of the (highly-conflicted) Kasowitz firm to pursue four suits "against Dalia and other parties on a very favorable contingency fee basis." Settlement Motion at ¶12.  What he neglects to tell the Court is that two of those suits seek no money damages, one other has already been dismissed (a result the New York court recently reaffirmed), and the fourth has been found by the Court-appointed accountant to have damages of no more than $30,000.  He also neglects to inform the Court that "the very favorable contingency basis" (33%) for that final suit is *worse* than ██████████████ ██████████████████████████████████.

B.     The Settlement Agreement Allows the Wealthy Debtor to Complete Over a Decade of Efforts to Shield Her Assets from Her Rightful Creditors

9.     The Settlement Agreement presents, as its factual recitation, an alternative reality from the one adjudicated by the parties in multiple federal court actions.  This submission, by contrast, reflects the findings of the U.S. District Court for the Southern District of New York in two final decisions, both unanimously affirmed by the U.S. Court of Appeals for the Second Circuit. *See Genger v. Genger*, 76 F. Supp. 3d 488, 501 (S.D.N.Y. 2015) ("***Genger I***"), *aff'd,* 663 F. App'x 44 (2d Cir. 2016); *Genger v. Genger*, 2018 WL 3632521 (S.D.N.Y. July 27, 2018)

("**_Genger II_**"), *aff'd,* 771 F. App'x 99 (2d. Cir. 2019).  As the debtor was a party to those actions, her Trustee should not be permitted to relitigate their findings in this action.[1]

10.      As part of their parents' divorce, Orly and Sagi received beneficial interests in their mother Dalia's shares of a family-owned company called Trans-Resources Inc. ("**TRI**"), subject to their mutual agreement to share the proceeds of those shares with Dalia to the extent she later required their financial assistance.  Since Orly was on vacation in Fiji at the time the divorce was finalized, her agreement to share in that responsibility was structured as an agreement to indemnify Sagi for 50% of the amounts he paid to their mother.  Sagi has lived up to his end of that bargain.  Orly has not only refused to do so, but has spent years litigating with her mother and brother to avoid her obligations. *See Genger I,* 76 F. Supp. 3d at 500.  The only (alleged) claims against the estate other than those of Sagi and Dalia are the costs of the litigation against them, which Orly now seeks to use as the tool to finally avoid her responsibilities.  The Debtor does not come to this process with clean hands, and this Court should consider that in connection with any settlement to which she is a party.

11.      Kasowitz is also not an ally of the rightful creditors of the Debtor, and any agreement that includes their retention on behalf of the estate is fundamentally flawed.  Kasowitz has been complicit in, if not one of the primary orchestrators of, Orly's efforts to escape her obligations.  Under the direction of her husband, Kasowitz senior partner Herschmann, the firm assisted Orly in sheltering assets, falsified documents to create bogus claims against the estate, lied under oath, and prosecuted specious litigation to prevent the repatriation of assets to Orly.  The Settlement Agreement would enable Herschmann to reap the benefit of assets that are rightfully Orly's, and use them to continue Orly's life of luxury post-discharge.

---

[1]      Upon the appointment of the chapter 7 trustee, Sagi and his counsel met with Mr. Satija and his counsel and offered to provide him with all of the information set forth in this submission.  Regrettably, the Trustee did not take Sagi up on his offer, and his Settlement Application is replete with false statements.

12. Similarly, the Broser parties do not have the interests of the estate in mind. Despite never having been creditors of the Debtor, they have participated in the scheme to deprive Orly's estate of assets that rightfully belong to it, and profited handsomely in the process. Ironically, the Motion itself gives lie to the problem with the Brosers when it states that "ADBG (an entity owned by the Brosers) continues to be owed millions of dollars by Arie." Settlement Motion at ¶7. Arie Genger, not Orly, allegedly owes the Brosers millions of dollars, but it is Orly's property that the parties have used and seek to continue using to satisfy Arie's obligations to the Brosers, even though the Brosers freely admit that Orly does not owe them a single dollar. *See*, Exh. J.

13. Orly Genger, the purported chapter 7 debtor in this case, lives in a collection of five multi-million dollar homes around the world. She has access to a car collection that has included a Rolls Royce, a Bentley, and a Lamborghini. Her husband, Herschmann, who received a severance package from a prior position worth approximately $50 million plus use of a corporate jet, is now a member of the Kasowitz firm, which produces profits per partner in excess of $2 million per year. Orly has a black American Express card that Herschmann pays for and upon which she regularly incurs charges of over $10,000 per month.

