## Page 1

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------------------
 3  SAGI GENGER,
 4                    Third-Party Plaintiff,
 5       -v-    Civil Action No. 1:17cv8181
 6  ORLY GENGER,
 7                    Third-Party Defendant.
 8  ------------------------------------------
 9
10           DEPOSITION OF MICHAEL BOWEN, a Witness
11  herein, taken by the Plaintiff, at the offices of
12  KELLEY DRYE & WARRREN LLP, 101 Park Avenue, 27th
13  Floor, New York, New York 10178, on Friday, October
14  5, 2018, at 10:00 a.m., before Jeffrey Shapiro, a
15  Shorthand Reporter and notary public, within and
16  for the State of New York.
```

## Page 2

```
 1  A P P E A R A N C E S :
 2  KELLEY DRYE & WARREN LLP
 3  Attorneys for SAGI GENGER
 4  101 Park Avenue, 27th Floor
 5  New York, New York 10178
 6  BY:  JOHN DELLAPORTAS, ESQ.
 7
 8
 9  Also Present:
10  Sagi Genger
11
12                    ***
```

## Page 3

```
 3       IT IS HEREBY STIPULATED AND AGREED by
 4  and between the attorneys for the respective
 5  parties hereto, that the filing, sealing and
 6  certification be, and the same are hereby waived;
 7
 8       IT IS FURTHER STIPULATED AND AGREED
 9  that all objections, except as to the form of the
10  questions, shall be reserved to the time of the
11  trial;
12
13       IT IS FURTHER STIPULATED AND AGREED
14  that the within examination may be subscribed and
15  sworn to before any notary public with the same
16  force and effect as though subscribed and sworn to
17  before this Court.
```

## Page 4

```
 1  Whereupon,
 2           MICHAEL BOWEN,
 3  after having been first duly sworn, was examined
 4  and testified as follows:
 5           DIRECT EXAMINATION
 6  BY MR. DELLAPORTAS:
 7       Q.   State your name for the record.
 8       A.   Michael Paul Bowen.
 9       Q.   What is your address?
10       A.   My work address is 1633 Broadway, New
11  York, New York 10019.
12           (Exhibit 1 was so marked for
13           identification.)
14  BY MR. DELLAPORTAS:
15       Q.   Good morning, Mr. Bowen.
16       A.   Good morning.
17       Q.   So I've marked as Exhibit Kasowitz 1,
18  the subpoena in this case for Kasowitz Benson &
19  Torres, LLP.
20       Mr. Bowen, you're here as the corporate
21  witness for Kasowitz Benson & Torres, LLP?
22       A.   Yes.  The witness for the entity
23  Kasowitz, Benson, & Torres.
24       Q.   And if I just refer to it for
25  shorthand as Kasowitz, you will know I'm referring
```



Exhibit B

Page 5

1           Bowen
2  to the firm?
3       A.   Sure or KBT.
4       Q.   Yeah, I'll never remember that.
5  Let's go with Kasowitz, but you can refer to it as
6  KBT if you prefer.
7       So you have a subpoena in front of you?
8       A.   I do.
9       Q.   If you can turn to Exhibit A.
10      A.   Yes.
11      Q.   And, specifically, the document
12 request on subject matters?
13      A.   Yes.
14      Q.   Do you see numbers one through nine?
15      A.   Correct.
16      Q.   Did you undertake a search on behalf
17 of the firm to see what documents you had?
18      A.   Yes.
19      Q.   And can you describe that search or
20 that process?
21      A.   I made a reasonable inquiry and also
22 used my own intimate knowledge of the firm's role
23 in connection with all things Genger.
24      Q.   And you have produced in response to
25 that one document entitled, "First Amendment to

Page 6

1           Bowen
2  Settlement Agreement and Release"; is that
3  correct?
4       A.   Correct.  And I think that's
5  responsive to Request No. 4.
6           MR. DELLAPORTAS:  Okay.  So let's
7       mark that as Kasowitz Exhibit 2.
8           (Exhibit 2 was so marked for
9       identification.)
10 BY MR. DELLAPORTAS:
11      Q.   So, other than this, you have no
12 responsive documents?
13      A.   That's correct.
14      Q.   Was anything withheld on privilege
15 grounds?
16      A.   Yes and no.  Excuse me.
17      Yes and no, because the primary objection is
18 relevance, although some documents that we deemed
19 irrelevant would also be privileged or at least
20 some of them are.
21      Q.   And when you say the primary
22 objection, where were those objections interposed?
23      A.   We can go through them all, but if
24 you take No. 4 as an example, "All documents
25 concerning the attached stipulation and the

Page 7

1           Bowen
2  attached first amendment to stipulation and
3  release," that would involve documents, for
4  example, of e-mail of either drafting this thing
5  or circulating it for signature.  And in our view
6  that's irrelevant.
7       Q.   Why is that irrelevant in your view?
8       A.   It's irrelevant because it has
9  nothing to do with identifying assets that belong
10 to Orly Genger or assets that are to be paid to
11 Orly Genger.
12      Q.   And has Kasowitz served any written
13 objections in response to the subpoena?
14      A.   No.  We are interposing the
15 objections orally.
16      Q.   So why don't we go through and you
17 can tell me what specifically are your objections?
18 Let's start with No. 1 -- if any.
19      A.   Well, we object to it as overbroad
20 and irrelevant because, again, to the extent the
21 firm has any knowledge of any agreements where
22 Orly Genger owes money or is a debtor, it's
23 irrelevant to property that -- or assets that she
24 owns or that are to be paid to her.  So it's
25 beyond the scope of Article 52.

Page 8

1           Bowen
2       On the other hand, if there are documents or
3  agreements that reflect assets owned by Orly
4  Genger or that are to be paid to Orly Genger, that
5  would be responsive and we think relevant and we
6  undertook a search for that and there are none.
7       Q.   Okay.  Number 2.  Do you have
8  objections to No. 2?
9       A.   No.  I think that's completely
10 responsive.  That states, quote, "All documents
11 concerning any property held by or debts owed to
12 Orly Genger."  We -- the firm has no documents
13 responsive to that, but we interpose no objection
14 to that.
15      Q.   Okay.  What about No. 3?  Any
16 objections to that?
17      A.   "All documents relating to the
18 settlement agreement -- " Right.
19      Well, we object to you using the phrase
20 "Orly Settlement Agreement" to define that because
21 it's misleading and confusing.  It's not an Orly
22 Settlement Agreement.  What you are referring to
23 is a settlement agreement between the AG Group and
24 the Trump group and it's usually referred to as
25 the "AG/Trump Settlement Agreement."



Exhibit B

Page 9

1  Bowen
2  And because of that agreement or, quote,
3  unquote, "all documents relating to that
4  agreement," has nothing to do with property owned
5  by Orly Genger or property or assets to be paid to
6  Orly Genger. That entire request, at least
7  Subpart A, is irrelevant.
8     Q.  Why in your -- I'm sorry. I didn't
9  mean to cut you off.
10    A.  Okay. Subpart B, "any escrow
11 accounts, arrangements, to the extent that it was
12 for the benefit of Orly Genger" meaning the escrow
13 assets belong to her or are to be paid to her, we
14 deem that relevant and would produce responsive
15 documents if any, but I can attest today that
16 there are none.
17    And the same with Subsection C, "any
18 promissory notes issued thereunder." So if there
19 were any promissory notes in the possession,
20 custody, or control of Kasowitz that were payable
21 to Orly Genger or reflected assets that she owns
22 or that are due to be paid to her, we'd deem that
23 responsive and would produce any documents if any.
24 But I can attest here today that we are in
25 possession of none; no such documents.

Page 10

1  Bowen
2     Q.  Okay. We'll circle back to that.
3  Let's move on. Let's go through the list first.
4     A.  Okay. Number 4, I have already spoke
5  about unless you want me to reiterate it.
6     Q.  So you have given us the first
7  amendment and the stipulation itself, but you
8  haven't given us any documents related to what you
9  are interposing and irrelevance objection?
10    A.  Correct.
11    Q.  Number 5?
12    A.  Which states, quote, "All agreements
13 as to the past, present, or future disposition of
14 any settlement proceeds under the Orly settlement
15 agreement," close quote.
16    Again, we object to that phrase Orly
17 settlement agreement as misleading and potentially
18 misleading and potentially false.
19    But if you are referring to the AG/Trump
20 Settlement Agreement, which we think you are, if
21 there were agreements that reflected assets owned
22 by Orly or to be paid to Orly under that
23 settlement agreement or in relation to that
24 settlement agreement, that's relevant in our view
25 and we would produce such documents if any

Page 11

1  Bowen
2  existed. And we did search for such documents,
3  but I can attest, on behalf of the firm, there ae
4  no such documents in our possession, custody, or
5  control.
6     Q.  Let's go to No. 6. Any objections to
7  that?
8     A.  Quote, "all accounts, statements for
9  any escrow accounts related to the" -- what you
10 call the "Orly Settlement Agreement."
11    Again, the same objection as misleading,
12 intentionally so, but the AG/Trump Settlement
13 Agreement. If there were account statements for
14 escrow accounts that reflected assets owned by
15 Orly or to be paid to Orly Genger, we would
16 produce those, but I can attest that we're not,
17 you know, we're not in custody, possession, or
18 control of any such accounts.
