## Page 1

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
     -------------------------------
     SAGI GENGER,
               Plaintiff,
               vs.              No. 1:17CV8181
     ORLY GENGER,
               Defendant.
     -------------------------------



                DEPOSITION OF DAVID BROSER
                     New York, New York
                  Tuesday, October 23, 2018






     Reported by:
     Yaffa Kaplan
     JOB NO. 3006866
```

## Page 2

```
                    October 23, 2018
                       10:25 a.m.

          Deposition of DAVID BROSER, held at
     the offices of Kelly Drye & Warren, 101
     Park Avenue, New York, New York, pursuant
     to Subpoena, before Yaffa Kaplan, a Notary
     Public of the State of New York.
```

## Page 3

```
     A P P E A R A N C E S:

          KELLY DRYE & WARREN LLP
          Attorneys for Plaintiff
               101 Park Avenue
               New York, New York 10178
          BY:  JOHN DELLAPORTAS, ESQ.

          OCHS & GOLDBERG LLP
          Attorneys for Witness
               60 East 42nd Street, Suite 2101
               New York, New York 10165
          BY:  MITCHELL D. GOLDBERG, ESQ.

     ALSO PRESENT:
          SAGI GENGER
```

## Page 4

```
          IT IS HEREBY STIPULATED AND AGREED,.
     by and between counsel for the respective
     parties hereto, that the filing, sealing and
     certification of the within deposition shall
     be and the same are hereby waived;
          IT IS FURTHER STIPULATED AND AGREED
     that all objections, except as to the form
     of the question, shall be reserved to the
     time of the trial;
          IT IS FURTHER STIPULATED AND AGREED
     that the within deposition may be signed
     before any Notary Public with the same force
     and effect as if signed and sworn to before
     the Court.
```



Page 5

1      D. Broser
2      (D. Broser Exhibit 1, Subpoena, marked
3    for identification, as of this date.)
4   D A V I D   B R O S E R, called as a
5    witness, having been duly sworn by a Notary
6    Public, was examined and testified as
7    follows:
8   EXAMINATION BY
9   MR. DELLAPORTAS:
10    Q.   What is your name and address?
11    A.   David Broser, 37 Charles Street, New
12  York, New York 10014.
13    Q.   Good morning, Mr. Broser.
14    A.   Good morning.
15    Q.   What is the Genger Litigation Trust?
16    A.   I don't know what that is referring to.
17    Q.   Never heard that term before?
18    A.   Possibly.
19    Q.   Is there a trust or other account held
20  by Northern Trust Bank which relates to the Genger
21  litigation?
22    A.   Not really sure.
23         MR. DELLAPORTAS:  So I have marked as D.
24    Broser Exhibit 1 the subpoena in this case,
25    and I would like to now show the witness a

Page 6

1      D. Broser
2    document previously marked as Hirsch Exhibit
3    10.
4    Q.   So Mr. Broser, this is a document
5  entitled "TAS Client Trust Ledger Wachtel Missry
6  LLP", and it reflects a wire transfer of 17 million
7  257,001 dollars to Northern Trust Co. for credit to
8  the Genger Litigation Trust.  Do you know what this
9  references?
10    A.   I think it's a bank account that Lance
11  Harris has for Ari.
12    Q.   So are you a signatory on this bank
13  account?
14    A.   Possibly.
15    Q.   Are you a trustee of the Genger
16  Litigation Trust?
17    A.   Possibly.
18    Q.   Are you a beneficiary of the Genger
19  Litigation Trust?
20    A.   No.
21    Q.   What about your father?  Would he be a
22  trustee of the Genger Litigation Trust?
23    A.   No.
24    Q.   Would he be a signatory on this account?
25    A.   No.

Page 7

1      D. Broser
2    Q.   What do you understand to be the purpose
3  of this bank account?
4    A.   The purpose was all proceeds from the
5  settlement agreement were going to go to Ari
6  Genger, and it would be disbursed by a trust to be
7  able to pay off what Ari wanted to be paid off.
8    Q.   Now, are you or your father or anyone
9  associated therewith a creditor of Ari Genger?
10         MR. GOLDBERG:  Individually?
11    Q.   Individually or through your entity?
12         MR. GOLDBERG:  And Ari individually?
13         MR. DELLAPORTAS:  And Ari individually.
14         THE WITNESS:  How can I answer that
15    question?
16         MR. GOLDBERG:  Can you state the
17    relevance to your action which is a
18    supplemental proceeding to enforce a judgment
19    against Orly Genger?
20         MR. DELLAPORTAS:  Sure.  The United
21    States District Court held that Orly Genger
22    monetized --
23         MR. GOLDBERG:  You are referring to the
24    opinion --
25         MR. DELLAPORTAS:  Hold on.  You asked me

Page 8

1      D. Broser
2    to say something, so let me finish my
3    sentence.  The United States District Court
4    found in its decision granting summary
5    judgement to my client Sagi Genger as well as
6    in prior decisions that Orly Genger monetized
7    her interest in what are called the Orly Trust
8    shares for TRI for 32.3 million dollars.  Orly
9    Genger has given us a sworn statement that she
10    does not know what became of that 32 million
11    dollars, and therefore, we are trying to find
12    out what became of the 32 million dollars to
13    understand whether or not Orly has a potential
14    claim which we, as a judgment creditor, can
15    use to collect our judgment.
16         MR. GOLDBERG:  I understand but John,
17    again the initial question was what does David
18    possibly having a judgment creditor
19    relationship with Ari have to do with your
20    ability to collect the judgment?
21    Notwithstanding what the Court may or may not
22    have said.
23    Q.   Let me withdraw and ask some
24  foundational questions.
25    A.   Okay.



Page 9

1     D. Broser
2  DI  Q.  Did Ari use any of that 17.257 million
3  dollars to pay either you, your father, or any of
4  these associates?
5     MR. GOLDBERG:  Same objection for you
6  guys.  What does that have to do -- again,
7  relevance.
8     MR. DELLAPORTAS:  I have articulated it.
9     MR. GOLDBERG:  No.  Again, you are here
10  to enforce -- we spoke on the phone yesterday.
11  Keep your eye on the ball.  This is a
12  supplementary proceeding to enforce a judgment
13  that you have against Orly Genger, so you
14  should be focusing your questions as to what
15  assets he is aware of that relate to your
16  ability to enforce that judgment.
17     MR. DELLAPORTAS:  Is that a direction
18  not to answer?
19     MR. GOLDBERG:  No.  I am objecting on
20  relevance.
21     MR. DELLAPORTAS:  Okay.  I would ask
22  that you keep your objections to properly
23  formulated objections as the federal court
24  rules.
