IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 7 |
| ORLY GENGER, | § | |
| | § | CASE NO. 19-10926-TMD |
| Debtor. | § | |

## AMENDED AND CORRECTED

### OBJECTION AND RESPONSE OF DALIA GENGER AND D&K GP LLC TO THE TRUSTEE'S APPLICATION UNDER FEDERAL RULE OF BANRUPTCY PROCEDURE 9019 AND LOCAL RULE 9019 TO APPROVE COMPROMISE
[Dkt No. 52]

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE:

Dalia Genger ("**Dalia**") and D&K GP LLC, by and through the undersigned counsel of record, hereby files this Objection to the Application Under Federal Rule of Bankruptcy Procedure 9019 and Local Rule 9019 to Approve Compromise (the "**Settlement Motion**") filed by Ron Satija (the "**Trustee**"), the Chapter 7 trustee in the above-captioned bankruptcy case. In support of her objection, Dalia respectfully states as follows:

### I.
### INTRODUCTION

1.  This Court is being asked to approve a settlement the effect of which (whether or not it was the Trustee's intent) would be to deprive Dalia, a senior homemaker with no source of income, of the assets she had set aside for her retirement. The proposed settlement basically blesses a scheme whereby the Debtor (who has been estranged from her mother for many years) earned $32.3 million, of which approximately $12.25 million belonged to Dalia, and instead fraudulently conveyed it to her husband, her father and his creditors. Just when, following years of litigation, the U.S. District Court for the Southern District of New York (SDNY) was about to

set aside those conveyances, the Debtor filed this case to aim for a better deal.

2. The Court need not take Dalia's word for it—most of the critical determinations have already been rendered in two final judgments by the SDNY, both unanimously affirmed by the U.S. Court of Appeals for the Second Circuit. For simplicity, and to avoid needless factual disputes, we quote below some of the relevant findings from those decisions, which were adjudicated against Orly, and therefore cannot be denied by the Trustee.

3. The story begins with Dalia's divorce from Arie in 2004:

> **As part of the divorce, Dalia agreed to convey her marital rights to 794.40 shares of [Genger family-owned business Trans-Resources, Inc., aka] TRI to trusts benefiting Sagi and Orly (the "Sagi Trust" and the "Orly Trust," respectively) in exchange for a commitment by Sagi and Orly to financially support her. This arrangement was effectuated via three documents.**
>
> **First, Dalia and Arie signed a stipulation of settlement finalizing the terms of their divorce settlement (the "2004 Divorce Stipulation"), which was fully executed on October 30, 2004. … In the 2004 Divorce Stipulation, Dalia promised to convey equal interests in a total of 794.40 shares of TRI to the Orly Trust and the Sagi Trust. … The 2004 Divorce Stipulation contains an "entire understanding" clause, which is subject to a carve-out for other agreements … "entered into concurrently herewith." …**
>
> **The second was a letter signed by Sagi and Dalia dated October 30, 2004 (the "2004 Promise"). … In the 2004 Promise, Sagi agreed to pay Dalia up to an amount equal to all dividends, distributions, proceeds or other payments attributable to the TRI shares, upon Dalia's demand. …The 2004 Promise also states that the agreement is made "in consideration of" the following: "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of [TRI], or beneficial interests in those shares, by trusts for [their] benefit." …**
>
> **At the time the 2004 Promise was signed, Orly was vacationing in Fiji, and thus could not contemporaneously sign the 2004 Promise. … However, before Sagi signed the 2004 Promise, Orly verbally agreed to indemnify Sagi for 50% of the payments he would have to make under the 2004 Promise. …**
>
> **The third agreement was a letter signed by Sagi and Orly dated November 10, 2004 (the "2004 Indemnity"). … In the 2004 Indemnity, Orly agreed to indemnify Sagi "for and against one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations ..., including [Sagi's] reasonable counsel and other professional**

> **fees, expenses and costs, which arise from [Sagi's] undertakings in the [2004 Promise]."** …
>
> On June 16, 2013, Orly entered into a settlement agreement (the "2013 Settlement Agreement") with the Trump Group and others regarding her claims to ownership of the TRI shares. … <u>The agreement provides that Orly, Arie, and their litigation funders, will receive $32.3 million</u> in exchange for a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and that Orly waives all of her claims to the TRI shares ….

*Genger v. Genger*, 76 F. Supp. 3d 488, 492 (S.D.N.Y. 2015) (emphasis added).