14. Of course, in addition to the wealth that her husband brings to the marriage, Orly is also the beneficiary of the $32.3 million she won through the Trump Settlement, which she has attempted to shelter in other people's names since before the Trump Settlement was even agreed to. Pursuant to litigation that was pending in the Southern District of New York, all or a significant portion of that value was on the verge of being brought back into Orly's name for the benefit of her creditors. The Debtor filed this case specifically in order to avoid the threat of that decision being issued imminently. Notwithstanding Orly's luxurious

lifestyle and her access to untold millions of dollars, she now presents herself to the court as a chapter 7 debtor in order to wipe out her obligations to Sagi and Dalia.

15.     The Settlement Agreement would do just that and would reward the misdeeds of Team Arie.  It would give them releases and implicit approval of the fraudulent transfers of the Debtor's assets in exchange for nominal payments.  Rather than allow the SDNY to issue its decision with respect to those fraudulent transfers, the Trustee proposes to settle those claims for a tiny fraction of the amounts the parties absconded with.

16.     Compounding the injustice that releasing the perpetrators of millions in fraudulent transfers would represent is that the Settlement Agreement is centered around giving Kasowitz free reign to continue litigating with Sagi and Dalia (which litigation has been a losing proposition for Orly at all stages).  Sagi and Dalia would be subject to potentially years of expensive, spiteful litigation, while the valid derivative counter-claims they currently assert will have been released pursuant to the Settlement Agreement.

17.     As stated herein, if the case is not dismissed or transferred, the Settlement Agreement must not be approved.  The Trustee should be instructed instead to continue Sagi's work to recover Orly's assets for the benefit of her rightful creditors.

## ARGUMENT

18.     Rule 9019(a) of the Federal Rules of Bankruptcy Procedure governs the bankruptcy court's authority to approve settlements.  This rule provides that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

19.     In order to approve a settlement, the Court must conclude that the proposed settlement is "'fair and equitable'… and in the best interests of the estate." *In re U.S.*

*Brass Corp.*, 255 B.R. 189, 192 (Bankr. E.D. Tex. 2000), *aff'd In re U.S. Brass Corp.*, 301 F.3d 296 (5th Cir. 2002) (citation omitted). To determine whether a settlement meets the "fair and equitable" standard, the bankruptcy court must "apprise [itself] of the relevant facts and law so that [the court] can make an informed and intelligent decision…" *Matter of Cajun Elec. Power Co-op., Inc.,* 119 F.3d 349, 356 (5th Cir. 1997) (citation and quotation omitted). Thus, the court must be presented with facts sufficient to enable it "to evaluate the reasonableness of the proposed compromise, and must reject the settlement if such facts are not presented…<u>The burden is on the settlement proponent – here, the Trustee – to make this showing</u>." *In the Matter of Gary M. BEACH*, 2017 WL 2861282, 33 (5th Cir. 2017) (emphasis added).

20.     "[I]n the bankruptcy context, the interest of the creditors not the debtors are paramount." *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) (citation and quotation omitted). Five factors are used by courts to perform the "fair and equitable" analysis and thereby determine whether the settlement advances the creditors' interests: "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection; (3) the paramount interest of the creditors and a proper deference to their respective views; (4) the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and (5) all other factors bearing on the wisdom of the compromise." *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010); *accord Matter of Foster Mortg. Corp.*, *supra*.

A.      Probability of Success in Litigation, with
        <u>Consideration for Uncertainty in Fact and Law</u>

21.     In evaluating the debtor's probability of success in litigation, "it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in

the settlement. The court need not resolve disputed issues but should apprise itself of the relevant facts and law so that it can make an informed and intelligent decision as to the reasonableness of the settlement." *In re ASARCO LLC,* 2009 WL 8176641, at *10 (Bankr. S.D. Tex. June 5, 2009) (internal citation omitted). The court must conclude that a substantial controversy with an uncertain outcome exists. *Matter of Jackson Brewing Co.,* 624 F.2d 605, 610 (5th Cir. 1980) (affirming approval of settlement where "the Court concluded that there was a substantial controversy between the Trustee and the [defendant] with an uncertain resolution").