19    In fact, I don't mind telling you that we
20 are not in possession, custody, or control of any
21 account statements or any escrow accounts relating
22 to the AG/Trump Settlement Agreement, period.
23    Q.  Okay. Number 7. Do you have any
24 objection to that?
25    A.  Quote, "All documents concerning any

Page 12

1  Bowen
2  indemnity demands and/or indemnity payments made
3  under the Orly settlement agreement." The same
4  objection as using that phrase to be potentially
5  misleading.
6     We read that as referring to the AG/Trump
7  Agreement. It is kind of a vague, ambiguous
8  objection there. I'm not really sure what you are
9  asking. Maybe you can clarify that today, but I
10 can say we're not aware of any -- the firm is not
11 aware of indemnity demands and/or indemnity
12 payments related to the AG/Trump Settlement
13 Agreement period.
14    But we would deem, if we were aware or had
15 such documents and they reflected Orly's assets or
16 assets to be paid to Orly, we would deem that
17 relevant and responsive.
18    But like I said, I can go beyond that and
19 say we are not aware of any indemnity demands,
20 period. But that is subject to you clarifying
21 what you really meant by that. I may be
22 misinterpreting that.
23    Q.  We will come back to that, let's just
24 get through our list.
25    Number 8. Any objections to that?



Exhibit B

| Page 13 | Page 15 |
|---|---|
| 1  Bowen | 1  Bowen |
| 2  A. Quote, "All payments made to any | 2  Q. Let's go back to No. 7, because that |
| 3  person or entity pursuant to the Orly Settlement | 3  one, I think, you asked for clarification on? |
| 4  Agreement."  The same objection as intentionally | 4  A. Correct. |
| 5  misleading by referring to it as the "Orly | 5  Q. Have you read the -- what you refer |
| 6  Settlement Agreement" it is the AG Group/Trump | 6  to as the AG/Trump Settlement Agreement? |
| 7  Group Settlement Agreement. | 7  A. Only in part and a long time ago. |
| 8     With that understanding, if we had records, | 8  Q. Okay.  Are you aware that there are |
| 9  meaning the firm, of payments to Orly or that were | 9  two promissory notes that were issued pursuant to |
| 10  to be paid to Orly in relationship to that -- in | 10  the Trump Group -- AG/Trump Group Settlement |
| 11  relation to that particular settlement agreement, | 11  Agreement for $7.5 million each? |
| 12  but this is also subsumed under your first | 12  A. There are promissory notes by the |
| 13  request, those documents, in our view, would be | 13  Trump Group if I am remembering correctly, yes. |
| 14  responsive and relevant and we would produce them, | 14  Q. Okay.  And those payments, to the |
| 15  if any. | 15  best of your knowledge, have not been made yet; |
| 16     To the extent that you are asking about | 16  correct? |
| 17  other people that -- that are not Orly or that | 17  A. To the best of the firm's knowledge |
| 18  don't reflect assets owned by her or to be paid to | 18  -- I mean, the firm had no knowledge of that |
| 19  her, we would object that that is beyond the scope | 19  whatsoever. |
| 20  of Article 52 and irrelevant and not responsive. | 20  Q. Okay.  Do you recall in reading the |
| 21     Having said all of that, on behalf of the | 21  agreement that the Trumps have certain rights to |
| 22  firm, I can attest that there are -- the firm is | 22  deduct defense costs and other related legal costs |
| 23  in possession of no records whatsoever of any | 23  for indemnification and whatnot? |
| 24  payments made under this AG/Trump Settlement | 24  A. Correct, yes. |
| 25  Agreement. | 25  Q. From those ultimate payments of $15 |

| Page 14 | Page 16 |
|---|---|
| 1  Bowen | 1  Bowen |
| 2  Q. Lastly, No. 9, "All non privileged | 2  million? |
| 3  communications regarding any of the forgoing | 3  A. That's my understanding, yes. |
| 4  subjects." | 4  Q. Okay. |
| 5  A. Everything I said previously would | 5  A. And when I say "my" I mean on behalf |
| 6  apply to that. | 6  of the firm. |
| 7  Q. Incorporate all of your prior | 7  Q. Yeah.  I'll just -- everything from |
| 8  objections? | 8  this point forward, I will have an understanding |
| 9  A. Right.  Obviously, you're -- you're | 9  if you say "my" you mean the firm and if I say |
| 10  subpoenaing a law firm that represents Orly | 10  "you" I mean the firm. |
| 11  Genger.  Every single one of these requests could | 11  A. If there are any singular pronouns, I |
| 12  impinge upon privilege; so it could be the case | 12  mean, I'm speaking with the royal we. |
| 13  that there are e-mails and other types of | 13  Q. Yeah.  I'll assume the royal we |
| 14  documents that would be attorney-client privilege | 14  unless you specify other words and you can assume |
| 15  and work-product privilege, and we're not | 15  from me the royal we unless I specify you |
| 16  undertaking to do a log because we think that is | 16  personally? |
| 17  overly burdensome and bordering on harassment. | 17  A. Understood. |
| 18     And when you subpoena a law firm that | 18  Q. So with that clarification, do you |
| 19  represents a person that you are adverse to, I | 19  have any documents responsive to that demand? |
| 20  assume you're expecting a lot of it to be | 20  A. Well, with that clarification, the |
| 21  privileged. | 21  firm is unaware of any documents relating to those |
| 22  Q. So, other than what you have just | 22  two promissory notes or the Trump Group's claim of |
| 23  stated, does Kasowitz have any further objections | 23  offset on promissory notes that relate to assets |
| 24  to Nos. 1 through 9? | 24  owned by Orly or to be paid to Orly. |
| 25  A. I don't think so. | 25  Q. Okay.  So you have intentionally |



**Exhibit B**

| Page 17 | Page 19 |
|---|---|
| 1  Bowen | 1  Bowen |
| 2  narrowed the request to your view of anything | 2  disposition of the $15 million?  I'm sorry, |
| 3  that's relating to payments to be made to Orly? | 3  Mr. Hirschman? |
| 4       A.   Or that reflects assets she owns. | 4       A.   I understood you meant Mr. Hirschman. |
| 5       Q.   Okay.  And why in your view would | 5       Well, I'm not going to get into any |
| 6  indemnity demands by the Trump Group not relate to | 6  methodology that I used in preparing for the |
| 7  any assets owned by Orly or to be paid to Orly? | 7  deposition because that's privileged work product. |
| 8       A.   You are dealing with the scope of the | 8  I am testifying under oath that I made a |
| 9  firm's understanding of this, so with that caveat, | 9  reasonable inquiry and a reasonable search.  And |
| 10  the payments that are due under the AG/Trump | 10  your question was -- I'm sorry.  I lost your |
| 11  Settlement Agreement, and under those two | 11  question. |
| 12  promissory notes, are to the AG Group and not to | 12       Q.   In deciding not to produce documents |
| 13  Orly. | 13  responsive to the subpoena on the ground that they |
| 14       Q.   Okay. | 14  do not relate to payments ultimately to be made to |
| 15       A.   If there is some arrangement within | 15  Orly Genger, did the firm inquire with its |
| 16  the AG Group that allocates any portion of the | 16  partner, Mr. Hirschman, to confirm that in fact |
| 17  payments to Orly, the firm is unaware of it. | 17  none of the $15 million will ultimately be paid to |
| 18       Q.   Is the firm aware of any arrangement | 18  Orly Genger? |
| 19  with respect to the payment of the remaining | 19       A.   Well, without specifying what |
| 20  proceeds at all? | 20  methodology I used to gather information |
| 21       A.   My hesitation in answering that | 21  responsive to this subpoena, and to make decisions |
| 22  question is that it may be impinging on privileged | 22  about what is and is not responsive, I can testify |
| 23  information.  To the extent that we have that | 23  that to firm's understanding and to the firm's |
| 24  information, it would be in the attorney-client | 24  knowledge, none of that money belongs to or is to |
| 25  relationship with Orly.  And I'm not at liberty to | 25  be paid to Orly Genger. |

| Page 18 | Page 20 |
|---|---|
| 1  Bowen | 1  Bowen |
| 2  waive privilege, so I would assert privilege as to | 2       Q.   And is your position driven by the |
| 3  that question on behalf of Orly Genger as the | 3  fact that on the face of the agreement it says |
| 4  owner of the privilege. | 4  that the money is to be paid to something called |
| 5       Q.   Well, you declined to produce | 5  the "AG Group"? |
| 6  documents responsive to our requests on the ground | 6       A.   I don't understand your question. |
| 7  that Kasowitz affirmatively takes the position | 7       Q.   What is the basis of your |
| 8  that there is no arrangement that Orly will get | 8  understanding that none of the money is to be paid |
| 9  any of that money.  Do I understand that | 9  to Orly Genger? |
| 10  correctly? | 10       A.   The basis for the firm's |
| 11       A.   No.  You misstated my testimony. | 11  understanding is the knowledge, institutional |
| 12  It's not that we affirmatively understand that | 12  knowledge, that we have based on our review of |
| 13  Orly is not getting any of that money, it's that | 13  documents, some of which are privileged, and my |
| 14  the Kasowitz has no information. | 14  reasonable inquiry of the lawyers at the firm that |
| 15       Q.   Does that include Mr. Hirschman when | 15  have been involved in the Genger matter since the |
| 16  you say, "Kasowitz has no information"? | 16  firm was originally involved. |
| 17       A.   Well, Mr. Hirschman is Orly Genger's | 17       And if you are asking me did we make some |
| 18  spouse, so he may have information qua spouse, but | 18  kind of interpretation and are we just basing this |
| 19  not as a partner in the firm.  And I frankly don't | 19  on the interpretation of one document, the answer |
| 20  know what is in his head. | 20  is no. |
| 21       Q.   Okay.  So nobody in -- in making the | 21       Q.   Okay.  And circling back to my |
| 22  decision not to produce documents responsive to | 22  question:  Did anyone inquiry of Mr. Hirschman |
| 23  this request on the ground that Orly wasn't | 23  about that? |
| 24  getting any of the money, nobody asked | 24       A.   I'm not going to answer any questions |
| 25  Mr. Kasowitz as to his knowledge of the ultimate | 25  about methodology that I used on behalf of the |



Exhibit B

Page 21

1       Bowen
2  firm to be prepared to answer questions today
3  because that's a protected work product.  But I am
4  telling you and attesting under oath that I made
5  reasonable inquiry.  I don't mind telling you that
6  reasonable inquiry would involve communications
7  with Mr. Hirschman.