25     MR. GOLDBERG:  There is a record.  We

Page 10

1     D. Broser
2  have a record here.
3     MR. DELLAPORTAS:  Objection, relevance.
4  Speaking objections are inappropriate.
5     MR. GOLDBERG:  You asked me to expand on
6  the objection.
7     MR. DELLAPORTAS:  I did not ask you to
8  expand on the objection.
9     MR. GOLDBERG:  Okay.
10     MR. DELLAPORTAS:  I will never ask you
11  to expand on any of your objections.
12    Q.  Can you answer the question?
13     MR. GOLDBERG:  He cannot.
14     MR. DELLAPORTAS:  Why not?  You are
15  instructing him not to answer?
16     MR. GOLDBERG:  I am instructing him not
17  to answer.
18     MR. DELLAPORTAS:  Okay.  Let's call the
19  Court.
20     Let me ask one further question and see
21  if we get an instruction not to answer.
22    Q.  Do you have knowledge how the 17.257
23  million dollars was used or disbursed?
24    A.  Yes.
25    Q.  Please tell me.

Page 11

1     D. Broser
2    A.  None of it went to Orly.
3    Q.  That's not what I asked.  Can you answer
4  the question?
5     MR. GOLDBERG:  Your question though
6  should be -- well, John, we can laugh and
7  might as well get the Court on the phone right
8  now.  Your inquiries should be directed to
9  whether or not Orly received any of the monies
10  from that account.
11     MR. DELLAPORTAS:  Okay.  All right.
12  Let's call.
13     MR. GOLDBERG:  Not who else received it.
14     (Discussion off the record.)
15    Q.  Is there an agreement among the members
16  of the AG Group as that term is defined under the
17  settlement agreement as to how the 32.3 million
18  dollars in past and future proceeds will be
19  distributed?
20    A.  What are you talking about?  Can you
21  show me the specifics?
22    Q.  Are you aware of a settlement agreement
23  that you entered into with parties collectively
24  known as the Trump Group?
25    A.  Yes, I am.

Page 12

1     D. Broser
2    Q.  Are you aware that there was a
3  settlement agreement with your signature on it?
4    A.  Yes, I am.
5    Q.  Are you aware that the settlement
6  agreement provided that 17.2 million dollars would
7  be paid around the time of execution and another 15
8  or so pursuant to promissory notes under that
9  agreement?
10    A.  There is a lot of different numbers in
11  the agreement, so I would like to see which
12  specific numbers you are referring to.
13    Q.  Are you aware that any money was to be
14  paid under that settlement agreement?
15    A.  Yes.
16    Q.  Is there an agreement as to where that
17  money is to go as among the members of the AG
18  Group?
19     MR. GOLDBERG:  Pursuant to the
20  settlement agreement?
21    Q.  Can you answer my question?
22    A.  Can you repeat the question?
23     MR. DELLAPORTAS:  Can you read it back?
24     (Record read.)
25     MR. GOLDBERG:  I am asking that money



Page 13

1  D. Broser
2  referring to the money under the settlement
3  agreement.
4      MR. DELLAPORTAS: I think my question is
5  clear.
6  Q.  Can you answer it?
7  A.  Where all the money goes under the
8  settlement agreement? I believe the settlement
9  agreement has more than 32 million dollars in it.
10  Q.  Whatever the amount is, my question
11  didn't specify an amount. Is there an agreement as
12  to where where any or all of that money is to go as
13  among the members of the AG Group?
14  A.  I would like you to read back the
15  question when you brought up 32 million dollars as
16  the number because you did specify a number
17  earlier.
18  Q.  Can you answer this question, or are you
19  refusing to answer this question?
20  A.  Ask it the proper way, I will answer it.
21      MR. DELLAPORTAS: Can you read back the
22  last question?
23      (Record read.)
24  A.  Yes.
25  Q.  What is that agreement?

Page 14

1  D. Broser
2  A.  What is that agreement?
3  Q.  What is the agreement?
4  A.  All the money goes to Ari Genger.
5  Q.  Is that agreement reduced to writing
6  anywhere?
7  A.  No. Facts speak for it.
8  Q.  When was that agreement reached?
9  A.  As the litigations were going on with
10  the Trumps, very, very early in this process.
11  Q.  Sorry. When you say "very, very early",
12  what do you mean?
13  A.  I mean the same time that Sagi stole all
14  his sister's assets and had claims against Sagi and
15  had the claim against the Trumps for her specific
16  shares. All the other assets were to go to Ari for
17  the control that his son tried to steal away from
18  him also. So that's when the process took place.
19  MO Q.  So I am going to move to strike the
20  references to stealing. There have been court
21  adjudications with regard to the money that was
22  found that was properly paid to TRS found by United
23  States District Judge Keenan and several other
24  judges. I am going to ask in the future that you
25  simply answer my question without inserting

Page 15

1  D. Broser
2  disparaging false comments about my client that
3  were adjudicated contrary to how you claim.
4      So when was this agreement reached? Can
5  you answer that question without putting in
6  spurious insults about my client?
7  A.  I already answered the question.
8  Q.  When?
9  A.  Can you read back my answer I said?
10  Q.  A date. I would like a date. A day, a
11  month, a year. Can you give me a year? Start with
12  that, a decade. When was this agreement reached?
13  A.  Pretty early in the process of the
14  litigations against the Trumps.
15  Q.  What litigations against the Trumps?
16  A.  The Delaware actions.
17  Q.  Describe to me that agreement.
18  A.  I had several communications with Jules
19  Trump during the years to -- Eddie Trump and Jules
20  Trump to settle the cases and there was a perfect
21  understanding that all the money was going to Ari.
22  There was litigation with Ari and the Trumps
23  throughout the whole process. At the end when the
24  settlement was -- took place, there were signatures
25  put on requested by the Trumps. It was known that

Page 16

1  D. Broser
2  all the money was going to go to Ari.
3  Q.  Known by who?
4  A.  By every member of the AOG Group.
5  Q.  So just to be clear, it's defined as the
6  AG Group in the settlement agreement. You are
7  referring to the same thing?
8  A.  Yes.
9  Q.  Did you ever speak directly with Orly as
10  to this agreement?
11  A.  Not sure.
12  Q.  What about your father?
13  A.  Not sure.
14  Q.  Did you ever see anything in writing
15  from Orly where she agreed that all the money was
16  to go to Ari Genger?
17  A.  Did not see anything in writing.
18  Q.  Not a signed agreement?
19  A.  Not that I recall.
20  Q.  Not an e-mail from her saying yes, all
21  the money goes to Ari?