4. Orly claimed she never actually got the money, and therefore should be relieved of her financial obligation to her mother. The District Court disagreed, holding that: "**as it turns out, Orly has effectively monetized an interest in the very [TRI] shares she claims not to have received to the tune of $32.3 million**." 76 F. Supp. 3d at 491.

5. Orly appealed, arguing that, because she turned over the first tranche of settlement proceeds to her father and/or the Brosers, the agreement was unenforceable. The Second Circuit was not swayed, finding: "**Orly benefitted from the shares regardless of whether the settlement money went to Orly, as a gift to Arie, or to pay debts owed to her litigation partners**." *Genger v. Genger*, 663 Fed. Appx. 44, *48 (2d Cir. Sept. 29, 2016).

6. No sooner had that litigation concluded then Orly repudiated her financial commitment yet again, necessitating further litigation. Although entitled under the agreement to over $24 million from Orly and Sagi, requested less than a quarter of that amount, which she believed would be sufficient to carry her through her retirement. In the follow-on litigation, the District Court calculated the exact amount owed to Dalia by Orly and Sagi:

> **…Both Dalia and Sagi agree that Dalia's conveyed marital interest of 794.4 shares represents 36% of the total TRI shares that were monetized. Using that figure, the maximum amount payable to Dalia under the 2004 Integrated Agreement is approximately $24.7 million (or 36% of the total $69.3 million value). Orly has not specifically disputed the 36% figure, though she has raised**

**unrelated questions about how the so-called "cap" in the 2004 Integrated Agreement affects her obligations to Sagi.**

*Genger v. Genger*, 2018 U.S. Dist. Lexis 126958, *18 n.5 (S.D.N.Y. July 27, 2018).

7. Once again, Orly appealed; and once again, the Second Circuit affirmed, finding that Orly could not evade her financial obligations to her mother:

> **…the 2004 Promise states that Sagi must, at Dalia's request, pay her "an amount equal to all dividends, distributions, proceeds or other payments attributable to 794.40 shares of TRI … that have previously been paid to Orly, [Sagi] or any trust for the benefit of either of us." … This provision does indeed include a "cap" on the amount that Sagi is obliged to pay Dalia. It says nothing, however, about Orly's indemnification obligation. The 2004 Indemnity unconditionally requires Orly to "indemnify, defend, and hold [Sagi] harmless, for and against one-half (1/2) of any and all payments, … claims, … judgments or obligations" arising from the 2004 Promise. … We are not free to disregard the agreement's unambiguous terms.**

*Genger v. Genger*, 771 Fed. Appx. 99, 100 (2d Cir. 2019).

8. In summary, and while the background facts are a long-winded tragic path of a family's litigation, this case is actually fairly simple. Arie Genger lied to his wife when they got divorced to induce her to transfer millions of dollars in property—the "TRI Stock"—to their daughter's trust. This Chapter 7 bankruptcy is about monetizing those lies through the proposed Settlement Agreement, for a fraction of the actual fraudulent transfers, leaving the remainder with the fraud-actors. Arie now seeks, with the assistance of his Debtor-daughter, her husband and his law firm, to have Dalia's financial support funds transferred to them through a blessing of their fraudulent scheme in the guise of a bankruptcy "settlement."

9. The Settlement Agreement seeks to assign rights to the $15 million in promissory notes—that portion of the $32.3 million litigation settlement which is yet to be paid—*to Debtor's father and husband* with nothing to be retained by the estate.[1] As set out herein, Dalia already

---

[1] The $1 million contingent payment outlined in the agreement is meaningless as the payors security interest is being left undisturbed despite being created within the 1 year preference period.

enjoys a constructive trust over that consideration by operation of New York Law. Accordingly, her interest is superior to that of the Trustee under Fifth Circuit precedent. The Settlement Motion contravenes all manner of laws, and should be rejected outright.

## II.
## ARGUMENT

    A.    **THE TRUSTEE NEVER CONSULTED DALIA BEFORE ENTERING INTO THIS SETTLEMENT AND SHOWING UP IN NEW YORK COURT SEEKING TO REINITIATE LITIGATION AGAINST DALIA THAT HAS BEEN DISMISSSED**

    10.    Dalia regrets having to burden the Court with this dispute. Had the Trustee bothered to consult Dalia and her counsel, review the relevant Court decisions, and become broadly acquainted with the basic facts, all this could be avoided. But he did not.