22. The approval of settlements is not automatic and must be thoroughly examined by the bankruptcy court. In *In re JNS Aviation, LLC*, 350 B.R. 283 (Bankr. N.D. Tex. 2006), for example, the trustee moved for approval of the proposed settlement of fraudulent conveyance and other claims. The court rejected the proposed settlement and held that the approval was not warranted, finding that there was a "fundamental misunderstanding … concerning what [was] being settled." *Id*. at 292. In that regard, the *JNS Aviation* Court noted, *inter alia*—as is true in this case—that the "debtor's schedules are of little help. Every statement, representation, and disclosure is conditioned in some fashion. The condo…*may* be owned by the debtor; its value 'may not be accurate.'" *Id.* at 293.

23. Similarly, the Trustee in this case glosses over the forfeiture of the $15 million Notes (copies of which are annexed hereto as Exh. L), stating that "[t]he only testimony is that Orly had no interest in any future payments related to the Trump Settlement." Settlement Motion at ¶26. There is no polite gloss that can be placed on this statement; it is simply a fabrication.

24. In the federal court action, Orly was expressly asked in her interrogatories to: "[i]dentify the amount, date, and recipient of all payments made and/or to be made to any

person or entity pursuant to Defendant's 2013 settlement" (which includes the $15 million Notes). Exh. A at 16. Orly responded, under oath, that she had "no knowledge." *Id*. at 17. Her attorney, Kasowitz partner Michael Bowen (who also happens to be, not coincidentally, the noteholder), signed the same interrogatories, and also testified under oath, on behalf of the Kasowitz firm that: "We don't have any information about any agreements" concerning payments yet to come due under the Agreement. Ex. B at 32. Both of these sworn statements turned out to be false, but not in a way that supports the Trustee's position. Rather, ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████. Obviously, this completely contradicts the Trustee's claim that Orly has "no interest" in these payments.

25.    Rather than try to reconcile their past sworn testimony with the agreement bearing their signature, the Debtor and her husband Herschmann have instead demanded—rather remarkably—that Your Honor himself must avert his eyes. In their respective October 3, 2019 Notices Regarding Supplemental Information Under Seal, both the Debtor and her husband insisted that such materials "should not be considered *or reviewed by* the Court in connection with any pending matter." (Docket 66 at ¶1; Docket 67 at ¶1) (emphasis added). Apparently, the Trustee agrees, as he has given away estate assets without bothering to review the agreement in question.

26.    Even were the Trustee's statement truthful, such testimony would be wholly irrelevant, as multiple court decisions have *conclusively determined* that the proceeds of

the Trump Settlement belong to Orly.  Judge Forrest of the Southern District of New York ruled that "Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement." *Genger I*, 76 F. Supp. 3d at 499.  Judge Forrest reiterated in a subsequent decision that "[b]ased on the prior rulings of this Court in *Genger I* (and the Second Circuit's subsequent affirmance in *Genger II*), it has been conclusively established that … Sagi and Orly monetized their beneficial interests in the TRI shares for a total of $69.3 million." *Genger II*, 2018 WL 3632521, at *6.  Curiously, the Trustee makes no mention of these decisions, despite being made aware of them prior to filing his Settlement Motion.

27.     Even absent these court rulings, the settlement proceeds could <u>only</u> belong to Orly.  Her co-parties to the 2013 Settlement Agreement, Arie and the Brosers, had no live claims to monetize. As Orly's counsel, Mr. Wachtel, explained, the Brosers (Arie's litigation funders) "are in this agreement because they are exchanging general releases and nothing more." Exh. C.  The Trump Group had earlier impleaded the Brosers into the state court suit as third party defendants, claiming that the Brosers' litigation funding of Arie's suit constituted illicit champerty and maintenance under New York law.  As for Arie, by the time the Settlement Agreement was signed, the Delaware Chancery Court had already extinguished his own claim to ownership of the TRI shares, and threatened to hold him in contempt if he did not immediately withdraw his duplicative New York claims against the Trump Group. *See TR Investors, LLC v. Genger*, 2013 WL 603164 (Del. Ch. Feb. 18, 2013).

28.     The $32.3 million paid by the Trump Group, including the $15 million Note, was and remains Orly's property and an asset of the estate.  What makes the Trustee's position so mystifying is that he is giving away assets that do not even require a collection suit.

While the $17.3 million previously fraudulently transferred to third parties would need to be recovered by the Trustee (alternatively, the Trustee could permit the pre-petition recovery action commenced by Sagi to proceed), all the Trustee has to do with respect to the $15 million is collect it once it is released pursuant to the escrow agreement.