8       Q.   Is Mr. Hirschman currently a partner
9  in the firm?
10      A.   Yes.
11      Q.   Is he an equity partner?
12      A.   I don't know what you mean by that.
13 I'm not sure what that means at my firm.  Now I'm
14 speaking personally, not on behalf of the firm.
15 The firm knows.
16      I did not do any reasonable inquiry on that
17 particular question, so I don't know the answer to
18 that.
19      Q.   Okay.
20      A.   It's beyond the scope.
21      Q.   Well, you know, every firm organizes
22 their partnership different from every other firm,
23 but in some cases the title "partner" is just a
24 title and in other cases it implies what I view as
25 more of an actual partnership which is an

Page 22

1       Bowen
2  ownership, and they share the profits and what
3  have you.  So I don't know how Kasowitz organizes
4  things, but to that extent, would you view
5  Mr. Hirschman as a either an equity partner or a
6  true partner or a profit sharing partner?
7       A.   That is beyond the scope of what I'm
8  prepared to attest to on behalf of the firm.  I
9  honestly don't know the answer to that question.
10      Q.   Okay.  So who, in your view, is the
11 $15 million to be paid to?
12      A.   Well, the view of the firm is that
13 the money is to be paid into -- into, I guess, a
14 trust or into an escrow -- I forget how the
15 wording works -- into an escrow that's to be held
16 by me personally and in -- I shouldn't say
17 personally, but me in my capacity as partner with
18 the Kasowitz firm.  But the disposition of that
19 money, once -- if it is ever received -- is up to
20 the AG Group.
21      Q.   When you say, "the AG Group" what do
22 you mean by that?
23      A.   Well, the AG Group is defined in the
24 AG/Trump Settlement Agreement.
25      Q.   Let's go ahead and mark that as

Page 23

1       Bowen
2  Kasowitz 3.
3       (Exhibit 3 was so marked for
4       identification.)
5  BY MR. DELLAPORTAS:
6       Q.   So if you look on the opening
7  paragraph, there is the description of the AG
8  Group.  Do you see that?
9       A.   Yes.
10      Q.   When you refer to the AG Group are
11 you -- what you are referring to is consistent
12 with this definition?
13      A.   Yes.
14      Q.   And so the definition has the AG
15 Group including Arie Genger; is that right?
16      A.   Yes.
17      Q.   And Orly Genger?
18      A.   Yes.
19      Q.   And Arnold Broser?
20      A.   Yes.
21      Q.   And David Broser?
22      A.   Yes.
23      Q.   And it says, "In their individual
24 capacity on behalf of all entities managed, owned
25 or controlled in any way by Arnold or David Broser

Page 24

1       Bowen
2  and which are in any way relating to the subject
3  matter hereof."
4       Do you see that?  It's lines 4 and 5?
5       A.   Yes.  That's the -- you read the
6  parenthetical after David Broser?  Yes.
7       Q.   So, what entities are those?
8       A.   I have no idea.
9       Q.   You don't know any -- you don't know
10 the names of any entities associated with Broser?
11      A.   No.
12      Q.   Let's go back to Kasowitz 2 --
13      A.   Okay.
14      Q.   -- which is the first amendment.
15      A.   Right.
16      Q.   What are the circumstances by which
17 this came about?
18      A.   I'm not sure that's within the scope
19 of your subpoena, but I'm willing to give you some
20 leeway.
21      Q.   I think there is a whole category.
22      Well, all documents concerning any property
23 -- it's No. 4.  So you can answer, you can object,
24 but that's my question.
25      A.   Well, I object that it's outside the



Exhibit B

| Page 25 | Page 27 |
|---|---|
| 1 Bowen | 1 Bowen |
| 2 scope of the subpoena. Your authority is to look | 2 right. I don't -- it's beyond the scope. |
| 3 for assets that belong to Orly Genger or that are | 3    Q.   Well, let's say they all get on the |
| 4 to be paid to her. I don't see how the context of | 4 phone with you. Let's take out writing. |
| 5 this first amendment has anything to do with that | 5    A.   What is the question? |
| 6 for the reasons we just discussed. | 6    Q.   Is it correct that the only way you |
| 7    Q.   Yet you produced it. | 7 will release the proceeds is if you are instructed |
| 8    A.   Yes. Yes, we did because you | 8 by all four of those individuals to do so in the |
| 9 specifically asked for it and you produced a copy | 9 same manner? |
| 10 to us but it was unsigned so we gave you the | 10    A.   No, that is not correct. |
| 11 executed copy. | 11    Q.   How is it incorrect? |
| 12    Q.   Okay. And you would agree -- | 12    A.   There is no understanding that the |
| 13    A.   Just so it's perfectly clear that you | 13 firm is aware of that it's a majority vote or a |
| 14 have the operative document. | 14 consensus vote or anything like that. It's |
| 15    Q.   Okay. And you would agree with me, | 15 whatever -- whatever the agreement there is in and |
| 16 wouldn't you, that this document contemplates an | 16 among the members of AG Group, the firm has no |
| 17 eventually payment of up to $15 million to you; | 17 knowledge of that. |
| 18 correct? | 18    Q.   Is the AG Group a corporation? |
| 19    A.   No. | 19    A.   I have no idea. |
| 20    Q.   No? What does it do? You tell me. | 20    Q.   A trust? |
| 21    A.   It is a mechanism for payment under | 21    A.   I have no knowledge. |
| 22 the AG/Trump Settlement Agreement that goes into | 22    Q.   LLC? |
| 23 an escrow account that would be set up by me | 23    A.   No knowledge. |
| 24 and/or the Kasowitz firm per direction from the AG | 24    Q.   When you say you are going to take |
| 25 Group. | 25 instructions from the AG Group, how is that going |

| Page 26 | Page 28 |
|---|---|
| 1 Bowen | 1 Bowen |
| 2    Q.   And so when you say, "direction by | 2 to be communicated to you? |
| 3 the AG Group," what would you consider to be | 3    A.   I think that's beyond the scope of |
| 4 direction by the AG Group? | 4 this deposition and beyond the scope of your |
| 5    A.   I don't know how else to describe | 5 authority under Article 52. With that objection, |
| 6 what I just described. | 6 and without waiving that objection, I'm really not |
| 7    Q.   Let's assume a year from now $15 | 7 sure how to answer that question. |
| 8 million comes in. What will it take for you to | 8   How would that be communicated to me. |
| 9 make a payment to anyone of that $15 million? | 9    Q.   Look, in a few days we are going to |
| 10    A.   It would take direction from the AG | 10 go before a judge, just to be frank. The judge is |
| 11 Group. | 11 going to want to know about this $15 million. You |
| 12    Q.   Meaning what? | 12 are the escrow agent for the $15 million. Clearly |
| 13    A.   Meaning direction from the members of | 13 you know the circumstances under which you would |
| 14 the AG Group. | 14 release the $15 million, so why don't you just |
| 15    Q.   Meaning Arie Genger, Orly Genger, and | 15 share this with me now so that you don't |
| 16 the two Brosers? | 16 unnecessarily annoy the federal judge? |
| 17    A.   That's how it's defined to the firm's | 17    A.   Is that a question? |
| 18 understanding in the relevant documents. | 18    Q.   It's a suggestion. I've asked |
| 19    Q.   Okay. So, the only way you will | 19 several questions and you have been very |
| 20 release the proceeds at some -- if such proceeds | 20 disingenuous. Why don't you just try to answer |
| 21 should come in the future -- is from a written | 21 them. |
| 22 instrument signed by Arie Genger, Orly Genger, | 22    A.   Look. I don't understand why you are |
| 23 Arnold Broser and David Broser? | 23 making this into a hostile, ad hominem attack on |
| 24    A.   I don't know if there is a | 24 me. |
| 25 requirement for a written instrument. It may be | 25    Q.   I'm not making an ad hominem on you. |



Exhibit B

Page 29
1        Bowen
2    A.   I'm speaking on behalf of the firm.
3   I have --
4    Q.   You are saying you have $15 million
5   and you --
6    A.   Excuse me.  Let me finish.
7    Q.   -- have no idea how it is going to.
8   Do you understand how this is going to look when
9   the judge sees this transcript?  I'm trying to
10  help because I don't want -- I don't need to make
11  unnecessary motions.  I'm just trying to collect
12  some money here.  I'm not trying to burden the
13  court.