22  A.  Not that I recall.
23  Q.  The AG Group appointed a gentleman named
24  William Wachtel as payment agent, correct?
25  A.  I believe that's the case, yes.



Page 17

1         D. Broser
2     Q.   And then at some point it was switched
3  to another gentlemen called Michael Bowen, correct?
4     A.   I believe so, yes.
5     Q.   Why was that change made?
6     A.   I don't know.
7     Q.   You agreed to the change in writing,
8  correct?
9     A.   Yes, I believe so.
10    Q.   Who among the AG Group in your view is
11 authorized to give payment directions to the
12 payment agent, whether it be Mr. Wachtel or Mr.
13 Bowen?
14    A.   Ari Genger.
15    Q.   Nobody else?
16    A.   Nobody else.
17    Q.   Have you ever seen any agreement in
18 writing reflecting that?
19    A.   No.
20    Q.   Are you currently in business with Ari
21 Genger?
22         MR. GOLDBERG:  Objection, relevance.
23    Q.   The relevance is we are trying to find
24 out if any of Orly's money ended up in one of your
25 business ventures.

Page 18

1         D. Broser
2         MR. GOLDBERG:  Objection, relevance.
3    Same objection.
4         MR. DELLAPORTAS:  That's pretty clear.
5    A.   Excuse me?
6         MR. GOLDBERG:  Same objection.
7         MR. DELLAPORTAS:  I think it's pretty
8    clear what the relevance is.
9         MR. GOLDBERG:  Same objection.
10    Q.  Did any of the money from the settlement
11 end up in one of your business ventures with Ari
12 Genger?
13        MR. GOLDBERG:  Same objection.
14        MR. DELLAPORTAS:  Is that an instruction
15   not to answer?
16        MR. GOLDBERG:  Can I speak to the
17   witness?
18        MR. DELLAPORTAS:  Yes.  We will step
19   outside.
20        (Discussion off the record.)
21        (Record read.)
22    A.  Not to my knowledge.
23 DI Q.   Are you in business with Ari Genger?
24        MR. GOLDBERG:  Objection, relevance.
25    Q.  Can you answer the question?

Page 19

1         D. Broser
2         MR. GOLDBERG:  No.
3         MR. DELLAPORTAS:  Well, we will add
4    that.
5         MR. GOLDBERG:  Of course.  All of this
6    we are piling up.
7         MR. DELLAPORTAS:  We will establish a
8    record.
9  DI Q.   Are you partners with Mr. Genger in a
10   matter called Core Capital Group?
11        MR. GOLDBERG:  Objection, relevance.
12        MR. DELLAPORTAS:  Are you instructing
13   him not to answer?
14        MR. GOLDBERG:  I am.
15        (Discussion off the record.)
16        THE COURT:  This is Judge Broderick.  I
17   am calling -- I understand there is a dispute
18   with regard to a deposition?
19        MR. DELLAPORTAS:  Yes, Your Honor.
20        THE COURT:  Are the parties all there
21   and is a court reporter available?
22        MR. DELLAPORTAS:  We do have a court
23   reporter.  This is a judgment collection
24   proceeding deposition.  My name is John
25   Dellaportas.  I am here on behalf of the

Page 20

1         D. Broser
2  judgment creditor and it's a third-party
3  deposition of Mr. Broser and I will allow his
4  attorney to introduce himself.
5         MR. GOLDBERG:  Good morning, Your Honor.
6  It's Mitchell Goldberg.  I am here on behalf
7  of the nonparty witness subject to a subpoena,
8  David Broser
9         THE COURT:  Okay.  Are we on
10  speakerphone right now?  Okay.  So let me
11  hear.  I understand there was a question or
12  perhaps a series of questions and there was a
13  direction not to answer.  If I have that
14  incorrect, you can just correct me on that.
15  Why doesn't the party seeking to -- I take it
16  that counsel for the third-party witness
17  directed the witness not to answer; is that
18  correct?
19        MR. GOLDBERG:  Correct, Your Honor.
20        THE COURT:  Okay.  And what was the
21  nature of the questions that were being asked?
22        MR. GOLDBERG:  This is a -- for all
23  practical purposes a supplementary proceeding
24  to enforce a judgment.  Plaintiff's counsel
25  represents Sagi Genger.  The judgment debtor

Page 21

 1      D. Broser
 2   is Orly Genger.  And the questions that we
 3   have objected to on relevance pertain to my
 4   client's business relationship with a nonparty
 5   to this litigation that bears no effort
 6   whatsoever, zero, to seek to enforce a
 7   judgment that plaintiff's counsel has against
 8   the judgment creditor.
 9      THE COURT:  Okay.  Let me hear from
10   counsel for the judgment creditor.
11      MR. DELLAPORTAS:  Thank you, Your Honor.
12   So Your Honor, as you know, this was -- this
13   case was transferred to Your Honor upon the
14   retirement of Judge Forest.  Judge Forest
15   entered a 3-million-dollar judgment in our
16   favor which has not been paid.  The judgment
17   debtor, Ms. Orly Genger, has indicated that
18   she has no assets to pay it.  Judge Forest
19   found in her July 27, 2018 summary judgment
20   decision in my client's favor that, "Orly had
21   monetized her beneficial interest for 32.3
22   million dollars".  That's Docket Number 101 on
23   this case.
24      THE COURT:  Let me ask this before you
25   continue.  When you say when Judge Forest said

Page 22

 1      D. Broser
 2   monetized her interest, can you flesh that
 3   out?  In other words, in what way was that
 4   interest monetized?
 5      MR. DELLAPORTAS:  Sure.  So Orly brought
 6   a litigation along with her father who was a
 7   co-plaintiff and against these parties called
 8   the Trump Group.  And they settled it for 32.3
 9   million dollars, of which 17.3 million dollars
10   was paid right away.  This is in 2013 and
11   another 15 million dollars is to be paid in
12   the future pursuant to promissory notes.  When
13   we served interrogatories on Orly to find out
14   what became of that money because obviously 32
15   million dollars would help pay our
16   3-million-dollar judgment, Orly said she did
17   not know what became of that money.  Either
18   the 17.3 million already paid and she didn't
19   know what was to become of the 15 million yet
20   to be paid.  We subpoenaed bank records and we
21   found that 17.3 million was paid into a trust
22   account.  We were advised by the payment agent
23   that the trust account was controlled by a Mr.
24   David Broser, the witness here today.
25       So in our question we sought to find out

Page 23

 1      D. Broser
 2   what became of that 17.3 million dollars
 3   because obviously in our view, Orly has a
 4   claim against that 17.3 million dollars.  We
 5   also would like to know what is to become of
 6   the 15 million dollars yet to be paid because
 7   in our view this was a settlement of claims
 8   brought by Orly Genger and she has the right
 9   to that money as well.  The settlement
10   agreement itself says that the AG Group as
11   it's defined of which she is a member is to
12   get this 32.3 million dollars.  So we are here
13   trying to find out what's become of Orly's
14   32.3 million dollars that she monetized, and
15   we are getting directions not to answer on
16   relevance grounds.