    11.    Contrary to the representations he makes in the proposed Settlement Motion that all parties were consulted, the Trustee <u>never</u> consulted with Dalia or her counsel before making his Settlement Motion. Neither Mr. Satija nor his counsel reached out to Dalia or her counsel, even though she is listed as a creditor in her individual capacity on Orly's schedule of financial affairs. Of all of the people, the Trustee should not be ignoring is Dalia, who is the principal target of this bankruptcy filing. Making matters worse, the Trustee has thus refused to share critical documents the Trustee has under the SDNY Protective Order (despite a commitment by Dalia's counsel to execute a confidentiality agreement). It is clear to Dalia that the Trustee is not disinterested and has determined that Dalia's rights and her input into this process are unnecessary, notwithstanding his fiduciary duties to her as creditor.

    12.    The Settlement Motion is the direct consequence of this fiduciary breach.

    B.    **DALIA HAS A CONSTRUCTIVE TRUST AGAINST THE PROPERTY TRANSFERRED TO AND FROM DEBTOR**

    13.    As noted above, it has been finally adjudicated that Dalia enjoys superior rights to

$12.25 million of the $32.3 million that the Trustee proposes to give away to the Debtor's cohorts. Accordingly, the Trustee, a successor in interest to Debtor, is bound to those findings under principals of collateral estoppel, estoppel by judgment, and *res judicata*.

14. Under governing New York law, Dalia is entitled to a constructive trust over the remaining $12.25 million of that *res*, and therefore her interest is superior to that of the Bankruptcy Trustee under Fifth Circuit precedent.

15. A constructive trust under New York law is an equitable remedy imposed to prevent unjust enrichment. *See Simonds v Simonds*, 45 N.Y.2d 233 (1978); *Sharp v Kosmalski*, 40 N.Y.2d 119 (1976). According to the New York Court of Appeals, the constructive trust is "the formula through which the conscience of equity finds expression. Where property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee" 45 N.Y.2d at 120 (citing *Beatty v Guggenheim Exploration Co.*, 225 N.Y. 380, 386 (1919)). "[I]ts applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." *Latham v Father Divine*, 299 N.Y. 22, 27 [1949].

16. Mostly, this principal is applied to transfers between family members. In *Sharp v. Kosmalski*, a case reviewed by the New York Court of Appeals, property was transferred to the daughter. There the court construed an <u>implied</u> promise of support that was broken creating a constructive trust. Here, Debtor has already been adjudicated to have made such an express promise. A promise which is reflected in a written instrument. That case, and a panoply of New York decisions discussed below outline the legal principals at work.

17. Constructive trusts are honored in bankruptcy. In *In re Southmark Corp.*, 49 F.3d 1111, 1118 (5th Cir. 1995), the Fifth Circuit held "funds in question were held in "quasi" (or

constructive) trust by Southmark for ARA. Section "541(d) excludes property subject to a constructive trust from the bankruptcy estate." *Id.* at *1115 n.8* (citing *In re Carolin Paxson Advertising, Inc.,* 938 F.2d 595, 597 (5th Cir. 1991)) ("A constructive trust generally arises when a person with legal title to property owes equitable duties to deal with the property for the benefit of another."); *accord In re Bullion Reserve of N. Am.,* 836 F.2d 1214, 1217 n. 3 (9th Cir.) (explaining that presumption that funds in debtor's account belong to its estate is overcome by showing that funds were held in constructive trust for another).

18. Since the Trustee's proposed Settlement Agreement not only interferes with those rights but in fact acts to also destroy those rights, it should not be approved. The Trustee's Settlement Agreement seeks to approve the theft of property owned by Dalia pursuant to her marital settlement which incorporated the contemporaneous Integrated Agreement executed by the Debtor. Dalia's current and ongoing priority rights to the constructive trust encumbering those funds under New York law is clear:

> *…the court has indicated that a constructive trust, similar to an express trust, 'springs from the intention of the testator and the promise of the legatee, and not from any act of the court.* (citations omitted).
> *…*
> It would seem that there is no foundation whatever for the notion that a constructive trust does not arise until it is decreed by a court. It arises when the duty to make restitution arises, not when the duty is subsequently enforced.

*United States v. Fontana*, 528 F.Supp. 137, 144, 146 (Dist Ct SD NY 1981).