29. In addition to forfeiting the $15 million Notes, with respect to the Broser Parties, the Trustee is settling more than $25 million in claims (the $17.3 million fraudulently conveyed to them in 2013 plus six years of 9% prejudgment interest under New York CPLR 5004) for an absurd $250,000, *i.e.,* less than one cent on the dollar. This represents yet another unjustifiable forfeiture by the Trustee. The Broser Parties received the entirety of the first $17.3 million received by Orly through the Trump Settlement notwithstanding that they had no claims against Orly and Arie had no claim to those proceeds. The Broser Parties have stated under oath that they had no claims against Orly and that the $17.3 million was paid in satisfaction of only Arie Genger's obligations to them. The Broser's counsel told the SDNY court that the "agreement that was put in place in 2012 was to protect the lender so that the first monies that were paid under the settlement agreement would go to pay the liability of <u>Arie Genger</u> under the credit agreement." Exh. D at 79. David Broser, in a deposition on October 23, 2018, testified that Orly Genger was never a borrower of his. Exh. E at 36. Indeed, the Settlement Motion itself concedes that "ADBG still claims to be owed millions of dollars by Arie in unpaid loan obligations." Settlement Motion at ¶7.

30. The Trustee also alleges in the Settlement Motion, without legal citation, that the statute of limitations with respect to the claims against the Broser Parties has passed. This is false. The applicable New York statute of limitations for fraudulent conveyances is six years, accruing on the date of the transfer. *See Aetna Life & Cas. Co. v. Nelson*, 67 N.Y.2d 169,

171 (1986).  In this case, the $17.3 million was transferred on July 1, 2013.  Sagi has brought two proceedings to set aside that conveyance.  The first is a post-judgment motion brought pursuant to CPLR 5225(b) and CPLR 5227 in an action filed on October 24, 2017. *Genger v. Genger,* Case No. 2017cv08181 (S.D.N.Y.).  The second is a plenary action filed on June 28, 2019. *Genger v. Broser*, Case No. 2019cv06100 (S.D.N.Y.).  Both actions are assets of the estate that the Trustee can prosecute or permit Sagi to continue prosecuting.

31.     The Trustee tries to justify this forfeiture by claiming that "Orly assigned any such proceeds to the Genger Litigation Trust in 2012, well outside of the applicable statutes of limitations for fraudulent conveyance claims." Settlement Motion at ¶26.  This, too, is false.  New York EPTL Section 7-1.18 provides that "transfer is not accomplished by recital of assignment, holding or receipt in the trust instrument," but rather by actual transfer or recording of the transfer, neither of which was done in 2012.  *See In re Estate of Rothwell*, 189 Misc. 2d 191 (Surr. Ct. Dutchess County 2001) (holding that simply attaching a schedule, which recited that certain assets belonged to trust, was not sufficient; the grantor was obligated to actually transfer the assets).

32.     Had the Trustee presented the proposed Settlement Agreement to the creditors, this and other important context for the flaws of the Settlement Agreement could have been explained to him.  Unfortunately, he did not do so and appears to have taken at their word the very parties who perpetrated and effectuated the fraudulent conveyances such that those conveyances could not be undone.  The failure to perform the due diligence necessary to understand the implications of the Settlement Agreement should be disqualifying.

33.     Lastly, the Trustee has also effectively forfeited with respect to the Debtor's interest in the Austin Condominium and the claims against the Broser Parties.  The

Austin Condominium, an extreme luxury condominium in the W Hotel, appears to have a market value of approximately $3.5 million. Exh. M. The Debtor owns an undivided 50% interest in the property, but asserts a homestead exemption with respect thereto. Additionally, Herschmann asserts a lien upon the Debtor's interest in the Austin Condominium. While strong arguments exist against both the homestead exemption and the lien asserted by Herschmann, the Settlement Agreement provides for Herschmann to pay just $200,000 for the Debtor's interest in the Austin Condominium, an almost 90% discount from fair market value. *See id.*

34. The Trustee also relies on Herschmann's agreement to cause Kasowitz to provide legal services to the Trustee to justify the settlement with respect to the Austin Condominium. For the reasons stated below, zero if not negative value should be attributed to this settlement on account of that retention.