14       A.   You interrupted my answer.  You spoke
15  over me so that the court reporter couldn't take
16  down what I was saying.
17       Q.   Knock yourself out.
18       A.   I'm not going to engage in this kind
19  of argumentative behavior.  I thought that we were
20  going to be here as two professionals talking in a
21  professional way.  You have immediately devolved
22  into your normal mode of behavior, which is ad
23  hominem attack and unreasonable speeches on the
24  record.
25       Everything you said I disagree with.  I have

Page 30
1        Bowen
2   been very clear about the scope of which I'm
3   prepared to answer and the scope within which we
4   think your subpoena is authorized.
5       If you want to continue this, you must deal
6   with me civilly.  If you do that again, I'm going
7   to leave and then you can explain to the federal
8   judge and you can go look at the ethical rules,
9   the professional rules which require you to be
10  civil, why it was you weren't able to complete
11  this deposition.
12       Q.   I have been perfectly --
13       A.   Do you want to continue?
14       Q.   I have been perfectly civil with you.
15  Your answers, frankly, are an embarrassment.
16       A.   Don't characterize my answers.
17  That's not being civil.  Ask a question.  If you
18  have objections to my answers, you can proceed.
19       Q.   Please testify as to under -- what
20  circumstances you will release the proceeds
21  pursuant to the document where you are the escrow
22  agent?
23       A.   I have already testified.  This is
24  asked and answered -- I'll interpose that
25  objection -- at the direction of the AG Group.

Page 31
1        Bowen
2    Q.   What does that mean?
3    A.   I don't know how else to explain it
4   to you.
5    Q.   What does it mean?
6    A.   What do you not understand about it?
7    Q.   Tell me what it means to be at the
8   direction of the AG Group?
9    A.   Well, first of all I object that this
10  is outside the scope of your subpoena.  If you had
11  a basis to say that some of that money is either
12  belongs to Orly Genger or is payable to Orly
13  Genger, you can make that showing and we can have
14  that discussion.
15       Q.   Well, I think we have a document
16  here --
17       A.   We'll probably have to -- excuse me.
18  I'm in the middle of my answer.
19       Q.   Okay.
20       A.   We'll probably have to litigate that,
21  but as of right now I see that outside of the
22  scope of your authority under Article 52 and
23  outside the scope of this subpoena.
24       However, without waiving that objection, I'm
25  willing to give you some latitude which is what I

Page 32
1        Bowen
2   said and I'm willing to describe to you the firm's
3   understanding of how this mechanism works.
4    Q.   So please proceed.
5    A.   Well, I have already told you that
6   the AG Group has to give direction about how the
7   money is disbursed after it hits the escrow
8   account held by the firm.
9    Q.   Uh-huh.
10       A.   You asked me how is that direction
11  going to be communicated.  My response is, on
12  behalf of the firm, however the AG Group wants to
13  communicate it.  It can be in writing, it can be a
14  phone call.  It would have to be something that
15  could be documented I would assume just to, you
16  know, discharge our recordkeeping responsibilities
17  to show the flow of the money and, you know, 1099s
18  and whatnot.
19       And then you are asking me who can speak on
20  behalf of the AG Group whether it has to be all
21  four in consensus, whether it has to be a majority
22  vote, whether somebody else can speak on behalf of
23  the AG group and my answer is:  We don't have any
24  information about any agreements between the AG
25  Group.  We're not aware that there is any dispute


Exhibit B

| Page 33 | Page 35 |
|---|---|
| 1  Bowen | 1  Bowen |
| 2  among the members of the AG Group, that there is | 2  this document? |
| 3  any agreement among the AG Group about who can | 3  A.  Well, the trump Group signed Exhibit |
| 4  direct the money and who can't direct the money | 4  2, the members of the Trump Group did, so yes. |
| 5  maybe.  If that -- maybe that will become an issue | 5  Q.  Were new notes issued pursuant to |
| 6  down the road but we are not aware of it. | 6  this document? |
| 7  Q.  Are you aware of anyone who is | 7  A.  No. |
| 8  authorized to speak on behalf of the AG Group? | 8  Q.  Promissory notes? |
| 9  A.  Well, my understanding is that the | 9  A.  I think there were amendments.  It |
| 10  members of the AG are reflected in Exhibit 3, | 10  might have been a supplemental amendment.  I don't |
| 11  these four individual people, and then the | 11  recall.  It just reflects the same information |
| 12  entities as you have pointed out.  I'm not aware | 12  that's in this amendment. |
| 13  of any issue about who the spokesperson for the | 13  Q.  I'm sorry.  Can you just read that |
| 14  group can be. | 14  back. |
| 15  If you are asking me can I identify who the | 15  A.  I will explain.  If you read Exhibit |
| 16  spokesperson for the group is, the answer is no. | 16  2 you will see that it's making amendments about |
| 17  We're not aware that a spokesperson has been | 17  the direction of how the Trump group is to route |
| 18  designated.  We're not aware that it's an issue. | 18  the money.  I believe and I'm going from memory |
| 19  Q.  Well, let me ask you: $15 million | 19  here, that the note itself -- the originally |
| 20  comes in, Arie Genger calls you up and says, I'm | 20  issued note -- refereed to Watell. |
| 21  speaking on behalf of the AG Group, will you send | 21  That there was either a supplemental |
| 22  him the money? | 22  attachment to the note or an amendment to the note |
| 23  A.  I can't really answer that question. | 23  that substituted Kasowitz firm, me, for Watell. |
| 24  It's a hypothetical.  I'm not -- again, I think | 24  Any changes to the note are changes that you see |
| 25  it's outside the scope of the subpoena so I'll | 25  reflected here. |

| Page 34 | Page 36 |
|---|---|
| 1  Bowen | 1  Bowen |
| 2  object on that basis, but in the spirit of giving | 2  Q.  And Kasowitz was in possession of the |
| 3  you some latitude so that you have some | 3  old notes? |
| 4  transparency into this arrangement at least as far | 4  A.  The answer to that is no. |
| 5  as the firm is aware, the answer is maybe yes, | 5  Q.  What about the new notes?  Or the |
| 6  maybe no.  I mean, if we don't hear from the other | 6  amended notes? |
| 7  members of the group that there is some | 7  A.  Yes. |
| 8  dissension, then the answer would be that we would | 8  Q.  You haven't produced those? |
| 9  follow that direction, hypothetically speaking. | 9  A.  No. |
| 10  Q.  If I ask that question for Orly | 10  Q.  Why haven't you produced those? |
| 11  Genger, would you give the same answer? | 11  A.  Because we don't see it within the |
| 12  A.  If Orly Genger called up speaking on | 12  scope of the subpoena or the scope of your -- the |
| 13  behalf of the AG Group?  Yes, the same answer. | 13  wording. |
| 14  Q.  What about Arnold Broser? | 14  Q.  And the reason? |
| 15  A.  Same answer. | 15  A.  If you want it, I will take it under |
| 16  Q.  David Broser? | 16  advisement.  I mean, we gave you the executed |
| 17  A.  Same answer. | 17  version of the first amendment because you gave it |
| 18  Q.  Has any money been received pursuant | 18  to us unsigned.  In the spirit of full |
| 19  to this document? | 19  transparency, we wanted you to have the document |
| 20  A.  No. | 20  that shows that that's the operative agreement so |
| 21  Q.  This Kasowitz 2? | 21  you don't have any confusion about it. |
| 22  A.  No. | 22  Q.  And in your view, why were the |
| 23  Q.  Okay.  Have there been any | 23  amended subordinated notes production of the |
| 24  communications with members of the Trump Group | 24  amendment subordinated notes beyond the scope of |
| 25  about potential receipt of this money pursuant to | 25  the subpoena? |



Exhibit B

Page 37
Bowen
A. Because it doesn't reflect assets owned by Orly or to be paid to Orly.
Q. Why not?
A. I don't know what you mean "why not," it doesn't.
Q. Well, because it's to be paid to a quote, unquote, group of which Orly is one member; correct?
A. Well, your statement that she is a member of the AG Group is correct.
Q. And the notes are to paid to the AG Group; correct?
A. No. They are to be paid at the direction of the AG Group.
Q. Okay. And the AG Group is not in itself some sort of corporation or partnership as far you know. It's not some sort of legal entity; correct?
A. The firm has no information about that.
Q. Okay. But to the best of your knowledge, you're not aware of any legal entity created that's known as the AG Group?
A. The firm is not.

Page 38
Bowen
Q. Okay. So we have notes to be paid at the direction of a group of which Orly is one member and yet you are taking the position that that is not, in any way, relevant to that process by which we seek to identify assets potentially payable to Orly Genger herself?
A. That's correct because as I testified earlier, it is the firm's understanding that there is no -- there is no arrangement that any amount of that money is to be paid to Orly or that she owns or has any claims to any amount of that money.