17      MR. GOLDBERG:  That's not true.  Your
18   Honor, just to be clear, the questions that
19   relate to the 17 million dollars that were
20   paid into an account upon execution of this
21   settlement agreement between two constituent
22   groups are not being objected to and Mr.
23   Broser has answered.  It's the questions that
24   relate to Mr. Broser's business relationship
25   with Ari Genger, again, not a party to this

Page 24

 1      D. Broser
 2   litigation and has no relevance and is not
 3   aimed to determine whether or not they can
 4   enforce the judgment.  That's where we are
 5   objecting to.  Not the questions that relate
 6   to the settlement agreement and what happened
 7   to the proceeds being paid into the account.
 8      MR. DELLAPORTAS:  Well, I would be happy
 9   -- sorry, Your Honor.
10      THE COURT:  Let me direct the specific
11   question as I understand it related to the
12   business relationship I guess it was with Mr.
13   --
14      MR. GOLDBERG:  Correct.
15      THE COURT:  Between Mr. Broser and Mr.
16   Orly Genger.
17      MR. GOLDBERG:  No, it was between --
18   counselor is exploring the relationship
19   between David Broser, the witness here today,
20   and Ari Genger who is not a party to this
21   litigation.
22      MR. DELLAPORTAS:  Your Honor, we
23   disagree with that, and we would be happy to
24   play back the question which prompted this
25   call.



Page 25

1      D. Broser
2      THE COURT: Why don't we -- if the court
3   reporter can do that. Why don't we have that?
4   I would like to hear what that question is.
5   As the initial matter, I would like to rule on
6   that question, and then secondly, I would like
7   to hear -- well, let me hear the question
8   first and I may have some follow-up.
9      (Record read.)
10     THE COURT: I will allow it. That
11  question should be answered. So that question
12  -- I mean, it goes directly to, as I
13  understand it, the distribution of those
14  funds. The fact that they may have gone to
15  other people, third parties, and not directly
16  to Orly Genger, I think at least in my mind
17  doesn't require a direction not to answer.
18     MR. GOLDBERG: Your Honor, let me just
19  say the witness has already testified not only
20  that the funds didn't go to Orly, but it was
21  his understanding that Orly was not entitled
22  to any of the monies from the proceeds of the
23  settlement.
24     THE COURT: Here is the problem: The
25  witness's understanding -- and the witness may

Page 26

1      D. Broser
2   have been told this, the witness may not have
3   been told this, I don't know, but they are
4   trying to track the funds.
5      MR. GOLDBERG: So my client responded
6   that all of the proceeds from the settlement,
7   the first tranche of the settlement, my client
8   testified went to Ari Genger.
9      THE COURT: So the full 17 million
10  dollars went to Ari Genger?
11     MR. GOLDBERG: That's what the record
12  provides.
13     THE COURT: Okay. All right. So then I
14  am not exactly sure why there was a direction
15  not to answer because as I understand the
16  question --
17     MR. GOLDBERG: I'm sorry, Your Honor.
18  There was a follow-up to that what happened.
19  They effectively now want to know -- Mr.
20  Broser testified Orly Genger, to his
21  knowledge, was not entitled to the proceeds of
22  the settlement. All the proceeds of the
23  settlement went to Ari Genger, and now they
24  are trying to probe what did Ari Genger do
25  with the money.

Page 27

1      D. Broser
2      THE COURT: Okay. I'm sorry. Go ahead.
3      MR. DELLAPORTAS: I apologize, Your
4   Honor. We are trying to track what became of
5   the 32 million dollars that Orly Genger was
6   found to have monetized. So these are
7   lawsuits brought by Orly Genger. She got 32.3
8   million dollars. We would like to figure out
9   what became of those proceeds. It's
10  potentially -- the Second Circuit and a prior
11  ruling said that they might have been gifted
12  to Ari Genger or they might have been used to
13  pay off debts. Obviously if there is a
14  fraudulent conveyance here, that's of interest
15  to us. And the notion that Mr. Broser doesn't
16  believe that Orly Genger settled her own
17  claims and isn't entitled to any of the money
18  for settling her own claims, we obviously
19  would like to explore that by figuring out
20  where the money went, why it went there, and
21  if that was legitimate.
22     MR. GOLDBERG: Your Honor, let me just
23  say the reference to monetizing the 32 million
24  dollars is a red herring. It has nothing to
25  do with the settlement reached with the Trump

Page 28

1      D. Broser
2   organization that's the subject of the
3   questions. There was a settlement reached
4   with another constituent group that provided
5   for monies to be paid. The first tranche of
6   that has been paid. Mr. Broser testified that
7   the monies went to Orly Genger -- I'm sorry,
8   went to Ari Genger and that Orly Genger, to
9   his knowledge, was not entitled to any of that
10  money.
11     MR. DELLAPORTAS: To be clear, Your
12  Honor, the 32.3 million dollar quote from
13  Judge Forest's decision is an answer to a
14  settlement agreement to which both Orly
15  Genger, the judgment credit debtor, and David
16  Broser, the witness, are parties.
17     THE COURT: I think I heard enough.
18  With regard to -- as I understand it, there is
19  a judgment for approximately 3 million
20  dollars, and you are attempting to figure out
21  where money funds may have gone. Whether or
22  not at the end of the day that the judgment
23  creditor will be able to collect once they
24  figure out where these funds went is a
25  separate issue. I am going to direct Mr.



Page 29

1      D. Broser
2  Broser to answer those questions such that
3  there can be a determination of where the 17
4  million ended up to the extent Mr. Broser
5  knows and so that -- and to the extent he has
6  any awareness of where the balance of those
7  funds may have gone or where they may be or
8  whether they have been paid.
9      MR. GOLDBERG:  Thank you, Your Honor.
10  Again, the only monies paid to date are the 17
11  million.  There is 15 million in payables that
12  are subject to a promissory note.  The other
13  questions though -- and I understand your
14  Honor's direction about the 17 million -- I
15  believe Mr. Broser has already testified to
16  his knowledge what happened to those funds,
17  but the judgment creditor's counsel is asking
18  about a business relationship that Mr. Broser
19  may or may not have with Ari Genger.  How is
20  that relevant to this proceeding to enforce a
21  judgment?