19. Dalia's rights to constructive trust sprung into existence not later than when Orly repudiated her of support triggering her duty as Dalia's constructive trustee to make restitution. This rule is recognized in a bankruptcy proceeding. In *N Geltzer v. Balgobin (In re Balgobin)*, 490 B.R. 13, *22 (Bankr. E.D.N.Y. 2013) the Bankruptcy Court explained:

> … the duty of restitution does not arise until the constructive trustee breaches or repudiates the agreement…

> ... For this reason, the few cases in this Circuit in which a constructive trust has been imposed against a bankruptcy estate have found some pre-petition unjust conduct by the debtor relating to the property upon which the constructive trust was sought to be imposed...

20. Of course, here there is far more than "some pre-petition unjust conduct" by the Debtor. There is <u>a total repudiation</u> of the Integrated Agreement, and actual fraud in accomplishing the denuding of this Debtor. Notwithstanding the unambiguous language (so found by the federal courts), Orly and her father simply agreed Dalia would get nothing and implemented years of losing and wasteful litigation. Quickly thereafter, Orly suffered two judgments in excess of $3 million for the support payments due Dalia. The threat of these judgments, and the full extent of Orly's future liability triggered her decision to transfer and encumber the $32 million and file for bankruptcy. When the judgments against Orly were entered, this triggered the second round of fraud to occur—the Debtor encumbered the $15 million in unmatured promissory notes, by pledging them as security for millions of dollars in false liabilities to, her father and lawyer-husband. Dalia has a right to recoup those funds the subject of her constructive trust from each of the transferees (all non-debtors).

21. As part of the Court's analysis in recognizing Dalia's constructive trust, it should be noted that under New York law that Orly was a fiduciary to her mother at the time of the transfer. Dalia enjoyed a confidential or fiduciary relationship with both her children and her soon to be ex-husband. Under New York law, absent prior litigation, family members stand in a fiduciary relationship with each other as the New York Court of Appeals explained in *Braddock v. Braddock*, 871 N.Y.S.2d 68, 72 (1st Dep't 2009):

> Family members stand in a fiduciary relationship toward one another in a co-owned business venture ... A fiduciary relationship is "[f]ounded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and

abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another" …

(Citations omitted.)

22. A trustee of a constructive trust has a fiduciary duty to restore the property to its rightful owner. Dalia is now the beneficiary of the constructive trust. The Settlement Agreement has the effect of causing the trustees of that constructive trust, Debtor and her attorney, Michael Bowen, to breach their duty to Dalia. The Court should not countenance it.

### C. THE SETTLEMENT AGREEMENT ALSO INTEFERES WITH DALIA'S RIGHT TO ENFORCE (AND PROTECT) EQUITABLE DISTRIBUTIONS FROM A DIVORCE SETTLEMENT AND DOMESTIC SUPPORT

23. As the District Court found, the Divorce Settlement Agreement and the Integrated Agreement are conditioned on each other, and both deal directly with the relinquishment of Dalia's marital property in exchange for support obligations. At least $12.25 million of the $32.3 million represents an equitable distribution of that property. That property is being used in lieu of maintenance, in the nature of a Domestic Support Obligation. The effect of the Settlement Agreement is to transfer that property back to Dalia's ex-husband. Bankruptcy courts are generally barred from redistributing marital property post-divorce decree.

24. The Trustee's Settlement Agreement purports to convey and release the $32.3 million, including the $12.25 million found to be owing to Dalia. Dalia holds a prior, superior right pursuant to her constructive trust and divorce decree to that property. Her claims cannot be discharged, nor may her property be forfeited by a Settlement Agreement among the Debtor and her insiders. For this reason as well, the Settlement should not be approved.

### D. THE SETTLEMENT AGREEMENT IGNORES JUDICIAL COMITY BETWEEN THE FEDERAL AND STATE COURTS' MULTIPLE ORDERS, JUDGMENTS AND OPINIONS

25. Everything sought by the Settlement Agreement to be adjudicated in a summary contested Rule 9019 Settlement Agreement is now pending in the SDNY. As discussed in *Am. Bankers Life Assurance Co. v. Overton,* 128 F. App'x 399, 403 n.16 (5th Cir. 2005), "[t]he federal courts have long recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs." (citations and quotations omitted); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1161 n. 28 (5th Cir. 1992) ("The *West Gulf* and *First City* cases deal with the so-called first-to-file rule, which comes into play when a plaintiff files similar lawsuits in two different federal districts."); *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985) ("To avoid these ills, a district court may dismiss an action where the issues presented can be resolved in an earlier-filed action pending in another district.")." The same rule applies when parallel proceedings are pending – ("Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999).