35. In sum, the probability of success with respect to (a) the collection of the $15 million Notes, (b) the fraudulent transfer claims against the Broser Parties, and (c) the monetization of Orly's share of the Austin Condominium is night-and-day better than the Settlement Agreement implies and the Settlement Agreement falls well below the lowest point in the range of reasonable outcomes. To forego approximately $45 million in estate assets and claims for $400,000 plus a conditional payment of $750,000 is simply not in keeping with the high probability of success the litigation would bring to the estate if properly prosecuted.

B.     Complexity and Likely Duration of Litigation and
         Any Attendant Expense, Inconvenience, and Delay,
         Including Difficulties, if any, to be Encountered in Collection

36. While the litigation the Trustee is settling has been long and drawn out, it is largely coming to its conclusion. Ironically, the impending nature of that conclusion is why this bankruptcy case was commenced in the first place. Orly's liabilities to Sagi and Dalia had been established by final court orders and Sagi's fraudulent transfer motion was fully briefed

before the District Court as of June of this year. Team Arie was just a few days away from filing their responses to the motion (after procuring a lengthy extension from Sagi, supposedly on the grounds of Mr. Bowen's vacation schedule). That motion has the potential to bring tens of millions of dollars into Orly's estate in relatively short order.

37.     The issues in the case are not particularly complex either. Nearly $20 million of the Debtor's money was paid to the Brosers despite them admittedly not having any claims against her. Additionally, the claims of Arie and the Debtor's husband were manufactured for purposes of frustrating Orly's legitimate creditors[2]. The underlying facts are either undisputed or already adjudicated by the federal courts.

38.     No litigation should be needed at all with respect to the $15 million Notes. It is simply an asset of the estate that the Trustee should collect for the benefit of all the Debtor's creditors. To the extent the escrow agreement—which, in any event, reserves at least $8.5 million of the $15 million for future instruction — is not set aside as an obvious fraudulent conveyance, it can be rejected like any other executory contract. *See* Exh. K.

39.     Any litigation over the Debtor's homestead exemption and Herschmann's purported Homestead Lien should similarly not be overly complex or time-consuming. These are issues that are routinely addressed in Texas bankruptcy cases and that this Court is perfectly capable of disposing of in a timely manner. Indeed, on its face, the parties' Deed of Trust only creates a lien "[t]o and only to the extent that it is determined that homestead protection has been waived by Grantor and by Grantee," which is not alleged here. Exh. F at 2. Thus, here as well, the Trustee incomprehensibly has given up estate assets for woefully deficient consideration.

C.     Paramount Interest of Creditors and Proper
        Deference to Their Respective Views

---

[2] The facts are clear and have already been laid out in more detail by Sagi in the fraudulent transfer motion.

40.    In *In re ASARCO LLC*, the court held that "[i]n evaluating the interests of the creditors, the court must take into account the consideration offered by the settling party and the degree to which the creditors object to determine whether the settlement furthers their best interests." 2009 WL 8176641, at *10.  That standard plainly is not met here.

41.    In *Matter of Foster Mortg. Corp.*, for example, the Fifth Circuit found that the district court's approval of the settlement agreement was an abuse of discretion, reversed the district court's ruling, vacated the settlement and remanded for further proceedings. 68 F.3d at 919. The court there found that the district court "abused its discretion by not showing proper deference to the views of the creditors" when they gave no consideration to the following factors: (1) "nearly all creditors in interest opposed this settlement" and (2) "the settlement was reached between insiders without the participation of creditors." *Id.* at 918.

42.    In this case, Dalia and Sagi – the only creditors of the estate whose claims are based upon arm's length agreements with the Debtor reflecting actual liabilities – oppose the settlement because it gives away tens of millions of dollars in value that they have dedicated years and millions of dollars in fees to ensure would be available to satisfy Orly's obligations to her brother and mother.  The Settlement Agreement would permit this extraordinarily wealthy Debtor to keep the millions of dollars given to her by her mother without having to satisfy the obligation she took on in exchange for her mother's generosity.

43.    In refusing to approve the settlement there, the *Foster Mortgage* court also considered the fact that the opposing creditors there "were … prepared to bring [the claims the debtor was settling] and which it settled in haste as the creditors closed in. [The objecting creditors were] willing to forego the $1.65 million received by [the debtor] in favor of uncertain litigation to establish [the debtor's] right to greater loss payments." *Id.*  Similarly, as noted

above, Sagi has been prosecuting the fraudulent transfer claims the Trustee has settled on the cheap here.