Q. What is the firm's understanding as to how that money is to be disbursed if received?
A. It's up to the AG Group. It has nothing to do with any kind of ownership claim by Orly.
Q. Has the AG Group shared that understanding with Kasowitz?
A. That's the firm's understanding. I'm not going to try and parse out what part of that may be protected by privilege and what part of it is coming through third party communications. I'm not in a position to do that.

Page 39
Bowen
Q. Well, has the AG Group shared its intention as to how, if the money is received, it intends to direct you to disburse it?
A. No. Other than it's our understanding, again, based on communications that I can't parse out, that Orly Genger has no claim to any of that money nor is any of that money being paid to her.
Q. What is your understanding based on?
A. I already explained to you that I can't parse out what communications that's based on because some are privileged and some are not. And it's just -- it's an impossibility to try and make that kind of fine distinction, but it involved communications with our client and it involved communications with the members of the AG Group.
Q. Okay. Is Arnold Broser a client of the firm with respect to this matter?
A. Not with respect to the Gengers, no.
Q. With respect to anything else?
A. No. Well, I don't know.
Q. That you are aware?
A. Well, I -- I don't know.

Page 40
Bowen
Q. In which you, Michael Bowen, are aware?
A. Well, I'm not really here testifying on my behalf to try and move this along. I can say that it's without the scope of the subpoena so I didn't do any reasonable inquiry trying to figure out if the firm represents the Brosers in any, you know, any other matter totally unrelated to this. I have no knowledge of that. I guess, just to help you, I will volunteer in my individual capacity, I have to idea.
Q. Let me just limit it to this. Limited to this, Arnold Broser is not a client of the firm?
A. That's correct.
Q. And what about David Broser?
A. Same answer.
Q. What about Arie Genger?
A. Arie Genger is a little more complicated because we -- the firm has appeared on his behalf in some of his litigations involving disputes with Sagi Genger, who may or may not be related to this settlement agreement because it's so convoluted. I don't know the answer to that.



Exhibit B

Page 41

1  Bowen
2  Q.  With respect to this settlement
3  agreement, you are not able tell me whether the
4  firm believes it has a privileged attorney-client
5  relationship with Arie Genger?
6  A.  That's correct.  I'd have to look
7  into that.
8  Q.  And the reason I ask is because you
9  declined to answer certain questions with regard
10 to your knowledge of the ultimate disposition o
11 these proceeds on privileged grounds.
12     So, when you make that objection, are you
13 specifically speaking of Orly's privilege or are
14 you speaking also of a potential privilege with
15 Arie?
16  A.  Well, I haven't declined to answer
17 anything.  I have answered all of your questions.
18 I have interposed objections that constrain the
19 information that I can provide.
20     It is certainly the case that we represent
21 Orly Genger in all aspects of her dispute --
22 disputes, plural, with Sagi Genger, and certainly
23 in connection with the AG/Trump Group Settlement
24 Agreement so that prohibits me from divulging
25 communications that we have had with members of

Page 42

1  Bowen
2  the AG Group to come to conclusions or the
3  understanding that we have.  It's not really
4  conclusions, it's really just our understanding.
5  Q.  So you are declining or you feel
6  constrained not to identify communications with
7  any of the four members of the AG Group?  Is that
8  what I understood your last answer to mean?
9  A.  I can't parse out how we came to the
10 understanding based on who told us what, because
11 some of that is privileged and I'm not going to
12 give you unprivileged communications so you can
13 deduce privileged information.
14  Q.  Well, let's put aside what I can
15 deduce and not deduce.  You have made a statement
16 that Kasowitz believes that none of the $15
17 million will ultimately be paid to Orly.  I have
18 asked you the basis for that understanding and you
19 said it's -- you're constrained by the privilege
20 from answering it.  I have asked who that
21 privilege is with --
22  A.  I've got to correct you.
23  Q.  Hold on.  Let me finish and then you
24 can correct everything I said that is wrong.
25     I've asked you the basis for who you had the

Page 43

1  Bowen
2  privilege with, and you said, "Orly and maybe
3  Arie."  What I'd like for you to do is to identify
4  for me any communications you have had with anyone
5  who is not Orly Genger or Arie to the extent you
6  are maintaining a privileged relationship with him
7  with respect to this matter with regard to the
8  ultimate disposition of the $15 million?
9  A.  I can't answer that question because
10 you -- you made some misstatements in there about
11 what I have said just moments ago.  So I can't
12 adopt your long preamble and now, because you
13 interrupted me when I tried to correct you, I
14 don't remember what it was you were saying that it
15 was mistaken.
16  Q.  I can do without the preamble.
17  A.  I'd like to correct the preamble.
18  Q.  You can read it back and make any
19 corrections you want.
20     (Readback of prior question.)
21     THE WITNESS:  So you are mistaken in
22   saying that I'm constrained from telling
23   you the basis for the understanding.  I
24   told you the basis for the understanding.
25   You didn't ask to get into the

Page 44

1  Bowen
2    communications that -- the substance of
3    the communications that the firm has had,
4    I presume the question is with each member
5    of the AG Group on that topic, and my
6    answer to that is:
7       Because of the privilege, I cannot
8    parse out which information came from
9    which member of the AG Group, or how many
10   discussions we had over what period of
11   time or who had these discussions on
12   behalf of the firm.  That's not within the
13   scope of preparing for this deposition so
14   I don't have that information at my
15   fingertips.
16      And then, on top of that, there are
17   privilege concerns because some of that
18   information certainly came from Orly
19   Genger who is a client and some came from
20   Arie Genger who may be a client for these
21   purposes.  I'm not clear on that on behalf
22   of the firm.  That would take further
23   investigation on my part.
24  Q.  Let me just limit it to the Brosers.
25 What communications have you had with Brosers with



Exhibit B

Page 45

1 Bowen
2 respect to the ultimate disposition of the
3 proceeds?
4 A. Other than telling you that there
5 were communications with the Brosers between the
6 Brosers and the firm on that topic I cannot get
7 into details of the communications. That's not
8 available to me.
9 Q. Why can't you?
10 A. That's not something that I prepared
11 in anticipation of the testimony today. I did not
12 see it within the scope of the subpoena or
13 relevant to your inquiry.
14 Q. Why did you not see it within the
15 scope of the subpoena?
16 A. The question is: Did the firm have
17 an understanding that anything relating to the
18 settlement agreement or the $15 million notes, you
19 know, minus whatever setoffs the Trump Group is
20 going to claim. And that payment mechanism, if
21 anything related to that has a relationship to or
22 assets owned by Orly or assets to be paid to Orly,
23 and the firm's understanding is that it does not.
24 So how the firm came to that understanding
25 and what goes into that understanding and what

Page 46

1 Bowen
2 other people may have claims to that money or
3 don't have claims to that money, all of that is
4 irrelevant to us and irrelevant to your subpoena.
5 Once the firm has the understanding that it
6 is not an asset of Orly and it's not payable to
7 Orly, that answers your question.
8 Q. And so even if the firm has an
9 understanding as to whom that money is payable to,
10 you're not going to share that with me here today?
11 A. It's payable at the direction of the
12 AG Group, the AG Group has given us no direction
13 on where the money is to be paid.
14 Q. How do you know that it is not
15 ultimately to be paid in part to Orly Genger?
16 A. Because our understanding, based on
17 communications that we have had with members of
18 the AG Group, Orly has no claim to any of that
19 money and none of that money is payable to her.
20 Q. What's that understanding -- I'm
21 sorry, when were those communications made?
22 A. Over the course of multiple years
23 going back to at least the day of the amendment.
24 I think even earlier than this. What's the date
25 of this? June of -- no. This is dated, I think,

Page 47

1 Bowen
2 last summer, in 2017. It certainly predates that
3 so it's a series of communications that goes back
4 many years.
5 Q. When you say, "many years" what is
6 the start of that?
7 A. When was the trial that we did in
8 front of Judge Jaffe
9 Q. In 2015?
10 A. Yeah, so it started in that time
11 period to the present.
12 Q. So who does have a claim to those
13 assets if not Orly? To those proceeds if not
14 Orly?
15 A. Well, since it's at the control of
16 the AG Group, I think the AG Group would have that
17 understanding. The firm does not.
18 (Recess taken.)
19 BY MR. DELLAPORTAS:
20 Q. I'm going to just clarify one of your
21 prior answers.
22 A. Sure.
23 Q. When you say that Orly Genger has no
24 claim to the payments made under the note, are you
25 saying that the money -- that the money is going

Page 48

1 Bowen
2 to AG Group, and beyond that you don't know what
3 they plan to do with it, or are you saying that
4 you have knowledge that the AG Group will not be
5 transmitting any of that to Orly Genger?
6 A. The latter.
7 Q. Okay.
8 MR. DELLAPORTAS: I would like to
9 next mark as Kasowitz 4 a document
10 entitled: "Satisfaction of Judgment"
11 dated March 28, 2018.
12 (Exhibit 4 was so marked for
13 identification.)
14 BY MR. DELLAPORTAS:
15 Q. Mr. Bowen, this is a satisfaction of
16 judgment in the predecessor case in which your
17 firm represented Ms. Genger; correct?
18 A. It's a 2014 case?
19 Q. Yes.
20 A. Yes. That's correct.
21 Q. And this payment was -- this
22 satisfaction was filed on March 28, 2018?