22      THE COURT:  Well, as I understand it,
23  certain of the monies went to Mr. Genger, so I
24  think he is entitled to explore that.  I
25  didn't hear anything about what is your

Page 30

1      D. Broser
2  business relationship with Ari Genger.  It
3  also goes quite frankly to the extent there is
4  some bias on behalf of the witness because of
5  this business relationship.  I think he is
6  entitled to ask that question also.
7      MR. GOLDBERG:  Relating to bias?
8      THE COURT:  Well, relating to bias.  But
9  my understanding -- is that right?  The monies
10  were given to Ari Genger, right?  The question
11  as I understand it was well, what happened to
12  the money after it went to Mr. Genger.  And
13  then there was a direction not to answer.
14      MR. DELLAPORTAS:  That's correct, Your
15  Honor.
16      THE COURT:  So that question needs to be
17  answered.  I don't know what this issue is
18  about, you know, their business relationship,
19  but as I understand what counsel for the
20  judgment creditor is simply trying to figure
21  out where that money stopped.  In other words,
22  who was the ultimate person who got that money
23  or people who got that money.
24      MR. DELLAPORTAS:  That's correct, Your
25  Honor.

Page 31

1      D. Broser
2      MR. GOLDBERG:  Well, it seems to me that
3  Ari Genger would be the best person to answer
4  that question.
5      THE COURT:  And that may be and that may
6  happen, but your client is there now and he
7  has to answer the question.
8      MR. GOLDBERG:  To the extent that he has
9  knowledge of what Ari Genger did with the
10  proceeds of the settlement?
11      THE COURT:  Well, to the extent he was
12  involved in that.
13      MR. GOLDBERG:  And to the extent he was
14  involved in it.
15      THE COURT:  If he has any -- to the
16  extent he has any knowledge about what
17  happened to those monies, he needs to answer
18  the question.  Wherever that knowledge may
19  have come from.
20      MR. GOLDBERG:  Even if the underlying
21  testimony of Mr. Broser is that Orly Genger
22  was not entitled to any of the proceeds from
23  the settlement?
24      THE COURT:  He is not the decision-maker
25  with regard to that.  He may have that view.

Page 32

1      D. Broser
2  He can testify to that view. He can be asked
3  what is the basis for his understanding that
4  that is the case, but the fact is he simply
5  can't say well, it's my understanding, you
6  know, the person wasn't due any of this money
7  and therefore I am not going to answer the
8  questions.  No.  That's not the way this is
9  going to work.
10      MR. GOLDBERG:  Okay, Your Honor.  All
11  right.
12      THE COURT:  Thank you.
13      MR. DELLAPORTAS:  Thank you, Judge.
14      THE COURT:  Thank you very much.
15  Good-bye.
16      MR. DELLAPORTAS:  Let's take a quick
17  break.
18      (Recess taken.)
19      MR. DELLAPORTAS:  So we would ask that
20  an answer be given to the question for which
21  there was a direction.
22      MR. GOLDBERG:  Just so we are clear, can
23  you read back that last question that was the
24  subject of the call to the Court?
25      (Record read.)



Page 33

1  D. Broser
2  MR. GOLDBERG: So the question is do you
3  have knowledge how the 17.257 was used. Is
4  that the question?
5  (Record read.)
6  A.  Yes.
7  Q.  Can you please tell me?
8  A.  To pay off Ari's debts.
9  Q.  To whom?
10  A.  I don't know the list.
11  Q.  Was you, your father, or any of the
12  entities associated with your father among those
13  creditors?
14  A.  Yes.
15  Q.  And what portion of the 17.3 million
16  dollars went to pay off you, your father, or any of
17  the entities associated therewith?
18  A.  Not sure of the percentage.
19  Q.  How much did you receive?
20  A.  I am not sure how much I received.
21  Q.  Approximately?
22  A.  I can give you a range: 11 to 13
23  million.
24  Q.  What is your knowledge as to what Ari
25  did with the balance of the money?

Page 34

1  D. Broser
2  A.  I believe he had other legal fees that
3  he was paying off.
4  Q.  Anything other than legal fees?
5  A.  Not that I am aware of.
6  Q.  And which firms received that money to
7  the best of your knowledge?
8  A.  Davis Polk -- not Davis Polk. I'm
9  sorry. The other one.
10  Q.  Paul Weiss?
11  A.  The one with Judge Lamm, whatever firm
12  that is. Paul Weiss. Paul Weiss and then the firm
13  with -- again, I am terrible with legal names.
14  Lauren and Paul's firm.
15  Q.  Mitchell Silverberg I think.
16  A.  That's all I know of. Could have been
17  others.
18  Q.  Is there a document reflecting how those
19  funds were distributed?
20  A.  There is no document that I am aware of.
21  Q.  What's the basis of your knowledge?
22  MR. GOLDBERG: Of what?
23  MR. DELLAPORTAS: Of where that money
24  went.
25  A.  Well, mine, I received it. On the

Page 35

1  D. Broser
2  others, I was aware there was outstanding bills,
3  and those had to be paid down from us.
4  Q.  What's the basis of your awareness?
5  A.  I think Ari told me that.
6  Q.  Did you receive account statements for
7  the Northern Trust Bank account?
8  A.  Currently? Probably, yes.
9  Q.  Did you have to approve those payments
10  other than to yourself?
11  A.  No. I think Lance Harris did.
12  Q.  So you did not have to, for example,
13  sign the checks or approve the wires to the other
14  funds?
15  A.  No. I think Lance took care of all
16  that.
17  Q.  And I said other funds. I meant other
18  firms.
19  And the 11 to 13 million dollars that
20  either you, your father, or any of the entities
21  associated with received, what was the basis for
22  that debt?
23  A.  It was loans given to Ari to fund his
24  litigation against the Trump Group.
25  Q.  And there were multiple litigations

Page 36

1  D. Broser
2  against the Trump Group, correct?
3  A.  Yes.
4  Q.  Is that just the Delaware action, just
5  the New York action, or both?
6  A.  It would be whatever he needed for legal
7  fees. So to state your answer, probably would be
8  for all of them. For all his actions.
9  Q.  Was Orly Genger a borrower from you?
10  A.  No.
11  Q.  Do you have some sort of loan or other
12  agreement with Ari Genger?
13  A.  Yes.
14  Q.  Is additional money owed by Ari Genger
15  purusant to that agreement?
16  A.  Yes.
17  Q.  Approximately how much?
18  A.  Four to 4 and a half million dollars.
19  Q.  Do you have an agreement or
20  understanding with Mr. Ari Genger as to how that
21  money -- how, if at all, that money is to be
22  repaid?
23  A.  Paid by him but you know, from the
24  litigation. From -- at this point, from whatever
25  he receives from the litigation.