26. Rather than grant this egregious Settlement, the far more lawful and equitable course would be to dismiss this case and allow the SDNY to complete its adjudication of the rights of the parties. Simply put, there is no compelling reason to reward the beneficiaries of this Settlement Agreement with a $32.3 million windfall, after their long history of fraud, including fraud that allowed them to obtain these funds in the first place. This is nothing more than bad faith and abuse of the bankruptcy system which the courts have long since rejected. *See*, *e.g.*, *Krueger v. Torres (In re Krueger),* 812 F.3d 365 (5th Cir. 2016); *Jacobsen v. Sramek (In re Jacobsen)*, 609 F.3d 647, 649 (5th Cir. 2010); *In re Jacobsen*, 432 F. App'x 341 (5th Cir. 2011); *In re Newton*,

No. MW 01-031, 2002 Bankr. LEXIS 2089 (B.A.P. 1st Cir., 2002); *Condon v. Brady (In re Condon)*, 358 B.R. 317 (B.A.P. 6th Cir. 2007); *Bauer v. Iannacone (In re Bauer)*, 298 B.R. 353 (B.A.P. 8th Cir. 2003). It should be rejected here as well.

### III.
### ADOPTION AND INCORPORATION BY REFERENCE OF SAGI GENGER AND THE ORLY GENGER 1993 TRUST OPPOSITION PLEADINGS

27. Dalia adopts and incorporates by reference, as if set out herein verbatim, the facts, arguments and authorities set forth in the respective objections of Sagi Genger and The Orly Genger 1993 Trust to approval of this Settlement Agreement, to the extent not inconsistent with the arguments made herein.

WHEREFORE, Dalia Genger request an order denying the approval of the Trustee's Settlement Agreement and dismissing this bankruptcy case, or alternative to dismissal, to transfer the venue of this bankruptcy to the Southern District of New York, where all other litigation and proceedings are pending, and for such other and further relief that Objectors, or any one of them, may be justly entitled, both at law and in equity.

Dated: October 18, 2019

Respectfully submitted,

  /s/ *Shelby A. Jordan*
Shelby A. Jordan
Texas Bar No. 11016700
**JORDAN HOLZER & ORTIZ, P.C.**
500 N. Shoreline Blvd., Suite 900
Corpus Christi, Texas 78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
sjordan@jhwclaw.com
**ATTORNEYS FOR DALIA GENGER AND D&K GP LLC**

## CERTIFICATE OF SERVICE

      The undersigned hereby certified that a true and correct copy of the foregoing instrument has been served on this 18th day of October 2019 upon the parties listed in the attached service list and via ECF notification.

                                         */s/ Shelby A. Jordan*
                                         Shelby A. Jordan

**Via ECF**
United States Trustee – AU12
United States Trustee
903 San Jacinto Blvd., Suite 230
Austin, Texas 78701

**Via ECF**
Arie Genger
c/o Deborah D. Williamson
Dykema Gossett PLLC
112 East Pecan St., Suite 1800
San Antonio, TX 78205

**Via ECF**
c/o Trustee Ron Satija
Brian Talbot Cumings
Graves, Dougherty, Hearon & Moody
401 Congress Avenue, Suite 2700
Austin, Texas 78701

**Via ECF**
Arie Genger
c/o Deborah N. Williamson
Dykema Gossett PLLC
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205

**Via ECF**
Eric Herschmann
c/o Raymond Battaglia
66 Granburg Circle
San Antonio, TX 78218-3010

**Via ECF**
Sagi Genger
c/o Sabrina Streusand & TPR Investment
Streusand, Landon, Ozburn & Lemmon, LLP
1801 S. MoPac Expressway, Suite 320
Austin, Texas 78746

**Via ECF**
Eric J. Taube
Waller Lansden Dortch & Davis, LLC
100 Congress Ave, Suite 1800
Austin, Texas 78701

**Via ECF**
Thomas A. Pitta
Emmet, Marvin & Martin, LLP
120 Broadway
New York, NY 10271

**Via ECF**
The Orly Genger 1993 Trust
c/o Jay Ong
Munsch Hardt Kopf & Harr PC
303 Colorado Street, #2600
Austin, Texas 78701

**Via ECF**
SureTec Insurance Co.
c/o Ryan Brent DeLaune
Clark Hill Strasburger
901 Main Street, Suite 6000
Dallas, Texas 75202

**Via ECF**
Ron Satija
P.O. Box 660208
Austin, TX 78766-7208