D.   Extent to Which Settlement is Truly the Product of
     Arm's-Length Bargaining (Not Fraud or Collusion)

44.   The court in *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 968 (2018) defined an "arm's-length transaction [as] a transaction conducted as though the two parties were strangers" (quoting *Black's Law Dictionary* (10th ed. 2014)). The Settlement Agreement was entered into between the Trustee and a group of insiders, i.e. the Debtor, her husband, her father and parties that are owed money by her father but seek to collect it from her.   These parties have been coordinating a litigation effort to frustrate Orly's creditors for years.   While the presence of a trustee would normally suggest that a settlement was reached at arm's length, that presumption should not be applicable here, as the Settlement Motion would vindicate the fraud.   As demonstrated herein, the Trustee here clearly did not understand the Debtor's assets and liabilities when he entered into the Settlement Agreement and relied on the insiders for the factual background underlying the agreement.

45.   The most blatant aspects of Team Arie's fraudulent scheme—namely, the creation of phony encumbrances on the $15 million Notes—are the very ones which Trustee, through his Settlement Agreement, would validate.

46.   The plan to frustrate Orly's legitimate creditors, and thereby retain the full $32.3 million for Team Arie, appears to have been hatched shortly after the District Court awarded summary judgment to Sagi on January 5, 2015, and thereafter was accelerated when the Second Circuit affirmed the enforceability of the Debtor's 2004 indemnity obligation on September 29, 2016.   Key to the plan were three backdated documents, each of which Team Arie concealed until the District Court ordered them produced.

47.     The first backdated document is █████████████████████████
██████████████████████████████████████████████████████████████
████████████  ████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████████  █████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████.

48.     The second backdated document is Orly's ████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████. In March 2015, Mr. Herschmann told that court that: "I have a retainer letter that would reflect that all of the attorneys that are on the trial for Kasowitz are working pro bono." Exh. H at 957. █████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

████████████████████████████████████████████ Now the
Trustee appears to have agreed to a $1.5 million claim for Kasowitz and purports to replace this
pro bono legal arrangement with one whereby Kasowitz would receive one-third of any
recovery, calling it "very favorable."

49.     The third backdated document is the ████████████████████

████████████████████████     ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████.

50.     Now, the Trustee proposes not only to release all these parties from their
wrongful conduct, but to put the ringleader, the Kasowitz firm, in charge of litigating claims on
behalf of the estate for which the best that can be said is: "they are worthless."  The following
chart summarizes the four lawsuits the Trustee would like to pursue:

| *Case Name and Index No.* | *Case Status* |
| --- | --- |
| *In the matter of the Application of Orly Genger*, NY Cnty. Surrogate's Court File No. 001712008 | Orly's Third Amended Petition seeks no damages for the estate, only to replace Dalia Genger as trustee, even though she resigned three months ago. |
| *In the Matter of Petition of Dalia Genger*, NY Cnty. Surrogate's Court File No. 2008-0017/E | Orly is a counterclaim defendant in the proceeding, which seeks to recover the moneys she fraudulently conveyed in a fiduciary capacity as derivative plaintiff on behalf of the trust. |
| *Orly Genger, elc. v. Dalia Genger, et al.,* NY Cnty. Supreme Court Index No. 109749/09 | Last Spring, the court entered final judgment dismissing all the claims in the case.  Earlier this month, the court denied the Trustee's rehearing motion. There remains only an appeal, which would need to overcome the witness credibility findings made at trial. |

| Orly Genger v. Sagi Genger, NY Cnty. Supreme Court Index No100697108 | The Court-appointed CPAS and valuation expert has issued a 145-Page report assessing damages of $0-33,000, either of which would be subject to Sagi's +$3 million setoff . |
| --- | --- |

51.     It would be one thing for the Trustee to pursue these dubious claims on his own.  But in this case, Kasowitz has expressly conditioned its agreement to pursue these worthless claims on the Trustee giving away the store on everything else.  That is a deal that would create no benefit for the estate or its creditors.