23 A. According to the document, yes.
24 Q. Okay. And the third whereas clause
25 says that, "Whereas Orly Genger caused the



Exhibit B

Page 49
1                    Bowen
2  $21,005.24 to be paid on March 27, 2018."
3       A.   I see that.
4       Q.   And it was signed and filed by
5  Kasowitz; correct?
6       A.   Yes.
7       Q.   How did Ms. Genger make that payment?
8       A.   I have no knowledge.
9       Q.   Do you know where the money came
10 from?
11      A.   No.
12      Q.   And Kasowitz doesn't know where the
13 money came from?
14      A.   I don't believe so.  I don't believe
15 this went to Kasowitz.
16      Q.   How did Kasowitz have the comfort
17 level to file a statement in federal court saying
18 a payment was made?
19      A.   I don't understand your question.
20 Are you saying that we didn't have a reasonable
21 basis to make that statement?  Did you receive the
22 money?  Your client should know whether or not he
23 received the money.  We never heard any complaint
24 that the money was not received.
25      Q.   What was the basis for your belief

Page 50
1                    Bowen
2  that the $21,000 and so forth, was paid by Orly
3  Genger on March 27, 2018?
4       A.   That's beyond the scope of your
5  subpoena, number one.  It's trying to invade
6  privilege, number two.  Number three, do you have
7  the basis to say the money wasn't paid?  Is what
8  you are saying is that the money was not paid?  Is
9  that what your claim is?
10      Q.   Well, I'm just here to ask
11 questions --
12      A.   Is that implicit in your questions?
13      Q.   -- not to answer questions.
14      A.   Let me put it this way:  To the
15 extent that you are implicit in your question of
16 the claim that $21,005.24 reflected on Exhibit 4
17 was not in fact paid in full satisfaction of the
18 judgment, then to the extent that that is what you
19 are saying, we -- we reject that claim.  We have
20 no information that it was not paid.
21      Q.   Implicit in my question is that if
22 Kasowitz was being truthful in his representation
23 in federal court, then Ms. Genger, at one point in
24 time, during the course of this litigation, had
25 access to $21,000 in order to make that payment.

Page 51
1                    Bowen
2  My question is:  Where did that come from?
3       A.   That's a false premise.  Why would
4  you possibly say that.
5            (Laughter.)
6            Why are you laughing?
7       Q.   Because you are being an idiot.
8  That's fine.
9       A.   So you just called me an idiot.
10 Calling me an idiot in a federal deposition is
11 against your ethical obligations.
12      Q.   Can you answer the question?
13      A.   Can you acknowledge the fact that you
14 just violated your ethical obligations by calling
15 me an idiot?
16      Q.   Can you answer the question?
17      A.   Do you want to retract that statement
18 or do something to try and fix the fact that you
19 just made another ad hominem attack after I told
20 you that I will not tolerate that?
21      Q.   Can you please answer the question?
22      A.   If you acknowledge the fact that you
23 are out of line and you retract your statement.
24      Q.   I will correct it:  Your answer was
25 idiotic.

Page 52
1                    Bowen
2       A.   Fine.  That's still an ad hominem
3  attack.  Do you think that's better?  Do you know
4  a federal judge is going to be reviewing this
5  transcript?  Fine.  I will take that as your -- as
6  your position.  I'll make sure a federal judge
7  reviews this transcript.
8       Q.   Wonderful.  Can you now answer the
9  question?
10      A.   State your question again, please.
11      Q.   Can you read back the last question.
12           (Question read back.)
13 BY MR. DELLAPORTAS:
14      Q.   If Kasowitz was being truthful in his
15 representation to the federal court that Orly paid
16 -- cause to be paid $21,000, implicit within that
17 is that Orly at one time had access to $21,000 and
18 my question is:  What is Kasowitz' knowledge with
19 respect to the source of that asset?
20      A.   I can't answer that question because
21 you have false premises.  The fact that somebody
22 has paid a judgment doesn't mean that that person
23 had the assets to pay the judgment.  You can ask a
24 third party to pay the judgment.  You can obtain
25 loans which means you are taking on even more debt



Exhibit B

Page 53

1 Bowen
2 to pay the judgment.
3     Q.   So which is it?
4     A.   So I don't know, but I can't answer
5 the question with all of those presuppositions
6 that you put in there, which are not necessarily
7 true.  Leaving that aside, if your question is,
8 what does the firm know about where Orly Genger
9 got the money to pay this judgment, this amount of
10 money that is reflected in Exhibit 4, the answer
11 is, which I think I told you before, we don't
12 know.
13     Q.   That includes Mr. Hirschman?  He
14 doesn't know how his wife paid that judgment?
15     A.   I don't know how a spouse or the
16 information a spouse had in relationship to a
17 spouse.  I'm not here testifying on behalf of
18 Mr. Hirschman.  And there are spousal privileges
19 that may or may apply to that information.  I can
20 only speak on behalf of the firm.
21     On behalf of the firm, we have no knowledge
22 about where that money was sourced from or even
23 how it was transmitted.  I guess I have to look at
24 how it was transmitted.  I may -- the firm may
25 have that information.  It was not something I

Page 54

1 Bowen
2 prepared for today because you didn't identify it
3 as a topic in your subpoena.
4     But, in any event, to suggest that Kasowitz
5 as a firm is acting in bad faith because it didn't
6 have a good faith basis for filing this
7 satisfaction of judgment, on behalf of the firm, I
8 completely reject that and I think it's unethical
9 and unprofessional for you even to suggest it.
10 That's my answer.
11     Q.   First of all, you're being
12 disingenuous.  There was no suggestion that you
13 were acting in bad -- the firm was acting in bad
14 faith in filing this piece of paper.  I do think
15 there is a serious question in that regard with
16 respect to your answers here today but we will
17 proceed.
18     Is that your signature on page 2 or is that
19 Mr. Hirschmann?
20     A.   Well, I will just note that, once
21 again, you are making an ad hominem attack.
22     Q.   I'm clarifying an allegation you made
23 against me.
24     A.   You're making an ad hominem attack on
25 me and you are saying I'm acting in bad faith when

Page 55

1 Bowen
2 I'm here --
3     (Talking over each other.)
4     Q.   That's a serious question.
5     A.   -- trying to give you serious and
6 professional and careful answers on behalf of the
7 firm.
8     Q.   Okay.  Well, one is them is:  Whose
9 signature is that on page 2?
10     A.   Which exhibit?
11     Q.   Kasowitz 1.
12     A.   That's my signature.
13     Q.   And so at the time you made this, you
14 had no idea how Orly came to pay the $21,000?
15     A.   It's asked and answered, but I will
16 try and explain it again to you.  The firm has no
17 information about the source of those funds.  It
18 may have information about the mechanism of how
19 the funds were transferred, but I did not prepare
20 that information for today.  I don't personally
21 have it and I did not prepare that information for
22 today, because it was not identified as a topic
23 for this deposition.
24     By the way, this also doesn't refer to
25 assets that Orly owns or that are payable to Orly.

Page 56

1 Bowen
2     Q.   And when you say "the firm" you are
3 excluding Mr. Hirschman who is a partner of the
4 firm?
5     A.   Absolutely not.
6     Q.   So you are saying Mr. Hirschman has
7 no idea where that money came from?
8     A.   Absolutely not.  I'm speaking only on
9 behalf of the firm.
10     Q.   And you understand that the firm is
11 comprised of its partners; correct?
12     A.   Yes.
13     Q.   Mr. Hirschman is one of its partners?
14     A.   Yes.
15     Q.   If fact, he was the -- listed as the
16 lead counsel with respect to the matter in which
17 the satisfaction of judgment was filed.
18     A.   That may be.
19     Q.   He is not just some random partner
20 who I picked out of the website.  He was actually
21 the lead partner and lead attorney with respect to
22 the matter that I'm now asking you about; correct?
23     A.   Asked and answered.
24     Q.   Okay.  And so when you're speaking
25 that the firm doesn't know where this $21,000 came



Exhibit B

Page 57
1                Bowen
2  from, are you including Mr. Hirschman in that or
3  are you excluding Mr. Hirschman from that?
4      A.   Speaking on the information that is
5  available to the firm, qua firm, that
6  Mr. Hirschman has information available to him,
7  qua spouse -- I'm not privy to that information
8  speaking only on behalf of the firm.  Speaking on
9  behalf of the firm, I'm not excluding any
10 available source of information available to the
11 firm.
12     Q.   And how do you parse through, in your
13 mind, what Mr. Hirschman knows qua firm versus qua
14 spouse?
15     A.   I don't even know how to answer that
16 question.
17     Q.   It was the basis upon which you
18 answered the last question so I'd like to probe
19 the basis on which you answered the last question.
20     A.   Let me put it this way:  I didn't
21 interview Mr. Hirschman to invade his marital
22 relationships with his wife.  I didn't ask him
23 about personal information of any sort at any
24 time.  I am, however, privy to information that
25 Mr. Hirschman has that's relevant to your

Page 58
1                Bowen
2  subpoena.  And that is available to the firm
3  meaning it's information that he learned in his
4  capacity as a lawyer at the firm.
5      Q.   When you said you didn't interview
6  him about his marital communications, did you
7  interview Mr. Hirschman at all with respect to
8  your preparation for this?