Page 37

1      D. Broser
2   Q.   When you say "the litigation", you mean
3   the up to 15 million dollars yet to be paid under
4   the settlement agreement?
5   A.   Yes.  I don't know if there are any
6   other independent cases that he can win, but yes.
7   Q.   Are you aware that Orly Genger still has
8   pending cases against, among others, Sagi Genger?
9   A.   Yes.
10  Q.   And some of those are brought
11  individually, and some of them are brought on
12  behalf of her trust.  Are you aware of that?
13  A.   Yes, I think so.  I am not that familiar
14  with it.
15  Q.   Is there any agreement with regard to if
16  she were to recover money on those cases that those
17  monies would be pledged either to Ari Genger or you
18  or anyone else?
19  A.   I have nothing to do with that side of
20  it, so my relationship is just strictly with Ari,
21  so I am not aware of how that would play out.
22  Q.   Has Ari ever told you that if Orly were
23  to recover money as part of her other litigations
24  that that money would also be pledged or given to
25  him to pay off his debts or otherwise?

Page 38

1      D. Broser
2   A.   No.
3   Q.   Are you aware of any agreement as to
4   what, if anything, Orly would do with the funds of
5   those other litigations if she were to recover?
6   A.   No.
7   Q.   To the best of your knowledge, did Ari
8   use any of the settlement funds to invest in any
9   business venture in which either you, your father,
10  or your associated entities are a part?
11  A.   I don't think he did.
12  Q.   The lender to Ari Genger, is it you
13  personally, your father personally, or an entity?
14  A.   It's an entity.
15  Q.   What's the name of the entity?
16  A.   I think it's A-D -- there is -- I will
17  correct the record if I am wrong, but it's like
18  A-D-G -- it's A-G-D-G something with one more
19  acronym, with one more letter that -- which I don't
20  know.  It may be L.  So I end -- it's just four
21  letters together.  ADG.  That's the name of the
22  entity.
23  Q.   And is it a corporation or LLC or --
24  A.   It's an LLC.
25  Q.   Is it Delaware?

Page 39

1      D. Broser
2   A.   It's either Delaware or Florida.
3   Q.   Who is the managing member?
4   A.   I am.
5   Q.   So that we don't have to hold the
6   deposition open, if on a break you can look up the
7   name, that would be very helpful.
8       Is that true of all the money lent to
9   Ari Genger?
10  A.   Just to that one entity, yes.  Is that
11  the question?
12  Q.   Yes.
13  A.   Was all the money lent to Ari Genger for
14  litigation funds and whatnot, that was all through
15  that entity.
16  Q.   And again, that entity never loaned
17  anything to Orly Genger?
18  A.   No.
19  Q.   Let me ask this.  Is there a formal loan
20  document or agreement that reflects what Ari owes?
21  A.   I believe so.
22  Q.   For the remaining 4 to 4 and a half
23  million, is that continuing to accrue interest?
24  A.   No.
25  Q.   Is there a document somewhere that

Page 40

1      D. Broser
2   reflects what's owed?  Like a ledger or something?
3   A.   Yes.  I think we have a ledger.
4   Q.   Do you have an understanding as to what
5   Ari intends to do with the balance of the proceeds
6   to the extent that he collects amounts beyond
7   what's necessary to pay back your 4 to 4 and a half
8   million dollars?
9   A.   I think he has additional legal fees.
10  That's the only thing I know of.
11  Q.   Anything else?
12  A.   Nothing else I am aware of.
13  Q.   Other than your let's call it the loan
14  agreement with Ari Genger, are you aware of any
15  other agreements among any of the parties as to how
16  the balance -- any additional monies under the
17  settlement agreement are to be disbursed or used?
18  A.   I'm sorry.  Can you read back the
19  question?
20      (Record read.)
21  A.   Disbursed?  I'm sorry.  Disbursed or
22  used by Ari or --
23  Q.   By anyone?
24  A.   No.
25  Q.   When you testified earlier that it was



Page 41

1     D. Broser
2  your understanding that Orly was not to receive any
3  of the -- either the 17.3 already paid or the 15
4  million, up to 15 million yet to be paid -- did I
5  capture that correctly?
6     A.   Yes.
7     Q.   So just so we are clear, describe any
8  facts which form the basis of your understanding to
9  that effect.
10    A.   That we had several signatures on the
11 agreement with the Trumps, including myself and my
12 dad who should not have been in the agreement at
13 all and Orly should not have been in the agreement
14 at all.  This agreement was with Ari Genger to
15 settle the case with the Trumps.  Because of the
16 relation of the escrow, the 10 million and I
17 believe the 7 million dollars, approximate numbers
18 that were released to the two escrow accounts,
19 that's the reason the Trumps wanted Orly as a
20 signature.  They wanted my father and myself as a
21 signature just because they had included us in the
22 case and wanted some belts and suspenders I guess.
23 We wanted out of the case; they wanted us in the
24 settlement agreement.  I have no idea why I am in
25 there and all the other proceeds Orly was entitled

Page 42

1     D. Broser
2  to that 10 million dollars if she collected it and
3  then whatever she would collect in her litigation
4  against her brother and all the other money was
5  going to go to Ari.  It's his company and he has
6  had control against the business.  It was his
7  litigation against the Trumps.  It was not Orly's
8  litigation against the Trumps.
9     Q.   When you say "his company", you are
10 referring to Trans Resources?
11    A.   Yes.  Again, all these different
12 acronyms confuse me.  TRI, Trans Resources.  Trans
13 Resources, yes.
14    Q.   What's the basis for your belief that
15 Orly was not entitled to a share of the funds being
16 disbursed in exchange for the dismissal of claims
17 that she brought on her own behalf and on behalf of
18 the trust against the Trump Group?
19    A.   Well, she brought a claim, as you know,
20 as a shareholder.  Ari's claims were, you know, as
21 a control person, and he was the one battling it
22 out with Delaware against the Trumps.  It was not
23 Orly battling it out and so really was just Ari's
24 case.  And when I sat down with -- met with Eddie
25 Trump on several occasions and Jules Trump trying

Page 43

1     D. Broser
2  to settle the case, you know, before this
3  settlement, it was always discussed that the money
4  would go to Ari.
5     Q.   Did anyone inform the Trump Group during
6  these negotiations that all the money would be
7  going to Ari?
8     A.   I think it was just understood.
9     Q.   Understood by yourself, your side,
10 understood by the Trump Group, or understood by
11 both sides?
12    A.   I don't know.  I am speculating it was
13 understood by everyone, but again, I don't think
14 they really care.  I think they just kind of wanted
15 to pay the money and move on.  I don't think it was
16 a focus of where the money was going to on their
17 side.