E.     All Other Factors Bearing on the Wisdom of the Compromise

52.     In *In re JNS Aviation, LLC,* where Bankruptcy Court for the Northern District of Texas refused to approve a settlement, the Court found that:

> The debtor's schedules are of little help. Every statement, representation, and disclosure is conditioned in some fashion. The condo in Colorado may be owned by the debtor; its value "may not be accurate." The only other asset listed is the "fraudulent transfer claim" with no mention made of the other claims asserted by Nick Corp. Nick Corp.'s judgment of $1.8 million is listed as "disputed" although it was a final judgment ... James Shelton signed the schedules based on the "best information reasonably available." This bankruptcy case was obviously filed as a litigation tactic. The Sheltons and the other defendants preferred to deal with a bankruptcy trustee rather than Nick Corp. The result is that the Trustee is administering a bankruptcy case in which the only asset in the case is a pending lawsuit in which the Trustee seeks a recovery against the very parties that are charged with the responsibility of insuring that the debtor's assets are fully disclosed and recovered.

350 B.R. at 293 (emphasis added).

53.     This case presents an eerily similar situation to the *JNS Aviation* case.  Here, the Debtor's Schedules contain more caveats than they do information.  The Debtor specifically states in the "Global Notes" that precede her Schedules that she is "unable to warrant or represent the Schedules and Statements are without inadvertent errors, omissions or inaccuracies" and "[n]othwithstanding the foregoing, the Debtor shall not be required to update,

amend or supplement the Schedules and Statements, but reserves the right to do so." Docket No. 20 at 1-3. In fact, as the *JNS Aviation* schedules had not disclosed the debtor's interest in certain fraudulent transfer claims, the Debtor's Schedules (a) disclaim any interest in the fraudulent transfer claims asserted by Sagi in the New York litigation and (b) do not include <u>any</u> reference to the $15 million Notes, even though the Debtor has, even by her own admission, joint authority with her father to direct the proceeds of the Notes after payment of certain amounts enumerated under the escrow agreement. *See JNS Aviation*, 350 B.R. Of course, this failure is made ever worse in light of the fact that the Debtor is the actual owner of the Notes, as demonstrated above.

54. The Debtor here also discloses an interest in a condominium. Whereas the debtor in *JNS Aviation* stated that the value of the condominium there "may not be accurate", Orly simply states that the value of her ownership interest is "Unknown". *Id;* Docket No. 20 at 5. The Schedules also state that the current value of the Austin Condominium is $2,466,974.00, but that is the tax value assessed by Travis County, not a good faith estimate of the market value of the condominium. It appears from various online sources that the true market value of the condominium is likely closer to $3.5 million. Exh. M.

55. This case was also filed as a litigation tactic. Following a decade of litigation among the parties, the Debtor filed this case just days before Team Arie was set to have to answer Sagi's fraudulent transfer motion in the Southern District of New York. Clearly, they decided they would rather deal with a Trustee in Austin than a federal judge in New York, where they have consistently lost throughout this litigation, and where they have regularly impugned their credibility before those Courts by making false statements, refusing to provide discovery, falsifying documents and pursuing frivolous claims and defenses.

56.     Among the more baffling aspects of the Settlement Agreement is the Trustee's agreement to retain Kasowitz to represent the estate as special counsel in the litigations currently pending in the New York State Courts.  Kasowitz is not an ally of the rightful creditors of the Debtor, and any agreement that includes their retention on behalf of the estate is fatally flawed on that ground alone.  As set more fully in Sagi's other submissions, Kasowitz has been complicit in, if not one of the primary orchestrators of, Orly's efforts to fraudulently transfer assets out of her name in order to escape her obligations.  Under the direction of her husband, the firm has (a) assisted Orly in sheltering her assets, (b) falsified documents to create bogus claims against the estate, (c) lied under oath, and (d) prosecuted specious litigations to prevent the repatriation of assets to Orly's name.  Meanwhile, a significant portion of those assets have been transferred to Orly's husband and he uses them and his own extraordinary wealth to provide Orly, the chapter 7 debtor, a life of luxury.

57.     It would appear that Kasowitz's interest in being named counsel for the Trustee is rooted in the ability to spitefully continue litigating with Dalia and Sagi once all the counterclaims Dalia and Sagi could assert have been settled by the Trustee for a song.  The Court should not countenance this license to harass the rightful creditors of the estate and certainly should not consider Kasowitz's agreement to serve as counsel under the Settlement Agreement as a reason to approve that agreement.

58.     The *JNS Aviation* court held that "[t]he confusion between the parties concerning *what* they are settling coupled with [the creditor's] rejection of the settlement prevents this Court from approving the settlement." *JNS Aviation,* 350 B.R. at 293. This Court must similarly reject the Settlement Agreement because, as in *JNS Aviation,* the Trustee appears to be utterly confused as to what the Settlement Agreement settles, claiming that the estate will

still have "significant litigation claims against Dalia and other parties that belong to the bankruptcy estate." As noted above, the claims retained by the Trustee are anything but that.