9      A.   I'm not providing any answers about
10 what I did to prepare for this deposition other
11 than saying that I made reasonable inquiry and I
12 made reasonable searches and drawing upon my own
13 personal experiences as a partner at the firm, and
14 as a lawyer for Orly Genger, since we became
15 involved in the Genger affairs on behalf of Orly
16 Genger in, I guess, that was 2015.
17     Q.   Let me ask you more generally:  What
18 bank accounts are you aware that Ms. Genger
19 currently has access to?
20     A.   The firm is aware of no bank accounts
21 that she has that is in her name or that belong to
22 her.  I have anecdotal information that -- that
23 belongs to the firm that she had some kind of an
24 account that was attached, I think, by your client
25 that had a few thousand dollars, like, $8,000 or

Page 59
1                Bowen
2  something to that extent, which is, I think, part
3  of this 2014 proceeding, if I remember right.
4      Q.   Does Ms. Genger pay for your
5  services?  Pay the firm?
6      A.   That's privileged information.  I'm
7  not getting into any financial arrangements
8  between Orly Genger and the firm other than to
9  tell you that there is no money or assets that
10 belong to her or that are payable to her in that
11 relationship.
12     Q.   Can you read that back.
13          (Readback of prior question.)
14 BY MR. DELLAPORTAS:
15     Q.   What do you mean by that?
16     A.   I mean, there is no money going the
17 other way.  Meaning the firm doesn't hold assets
18 for Orly Genger and there are no assets or funds
19 that are payable to Orly Genger that the firm has.
20 For example, sometimes clients pay a retainer that
21 has not been charged against yet.  There's nothing
22 like that in this relationship.
23     Q.   Okay.  Have payments been made during
24 the relationship from Orly Genger to the firm?
25     A.   I'm not privy to answer that

Page 60
1                Bowen
2  question; it's privileged information.
3      Q.   What's your basis for saying that's
4  privileged information?
5      A.   Because the relationship between
6  attorney-client is highly confidential and most
7  often privileged.  Unless you have some authority
8  you want to talk about, we can reconsider it.  You
9  have to have a reason if you are going to get into
10 the financial relationship with an attorney and a
11 client.
12     Q.   Yes.
13     A.   Given the fact that you are looking
14 for assets I'm comfortable in telling you that
15 there has been no payment of any sort from Orly
16 Genger to my firm in this year, 2018.
17     Q.   What about during the -- since the
18 lawsuit was filed in October 2017?
19     A.   I'm not -- I think that information
20 would both be irrelevant and protected by
21 privilege.
22     Q.   Why in your view would it be
23 irrelevant?
24     A.   It's not identifying assets that
25 belong to Orly Genger or that are payable to Orly



Exhibit B

Page 61
1                Bowen
2  Genger.
3        Q.   And you don't believe that if Orly
4  Genger made a payment from an account less than a
5  year ago, that might not have some bearing on the
6  location of her assets today?  You are so
7  confident in that that you are willing to have the
8  direction to yourself not to answer that question
9  in the context of discovery?
10       A.   I don't understand your question.  If
11 your question is:  Is the firm aware of the bank
12 account that it received funds from and the bank
13 account belongs to Orly Genger, the answer to that
14 question is no.  The firm is not aware -- other
15 than the one account I identified a moment ago,
16 which had $8,000 in it and I believe that was
17 attached by your client in the prior proceeding,
18 sub district, I believe, I may be getting those
19 facts mixed up in my head, but again, to try and
20 reframe your question so I understand it.
21       If your question is:  Did the firm ever
22 receive any payment from Orly Genger from a bank
23 account that the firm can identify as belonging to
24 Orly Genger?  The answer is no.
25       Q.   When you use the term "belong" --

Page 62
1                Bowen
2  "an account belonging to Orly Genger," what do you
3  mean by that?
4        A.   I mean an account that is either for
5  her benefit or that she controls.
6            MR. DELLAPORTAS:  We'll mark Kasowitz
7        5 a document entitled "Satisfaction of
8        Judgment" dated May 8, 2018.
9            (Exhibit 5 was so marked for
10           identification.)
11 BY MR. DELLAPORTAS:
12       Q.   This is, again, a document that your
13 firm filed it looks like May 2018.  Do you
14 recognize it?
15       A.   Yes.
16       Q.   Is that your signature on the second
17 page?
18       A.   Yes.
19       Q.   It reflects that a judgment was
20 satisfied to Ms. Dahlia Genger in the amount of
21 $58,059.30.
22       Do you see that?
23       A.   Yes.
24       Q.   What was the source of the payment
25 for that $58,000?

Page 63
1                Bowen
2        A.   The firm has no information about
3  that.
4        Q.   So you are representing that the firm
5  does not know how Ms. Genger made that $58,000
6  payment?
7        A.   No.  That's a separate question.  The
8  first question was what's the source and the
9  answer is that the firm does not know the source.
10 The second question is how the payment was made.
11 The answer to that is that the firm may have that
12 information, but I didn't research that and I'm
13 not prepared to address it because it wasn't
14 within the scope of your subpoena.
15       Had you identified it I could have given you
16 a definitive answer.  So we made no, you know,
17 whatever mechanism or method or route the money
18 went, but I don't have that information at the tip
19 of my finger tips right here today.
20       Q.   So, your view is that Ms. Genger's
21 access to $58,000 just a few months ago, was not
22 within the scope of our subpoena?
23       A.   No.  I didn't testify to that.  I
24 testified that had you identified that one of the
25 topics that you wanted to discuss was the method

Page 64
1                Bowen
2  or manner in which these satisfaction -- excuse
3  me -- these judgments were paid that are reflected
4  in these two documents Exhibits 4 and 5, I could
5  have been prepared to address that because it may
6  very well be that the firm does know how those
7  payments were made
8        Q.   Well, one of the subjects are
9  assets --
10       A.   Excuse me, one second.
11       Q.   -- of Ms. Genger?
12       A.   I have to finish that answer.
13       Q.   Okay.
14       A.   You also said that the fact that she
15 had access to this money and you made a comment
16 that that should be relevant within the scope of
17 your subpoena --
18       Q.   One would think.
19       A.   Well, I understand that you are
20 expressing your view -- your own personal view of
21 that -- but logic kind of dictates that that may
22 or may not be true because it always is the case
23 that an impecunious person can have a debt paid by
24 somebody else on their behalf, now whether that
25 happened here or not, I have no information.  The



Exhibit B

Page 65

1            Bowen
2  firm has no information.
3      Q.   So the firm doesn't know where this
4  money came from either?  That's what you are
5  saying?
6      A.   No.  Because you keep subtilely
7  changing the question and I think -- I want to,
8  make sure we are not misunderstanding each other.
9  If you are asking me the source of the money, the
10 firm does not know the source of the money.
11     If you are asking where the money came from,
12 what the manner was in which the money was
13 transferred from one location to another, was it
14 by check, was it by wire, or some other type of
15 electronic transfer, the answer is:  We may be
16 aware of that but I have not prepared that
17 information for today's deposition.
18     Q.   Is the firm aware of where Ms. Genger
19 currently resides?
20     A.   I believe that's outside the scope of
21 this deposition.  I don't understand what her --
22 where she -- I guess -- well, first of all, I
23 should clarify:  When you say where she resides,
24 are you asking for her domicile, in the technical
25 sense of that word?

Page 66

1            Bowen
2      Q.   Interpret it however will yield an
3  answer.
4      A.   Well, the firm is aware that she
5  primarily resides in Tel Aviv, Israel.  And also
6  that she has an interest in some form that -- I'm
7  not necessarily -- I may not be remembering
8  correctly, I believe a condominium in Austin,
9  Texas.  She spends some time there.  But I don't
10 know.  And I think there have been public filings
11 on that.  So whatever the public filings are to
12 the extent that the firm's knowledge on that as of
13 the time that those filings were made.
14     Q.   Does Ms. Genger have any interest in
15 any other homes other than the two that you just
16 described?
17     A.   Well, I don't know that she has any
18 interest in the Tel Aviv home.  If by "interest"
19 you mean ownership interest, the firm doesn't have
20 information about that at all.
21     Q.   What do you know about that subject?
22     A.   The only information that the firm
23 has is that she lives there at the address that is
24 a matter of public record.
25     Q.   What about other homes?

Page 67

1            Bowen
2      A.   The firm has no information about
3  that at all other than the fact that she does have
4  some type of interest and it may be through
5  marital property and it may not.  I don't know the
6  ins and outs -- the firm doesn't know the ins and
7  outs of the Austin, Texas property.
8      Q.   When you say "marital property," what
9  do you mean?
10     A.   I'm not using that in any kind of
11 legal or technical meaning or a term of art
12 meaning.  I just know that sometimes a husband and
13 wife can own property as joint tenants in common
14 or income and it's not something where -- it
15 doesn't necessarily reflect that one spouse or
16 another actually contributed anything to the
17 purchasing the property it's just by virtue of
18 their status of being married that it's considered
19 to belong to both.
20     Q.   What other marital property are you
21 aware of with respect to Ms. Genger?
22     A.   None.
23     Q.   Does Ms. Genger have an interest in
24 her husband's partnership interest?
25     A.   The firm is not aware of that.  To

Page 68

1            Bowen
2  the extent it's relevant, the firm is not aware of
3  it.