18    Q.   Why was under the settlement agreement
19 the money split up between 17 million -- 17.3
20 million paid upfront and 15 to be paid in the
21 future?
22    A.   Because that's the only way the Trumps
23 would do the deal.
24    Q.   Did they articulate to your side why
25 they were insisting on that structure?

Page 44

1     D. Broser
2     A.   I think they -- again, so many years ago
3  but I think they were -- they were worried about
4  future -- you know, them being dragged into
5  litigation, still being involved in the case,
6  having expenses that they can offset.  That being
7  one reason.  I think the other reason just on a
8  financial basis them having kind of freezed the
9  money for a few -- you know, a few years.
10    Q.   Why were there two promissory notes for
11 7 and a half million each as opposed to just one
12 for 15 million?
13    A.   Same reason.  They just wanted to delay
14 the second payment.
15    Q.   And so why under the settlement
16 agreement are the promissory notes not made out to
17 Ari Genger but instead were made out first to Mr.
18 Wachtel and then to Mr. Bowen?
19    A.   Bill negotiated the deal.  I don't know.
20 Really focused on that.
21    Q.   When it was changed a few years after
22 the fact from Mr. Wachtel to Mr. Bowen, why wasn't
23 it just changed to Ari Genger?
24    A.   I don't know.
25    Q.   Did you ask that question?



Page 45

1       D. Broser
2   A.  You know, I was -- I am a signature on
3 it but I didn't really care because I am not
4 directly getting any of the proceeds so I did -- I
5 just went along for the ride on that. I really was
6 -- you know, it didn't matter to me.
7   Q.  And have you ever spoken directly with
8 Orly as to the disposition of the 32.3 million
9 dollars?
10   A.  No.
11   Q.  Do you know if your father has?
12   A.  I would say definitely not but I can --
13 you know, I -- I am not sure, but I am pretty sure
14 the answer would be no.
15   Q.  And you mentioned earlier an attorney
16 named Lance Harris. Who does Lance Harris
17 represent?
18   A.  I don't know if it's Ari, Ari and Orly,
19 Orly, I really don't. I don't know. I just know
20 he is an attorney for, you know, Ari. I am not
21 sure if he is an attorney for Orly also. I
22 definitely know he is an attorney for Ari.
23   Q.  And you believe Lance Harris controlled
24 that account at Northern Trust?
25   A.  I believe Ari controlled the account. I

Page 46

1       D. Broser
2 think for some reason it was deemed to go into that
3 account so we know the proper disbursements would
4 go out, but indirectly Ari controlled it but I
5 think -- I think it was I think myself and Lance
6 were signatories on the account.
7   Q.  If there were checks to be paid or wires
8 to be sent, it would require both of your approvals
9 or either of your approvals?
10   A.  I am not sure.
11   Q.  With respect to the payment agents,
12 whether it be Mr. Wachtel or later Mr. Bowen or
13 even Mr. Harris in his capacity for this trust
14 account, is there any written agreement of which
15 you are aware which instructs those agents as to
16 from whom they are to take direction?
17   A.  I am not sure.
18   Q.  Have you ever signed such an agreement
19 personally?
20   A.  I don't think so. I mean, I am
21 definitely not -- you know, I have no power over
22 where that money goes.
23   Q.  So the settlement agreement refers to
24 something called the AG Group which it defines as
25 you, your father, Ari, and Orly. Is the AG Group

Page 47

1       D. Broser
2 some sort of incorporated entity, or is it just a
3 group of four individuals?
4   A.  It was a name put into the agreement.
5   Q.  Is there any agreement, either written
6 or oral as to -- as among the four members of the
7 AG Group other than the settlement agreement we
8 have been discussing here today?
9   A.  Not that I am aware of.
10   Q.  When is the last time you have spoken to
11 Ari Genger?
12   A.  Yesterday.
13   Q.  Was it about this deposition?
14   A.  Yes.
15   Q.  What did you discuss?
16   A.  Just I was going to go in for a
17 deposition. I kind of didn't know why I was being
18 deposed. And that was really it. Not nothing --
19 nothing like more -- you know, nothing more than
20 that. Just, you know.
21   Q.  When is the last time you have spoken
22 with Orly Genger?
23   A.  A while ago. I mean, I would say purely
24 social. Maybe after she had her baby. Or even you
25 know, a few months subsequent to that, but all

Page 48

1       D. Broser
2 like, you know, gifts -- my wife speaks to Orly, so
3 I might have been on the phone one time with Orly.
4   Q.  Have you ever spoken to Orly directly
5 about either this litigation or the prior federal
6 court litigation between her and her brother?
7   A.  No.
8   Q.  What about Mr. Hirschman, her husband?
9   A.  Yes.
10   Q.  When is the last time you have spoken
11 with Mr. Hirschman?
12   A.  Probably sometime in the last week.
13   Q.  What did you discuss?
14   A.  Again, like what I remember about the
15 case.
16   Q.  What questions did Mr. Hirschman ask
17 you?
18   A.  He just asked me on the settlement
19 agreement, Trump settlement agreement what's my
20 recollection, you know, what do I remember about
21 it.
22   Q.  And did he tell you what Orly's view was
23 on any of these matters?
24   A.  No.
25   Q.  Did he explain to you why he was



Page 49

1    D. Broser
2  calling?
3    A.  I believe I called him.
4    Q.  And you called him on your own
5  initiative or in response to a message from him or
6  a message from his firm?
7    A.  No.  Ari told me to call him.
8    Q.  Did Ari explain to you why he wanted you
9  to call him?
10   A.  No.
11   Q.  So was this a phone conversation or some
12 sort of e-mail or whatnot?
13   A.  It was phone.  He was in Israel.
14   Q.  And so Ari --
15   A.  Just one second.
16   Q.  Sure.  Ari told you to call Mr.
17 Hirschman?
18   A.  Yes.  Ari said you may want to speak to
19 Eric before -- before.
20   Q.  Other than your attorney or attorneys or
21 your spouse -- let's leave all that out -- have you
22 spoken with anyone else about this deposition?
23   A.  No.
24   Q.  What about the subpoena?
25   A.  My father.  Probably I mentioned it to

Page 50

1    D. Broser
2  my dad.
3    Q.  Anyone else?
4    A.  Not that I recall, no.
5    Q.  Have you had other communications with
6  either Mr. Hirschman or other members of his law
7  firm -- that's the Kasowitz firm -- regarding
8  either this litigation or the predecessor federal
9  court litigation between Orly and Sagi?
10   A.  No.
11   Q.  Sort of an open-ended question but we
12 are trying to avoid unnecessarily deposing your
13 father, so are you aware if your father has any
14 knowledge about the subject matters we have
15 discussed here today beyond what you have?