59. Lastly, "[e]ven if a settlement is fair and equitable to the parties to the settlement, approval is not appropriate if the rights of others who are not parties to the settlement will be unduly prejudiced." *In re Devon Capital Management*, 261 B.R. 619, 623 (Bankr. W.D. Pa. 2001), citing *In re AWECO, Inc*., 725 F.2d 293, 297-98 (5th Cir. 1984). Here, the proposed Settlement Agreement is manifestly unfair to Sagi and the Estate's other legitimate creditors, who were not consulted about it and are severely prejudiced by it.

## CONCLUSION

60. In sum, the Settlement Agreement does not maximize the assets of the estate, or even remotely approximate it. Rather, it rewards the bad behavior of people who were lying under oath and falsifying documents immediately before the bankruptcy by releasing them from liability for their bad acts. Accordingly, for the reasons stated herein, and for the additional reasons set forth by Dalia Genger (including the adoption of her claimed constructive trust, to the extent necessary), the Court should disapprove the Settlement Agreement and grant Sagi Genger such other and further relief as it deems just and appropriate.

WHEREFORE, PREMISES CONSIDERED, Sagi prays that the Trustee's Application Under Federal Rule of Bankruptcy Procedure 9019 and Local Rule 9010 to Approve Compromise is not approved and for such further relief to which he may be entitled.

Dated: New York, New York
      October 18, 2019

Respectfully submitted:

EMMET, MARVIN & MARTIN, LLP


By:   */s/ Thomas A. Pitta*
     Thomas A. Pitta (*Pro Hac Vice* Admission Pending)
     John Dellaportas
     120 Broadway
     New York, NY 10271
     (212) 238-3000
     tpitta@emmetmarvin.com
     jdellaportas@emmetmarvin.com

     Sabrina L. Streusand
     State Bar No. 11701700
     Streusand Landon, Ozburn & Lemmon, LLP
     1801 S. MoPac Expressway, Suite 320
     Austin, Texas 78746
     (512) 236-9901 (Telephone)
     (512) 236-9904 (Facsimile)
     streusand@slollp.com

     *Attorneys for Judgment Creditor*
     *Sagi Genger*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 18, 2019, a true and correct copy of the above referenced document was served via ECF filing and/or regular U.S. mail on the following parties:

Eric Herschmann
210 Lavaca St., Unit 1903
Austin, TX 78701-4582

Eric Herschmann
c/o Raymond Battaglia
66 Granburg Circle
San Antonio, TX 78218-3010

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia, PA 19101-7346

Kasowitz, Benson, Torres LLP
Attn: Daniel Benson, Esq.
1633 Broadway, 21st Floor
New York, NY 10019-6708

United States Trustee
903 San Jacinto, Suite 230
Austin, TX 78701-2450

Zeichner Ellman & Krause LLP
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-6149

Eric J. Taube
Waller Lansden Dortch & Davis, LLP
100 Congress Ave., Suite 1800
Austin, TX 78701-4042

Orly Genger
210 Lavaca St., Unit 1903
Austin, TX 78701-4582

Ron Satija
P.O. Box 660208
Austin, TX 78766-7208

Arie Genger
c/o Deborah D. Williamson

Dykema Gossett PLLC
112 East Pecan St., Suite 1800
San Antonio, TX 78205

Aaron M. Kaufman
Dykema Gossett PLLC
Comerica Bank Tower
1717 Main St., Suite 4200
Dallas, TX 75201

Arie Genger
19111 Collins Ave., Apt. 706
Sunny Isles, FL 33160-2379

SureTec Insurance Co.
c/o Clark Hill Strasburger
901 Main Street, #6000
Dallas, Texas 75202

Sagi Genger
c/o John Dellaportas
Emmet Marvin & Martin LLP
120 Broadway, 32nd Floor
New York, NY 10271-3291

The Orly Genger 1993 Trust
c/o Jay Ong
Munsch Hardt Kopf & Harr PC
303 Colorado Street, #2600
Austin, Texas 78701

Shelby A. Jordan
Jordan Holzer & Ortiz, P.C.
500 N. Shoreline Blvd, Suite 900
Corpus Christi, Texas 78401

*/s/ Sabrina L. Streusand*
Sabrina L. Streusand