4      Q.   When you mentioned you made a
5  reasonable inquiry with respect to the subject
6  matters of the subpoena, what specifically did you
7  do?
8      A.   I'm sorry?
9      Q.   When you say you made a reasonable
10 inquiry with respect to the subject matters of the
11 subpoena -- it's a term you've used several times
12 in deposition -- what, specifically, did you do?
13     A.   I'm not going to answer that
14 question.  That is privileged work-product
15 information.  I will repeat what I said before,
16 which is:  I made reasonable inquiries of
17 personnel at the firm who have knowledge into
18 Genger matters.  I made reasonable searches in the
19 sense that I looked at information both in
20 documentary form and otherwise that's available to
21 the firm that's related to this topic, and the
22 representation of Orly Genger.
23     And I'm basing it on my extensive knowledge
24 and participation in representing Orly Genger
25 since the firm became involved in the very



Page 69
1            Bowen
2  beginning -- I mean, in the very beginning of the
3  firm's involvement starting sometime in 2015, I
4  believe.
5      Q.   Where does Mr. Hirschman live?
6      A.   Well, I don't think that's relevant.
7  I don't see how that's relevant to the subpoena.
8      Q.   So you are declining to answer?
9      A.   I'm declining to answer on the basis
10 that confidential information about a partnership,
11 individual partners, is beyond the scope of this
12 subpoena.  If you want to clarify why you think
13 it's relevant I'm willing to reconsider, but I
14 don't see any relevance whatsoever.
15     Q.   To the best of your knowledge, are
16 they still married?
17     A.   I don't see how that's relevant
18 either.
19     Q.   Okay.
20     A.   If you want to explain why you think
21 it -- I mean, look, one of the things that you
22 have not ever tried to justify is why you are
23 trying to interfere or interpose into this private
24 marital relationship between Ms. Sagi's own sister
25 and her husband.  If you want to explain it, you

Page 70
1            Bowen
2  can explain it.
3      Q.   You just said they had marital
4  property.
5      A.   How -- how --
6      Q.   I have an uncollected $3 million
7  judgment.  Isn't it, at least, marginally rel
8  event that I inquiry about their marital property?
9      A.   You're not asking about their marital
10 property.  Now you are asking about their marital
11 relationship and whether or not they are still
12 married.
13     Q.   Yes.
14     A.   And I guess the question --
15     Q.   Isn't that relevant to marital
16 property if they are in fact still married?  No?
17     A.   No.  Well, first of all, I don't
18 think it's a valid question.  I think it's an
19 offensive question.
20     Q.   An offensive to ask whether they are
21 still marred?
22     A.   Yes.
23     Q.   Okay.
24     A.   Secondly, I'm speaking on behalf of
25 the firm, and the firm doesn't have information

Page 71
1            Bowen
2  about the marital status of it's various partners
3  unless or until there is some reason to notify the
4  firm about a marriage or a divorce or some other
5  type of change in status that the firm might need
6  to be aware of in terms of insurance.
7       I see that you're not really paying
8  attention to my answer so I am just going to stop
9  even though my answer is not finished.  If you
10 want to listen --
11     Q.   The reporter is capturing you
12 answers.
13     A.   No, I'm not going to speaking when
14 I'm being treated in this fashion.  If you want to
15 listen to the answer --
16     Q.   You're being treated perfectly fine.
17 Stop making speeches.  You are allowed to answer
18 the question.  I didn't interrupt.  You
19 interrupted yourself.  You were making a speech,
20 finish your speech and then we will go on to the
21 next question.  I'm listening.  I can do two
22 things at the same time.
23     A.   You were talking to your client.
24     Q.   I was not talking to my client.  I
25 was reviewing my notes while I was listening to

Page 72
1            Bowen
2  your answer.  Believe it or not, I'm capable of
3  doing that.
4      A.   Tell me where I was and I will pick
5  it up.
6      Q.   The reporter can tell you that.
7         (Readback of prior question.)
8         THE WITNESS:  I got it.  So continuing
9      my answer to the extent that your question
10     is asking whether or not there has been
11     any communications with the firm with
12     respect to Mr. Hirschman marital status
13     other than the fact he was married to Orly
14     Genger at some point, I believe, in 2016
15     if my memory is correct, the answer is no.
16        MR. DELLAPORTAS:  Make the next one
17     marked as Kasowitz Exhibit 6, February 5,
18     2018 letter.
19        (Exhibit 6 was so marked for
20     identification.)
21 BY MR. DELLAPORTAS:
22     Q.   This is a letter you submitted to the
23 court.
24     A.   Correct.
25     Q.   If you go to the last page, the first



Exhibit B

Page 73

1        Bowen
2  full paragraph on page 3.
3      A.   Yes.
4      Q.   In it you wrote to Judge Freeman
5  "Orly has attested that long before this action,
6  she purchased a home in Tel Aviv with her husband
7  and that she lives there with her infant
8  daughter."
9      What attestation are you referring to there?
10     A.   It would be the sworn declaration
11 that she submitted in this action.
12     Q.   In this case?
13     A.   I believe so.
14     Q.   Okay.  Do you represent Arie Genger
15 with respect to this matter?  I'm talking about
16 the case we are currently in to today?
17     A.   The judgment enforcement case?
18     Q.   Yes.
19     A.   I don't think he is a party in this
20 action.  We may or may not represent him for
21 purposes of discovery if and when there is any
22 discovery propounded on him, but I don't know the
23 answer to that.
24     Q.   So, I will represent to you that we
25 served a subpoena on him and he did not appear for

Page 74

1        Bowen
2  that as in fact I e-mailed you a few weeks ago.
3  Are you representing with respect to that
4  subpoena?
5      A.   I don't believe so.  What do you mean
6  you e-mailed me about it?
7      Q.   I e-mailed you --
8      A.   Do you mean me personally or the
9  firm?  Somebody else?
10     Q.   I e-mailed you personally.
11     A.   About Arie Genger?
12     Q.   Yes.  I e-mailed you, Mr. Freedman,
13 and Mr. Montclair --
14     A.   Mr. who?  I'm sorry.
15     Q.   Montclair?  Paul Montclair?  He was
16 prior attorney of Arie with regard to our subpoena
17 and asked if you represented him with regard to
18 that subpoena?
19     A.   You didn't get a response from
20 anybody at my firm?
21     Q.   No, I only e-mailed you.
22     A.   When you say Mr. Friedman, who are
23 you talking about?
24     Q.   Leon Friedman.  That's another prior
25 attorney of Mr. Genger.

Page 75

1        Bowen
2      A.   It's possible that I missed that
3  e-mail.  If you didn't include anybody else on the
4  Kasowitz team.  I don't remember it personally.
5  On behalf of the firm, I have no information that
6  we represent Arie Genger with respect to any
7  process that you may or may not have served on
8  him.
9      Q.   In this case.
10     A.   I have no information about whether
11 or not -- right, in this case.  Currently.  Let's
12 just say currently.  And I don't have any
13 information about whether you in fact did serve
14 process on him.
15     Q.   Okay.
16     A.   So I can't comment on that either.
17     Q.   So, suffice it to say that we don't
18 believe your relevance objections were well taken.
19 Our position is this deposition has to be
20 continued until the proper documents are produced
21 and the proper questions are answered, but subject
22 to that position we have nothing further for
23 today?
24     A.   Okay.
25         (Time noted:  11:41 a.m.)

Page 76

1        Bowen
2      THE WITNESS:  Read and sign.
3     (Time noted:  p.m.)
4
5
        _____
6          MICHAEL BOWEN
7
8  Subscribed and sworn to before me
   this _____ day of _____, 20___.
9  _____
         NOTARY PUBLIC
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Exhibit B

## Page 77

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| MR. BOWEN | DIRECT / DELLAPORTAS | 4 |

EXHIBITS

| KASOWITZ | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Subpoena | 4 |
| 2 | Amendment to Settlement Agreement | 6 |
| 3 | AG/Trump Settlement Agreement | 23 |
| 4 | Satisfaction of Judgment | 48 |
| 5 | Satisfaction of Judgment | 62 |
| 6 | February 5, 2018 letter | 72 |

## Page 78

C E R T I F I C A T I O N

I, Jeffrey Shapiro, a Shorthand Reporter and notary public, within and for the State of New York, do hereby certify:

That MICHAEL BOWEN, the witness whose examination is hereinbefore set forth, was first duly sworn by me, and that transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of October, 2018.

_____
JEFFREY SHAPIRO

## Page 79

DEPOSITION ERRATA SHEET

Our Assignment No. J2899510
Case Caption: Genger vs. Genger

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

_____
Michael Bowen

Subscribed and sworn to on the _____ day of _____, 20____ before me,
_____
Notary Public,
In and for the State of _____

## Page 80

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to: _____
_____
Reason for change: _____
Page No._____Line No._____Change to: _____
_____
Reason for change: _____
_____
Page No._____Line No._____Change to: _____
_____
Reason for change: _____
Page No._____Line No._____Change to: _____
_____
Reason for change: _____
Page No._____Line No._____Change to: _____
_____
Reason for change: _____
_____
Page No._____Line No._____Change to: _____
_____
Reason for change: _____

SIGNATURE:_____DATE:_____
Michael Bowen



Exhibit B