16   A.  Definitely not.  Definitely not.  Ask
17 the question.  I will try to clear up so you guys
18 don't have to waste the trip.
19   Q.  Do you believe your father has any
20 knowledge about the subject matters you testified
21 to beyond what you testified today?
22   A.  No.
23   Q.  Are you more the point person in this
24 regard as opposed to your father?
25   A.  Yes.

Page 51

1    D. Broser
2    Q.  Would your father have documents related
3  to these matters?
4    A.  Definitely not.
5    Q.  Your father resides in Florida
6  currently?
7    A.  Yes.
8    Q.  Where in Florida does he reside?
9    A.  Fisher Island.
10   Q.  So I want to just circle back to one of
11 your earlier answers where we talked about when
12 this agreement was reached as to look at the
13 proceeds and you mentioned -- I think you used the
14 words "early on" but you can correct me.
15   A.  Yes.
16   Q.  And then you referenced the Delaware
17 litigations.  So I just want to see if we can place
18 a closer time frame on that.
19       Was this agreement that Ari would get
20 all the proceeds dating from the onset of those
21 Delaware litigations which I am told -- predates me
22 but I am told was 2008, or was it developed at some
23 later point in time?
24   A.  I think it was 2008.  You know -- you
25 know, it's hard because they were battling for

Page 52

1    D. Broser
2  their shares so I don't know the exact date.  Like
3  things evolved with the case.  The original
4  litigation was for Ari to try to get control of the
5  company for him to get his shares back and her to
6  get her potential shares back and it evolved to the
7  decision was made by the courts.  You know, a lot
8  of twists and turns as I am sure you are aware of.
9    Q.  But at some point you say there was an
10 agreement reached whereby if anything was to come
11 from these litigations, it would belong to Ari; is
12 that correct?
13   A.  That was my understanding, yes.
14   Q.  And just so I have it all, what's the
15 factual basis for that understanding?
16   A.  I think it was when the negotiations
17 started with the Trump Group to settle the case
18 which I originally was point person on.  This is
19 going back probably a year and a half before the
20 settlement agreement.  Where the monies would go to
21 Ari.  The remaining ten million dollars that was
22 held up in, you know, in a trust, you know, kind of
23 battling between I guess TPR and Orly, that would
24 go to Orly and then Orly would have her claims
25 against her brother for, you know, whatever she



Page 53

1 D. Broser
2 could collect on that end.
3     MR. DELLAPORTAS:  We are going to take a
4   couple of minutes break.  We are almost done.
5     (Recess taken.)
6   Q.  Mr. Broser, does it refresh your
7 recollection that the name of the entity is AGDB
8 LLC?
9   A.  I think you nailed it.
10   Q.  And that's the initials Ari Genger and
11 David Broser?
12   A.  Yes.  I am 99.9 percent sure.  I will
13 correct the record if you are wrong on that, but I
14 think you are right.
15 RQ    MR. DELLAPORTAS:  In light of the
16   Court's ruling as to relevance, we believe
17   that there were documents that weren't
18   produced in the subpoena that should have
19   been.  We would ask counsel to, after the
20   deposition is over, go to review this and see
21   and if a supplemental production --
22     MR. GOLDBERG:  You want to tell me
23   specifically?
24     MR. DELLAPORTAS:  Specifically any
25   account documents or formation documents with

Page 54

1 D. Broser
2   regard to the Genger Litigation Trust or any
3   documents about disbursements from the Genger
4   Litigation Trust, the loan agreement which
5   AGDB loaned money to Ari Genger, and any
6   documents, specifically the ledger, as to what
7   remains owed and any communications regarding
8   any past, present, or future disbursements
9   either from the AG Litigation Trust or from
10   any source which received money from the AG --
11   from the Genger Litigation Trust.
12     And subject to that, we are going to
13   hold open the deposition to see if they reveal
14   anything, and if so, if there is any further
15   questions, but we have no further questions at
16   this time.
17     (Time noted: 11:38 a.m.)
18   _____.
19   DAVID BROSER
20
21 Subscribed and sworn to before me
22 this ___ day of _____, 2018.
23
24 _____

Page 55

1 D. Broser
2     C E R T I F I C A T E
3 STATE OF NEW YORK    )
4                      : ss.
5 COUNTY OF QUEENS     )
6
7     I, YAFFA KAPLAN, a Notary Public
8   within and for the State of New York, do
9   hereby certify:
10     That DAVID BROSER, the witness whose
11   deposition is hereinbefore set forth, was
12   duly sworn by me and that such deposition
13   is a true record of the testimony given by
14   the witness.
15     I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage, and that I am
18   in no way interested in the outcome of this
19   matter.
20     IN WITNESS WHEREOF, I have hereunto
21   set my hand this 27th day of October, 2018.
22                     _Yaffa Kaplan_
23   _____
24   YAFFA KAPLAN
25

Page 56

1 D. Broser
2 ----------------- I N D E X ---------------
3 WITNESS              EXAMINATION BY       PAGE
4 David Broser         Mr. Dellaportas         5
5
6 ----------- INFORMATION REQUESTS ----------
7 DIRECTIONS: 9, 18, 19
8 RULINGS:
9 TO BE FURNISHED:
10 REQUESTS: 53
11 MOTIONS: 14
12
13 ---------------- EXHIBITS ----------------
14 D. BROSER                              FOR ID.
15 1................Subpoena....................5



### Page 57

```
 1              D. Broser
 2         DEPOSITION ERRATA SHEET
 3
 4   Our Assignment No. 3006866
 5   CASE NAME: Genger vs. Genger
 6
 7     DECLARATION UNDER PENALTY OF PERJURY
 8      I declare under penalty of perjury
 9   that I have read the entire transcript of
10   my Deposition taken in the captioned matter
11   or the same has been read to me, and
12   the same is true and accurate, same and
13   except for changes and/or corrections, if
14   any, as indicated by me on the DEPOSITION
15   ERRATA SHEET hereof, with the understanding
16   that I offer these changes as if still under
17   oath.
18   _____
19          DAVID BROSER
20   Subscribed and sworn to on the _____ day of
21   _____, 2018 before me,
22   _____
23   Notary Public,
24   in and for the State of _____
25
```

### Page 58

```
 1              D. Broser
 2         DEPOSITION ERRATA SHEET
 3   Page No._____Line No.____Change to:_____
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No.____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._____Line No.____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No.____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No.____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No.____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No.____Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25          DAVID BROSER
```

### Page 59

```
 1              D. Broser
 2         DEPOSITION ERRATA SHEET
 3   Page No._____Line No.____Change to:_____
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No.____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._____Line No.____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No.____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No.____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No.____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No.____Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25          DAVID BROSER
```

